UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

THE ESTATE OF PAUL DANIELS, by      )
Personal Representative Kay Stover,   )
                                      )
    Plaintiff,                         )
                                      )
    v.                                  )    Case No. 1:20-cv-02280-JRS-MJD
                                      )
CITY OF INDIANAPOLIS, et al.,        )
                                      )
    Defendants.                        )

## AFFIDAVIT

I, Stephen Griffith, being duly sworn and under oath, state as follows:

1.    I am over the age of 18 and competent to testify in this case.

2.    I have personal knowledge of the facts asserted in this affidavit.

3.    I am employed by the Indianapolis Metropolitan Police Department ("IMPD") as a Sergeant.

4.    My duties include developing and keeping track of IMPD's written directives.

5.    In this capacity, I work with the Commission for the Accreditation of Law Enforcement Agencies ("CALEA") to ensure that IMPD's directives meet and exceed national standards for best practices in law enforcement.

6.    Prior to and on September 1, 2018, I also reviewed complaints that were made about officers and ensured that they were investigated by IMPD's Special Investigations Unit ("SIU"), Internal Affairs, or a district sergeant.

7.    I also generate monthly data reports and on demand reports about department discipline and trends.

8.      I am also responsible for IMPD's early warning system. This system allows IMPD to proactively monitor officers' professional health by analyzing their uses of force, vehicle pursuits, and complaints. IMPD utilizes this system to ensure that all officers are meeting the high expectations that the City of Indianapolis and IMPD has set for them.

9.      IMPD develops and maintains formal written directives to provide officers with a clear understanding of the constraints and expectations governing the performance of their duties. Ex. A, General Order 2.2.

10.     These directives comply with applicable law and meet or exceed the standards for law enforcement agencies in the United States established by CALEA. Ex. A, General Order 2.2.

11.     Prior to September 1, 2018, IMPD published a General Order, General Order 2.2, that informed officers how it would disseminate and implement its directives. Ex. A, General Order 2.2.

12.     A true and accurate copy of that version of General Order 2.2 is attached to this affidavit as Exhibit A.

13.     This version of General Order 2.2 went into effect on April 25, 2012. Ex. A, General Order 2.2. This affidavit shall describe how the written directives system worked when this version of General Order 2.2 was in effect.

14.     All officers were required to read and understand this version of General Order 2.2 if they were employed by IMPD on or before September 1, 2018.

15.     Officers were required to understand all material contained in IMPD's directives that were relevant to their job functions, including rules and regulations, general orders, division orders, special orders, procedural notices, and standard operating procedures. Ex. A, General Order 2.2, Violations and Enforcement of Directives.

16.     Supervisors enforced IMPD's directives. Ex. A, General Order 2.2, Violations and Enforcement of Directives.

17.     A violation of any directive was sufficient cause for disciplinary action, up to and including termination. Ex. A, General Order 2.2, Violations and Enforcement of Directives.

18.     The Commander of the Oversight, Audit, and Performance Division, which was known as the Professional Standards Division on September 1, 2018, Accreditation Policy Section (1) maintained a master policy file of all written directives; (2) administered the reviewing, indexing, updating, and purging of all written directives; and (3) initiated the distribution of all written directives. Ex. A, General Order 2.2, Section V.

19.     IMPD's General Order Manual was available in electronic format and distributed using IMPD's electronic e-mail system to all officers. Ex. A, General Order 2.2, Section VIII.

20.     Under General Order 2.2, hard copies of IMPD's General Order Manual were required to be maintained at the Office of the Chief of Police, the Professional Standards Division Office, and each police district roll call briefing room. Ex. A, General Order 2.2, Section VIII.

21.     IMPD required supervisors or ranking officers to read and review new or revised written directives with their subordinates for four consecutive days before posting the directives in a designated location for at least 30 days. Ex. A, General Order 2.2, Section IX.

22.     The Professional Standards Division utilized an electronic written directives management system to distribute new and newly revised written directives to officers. Ex. A, General Order 2.2, Section IX.

23.     All new and newly revised directives were presumed known by all department personnel on the first working day after issuance. Ex. A, General Order 2.2, Section IX.

24.     Supervisors could also require their subordinates to review directives during their midyear and end-of-year performance appraisal process. Ex. A, General Order 2.2., Section X.

25.     Prior to September 1, 2018, IMPD published a General Order, General Order 1.30, that represented IMPD's official policy, practice, procedure, and custom concerning the use of force. Ex. B, General Order 1.30.

26.     A true and accurate copy of that general order, General Order 1.30, is attached to this affidavit as Exhibit B. This affidavit shall describe how IMPD's use of force policy functioned when this version of General Order 1.30 was in effect.

27.     General Order 1.30 went into effect on August 10, 2016. Ex. B, General Order 1.30. All officers were required to read and understand this version of General Order 1.30 if they were employed by IMPD on or before September 1, 2018.

28.     Under this version of General Order 1.30, IMPD authorized officers to use reasonable force to accomplish lawful objectives. Ex. B, General Order 1.30, Policy.

29.     When this version of General Order 1.30 was in effect, officers were permitted to use reasonable force if they reasonably believed that the force was necessary given the totality of the circumstances. Ex. B, General Order 1.30, Policy.

30.     Officers were required to obtain medical assistance as soon as practical for any person who, as a result of an officer's use of force, sustained visibly injury, sustained serious bodily injury, or expressed a complaint of injury or continuing pain. Ex. B, General Order 1.30, Procedure, Sec. I(A).

31.     If an individual refused medical attention, officers were required to fully document this refusal in their reports. Ex. B, General Order 1.30, Procedure, Sec. I(A).

32. Prior to September 1, 2018, IMPD published a General Order, General Order 1.31, that represented IMPD's official policy, practice, procedure, and custom concerning the investigation and reporting of use of force incidents. Ex. C, General Order 1.31.

33. A true and accurate copy of that general order, General Order 1.31, is attached to this affidavit as Exhibit C. This affidavit shall describe how IMPD's use of force policy functioned when this version of General Order 1.31 was in effect.

34. General Order 1.31 went into effect on August 10, 2016. Ex. C, General Order 1.31. All officers were required to read and understand this version of General Order 1.31 if they were employed by IMPD on or before September 1, 2018.

35. Under this version of General Order 1.31, it was IMPD's policy to consistently and thoroughly investigate every use of force. Ex. C, General Order 1.31, Policy.

36. General Order 1.31 gave officers notice that each use of force incident would be reviewed to ensure compliance with IMPD's policies and to identify and address areas for improvement. Ex. C, General Order 1.31, Policy.

37. General Order 1.31 established procedures for the investigation, reporting, and review of officers' application of force.

38. It required all officers to notify a supervisor via Communications, as soon as practical, following a use of force incident if the use of force exceeded un-resisted handcuffing. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(A).

39. Under General Order 1.31, officers who performed (a) pressure point manipulation, (b) joint lock manipulated escorts, (c) forcible takedowns, or (d) strikes were required to report that they had used this force as soon as practical to a supervisor. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(A)(1).

40. If a use of force resulted in or was alleged to result in serious bodily injury, injury, or a complaint of pain, officers were required to report this use of force as soon as practical to a supervisor. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(A)(3).

41. General Order 1.31 also required officers to document all uses of force that exceeded un-resisted handcuffing. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(B).

42. When documenting these uses of force, they were required to obtain an incident report number from Communications and write an initial incident report and Blue Team entry. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(B)(1).

43. They were also required to include a description of how the force was applied, whether it was effective, and describe any resulting injuries to the arrestee, the involved officer, or any other officers or involved citizens in their incident report and Blue Team entry. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(B)(2).

44. They were then required to forward their Blue Team entry to the investigating supervisor within 72 hours. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(B)(3).

45. Additionally, they were responsible for having photos taken of all alleged injuries, whether visible or not, and documenting the information in the initial incident report. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(B)(4).

46. If officers used force that exceeded un-resisted handcuffing, General Order 1.31 required a supervisor to respond to the scene and conduct a preliminary investigation regarding the use of force. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(C).

47. The supervisor's investigation had to include attempts to interview the involved officer(s), suspect(s), and witnesses. Supervisors were also required to document any other

relevant evidence during their investigation. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(C)(1).

48.     Supervisors were required to review the officer's Blue Team entry for accuracy and ensure the entry included the required documentation for the involved officer. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(C)(2).

49.     Supervisors were also required to provide a disposition of in compliance or not in compliance and enter comments that include results of their investigation, reason for their disposition finding, any further action taken, or recommendations for further action when reviewing the Blue Team entry. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(C)(3).

50.     Sergeants and lieutenants were required to forward any Blue Team entry up the chain of command or return it to the officer for corrections within three days of their receipt of the Blue Team entry. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(C)(4)-(5).

51.     Captains and commanders were required to forward the Blue Team entry up the chain of command or return it to the officer for corrections within five days of their receipt of the Blue Team entry. Ex. C, General Order 1.31, Procedure, Less Lethal, Sec. I(C)(6)-(7).

52.     Under General Order 1.31, IMPD maintained records for all use of force incidents that resulted in or allegedly resulted in serious bodily injury, injury, or complaint of pain. Ex. C, General Order 1.31, Procedure, Annual Analysis, Sec. XVI(A)(2).

53.     Records for these use of force incidents were maintained by the Professional Standards Branch. Ex. C, General Order 1.31, Procedure, Annual Analysis, Sec. XVI(B).

54.     The Professional Standards Branch was responsible for conducting a documented annual analysis of the above reports by reviewing the incidents in an effort to reveal patterns or

trends that could indicate training needs, equipment upgrades, or policy modifications. Ex. C, General Order 1.31, Procedure, Annual Analysis, Sec. XVI(C).

55. If training needs, equipment upgrades, or policy modifications were identified, the Professional Standards Branch would then notify the Training Division Commander or the Commander's designee as well as the Planning and Research Section for evaluation and implementation. Ex. C, General Order 1.31, Procedure, Annual Analysis, Sec. XVI(D).

56. Prior to September 1, 2018, IMPD published a General Order, General Order 4.7, which instructed officers how to work effectively with individuals who display symptoms of a mental disorder and to treat them and their families with dignity and respect. Ex. D, General Order 4.7, Policy.

57. A true and accurate copy of that general order, General Order 4.7, is attached to this affidavit as Exhibit D.

58. General Order 4.7 went into effect on December 12, 2015. Ex. D, General Order 4.7. All officers were required to read and understand General Order 4.7 if they were employed by IMPD on or before September 1, 2018.

59. General Order 4.7 identifies what officers are expected to do when they communicate with an individual who may have a severe mental illness or who is experiencing a crisis. Ex. D, General Order 4.7, Sec. I(B).

60. It also identifies when officers are permitted to perform an immediate detention under Indiana law. Ex. D, General Order 4.7, Sec. II.

61. And it instructs officers about what they must do when performing an immediate detention. Ex. D, General Order 4.7, Sec. III.

62.     General Order 4.7 also requires officers to report when they believe mental illness was a contributing factor during an incident. Ex. D, General Order 4.7, Sec. V.

63.     Prior to September 1, 2018, IMPD published a General Order, General Order 8.1, which informed officers of the risks of positional asphyxia and how to avoid it. Ex. E, General Order 8.1, Sec. III.

64.     A true and accurate copy of that general order, General Order 8.1, is attached to this affidavit as Exhibit E.

65.     General Order 8.1 went into effect on April 22, 2015. Ex. E, General Order 8.1. All officers were required to read and understand General Order 8.1 if they were employed by IMPD on or before September 1, 2018.

66.     General Order 8.1 required officers to be aware of the warning signs of positional asphyxia. Ex. E, General Order 8.1, Sec. III(A).

67.     It advised officers that subjects who are placed on their chest or stomach, with their legs and arms restrained behind their back, may have difficulty breathing, leading to serious injury or death. Ex. E, General Order 8.1, Sec. III(A).

68.     General Order 8.1 required officers to avoid leaving subjects on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used. Ex. E, General Order 8.1, Sec. III(A)(1).

69.     It also required officers to move subjects onto their side, allowing less interference with normal breathing, as soon as possible. Ex. E, General Order 8.1, Sec. III(A)(2).

70.     Under General Order 8.1, officers were expected to carefully observe subjects and summons medical assistance immediately to evaluate the subject's health. Ex. E, General Order 8.1, Sec. III(A)(3).

71.     General Order 8.1 also instructed officers to look for symptoms of excited delirium and to understand the risk that this condition might cause positional asphyxia. Ex. E, General Order 8.1, Sec. III(B).

72.     General Order 8.1 required officers to closely monitor any subject exhibiting those symptoms and to make sure the subjects remain alert, conscious, and able to sit and speak on their own before they are transported from a scene. Ex. E, General Order 8.1, Sec. III(C).

73.     General Order 8.1 required officers to have sick, injured, or disabled subjects transported to Eskenazi Hospital if they lose consciousness during an arrest. Ex. E, General Order 8.1, Sec. VII(A)(1).

74.     Officers are also required to have sick, injured, or disabled subjects transported to Eskenazi Hospital if their supervisor or medical personnel determine that it is necessary to transport the subject in an ambulance. Ex. E, General Order 8.1, Sec. VII(A)(8).

75.     IMPD began investigating complaints concerning alleged violations of its directives at least five years before September 1, 2018.

76.     IMPD also began investigating complaints of alleged violations of IMPD's other directives, such as its Rules and Regulations, at least five years before September 1, 2018.

77.     A true and accurate copy of the version of IMPD's Rules and Regulations that was in effect on September 1, 2018 is attached to this affidavit as Exhibit F.

78.     Those Rules and Regulations went into effect on June 25, 2014.

79.     All officers were required to read and understand those Rules and Regulations if they were employed by IMPD on or before September 1, 2018.

80.     Those Rules and Regulations required officers to "take proper action when they observe wrongful or negligent behavior by departmental members." Ex. F - Rules and Regulations, Sec. IV(J), Neglect of Duty.

81.     They also required supervisors to "take prompt action when they observe wrongful or negligent behavior by department members." Ex. F - Rules and Regulations, Sec. IV(K), Neglect of Duty.

82.     They prohibited officers from mistreating subjects in their custody and required them to handle these subjects in accordance with law and departmental order. Ex. F - Rules and Regulations, Sec. VI(H), Conduct Unbecoming an Officer.

83.     They also prohibited officers from using more force in any situation than is reasonably necessary under the circumstances. Ex. F - Rules and Regulations, Sec. VI(J), Conduct Unbecoming an Officer.

84.     An example of proper action would be an officer intervening to stop the use of excessive force or a violation of IMPD's directives.

85.     Another example of proper action would be an officer reporting a violation of IMPD's directives or use of excessive force to a supervisor, the Professional Standards Branch, or the Chief of Police.

86.     IMPD allows officers to report violations of IMPD's directives to their supervisor, the Professional Standards Branch, or to the Chief of Police.

87.     IMPD also allows the public to report violations of IMPD's directives.

88.     These reports may be made by electronic means, by telephone, or in person.

89.     IMPD investigates all reported incidents of alleged violations of its directives.

90.     When IMPD receives these reports or complaints, the Professional Standards Branch determines how these reports and complaints should be investigated.

91.     Reports and complaints may be investigated by IMPD's Special Investigations Unit ("SIU"), its Internal Affairs Unit ("IA"), or a district sergeant.

92.     IA investigates alleged violations of IMPD directives and SIU investigates alleged violations of statutory law.

93.     A complaint is generally sent to a district level when IMPD needs to gather additional evidence about a complaint that was not provided by the complaining party.

94.     It is IMPD's policy that IMPD supervisors who investigate district-level formal complaints shall conduct thorough, timely investigations that address all aspects of the complaint.

95.     Professional Standards provides these supervisors with detailed instructions outlining what they must do when investigating district-level complaints.

96.     For instance, supervisors are required to contact all parties who made a formal complaint and known witnesses.

97.     If supervisors are unable to contact a complaining party or a witness, they must provide an explanation of why they were unable to contact a party or witness.

98.     Supervisors are also directed to identify potential witnesses when conducting district-level investigations.

99.     Supervisors must also allow officers that are the target of a complaint to explain their actions in writing.

100.     Supervisors are directed to locate audio, video, police reports, court documents, and electronic evidence that relates to the complaint and to review that evidence when conducting a district-level investigation.

101. Once supervisors have completed a thorough, timely district-level investigation, they must recommend a finding of Exonerated, Unfounded, Not-Sustained, or Sustained for each allegation of the complaint.

102. An unfounded finding means that the investigation proved the allegation is false or not factual because the incident did not happen.

103. An exonerated finding means that the investigation proved the incident did occur. However, the officer did his or her job as trained and the interaction was lawful and proper.

104. A not sustained finding means that there is insufficient evidence to prove or disprove the allegations in a complaint.

105. A sustained finding means that there is sufficient evidence to prove the allegations in a complaint.

106. Supervisors are directed to contact the Professional Standards Manager if they have any questions or need assistance while conducting a district-level investigation.

107. If a district-level investigation raises additional concerns about an incident, Professional Standards may transfer the investigation to SIU or Internal Affairs.

108. IMPD's Internal Affairs is comprised of officers who are focused solely on conducting administrative investigations concerning alleged violations of IMPD's directives.

109. Internal Affairs investigations proceed in a similar fashion as district-level investigations.

110. Internal Affairs investigators also contact complaining parties and witnesses, identify additional witnesses, speak with the officers who are targets of investigations, and review audio, video, police reports, court documents, and electronic evidence that relates to the complaint.

111. Internal Affairs investigators will then provide all factual evidence they gathered to the Commander of Internal Affairs.

112. The Commander of Internal Affairs will then prepare a report and recommend a finding of Exonerated, Unfounded, Not-Sustained, or Sustained for each allegation of the complaint.

113. If a complaint alleges that an officer engaged in criminal conduct, the complaint is sent to SIU for a criminal investigation.

114. If SIU determines that there is probable cause to believe that an officer engaged in criminal conduct, IMPD will pursue criminal charges.

115. After SIU completes its investigation, IA may then complete an administrative investigation.

116. IMPD did not encourage or sanction the violation of any directives on or before September 1, 2018.

117. Instead, it investigated all complaints or reports concerning violations of IMPD's directives and disciplined officers who were found to have violated IMPD's directives.

118. In my position with the Professional Standards Branch, I have access to reports that have been generated using the data that IMPD has collected during supervisor investigations, using Blue Team reports, and during investigations completed by IA and district supervisors.

119. I reviewed those reports prior to preparing this affidavit to identify whether IMPD generated any reports to analyze negative trends concerning positional asphyxia.

120. I also reviewed data to identify whether IMPD had any data that would have reasonably led to concerns that officers were positioning detainees in a manner that is in violation of GO 8.1 or that ultimately led to death or serious bodily injury.

121.    When reviewing IMPD's reports and data, I did not locate any reports that were created or disseminated in regards to deficiencies in IMPD's policies or practices that led to death or serious bodily injury from improper positioning of detainees.

122.    From 2014 through 2018, I did not locate any discipline that was issued that was related to positional asphyxia, employees improperly placing detainees in positions that could lead to asphyxia, or violations of GO 8.1 Section III.

123.    From 2014 through 2018, I also did not locate any sustained Internal Affairs investigations for violations of GO 8.1 Section III or for the improper placement of detainees that lead to asphyxia, death, or serious bodily injury.

124.    From 2014 through 2018, I did not locate any sustained Citizens' Complaint investigations for violations of GO 8.1 Section III or for the improper placement of detainees that lead to asphyxia, death, or serious bodily injury.

125.    My investigation of IMPD's reports and data allowed me to learn that IMPD had no evidence of trends or incidents that would have triggered a reassessment of its policies or practices regarding IMPD officers positioning detainees in a manner that leads to death.

126.    My investigation of IMPD's reports and data also allowed me to learn that IMPD did not have any evidence of trends or incidents that would have triggered a reassessment of its policies or practices regarding encounters with disabled individuals that lead to death.

127.    There is no data that shows that IMPD should have been aware of any policy or practical deficiencies leading to disabled individuals being detained in a reckless manner.

128.    In my current position with IMPD, I am tasked with reviewing this data and these reports to identify trends that demonstrate training and policy deficiencies.

129.    Therefore, I am familiar with how to access the data and reports that would reveal trends that demonstrate training and policy deficiencies.

130.    Based upon my investigation of IMPD's reports and data, I know that IMPD did not have data or reports that would have provided it with notice that its training or policies would cause officers to position detainees in a manner that violates their rights or treat the mentally ill in a manner that might lead to their death.

## AFFIRMATION

I hereby affirm under the penalties of perjury that the foregoing representations are true and accurate to the best of my knowledge and belief.

Date:  ___9/1/21___            _____
                              Sergeant Stephen Griffith

# Exhibit A



## POLICY

The Indianapolis Metropolitan Police Department (IMPD) continually develops and maintains formal written directives to provide department personnel with a clear understanding of the constraints and expectations relating to the performance of their duties. Written directives outline policies, procedures, rules and regulations regarding matters that affect the entire department or a portion thereof. The written directives system also provides department personnel with rapid access to individual policies, procedures, rules and regulations.

The department's written directives shall be in compliance with applicable law and meet or exceed the standards for law enforcement agencies in the United States, as established by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA).

## VIOLATIONS AND ENFORCEMENT OF DIRECTIVES

Violations of directives including rules, regulations, general orders or other orders as explained herein may be considered sufficient cause for disciplinary action, up to and including termination.

Department personnel are accountable for all material contained in the written directives relevant to their job function, responsibilities and assignment. Supervisors shall enforce the provisions of the department's written directives which include, but are not limited to, the Rules and Regulations and General Orders.

## DEFINITIONS

<u>Policy</u>**:** A broad declaration of agency intent, objectives, goals and overall mission.

<u>Directive</u>**:** Any communication, whether oral or written, used to guide or affect the performance or conduct of department personnel. All directives are authorized by the chief of police or designee and are contained in the IMPD Rules and Regulations Manual and IMPD General Orders Manual.

<u>Executive Staff</u>**:** The chief of police and all appointed ranks.

## TYPES OF DIRECTIVES

I. <u>Rules and Regulations</u> – Apply throughout the department. They specifically enumerate the categories regulating conduct through orders, policy, standard operating procedures and/or rules of the department and provide for the disciplinary process of the department (remain valid until rescinded).

II. <u>Orders</u> – Used to convey policy and procedures.

    A. <u>General Orders</u> – Apply throughout the entire department. They are intended to provide long-term guidelines relating to department-wide issues (remain valid until rescinded).

    B. <u>Division Orders</u> - Apply to one division or part of one division. They must be reviewed annually by the issuing division commander to ensure they are up to date (remain valid until rescinded).

**WILLIAM D. LORAH**
CHIEF OF POLICE

**Supersedes IMPD General Order 2.2,**
**Effective 02/29/2008**

**Effective: APRIL 25, 2012**

Page **1** of 5



III. <u>Special Orders</u> – Used to announce one-time events, programs, special circumstances or temporary assignments.  Special orders have a self-cancelling date or self cancel in one year from the date of issue.  Special orders will be placed into two categories, (1) Special Orders (2) Traffic Detail Orders.

IV. <u>Procedural Notices</u> – Used to change or update procedures in general orders or other written directives.  Material contained in a Procedural Notice will be incorporated into the next revision of the affected general order.

V. <u>Standard Operating Procedures</u> (SOP) – Provide procedural guidelines which include, but may not be limited to, step-by-step procedures or detailed instructions. SOPs explain how a policy will be implemented.

**PROCEDURE**

**I. Authority of the Chief of Police**

   A. The chief of police or designee has the ultimate responsibility for issuing, modifying, approving or canceling a written directive (except Rules and Regulations) and for the complete discharge of all duties as set forth by applicable law. (See Revised Code of the Consolidated City/County 279-221 and Indiana Code 36-3-1-5.1)

   B. Directives will be reviewed as determined by the chief of police or designee.  All department orders and standard operating procedures have precedence over division orders and division standard operating procedures.

**II. Lawful Orders**

   A. An order is a directive, verbal and/or written, issued by a department supervisor or member who has been authorized to give orders.

   B. All orders, when issued by a superior, are presumed to be lawful.  All department personnel shall obey orders promptly and willingly.

   C. No supervisor shall knowingly and willfully issue an order in violation of any law, city/county ordinance, general order, policy, procedure, rule or regulation of the department.

   1. Should a supervisor make a conscious decision to issue an order, for any reason, contrary to general orders or any department policy, the supervisor shall complete and submit a memorandum to their commander via chain of command prior to the end of their shift with a thorough explanation of the circumstances and justification for the issuance of the order.

   2. The supervisor's commander shall determine whether further department action is required and document the incident in the supervisor's personnel file.

   D. The failure, or deliberate refusal, of any employee/member to obey an order given by a superior officer of the department shall be deemed insubordination and subject to discipline.

   E. Flouting the authority of any superior officer by wanton disrespect or by disputing their order, shall be deemed insubordination and subject to discipline.



## III. Conflicting Orders

A. In the event of conflicting orders, the most recent order given shall be followed, unless retracted or modified.

    1. Department personnel receiving orders from different ranking supervisors shall comply with the order from the highest ranking supervisor.

    2. The supervisor giving the conflicting order shall then determine which order shall be followed and shall advise the subordinate employee/member accordingly. In all cases, the subordinate employee/member shall promptly obey such order and the responsibility for such order shall rest with the supervisor, and not with the subordinate employee/member.

    3. Department personnel receiving conflicting orders from supervisors of the same rank shall inform the supervisor giving the most recent order of the conflict. Contradictory orders issued by supervisors of the same rank shall be subject to administrative review at an appropriate time.

B. Department personnel who disagree with department directives shall abide by Rules and Regulations Section II F. "Members shall not criticize the department or any of its officers if that criticism is in any way defamatory, obscene, or unlawful, or tends to impair the efficient operation of the department." Disagreements of this nature shall be dealt with through the proper chain of command (i.e., the aggrieved employee/member may discuss the issue with his/her supervisor).

## IV. Functional Communication

A. In order to establish the communication, coordination and cooperation vital for effective law enforcement, functions and personnel, all supervisors are encouraged to attend roll call, supervisor staff and other meetings to exchange information.

B. Information can also be forwarded by e-mail, voice mail, car-to-car communications via mobile data computers and by use of the daily information sheet.

## V. Written Directives System

A. The Professional Standards Division, Accreditation and Policy Section commander will manage the development and maintenance of written directives, which includes, but is not limited to, the following activities.

    1. Maintaining a master policy file of all written directives.

    2. Administering the review, indexing, updating and purging of all written directives.

    3. Initiating the distribution of all written directives.

## VI. Creation of Written Directives

A. The chief of police or designee has the ultimate authority to issue, modify, approve or rescind all written directives. No written directive shall take effect until it is approved and distributed in accordance with the procedures set forth herein.

B. The Professional Standards Division, Accreditation and Policy Section commander is responsible for the research and drafting of all written directives.


C. If a department employee/member desires to create, modify or delete a written directive, the following procedure shall apply:

1. The employee/member shall write a memorandum to the chief of police describing the proposed written directive. The memorandum shall be transmitted through the chain of command.

2. Each level of the chain of command shall forward the memorandum with comments and/or suggestions to the chief of police. Recognizing that the department's employees/members are its greatest asset, the intent of such procedure is to provide employees at all levels of the department a method to have direct input in the creation and modification of written directives.

3. The chief of police or designee shall review the proposal and determine whether to approve or deny the formal drafting of the proposed written directive.

4. If the chief of police or designee approves, the proposal will be forwarded to the Professional Standards Division, Accreditation and Policy Section commander for completion of a formal draft. A draft will be completed with input from the appropriate division commander and/or department subject matter expert and the employee/member originating the proposal. A final draft shall be submitted to the chief of police for approval.

5. Upon approval of a final draft by the chief of police, the Professional Standards Division, Accreditation and Policy Section commander shall distribute the written directive to all affected employees. If the written directive is a general order, the Professional Standards Division, Accreditation and Policy Section commander shall incorporate the written directive into the department's General Orders Manual. All other written directives will be maintained in the appropriate master file.

6. Special orders shall be reviewed by the Professional Standards Division, Accreditation and Policy Section commander at (30) day intervals and shall be either rescinded or implemented on a permanent basis after (90) days.

## VII. Directive Format

A. Each written directive shall be drafted in an outline form as approved by the Professional Standards Division, Accreditation and Policy Section commander and shall contain a minimum of three sections as follows:

1. Policy – This section consists of one or two paragraphs designed to provide a statement of organizational philosophy regarding a particular issue.

2. Definitions – This section is optional and may be used to define certain terms or phrases contained within the directive.

3. Procedure – This section consists of procedural matters and describes the application of the policy.



**VIII. Distribution of Policy and Procedure Operations Manuals**

A. The department's General Orders Manual, as well as copies of all Division and Special Orders shall be made available in an electronic format and distributed through the department's electronic e-mail system to all department personnel. Printed hard copies shall also be maintained in the following locations:

1. Office of the Chief of Police
2. Professional Standards Division Office
3. Each Police District Roll Call Briefing Room

**IX. Dissemination of Directives**

A. Every office (division, section, branch, unit, roll-call etc.) will designate a location for posting all new or revised written directives. Supervisors and/or ranking officers will read and review new or revised written directives with their subordinates at all roll calls and in all offices for four consecutive days and then post the directive(s) in the designated location for at least 30 days. Informational publications will be read at roll calls and offices for the number of days stated on each. They will then be posted until the expiration date given.

B. The Professional Standards Division, Accreditation and Policy Section shall utilize an electronic written directives management system to distribute new or newly revised written directives.

C. All new or revised general orders, department policies, procedures, rules and regulations and other department directives shall be presumed known and understood by all department personnel on the first working day after issuance.

D. In addition to reading and reviewing new or revised directives for four consecutive days as outlined above in Section A., all department supervisors and or ranking officers shall document the completion of this required procedural update for their assigned subordinates. Documentation will include the signature of each subordinate, date and confirmation that each subordinate received and read the new or revised written directive. The completed documentation will be recorded on an inter-department memorandum and will be signed and attested to by the subordinate's supervisor and/or ranking officer and placed in the subordinate's personnel file maintained by the supervisor and/or ranking officer.

**X. Review of Directives During Department-Required Employee Evaluation**

A. All department supervisors and/or ranking officers shall direct their subordinates to review all required general orders, department policies, procedures, directives, memoranda and rules and regulations as listed on the *IMPD Supplemental Information to Employee's Evaluation Report* form during the midyear and end-of-year performance appraisal process.

B. The *IMPD Supplemental Information to Employee's Evaluation Report* form will be signed and attested to by the subordinate's supervisor after completion by the subordinate, and will be placed in the subordinate's personnel file maintained by the supervisor and/or ranking officer.

# Exhibit B


## POLICY

This policy provides Indianapolis Metropolitan Police Department (IMPD) officers with guidelines for the reasonable use of force. The department authorizes reasonable force to accomplish lawful objectives. All officers shall exercise good judgment at all times when the use of force is necessary.

Officers may use reasonable force if the officer reasonably believes the force is necessary given the totality of the circumstances.

Officers may use deadly force <u>only if the officer</u>:

A. Reasonably believes that the force is necessary to prevent the commission of a forcible felony; or

B. Has probable cause to believe that the deadly force is necessary to effect an arrest of a person who the officer has probable cause to believe poses a threat of serious bodily injury to the officer or third person; and

C. Has given a warning, if feasible, to the person against whom the deadly force is to be used.


## DEFINITIONS

<u>Deadly Force</u> – Defined by IC 35-31.5-2-85: "Deadly force" means force that creates a substantial risk of serious bodily injury.

<u>Forcible Felony</u> – Defined by IC 35-31.5-2-138: "Forcible felony" means a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being.

<u>Involved Officer(s)</u> – Those officers who directly applied force.

<u>Reasonable Belief</u>- The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

<u>Serious Bodily Injury</u> – Defined by IC 35-31.5-2-292: "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus.


## PROCEDURE

### I. Medical Attention for Injuries Sustained Using Force

A. Medical assistance shall be obtained as soon as practical for any person who, as a result of an officer's use of force, has sustained visible injury or serious bodily injury, or who has expressed a complaint of injury or continuing pain. Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by IMPD personnel, firefighters, paramedics, hospital staff, or medical staff at the Arrestee Processing Center (APC) or jail. If any such

**TROY RIGGS**
CHIEF OF POLICE

Supersedes IMPD General Order 1.30,
Effective Date July 6, 2012

Effective: **AUGUST 10, 2016**

Page **1** of 5



individual refuses medical attention, such refusal shall be fully documented in related reports and, whenever practical, should be witnessed by another officer and/or medical personnel. If an audio recording is made of the contact or an interview with the individual, any refusal should be included if possible.

B. Persons who exhibit any combination of the following factors may be at an increased risk of sudden death and shall be examined by emergency medical services (EMS) as soon as possible:

1. Extreme agitation;

2. Violent, bizarre, or irrational behavior;

3. Profuse sweating;

4. Extraordinary strength beyond physical characteristics;

5. Unusual high tolerance to pain; and/or

6. Require a protracted physical encounter with multiple officers to bring under control.

C. Electronic Control Devices (ECD)

1. Following ECD deployment, the subject should be carefully observed for signs of distress. Should the subject exhibit signs of distress he/she should be provided with immediate medical evaluation. Officers should familiarize themselves with the following acute symptoms:

   a. Distress symptoms of over-exertion or exhaustion may indicate potential impairment of full ability to breathe.

   b. Symptoms of excited delirium may indicate an acute medical condition associated with sudden death. In addition to the factors listed above, officers should also look for the following excited delirium symptoms: shouting, paranoia, panic, and hyperthermia.

2. After the initial evaluation of the subject, the deploying officer shall notify Communications of the ECD deployment and request a district supervisor.

3. The deploying officer may remove the probes from the subject unless the probes are so embedded they cannot be easily dislodged.

4. To safely remove the probes, officers shall firmly grab the probe and quickly pull straight out of the skin. The probes should be treated as "sharps" and biohazard protocol should be followed (including the officer wearing protective gloves).

5. Officers shall inspect the probes after removal to ensure no part of a probe has been broken off under the subject's skin. If no additional injuries are discovered the subject may be transported to the APC.

6. When the probes become embedded and cannot be easily dislodged (exceeds ¼ inch), EMS shall be called to the scene to evaluate and/or treat the subject. If:

   a. EMS removes the embedded probe(s); and

   b. Minor bleeding is controlled and bandaged, and no other injuries or symptoms exist; then

   c. A signature of release (SOR) may be obtained from the subject and hospital transport will not be required.

7. Officers shall request EMS transportation of the subject to Eskenazi hospital and <u>shall not</u> remove the probes in the circumstances listed below. Eskenazi hospital personnel will remove the probes when:

   a. One or both probes are found to be broken off under the skin;

   b. One or both probes are embedded in sensitive tissue areas, to include the eyelid/globe of eye, neck, face, groin/genital area or a woman's breast; or

   c. One or both probes are deeply embedded or cannot be easily removed by either the officer or EMS.

8. If the subject is transported to Eskenazi hospital, the accompanying officer will inform the attending physician or medical person(s) treating the suspect that the individual has been exposed to electrical current from an ECD and provide relevant details with regard to:

   a. Potential primary and secondary injuries;

   b. Officer's knowledge of substance(s) influencing the subject; and

   c. Any suspected or confirmed mental health considerations.

D. Chemical Spray Systems

   1. Normal reactions to exposure to chemical spray may include mild difficulty breathing and irritation of the eyes and skin.

   2. Should an arrestee develop an <u>abnormal</u> reaction at any time while in custody, he/she should be transported to the nearest hospital or treated by emergency medical personnel at the scene.

   3. When practical, individuals contaminated with chemical spray should have their face and eyes flushed with cool bottled or purified water, removed to an area of uncontaminated air, and faced into the wind prior to being transported.

   4. Any person on whom chemical spray was used should be taken directly to the APC. The medical staff at the APC will evaluate the person for any necessary treatment. The arresting officer must notify the transporting officer, who in turn must notify APC personnel upon arrival that chemical spray was used on the person.

## LESS LETHAL FORCE

**II. Guidelines**

A. The department authorizes the use of chemical spray, ECDs, handcuffs, and batons. Use of other extended range impact weapons and chemical agents shall be governed by unit-specific SOPs.

B. In the absence of an imminent threat to an officer or third person, control devices shall not be used on a person who is handcuffed or secured for transportation.

C. Any less lethal option may be utilized against aggressive animals.

D. A person's head, neck, throat, spine, heart, kidneys, and groin should not be intentionally targeted with a baton except when deadly force is justified.



E. The use of chemical spray or other chemical agents by Mobile Field Force (MFF), Event Response Group (ERG) or Special Weapons and Tactics (SWAT) shall be governed by the current training guidelines, standard operating procedures, and/or approved tactics of the respective unit.

## III. Electronic Control Devices (ECD)

A. Every application of an ECD is a separate use of force requiring independent justification.

B. The act of fleeing, without other factors involved, does not justify the use of an ECD.

C. Except in exigent circumstances, officers <u>shall not</u> use an ECD in the following circumstances:

1. On a known pregnant person;
2. On the elderly or children;
3. On subjects riding on a self-propelled device;
4. On an individual who could fall from a significant height; or
5. On an individual in, or who could fall into, a body of water that poses a hazard of drowning.

D. Officers shall warn the subject and other officers at the scene of the intended use, should the subject not submit to lawful authority, if feasible.

E. The ECD shall not be intentionally targeted at an individual's head, neck, chest, groin, area around the heart, or at known pre-existing injury areas.

F. Reasonable efforts should be made to target below the chest or heart area, or from the shoulders downward on the rear of the body.

G. Officers shall not deploy an ECD when there is reason to believe the subject has a flammable substance upon his/her skin or clothing or is in a flammable or explosive environment.

H. An ECD is not authorized for use:

1. As a prod or escort device;
2. To rouse unconscious, impaired, or intoxicated individuals; or
3. To stop suspects from swallowing potential evidence or to retrieve evidence a suspect is attempting to swallow.

I. The preferred method of deployment of the ECD is in probe mode. Officers should not use the ECD in drive stun mode as a pain compliance technique. Officers using the ECD against a subject posing an immediate threat may supplement the probe mode with a drive stun to create a complete and larger incapacitation circuit.

J. Officers should utilize the five (5) second ECD cycle and handcuff the subject while he/she is affected by the ECD.

## DEADLY FORCE

While the use of a firearm is expressly considered deadly force, other force might also be considered deadly force if the force applied will create a substantial likelihood of causing death or serious bodily injury.

## IV. Firearms Use and Discharge

A. Nothing in this directive precludes an officer from un-holstering a firearm in a dangerous or life-threatening situation, such as serving a high-risk warrant, building search, high-risk vehicle stop, or other situations where the presentation of a firearm is a reasonable use of force.

B. Pointing a firearm at a person is a use of force that must be objectively reasonable in the circumstances.

C. All discharges from department-authorized firearms, on-duty or off-duty, except for training and/or qualification purposes, shall be immediately reported to an on-duty supervisor by the involved officer in the most expedient method possible. The on-duty supervisor shall make appropriate notification to his/her district commander or designee, respond to the scene of the incident, and conduct an investigation.

D. If an uninvolved department member has knowledge of an unreported shooting incident, he/she shall report the known facts to a supervisor.

E. Shooting at or from moving vehicles or occupants is prohibited.

F. Warning shots are prohibited.

| NOTE | Any deviation from the provisions of this policy shall be examined on a case by case basis. The involved officer must be able to clearly articulate the reasons for the use of force. |
| --- | --- |

# Exhibit C



# Indianapolis Metropolitan Police Department

## USE OF FORCE – INVESTIGATION AND REPORTING

### POLICY

The Indianapolis Metropolitan Police Department (IMPD) is charged with the important responsibility of objectively investigating and evaluating the use of force by IMPD officers. It is the policy of this department to consistently and thoroughly investigate every use of force. Further, each incident will be reviewed to ensure compliance with policy and to identify and address areas for improvement.

This policy establishes procedures for the investigation, reporting, and review of officers' application of force.

### DEFINITION

<u>Deadly Force</u> – Defined by IC 35-31.5-2-85: "Deadly force" means force that creates a substantial risk of serious bodily injury.

<u>Involved Officer(s)</u> – Those officers who directly applied force.

<u>Public Safety Statement</u> – A statement made by an involved officer in an officer-involved shooting to a supervisor, immediately following an officer-involved shooting incident, for public safety purposes.

<u>Serious Bodily Injury</u> – Defined by IC 35-31.5-2-292: "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus.

### PROCEDURE

#### LESS LETHAL

I. **Notification and Documentation of the Use of Force**

    A. An officer of any rank shall <u>notify</u> a supervisor via Communications, as soon as practical, following a use of force incident, as specifically outlined in this general order and as described below:

        1. Force applied that exceeds un-resisted handcuffing, including but not limited to:

            a. Pressure point manipulation;
            b. Joint lock manipulated escorts;
            c. Forcible takedowns; or
            d. Any strikes (palm heel, kick, etc.).

        2. Force applied through non-deadly weapons.

        3. Force applied resulting in, or alleged to have resulted in, serious bodily injury, injury, or complaint of pain of another person.

        4. Any force a supervisor determines should be documented.



| **NOTE** | These notification and reporting requirements apply to members of all ranks. If a supervisor uses force, the investigation does <u>not</u> need to be conducted by a supervisor of a higher rank. |
|----------|----|

B. Any use of force incident described above shall be promptly <u>documented</u> as follows:

1. The officer will obtain an incident report number from Communications and write an initial incident report and Blue Team entry.

2. The officer's incident report and Blue Team entry will include a description of how the force was applied, whether it was effective, and describe any resulting injuries to the arrestee, the involved officer, and/or any other officers or involved citizens.

3. The Blue Team entry will be forwarded to the investigating supervisor within seventy-two (72) hours.

4. The officer will be responsible for having photos taken of all alleged injuries, whether visible or not, and will document the information in the initial incident report.

C. When this policy or a supervisor requires a Blue Team entry, a supervisor <u>shall</u> respond to the scene and conduct a preliminary investigation regarding the use of force.

1. The supervisor's investigation will include attempts to interview the involved officer(s), suspect(s), and witnesses. The supervisor should also document any other relevant evidence.

2. The supervisor will review the officer's Blue Team for accuracy and ensure the entry includes the required documentation for the involved officer.

3. Within the officer's Blue Team entry, the supervisor must provide a disposition of in compliance or not in compliance and enter comments that include results of their investigation, reason for their disposition finding, any further action taken, and/or recommendations for further action.

4. Within **three (3) days** of receipt, the investigating the sergeant must forward the Blue Team entry, or return it to the officer for corrections.

| **NOTE** | When a use of force involves a weapon or device issued and controlled by a specialized unit, a supervisor of that unit should be carbon copied (CC). |
|----------|----|

5. Within **three (3) days** of receipt, the lieutenant must forward the Blue Team entry, or return it for corrections.

6. Within **five (5) days** of receipt, the captain must forward the Blue Team entry, or return it for corrections.

7. If applicable, within **five (5) days** of receipt, the commander must forward the Blue Team entry, or return it for corrections.

| **NOTE** | If a supervisor in the chain of command will be absent for a period of time making compliance with these deadlines impossible, that supervisor should be skipped and the Blue Team entry should go to the next supervisor in the chain of command. |
|----------|----|

## II. Special Electronic Control Devices (ECD) Considerations

A. Any discharges/deployments of an ECD or cartridge resulting from an accident and/or malfunction will be immediately reported to the officer's immediate supervisor. Should the discharge strike another officer, the supervisor shall forward the injured officer report to the Medical Liaison.

B. Property and Evidence Collection of ECD

1. Property and evidence collection associated with an ECD probe deployment is the responsibility of the deploying officer.

   a. In the event of an abnormal reaction or any secondary injury requiring medical treatment, the probes, wire, and cartridge will be submitted to the property room as evidence.

   b. When an officer is able to remove the probes, they should be disposed of and treated as biohazard material.

2. Photographs should be taken of any visible injuries on a subject after removal of the ECD probes and the photos should be placed into evidence.

3. The Firearm Training Section supervisor shall be notified if an ECD is placed into the Property Section as evidence or for any other reason.

## DEADLY FORCE

## III. Types of Investigations

A. If a firearm is discharged in an attempt to destroy an animal, or accidentally resulting in no injury to a person, the involved officer shall prepare an incident report and a Blue Team entry documenting the circumstances surrounding the firearms discharge. A diagram of the incident scene must be included as an attachment to the Blue Team entry.

1. The narrative section must be completed in detail documenting the circumstances surrounding the firearms discharge.

2. The Blue Team entry will be forwarded to the investigating supervisor within seventy-two (72) hours.

3. The investigating supervisor shall respond to the scene and conduct a preliminary investigation regarding the use of force.

4. The supervisor will review the officer's Blue Team entry for accuracy and ensure the entry includes the required documentation for the involved officer.

5. Within **three (3) days** of receipt, the investigating the sergeant must forward the Blue Team entry, or return it to the officer for corrections.

6. Within **three (3) days** of receipt, the lieutenant must forward the Blue Team entry, or return it for corrections.

7. Within **five (5) days** of receipt, the captain must forward the Blue Team entry, or return it for corrections.

8. If applicable, within **five (5) days** of receipt, the commander must forward the Blue Team entry, or return it for corrections.



| **NOTE** | If a supervisor in the chain of command will be absent for a period of time making compliance with these deadlines impossible, that supervisor should be skipped and the Blue Team entry should go to the next supervisor in the chain of command. |
|----------|--|

B. Officer-involved shootings involve two separate investigations:

    1. A criminal investigation of the incident by the agency having jurisdiction where the incident occurred. IMPD may relinquish its criminal investigation to an outside agency with the approval of the Chief of Police or designee.

    2. An administrative investigation conducted by the involved officer's agency to determine adherence to their respective department policy.

C. IMPD firearms discharges causing injury or death involve the following investigations:

    1. The Homicide Section will investigate and properly document all officer-involved firearms discharges resulting in injury or death, including attempts.

    2. The Professional Standards Branch/Internal Affairs Section will conduct a parallel investigation which will remain separate and independent of the Homicide investigation. The Internal Affairs Section commander will be responsible for overseeing the internal investigation and reporting the results through the Professional Standards Branch commander to the Chief of Police.

## IV. Jurisdiction for an Officer-Involved Shooting

Jurisdiction is determined by the location of the shooting and the agency employing the involved officer(s). The following scenarios outline the jurisdictional responsibilities for investigating an officer-involved shooting.

A. <u>IMPD Within This Jurisdiction</u> – IMPD is responsible for the criminal investigation of the suspect's actions and the administrative investigation. The criminal investigation of the officer's actions will be conducted by the Critical Incident Response Team (CIRT)/IMPD Homicide Section and/or other persons or units at the discretion of the Chief of Police. The administrative investigation will be conducted by the IMPD Professional Standards Branch/Internal Affairs Section. The Chief of Police has the discretion to relinquish all or a portion of the IMPD's responsibilities to an outside agency.

B. <u>Outside Agency's Officer Within This Jurisdiction</u> – IMPD is responsible for the criminal investigation of the suspect's actions. The criminal investigation of the outside agency officer-involved shooting will be conducted by the IMPD Homicide Section. The officer's employing agency will be responsible for any administrative investigation(s). The Chief of Police has the discretion to relinquish all or a portion of IMPD's responsibilities to an outside agency.

C. <u>IMPD Officer In Another Jurisdiction</u> – The agency where the incident occurred has criminal jurisdiction and is responsible for the criminal investigation of the incident. That agency may relinquish its criminal investigation of the suspect(s) and/or the IMPD officer to another agency. A timely administrative investigation will be conducted by the IMPD Professional Standards Branch/Internal Affairs Section. The Chief of Police has the discretion to relinquish all or a portion of the IMPD's responsibilities to an outside agency

## V. Officer-Involved Shooting – Investigative Procedure

The following guidelines shall be used when an officer-involved shooting occurs involving an IMPD officer within the IMPD jurisdiction.

A. Department personnel shall initially render the scene safe and provide emergency medical attention to involved person(s).



B. Detain, separate, and control all witnesses or anyone with knowledge of the incident and obtain the description and information on any outstanding suspects.

C. Immediately notify Communications of the location, conditions, and person(s) involved and provide initial suspect information for any outstanding suspects and/or suspect vehicles.

D. Communications will notify the immediate on-duty field supervisor, who will respond to the scene.

E. Communications will dispatch all necessary personnel and assistance as requested by officers on scene and from the on-duty field supervisor. This may include, but is not be limited to:

1. EMS/Fire Department;

2. Backup/assisting units;

3. CIRT/Homicide Section commander or designee;

4. Professional Standards Branch/Internal Affairs Section commander or designee; and/or

5. Specialty units as directed by the district supervisor, which may include, but is not limited to, Police Officer Support Team (POST), Public Information Officer (PIO), Police Chaplain and Executive Staff notification.

F. Officers arriving on the scene of an officer-involved shooting shall immediately begin to preserve the scene for possible evidence collection. An inner perimeter shall be established containing the scene, preferably using crime scene tape, police vehicles, and sufficient officers. A single point of entry to the inner perimeter shall be established. This containment procedure shall begin prior to the arrival of the on-duty field supervisor, if not already on scene.

G. An officer shall be assigned as soon as possible to the inner perimeter single entry point to maintain a *Critical Incident Log* documenting all persons entering and leaving the inner perimeter including the time and their purpose (e.g., EMT's, firefighters etc.). Absent emergency requirements, no entry shall be permitted into the inner perimeter by anyone, regardless of rank or position, not authorized by the lead CIRT investigator or designee and/or involved in the processing of the scene.

H. In order to provide a safe environment for all personnel, an outer perimeter shall be established. A staging area should be established on incidents involving numerous vehicles and resources. Safe routes of ingress and egress should be broadcast to assisting officers.

I. Field Supervisor's Responsibility

The assigned field supervisor will establish incident command per General Order 1.9 – *Incident Command* as needed or required and initially assume the role of incident commander until such time as he/she is relieved of the position. As incident commander, it will be his/her responsibility through delegation of authority or as circumstances permit to:

1. Assume initial investigative control over the scene;

2. Confirm initial medical attention has been provided and request additional medical attention as required;

3. Reevaluate and reconfigure the control points of the inner perimeter as required to contain and prevent access to the location, preventing contamination of any evidence/weapons pending the arrival of Homicide Section personnel;

4. Reevaluate the outer perimeter to restrict traffic and unauthorized persons as well as to ensure the safety of support personnel;



5. Obtain a <u>public safety statement</u> for public safety purposes to include but not limited to: known injuries, outstanding suspect(s) information including suspect(s) weapons information and direction of travel, boundaries of the incident scene(s), location of any witnesses, and direction of shots fired by officer(s)/suspect(s);

    a. Initially attempt to obtain the <u>public safety statement</u> from any officer on scene who is not involved in the shooting.

    b. In the event there are no officers who were not involved in the shooting, the supervisor should attempt to obtain a voluntary <u>public safety statement</u> from an officer who was involved.

    c. If necessary, the supervisor may administratively order any officer from the department to immediately provide a <u>public safety statement</u> necessary to secure the scene and pursue suspects.

6. Ensure an officer is assigned to maintain a *Critical Incident Log*, as outlined above;

7. Ensure all witnesses are located, identified, and separated (noting any witness observations);

8. Ensure all involved officers and uninvolved witness officers are separated;

9 Make notification to the involved employee's/member's commander if different from the incident commander's district;

10. Confirm the CIRT/Homicide Section and Professional Standards Branch/Internal Affairs commanders or designees have been notified; and

11. Be prepared to brief assigned personnel from the Homicide Section and Internal Affairs Section upon their arrival on scene and transfer investigative control of the criminal investigation and internal investigation respectively to the two investigative sections. The criminal investigation will take priority over any administrative investigation.

J. Each involved officer should be given an administrative order not to discuss the incident with other involved officers pending further direction from a supervisor in the officer's chain of command, Homicide detectives, or Internal Affairs detectives assigned to the shooting investigation.

## VI. Involved Officers

A. An involved officer's firearm will be exchanged by a Homicide supervisor or detective handling the shooting investigation. The Homicide supervisor or detective will obtain a department-owned and preapproved temporary replacement firearm from the Property Section (placed at the Property Section for this purpose) and issue the involved officer the department-owned temporary replacement firearm at the same time the involved officer's firearm is taken for evidence purposes.

1. The Homicide supervisor or detective handling the investigation shall notify the Firearms Training Section supervisor a replacement firearm was issued from the Property Section.

2. The Firearms Training Section supervisor will arrange with the involved officer(s) to exchange the temporary replacement firearm(s) for a permanent issued firearm(s).

3. The involved officer(s) shall complete a qualification course with the permanent issued firearm(s) as soon as possible.


B. An involved officer shall preserve the integrity of any physical evidence present on the officer's equipment and clothing, such as blood or fingerprints, until detectives or crime laboratory personnel can properly photograph and retrieve the items. Replacement clothing for an involved officer will be arranged for by Homicide Section detectives and or the assisting officer.

C. Detectives and/or other authorized personnel shall make reasonable accommodations to the officer's physical and emotional needs.

D. A mental health professional shall be provided by the department to each involved officer. A mental health professional shall be provided by the department to any other affected officers upon request.

　1. Interviews with a licensed mental health professional will be considered privileged and will not be disclosed except to the extent that the officer is or is not fit for return to duty.

　2. If an interview or session with a licensed mental health professional takes place prior to an involved officer providing a formal interview or report, involved officers shall not be permitted to consult or meet collectively or in a group with a licensed mental health professional prior to providing a formal interview or report with Homicide detectives and Internal Affairs detectives.

E. Involved officers shall be given reasonable paid administrative leave as determined by the Chief of Police or designee following an officer-involved shooting and it shall be the responsibility of the district commander or designee to authorize schedule adjustments to accommodate such leave.

F. While on administrative leave, involved officers will remain available for debriefing by detectives, interview by prosecutors, consultation with the mental health professional, and any other department requirements. Involved officers will be removed from line-duty assignment, pending an administrative review from the Firearms Review Board, or at the discretion of the Chief of Police, or designee.

## VII. Reports by Involved Officers

A. The assigned Homicide detective(s), who have received investigative control over the criminal investigation from the incident commander, will make the final decision as to required reports by any uninvolved officer(s).

B. In the event that suspects remain outstanding or subject to prosecution for related offenses, the department shall retain the authority to require involved officer(s) to provide sufficient information for related criminal reports to facilitate the apprehension and prosecution of those individuals.

C. Reports related to the prosecution of criminal suspects will be processed according to normal procedures, but should also be included for reference in the investigation of the officer-involved shooting.

## VIII. Shooting-Criminal Investigation

A. Once notified of an officer-involved shooting, it shall be the responsibility of the Homicide Section commander or designee as the lead component of the CIRT for this assignment to assign appropriate detective personnel to handle the department's investigation of the incident and all related crimes. Homicide detectives will be assigned to work with personnel and investigators from other units within the CIRT as well as any other required personnel.

B. Once on scene and after being briefed by the incident commander, the assigned detectives from the Homicide Section and Internal Affairs Section will control their separate investigations.

C. Uninvolved witnessing officers will provide a statement to the Homicide detective(s).



D. Homicide detectives will have the opportunity to interview involved officers. In order to provide them with an opportunity to give a voluntary statement, the following shall be considered for the involved officer(s).

1. Field supervisors and Internal Affairs Section personnel should not participate directly in any voluntary interview of officers. This will not prohibit such personnel from monitoring an interview through audio/video equipment without their physical presence in such interview(s).

2. If requested, any involved officer will be afforded the opportunity to consult individually with a representative of his/her choosing or an attorney, prior to speaking with Homicide detective(s). However, in order to maintain the integrity of each individual officer's statement, involved officer(s) shall not consult or meet with a representative or attorney collectively or in groups prior to being interviewed.

3. Any voluntary statement provided by the officer(s) will be made available for inclusion in the administrative investigation.

4. Absent consent from the involved officer(s) or as required by law, no administratively compelled statement(s) will be provided to criminal investigators.

E. Homicide detectives will forward all completed reports through their chain of command to the Chief of Police. After review, the criminal investigation reports will be included with all other reports associated with the investigation and transferred to the Chief's designee for compilation and presentation to the Firearms Review Board.

## IX. Internal Administrative Investigation

A. In addition to all other investigations associated with an officer-involved shooting, the department will conduct a confidential internal administrative investigation to determine conformance with department policy. This investigation will be conducted under the supervision of the Professional Standards Branch/Internal Affairs Section.

1. Involved officers are obligated to provide a statement to an Internal Affairs detective as a condition of employment. The statement will be for administrative purposes only and, with the exception of perjury, cannot be used in a subsequent criminal prosecution nor can the information be disclosed to Homicide detective(s). Involved officers will be given an administrative order to provide full and truthful answers to all questions during any related interview with an Internal Affairs detective (Garrity admonishment; Garrity v New Jersey, 385 U.S. 493 (1967).

2. Any officer involved in a shooting may be administratively compelled to provide a blood sample for alcohol/drug screening. Absent consent from the officer, such compelled samples and the results from any such testing will be for administrative use only.

3. Officers shall have the opportunity to contact an attorney and have the attorney present or select an uninvolved representative to be present during the interview.

4. Internal Affairs detectives will forward a completed administrative investigation report of the incident through the chain of command to the Chief of Police. After review, the report will be included with all other reports involving the investigation and transferred to the Chief's designee for compilation and presentation to the Firearms Review Board.

B. If a firearm is discharged at a person or occupied vehicle, whether or not the discharge results in injury or death, the assigned Internal Affairs investigator shall complete the Blue team entry.

1. The narrative section must be completed in detail documenting the circumstances surrounding the firearms discharge.

2. A diagram of the incident scene must be included as an attachment to the Blue Team entry.

3. The Internal Affairs investigator will also be responsible for completing any and all related Blue Team entries (i.e., use of force, vehicle pursuits, etc.).

**FIREARMS REVIEW**

## X. Administrative Review

An administrative review will be conducted for each reported discharge of a firearm by an IMPD officer. The administrative review will initially be the responsibility of the Firearms Review Board and based upon circumstances, may consist of additional oversight. The overall administrative review may involve the following:

A. IMPD Firearms Review Board;
B. IMPD Disciplinary Board of Captains;
C. IMPD Chief of Police;
D. Police Merit Board;
E. Federal Bureau of Investigation;
F. United States Department of Justice;
G. Marion County Grand Jury;
H. Marion County Prosecutor; and/or
I. Coroner.

## XI. Board Composition

The Firearms Review Board shall consist of the following personnel:

A. Chairman: Highest ranking member on the board; if the members are of equal rank, the Chairman will be chosen by ballot.

B. 1st Member: Homicide Section commander

C. 2nd Member: Training Section commander

D. 3rd Member: Internal Affairs Section commander

E. 4th Member: A lieutenant or above from the district level

F. 5th Member: A peer officer for the officer being investigated

## XII. Hearings

A. Hearings will be audio-recorded.

B. Type-written transcripts will be prepared at the request of the Chief of Police.

## XIII. Discipline

The Firearms Review Board does not have the authority to recommend discipline. The Firearms Review Board shall make a finding which will be limited to one of the following:

A. **In Compliance**: The officer's actions were within policy.

B. **Not In Compliance**: The officer's actions were in violation of department policy.

## XIV. Disposition



The Firearms Review Board will forward the completed case and the members' decision to the Chief of Police for disposition.

## XV. Chief of Police Responsibility

Upon receipt of the decision by the Firearms Review Board, the Chief of Police will have final authority to discipline any officer of the agency in accordance to the Rules and Regulations. In making his/her determination, the Chief of Police may refer to the matter to the Disciplinary Board of Captains for recommendations.

## XVI. Annual Analysis

A. The department will maintain records for use of force incidents involving:

1. Discharges of firearms;

2. Force applied resulting in, or alleged to have resulted in, serious bodily injury, injury, or complaint of pain of another person; or

3. Any force through the use of deadly or non-deadly weapons.

B. Records for use of force incidents will be maintained by the Professional Standards Branch.

C. The Professional Standards Branch will be responsible for conducting a documented annual analysis of the above reports by reviewing the incidents in an effort to reveal patterns or trends that could indicate training needs, equipment upgrades, and/or policy modifications.

D. The resulting report from the annual analysis shall be forwarded to the Training Division commander or designee and Planning and Research Section for evaluation and implementation.

# Exhibit D



# Indianapolis Metropolitan Police Department

## MENTAL WRITS/IMMEDIATE DETENTIONS

---

**POLICY**

During the normal course of duty, members of the Indianapolis Metropolitan Police Department (IMPD) may come into contact with individuals who display symptoms of a mental disorder. It is the policy of this department to train officers to work effectively with such individuals and treat them and their families with dignity and respect.

**DEFINITIONS**

Dangerous - As used in this general order, 'dangerous' shall be defined as:

1. An individual who presents an imminent risk of personal injury to themselves or to another individual; or

2. An individual who may present a risk of personal injury to themselves or to another individual in the future and the person:

   a. Has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and the person has not demonstrated a pattern of voluntarily and consistently taking medication while not under supervision; or

   b. Has documented evidence that would give rise to a reasonable belief that the person has a propensity for violent or emotionally unstable conduct.

| NOTE | The fact that a person has been released from a mental health facility or has a mental illness that is currently controlled by medication, does not establish the individual as dangerous. |
|------|---|

Emergency Detention/Mental Writ – An emergency detention order, up to seventy-two (72) hours, that can be initiated by law enforcement officer, emergency medical personnel, family, friend, or anyone who believes the individual is:

1. Mentally ill;

2. Dangerous or gravely disabled; and

3. In need of immediate restraint.

Emergency Detention/Mental Writ requires a signed application, confirmation of receiving hospital, and signed physician's statement. This application is then submitted to the Marion County Superior Court Probate Division for approval and signature of the judge.


<u>Gravely Disabled</u> – A condition in which an individual, as a result of mental illness, is in danger of being harmed because the individual is:

1. Unable to provide food, clothing, shelter, or other essential human needs; and

2. Has a substantial impairment or an obvious deterioration of judgment, reasoning, and/or behavior.

<u>Immediate Detention</u> – A hold for up to twenty-four (24) hours, that can be initiated by a law enforcement officer, having reasonable grounds to believe an individual is:

1. Mentally ill;

2. An imminent danger to themselves or others or gravely disabled; and

3. In immediate need of hospitalization and treatment.

The individual will be apprehended and transported to the nearest appropriate medical facility.

<u>Mental Illness</u> – A psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. This includes intellectual disability, alcoholism, and addiction to narcotics or dangerous drugs.


**PROCEDURE**

**I. Operational Responsibilities**

A. An officer who has reasonable grounds to believe a person qualifies for an Immediate Detention, as defined above, may place that person under Immediate Detention. Signs that can lead to reasonable grounds include, but are not limited to, the following:

1. General Appearance (Manner of dress and type of clothing, personal hygiene, avoiding eye contact or staring, etc.);

2. Speech (Is the rate slow, fast, or halting? What is the volume? Is it flat or excited?);

3. Mood (What is the individual's response to the question, "How are you doing?" What is their expression and attitude?);

4. Any mention or threat of suicide (including gestures and/or attempts);

5. Any threat or action to harm another individual;

6. Observed violent or reckless behavior (including property destruction);

7. Extreme agitation, anxiety, propensity for violence, or panic;

8. Immobilized by some type of disorder (i.e. depression, improper medication, psychotic episodes, etc.) and unable to care for themselves;

9. Extremely irrational, confused, illogical, or paranoid; and/or

10. Alcohol/drug intoxication or withdrawal that could present an immediate health risk.

B. When communicating with an individual who may have a severe mental illness and/or is experiencing a crisis, certain tactics, attitudes and demeanors work best. Officers should attempt to:

1. Use the individual's name;

2. Speak calmly and quietly;

3. Keep a reasonable and safe distance;

4. Be honest, respectful, and helpful;

5. Respond to rage with quiet and calm reassurances;

6. Slow down the pace of the situation and be patient;

7. Give firm, clear, and simple directions;

8. Be willing to repeat yourself;

9. Ask, "Are you taking your medication?";

10. Ask, "What medications are you supposed to be taking?";

11. Listen carefully and do not interrupt;

12. Maintain a non-threatening stance;

13. Do not challenge delusions or hallucinations;

14. Use "I" statements (i.e. I understand); and/or

15. Make no sudden movements.

| NOTE | Although compassion must be used, officers must be cautious while handling an individual suffering from mental disorders. |
|------|--------------------------------------------------------------------------------------------------------------------------|

C. When an officer encounters an individual who they believe is dangerous, the officer has a lawful right to access and seize any firearms.

1. The probable cause section of the incident report must be completed detailing why the officer believes the individual is dangerous (see Section I, sub-section A. above).

2. The Firearms Investigative Unit will then screen the probable cause affidavit with the Marion County Prosecutor's Office (MCPO), and the case will be set for a hearing.

3. All firearms will be placed in the Property Section with the notation "Firearms seized from Dangerous Person" and shall be held as evidence.



| **NOTE** | Indiana Code permits an officer to obtain a search warrant for the seizure of firearms possessed by a dangerous individual. The probable cause affidavit for seizure of the firearms should be screened by the MCPO. |
|---|---|

## II. Immediate Detention

A. Officers may have situations where an individual needs to be placed under Immediate Detention for his/her own safety or the safety of others.

B. When taking an individual into custody for Immediate Detention, officers will adhere to the following guidelines:

   1. The individual shall be restrained in accordance with procedures outlined in General Order 8.1 - *Prisoner Handling, Transportation, & Escape.*

   2. An individual taken into custody under Immediate Detention status shall be handcuffed behind the back *unless exigent circumstances* exist.

C. A search of an individual and their possessions shall be conducted for weapons and/or items that would constitute an obvious threat to the safety of the individual, officer, or the public.

D. Officers must complete an *Immediate Detention* Form, IMPD Form No. 6-5-24 R4.

| **NOTE** | Mental health professionals do not have access to incident reports; therefore, it is crucial that the Immediate Detention Form contain all pertinent information. This includes but is not limited to the presence of weapons, use of SWAT, officer concerns, contact name and numbers for witnesses and family members. |
|---|---|

E. Officers will also complete an incident report using the offense "Immediate Detention" and detail the circumstances under which the individual was taken into custody. Officers will also complete and attach the IMPD CIT form within the incident report in InterAct.

F. Individuals placed under Immediate Detention shall be transported as soon as possible to the hospital or appropriate facility via wagon (if available), unless emergency medical treatment and continuous medical care is warranted.

   1. If an individual is currently in treatment at a specific facility (e.g., VA hospital), they will be transported to that facility.

   2. If the individual is transported by ambulance, an officer shall either follow the ambulance to the hospital in their department vehicle or, at the request of the medic, ride in the ambulance.

   3. The individual must be transported to the hospital or appropriate facility, where they may be held up to twenty-four (24) hours for psychiatric assessment, along with a copy of the completed Immediate Detention Form.

| **NOTE** | If a question arises as to the appropriate method of transportation (e.g. police vehicle, wagon, ambulance, etc.) a supervisor shall be called to the scene to determine the appropriate method. |
|---|---|

G. Officers will close out their run with the CAD disposition "RPTCIT" for immediate detentions.



### III. Immediate Detention and Arrest

A. When an individual is placed under Immediate Detention and arrest, the individual will be transported to Eskenazi Hospital Detention Facility, even if Eskenazi Hospital is on diversion.

B. Officers will close out their run with the CAD disposition "ARCIT" when outright criminal offenses are charged against a person in addition to an immediate detention.

### IV. Mental Writs/Emergency Detention

A. The IMPD is responsible for serving court-ordered Mental Writs/Emergency Detention (ED) when necessary.

   1. An individual taken into custody on IMPD's jurisdiction by a court-ordered Mental Writ/ED is to be transported by Marion County Sheriff's Office (MCSO) wagon to the mental health facility designated on the Mental Writ/ED order.

   2. When an individual is taken into custody on IMPD's jurisdiction by a court-ordered Mental Writ/ED and is to be transported to a location outside of Marion County, MCSO wagon will transport the individual to Eskenazi Hospital and the MCSO will handle the transportation to the designated facility.

   3. A copy of the Mental Writ/ED should be left with the treatment facility staff.

B. Marion County Superior Court, Probate Division is the issuing court for Mental Writs/ED and Orders for Apprehension and Return.

   1. Marion County Superior Court, Probate Division will fax all Mental Writs/ED and Orders for Apprehension and Return to Marion County Sheriff's 911 Center. Fax (317) 327-3586.

   2. Communications will then type a pending run on the appropriate district and notify the on-duty shift supervisor. Communications can email or fax the Mental Writ/ED or Orders for Apprehension and Return to the shift supervisor.

   3. The shift supervisor is responsible for providing the next shift with the Mental Writ/ED or Orders for Apprehension and Return. If the individual was not located, the run shall be left open until service is complete.

   4. In the event of a bad address or updated information reference a Mental Writ/ED or Orders for Apprehension and Return, officers shall contact the Marion County Superior Court, Probate Division Coordinator at Denise.Safford@indy.gov.

C. Officers will also complete an incident report using the offense "Mental Writ" and detail the circumstances under which the individual was taken into custody.

D. Officers will close out their run with the CAD disposition "RPTCIT" for mental writs that are served.



## V. Other reporting

When documenting incidents in which the officer believes a mental illness is a contributing factor, officers will use the offense code "Mental Investigation" when the offense codes "Immediate Detention" or "Mental Writ" were not applicable. Officers will also attach and complete the IMPD CIT form within the incident report in InterAct.

## VI. Mental Illness Referrals

A. In cases where there is not a need for an Immediate Detention and mental illness is suspected, officers can refer to the National Alliance on Mental Illness (NAMI) Indianapolis website at www.namiindy.org or call 317-257-7517.

B. NAMI Indianapolis contains a list of community mental health programs, resources, and facilities.

C. Officers should attempt to make contact with family or mental health facilities on behalf of the individual in need, when possible.

## VII. Training

A. While attending the IMPD Academy, recruit officers will receive training on how to deal with individual(s) with a mental illness.

B. Officers shall also receive state-mandated in-service training on the subject annually.

## VIII. Crisis Intervention Team

A. The Crisis Intervention Team (CIT) is a community partnership that includes law enforcement and health care providers providing assistance to mental health individuals and their families.

B. CIT officers receive advanced training in handling individuals with a mental illness and will become part of a specialized team.

1. These officers become 'first responders' for calls involving individuals with mental illness who are experiencing a mental health crisis.

2. CIT officers will work with the community to help restore individuals to a 'pre-crisis' level of functioning.

C. CIT training consists of multiple curriculums that are provided by local mental health providers, legal experts, and family advocates. Training to become a CIT officer shall include, but not be limited to, the following:

1. Case Management;
2. Legal issues;
3. Special populations;
4. Psychopharmacology;
5. De-escalation techniques; and
6. Effective use of community resources.

# Exhibit E



# Indianapolis Metropolitan Police Department

**GENERAL ORDER**

## PRISONER HANDLING, TRANSPORTATION AND ESCAPE

**8.1**

## POLICY

Prisoner handling and transportation are very important aspects of law enforcement. Prisoners must be treated humanely, with dignity, and must not be ridiculed, harassed, or mistreated in any way. As a matter of course, all prisoners should be monitored frequently by both the arresting and transporting officers to ensure their well-being. All members of Indianapolis Metropolitan Police Department are responsible for ensuring this policy is enforced.

| NOTE | Nothing in this directive prohibits an officer from conducting a 'pat-down' search of any person for officer safety. |
|------|------|

## DEFINITIONS

<u>Juvenile</u> - A person who has been captured, detained and held in confinement and who is under the age of eighteen and has not been waived to an adult court.

<u>MCSO</u> - Marion County Sheriff's Office

<u>Prisoner</u> - A person who has been captured, detained and held in confinement.

<u>Positional Asphyxia</u> - A condition in which an extreme decrease in the amount of oxygen in the body is accompanied by an increase of carbon dioxide which may lead to loss of consciousness or death.

<u>Restraint Device</u> - Equipment used to restrain the movement of a person in custody, such as handcuffs, flex-cuffs, waist chains, ankle chains, etc.

## PROCEDURE

### I. Prisoner Handling

A. Any officer making a custodial arrest or otherwise coming into control of a prisoner must make an immediate and thorough search of the prisoner, including footwear, and all property under the prisoner's control (bags, purses, backpacks, etc.) prior to transportation to a detention facility.

B. When the individual in custody is of the opposite gender of the arresting officer, the officer may conduct only a "pat-down" search of the person and clothing for weapons or contraband.

1. The arresting officer must request an officer of the same gender as the prisoner respond to the scene of the arrest to conduct the search.





2. If an officer of the same gender is not available, the arresting officer must use the backside of their hand when searching the prisoner.

| NOTE | **An officer must conduct a prompt and thorough search of the prisoner before transporting the prisoner to a detention facility.** |
|------|-----|

C. All prisoners must be handcuffed behind the back as soon as possible with the handcuffs double-locked.

D. Officers requiring transportation of prisoners or subjects, (e.g. arrests, CHINS cases, or immediate detention) are responsible for ordering appropriate transportation, including:

1. MCSO Jail wagon (except CHINS cases);

2. Victim Assistance Unit (CHINS cases);

3. Ambulance; or

4. Personally transporting the person to the appropriate facility.

E. Violent prisoners may have legs restrained by use of any appropriate restraint device, if available, or as authorized by an on-scene supervisor (e.g. officer deems it necessary for the safety of officers and the prisoner, or to prevent damage to vehicles, etc.).

F. Prisoners will be transported by MCSO jail wagons. If a jail wagon is unavailable, an IMPD vehicle shall be used.

G. The arresting officer is responsible for the preparation of all paperwork and necessary reports. The transporting officer will hand-carry the paperwork, if not submitted electronically by the arresting officer, to the place of detention and deliver it to the appropriate facility (receiving area, prosecutor's drop box, etc.).

## II. Prisoner Transportation

A. Officers transporting, or assuming custody of a prisoner, must complete the following prior to transport:

1. Promptly conduct a second, thorough search of the prisoner and all clothing, including footwear, and property (bags, purses, etc.).

2. If the transporting officer is of the opposite gender of the prisoner, the officer must ensure that a thorough search has been made by an officer of the same gender as the prisoner, prior to transporting.

3. If an officer of the same gender as the prisoner is not readily available within a reasonable amount of time, the prisoner can be transported to the appropriate detention facility after a "pat-down" search by the transportation officer.  The detention facility staff must be advised that a thorough search of the prisoner has not been made.

B. Officers are prohibited from transporting any prisoner in any vehicle other than a department vehicle, unless being transported by an ambulance (refer to Section VIII).

1. If an MCSO jail wagon is unavailable and an IMPD vehicle must be utilized, prisoners shall be handcuffed with hands behind the back, and the handcuffs 'double-locked.' The following measures shall also be taken to minimize the opportunity of exit or escape by the prisoner:

   a. The prisoner shall be placed in the passenger side of the rear seat away from the transporting officer;

   b. The prisoner shall be secured with a seatbelt with the officer 'locking' the seatbelt in place;

   c. The officer shall engage the 'Child Safety Lock' on the rear doors so the rear door may not be opened from the inside; and

   d. The officer shall engage the window lock so the prisoner is unable to roll down the rear windows.

2. If prisoners are transported by a patrol vehicle, no more than two (2) adults or three (3) juveniles can be transported in one (1) vehicle.

3. Prisoners must not be left unattended in any sedan-type patrol vehicle.

   | NOTE | **Prisoners are prohibited from riding in the front seat of any vehicle.** |
   |------|---------------------------------------------------------------------------|

C. All prisoners must be transported directly to the appropriate detention facility (Arrestee Processing Center, Eskenazi Receiving Ward, etc.).

1. The transporting officer shall not initiate or become involved with any vehicle pursuit while transporting a prisoner.

2. Only where the risk to a third party is both clear and grave, and the risk of escape or injury to the prisoner is minimal should an officer stop to render assistance or take other enforcement actions.

3. Transporting officers must remain at the facility and assist receiving personnel until the prisoner is secured.

D. The officer must notify Communications when preparing to transport any passenger in a police vehicle, other than a pre-approved ride-along passenger. This includes witnesses, victims, etc., as well as suspects or prisoners. The information relayed to dispatch shall include the reason for the transportation, the beginning location and mileage, and the final destination and mileage once the officer arrives at the destination.

E. Prisoners who were subjected to CS/OC or pepperball projectile must be taken directly to APC for treatment by medical staff without undue delay.

1. The medical staff at the APC will evaluate the prisoner for any necessary treatment.

| 8.1 | **PRISONER HANDLING, TRANSPORTATION AND ESCAPE** |
|-----|---------------------------------------------------|
|     | **GENERAL ORDER**                                 |



2. The transporting officer must notify APC personnel upon arrival that CS/OC or pepper ball projectiles were used on the subject.

| NOTE | **This policy shall in no way prohibit an officer from calling for medical assistance at the scene if the officer feels such medical assistance is appropriate and/or necessary.** |
|------|----|

F. Officers transporting prisoners must not transport adult males, adult females, or juveniles together unless they are co-defendants in the same incident, or are transported in a police vehicle of such design that they are physically separated.

G. All individuals arrested for a crime or taken into custody and believed to be suffering from a mental illness must be transported in a separate compartment of the transportation vehicle away from other prisoners.

H. At the beginning of each duty shift, and prior to placing a prisoner in a transporting any vehicle, the transporting officer must visually inspect the vehicle's interior to ensure no weapons or other potentially hazardous materials are available to the prisoner.

I. The transporting officer has discretion to give permission to the prisoner to communicate with other individuals prior to transport.

1. Safety aspects during transport require that the prisoner's ability to communicate with attorneys and others will not normally be permitted during the period the prisoner is being transported.

2. However, there may be no physical contact and the conversation must take place in the presence of the officer.

J. After the prisoner has been delivered to the appropriate facility, the transporting officer must re-inspect the vehicle to ensure no weapons or contraband were left or hidden within the transportation vehicle by the prisoner.

### III. Positional Asphyxia

A. Officers must be aware of the warning signs that could result in death by positional asphyxia. A subject placed on their chest or stomach, with the legs and arms restrained behind the back, may have difficulty breathing, leading to serious injury or death.

1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used.

2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible.

3. The subject should then be carefully observed and medical assistance should be summoned immediately to evaluate the subject's health.


B. The signs listed below, especially high fever and shivering, may indicate a state of hypothermia resulting from excited delirium, a potentially dangerous condition. If a subject is suffering from any of the signs listed below, and placed in a prone position that interferes with breathing, there is a greatly increased risk of positional asphyxia.

1. Bizarre, aggressive, violent behavior outside the norm;

2. Shouting and screaming, especially at inanimate objects;

3. Violence toward objects, especially glass;

4. Profuse sweating;

5. High fever;

6. Unexpected physical strength;

7. Thrashing after restraint;

8. Shivering;

9. Dilated pupils;

10. Hallucinations;

11. Paranoia;

12. Tightness or pain in the chest;

13. Nausea;

14. Shortness of breath; and/or

15. Known drug overdose.

C. Any detained subject exhibiting some or all of the above symptoms must be closely monitored, especially if maximal restraint is used. Officers must make sure the subject is alert, conscious and can sit and speak on their own before transporting.

> **NOTE** Obese subjects are more at risk for positional asphyxiation, but death can result from anyone being improperly restrained.

## IV. Transportation for Other Agencies

If there are no MCSO jail wagons available, IMPD may transport prisoners of other law enforcement agencies, businesses, or security personnel when the arrest occurs within the IMPD jurisdiction. It is the responsibility of the arresting officer to complete an OAR and required incident reports. In extreme situations an officer may be dispatched to transport prisoners from other law enforcement jurisdictions which will be determined by a shift supervisor.

## V. Adult Prisoners

A. All adult prisoners who do not meet the criteria set forth in Section VIII., must be received through the vehicle sally port of the Arrestee Processing Center (APC), 752 East Market Street.

B. Upon arrival at the APC, the transporting officer shall notify the APC Control Room/Operator via the call box. APC staff will inform the transporting officer when they are ready for the officer to bring the prisoner into the receiving area.

C. No vehicles will be allowed into or out of the APC vehicle sally port until all prisoners are inside the secured area.


D. No firearms will be allowed in the prisoner receiving area. Officers must place their weapon in the gun locker before unloading the prisoner. There are several firearm lockers provided in the sally port area and in two additional areas in the APC, if needed.

E. Prisoners should be handcuffed with their hands behind their back. Arrestee Processing Officers will remove restraining devices inside the secured area once the prisoner has been searched. Officers will receive their restraining devices back through the pass-through door. When the prisoner is turned over to the Arrestee Processing Officer, the transporting officer shall notify them of any known existing medical problems or security hazards.

## VI. Juvenile Prisoners

A. All juvenile prisoners, regardless of the charges against them, will be transported to the Receiving, Screening and Release (RSR) unit at the Juvenile Detention Center at 2451 N. Keystone Avenue.

B. Juvenile prisoners are received in the prisoner-unloading bay at the Juvenile Justice Complex. To transfer a prisoner to the Juvenile Justice Complex, officers must:

1. Use the call-box on the parking lot to have the overhead door opened;

2. Pull into the bay and turn the engine off, overhead door will be closed;

3. Place weapons in the lock-box; and

4. Unload prisoner and transfer to receiving personnel.

> **NOTE** Refer to General Order 1.17 – Juvenile Arrest Procedures, for further guidance.

## VII. Sick, Injured, or Disabled Prisoners

A. Sick, injured or disabled prisoners (adult or juvenile) must be transported to the Marion County Sheriff's Office Detention Ward at Eskenazi Hospital by ambulance or by the transporting officer if the following symptoms are present:

1. When the prisoner has lost consciousness or is unconscious;

2. When the prisoner cannot stand unassisted (except if caused by physical handicap);

3. When the prisoner has suffered a serious or life-threatening injury;

4. When complaining of physical injury or illness with observable symptoms, (e.g., bleeding, swelling, distorted limbs, vomiting, pale, clammy skin, or cramping);

5. When juvenile prisoners show any significant signs of impairment by drug or alcohol intoxication or when tested by Juvenile intake personnel, the juvenile has a .08 BAC or above;

6. When a juvenile prisoner was subdued by use of a Taser, OC, or CS; or

7. When a juvenile prisoner was involved in car accident (PD or PI); or


8. When a supervisor or medical personnel determines it is necessary to transport the prisoner in an ambulance for the well-being of the prisoner or others (e.g., prisoner is suspected to be infectious or contagious and needs to be quarantined from others, or requires special attention provided by medical personnel).

| **NOTE** | **Officers must make notification to Eskenazi prior to bringing the prisoner to the Marion County Sheriff's Office Detention Ward.** |
|---|---|

B. If prisoners are transported by ambulance, arresting officers must consult with the medical personnel on the scene to determine the proper method of restraint within the ambulance to ensure security of the prisoner and protection of the ambulance personnel.

C. Ambulances transporting IMPD prisoners to a detainment facility must be followed by an officer in possession of the appropriate paperwork (OAR, Juvenile Fact Sheet, Immediate Detention Form, etc.). Upon arrival at the detainment facility, the officer must accompany the prisoner until properly received by a correction officer, deputy, or other authorized official.

D. If medical personnel on scene advise the prisoner can be transported by MCSO jail wagon, the Medic number, name and ID must be entered into the CAD and Transportation CAD. A prisoner only mildly ill, intoxicated or suffering minor injuries shall be transported directly to the APC by MCSO jail wagon to receive care by medical personnel at the APC. If the prisoner is evaluated at the APC and requires care beyond what can be provided, the prisoner will be transported to the hospital by Sheriff's personnel using an appropriate transportation vehicle.

E. If a prisoner is disabled and the disability prevents the use of a MCSO jail wagon for transporting the prisoner, the officer shall request a supervisor to assist in arranging appropriate transportation.

1. The application of restraint devices on a disabled prisoner is governed by the subject's physical capabilities, the seriousness of the charges against the prisoner, and the threat level of the prisoner.

2. Prisoners with disabilities may require special procedures. In these instances, the transporting officer shall:

   a. Ensure any special equipment required by the prisoner is transported along with the prisoner and request assistance when needed in order to make the transportation safe for both the prisoner and the officer;

   b. Request an ambulance to assist in transportation of the prisoner when medically appropriate; and

   c. Ensure that prosthetic devices are left with the prisoner only after being searched thoroughly for weapons and/or contraband.

F. If a prisoner arriving at a detention facility is determined to be medically unacceptable by the receiving officer due to illness or injury, the transporting officer must:

1. Obtain a duplicate OAR or Juvenile Fact Sheet leaving the original at the detention facility;

2. Allow the receiving officer to place the prisoner's thumb prints on both copies of the OAR.



3. Immediately transport the prisoner to the Marion County Sheriff's Detention Ward at Eskenazi Hospital and present all necessary paperwork to the receiving deputy at the ward.

| NOTE | If it is determined that the prisoner requires transportation by ambulance, it is IMPD's responsibility to provide escort for the protection of ambulance personnel. |
|------|------|

## VIII. Personal Property

A. All personal property (except contraband), which would fit in someone's pockets, wallet, or purse, may be sent with the prisoner.

| NOTE | No knives, mace, or any other item that could be a weapon will be accepted at the Juvenile Center. |
|------|------|

B. Personal property, including belts and currency less than $500.00, must be packaged in heat seal or self-seal bags for transport to the Arrestee Processing Center.

C. An Arrestee Personal Property List form must be completed and placed inside the prisoner's property bag.

D. All large items (e.g., suitcases, bags, or boxes) must be placed in the Property Section under the category "safekeeping."

## IX. Reporting Procedures

A. A supervisor must be notified and the reporting officer shall include details in the narrative section of the incident report when:

1. A full arm and leg restraint is used;

2. Property is removed from an unconscious prisoner; and/or

3. There is a complaint of injury to either the prisoner or officers.

B. When an adult prisoner is sent to the Sheriff's Detention Ward at Eskenazi Hospital, prior to going to the APC, the original OAR will be presented to MCSO personnel by the transporting officer and the OAR will remain with the prisoner at all times.

| NOTE | MCSO personnel will send a copy of the OAR to the APC. It will no longer be necessary for the arresting officer to transport a copy to the APC. |
|------|------|

C. When a juvenile is delivered to Eskenazi Hospital for treatment before being sent to Juvenile, the transporting officer shall immediately fax a copy of the fact sheet to Juvenile Intake.

1. The Juvenile Receiving fax number is 327-8306.

2. The transporting officer shall immediately telephone Juvenile Receiving at 327-8780 to advise them of the fax and the juvenile's name.

3. A fax machine and telephone are available for use in the Eskenazi Emergency Room.

## X. Prisoner Escape

In the event a prisoner or person in the control of Indianapolis Metropolitan Police personnel should escape from police custody, the procedure listed below must be followed:

A. The officer in control of the prisoner must immediately notify the communications center providing the location of the escape, direction and mode of travel, escapee's name, physical description, charges against the subject, and other appropriate information. (i.e., is the prisoner handcuffed, etc.).

B. Communications shall issue a general broadcast describing the escapee, location, direction of travel and offenses the escapee is charged with.

C. The officer's immediate supervisor must prepare an inter-department communication describing in detail the incident and circumstances contributing to the escape. This special report must be prepared within twenty-four (24) hours of the incident and distributed through the chain-of-command to the following:

   1. Chief of Police (original);

   2. Officer's division deputy chief; and

   3. Officer's district commander.

D. The officer last in control of the prisoner must include an account of the escape in the narrative section in an Incident Report.

   1. If the escape occurs before the transporting officer has left the scene of the prisoner transfer, the details may be included in the original Incident report by the arresting officer.

   2. If the escape occurs after the transporting officer has left the scene of the prisoner transfer, separate Incident Report must be created by the transporting officer.

| NOTE | **If a prisoner escapes from an MCSO Jail Wagon, an IMPD supervisor is not responsible for submitting any of the reports.** |
|------|---|

Exhibit F

# Indianapolis Metropolitan Police Department



# RULES
## AND
# REGULATIONS

**EFFECTIVE DATE:  JUNE 25, 2014**

PAGE INTENTIONALLY LEFT BLANK

THIS DOCUMENT IS FORMATTED
TO BE PRINTED TWO–SIDED
(FRONT AND BACK)

BLANK PAGES ARE NOTED AS SUCH

PAGE NUMBERS DO NOT
APPEAR ON  BLANK PAGES

THIS WILL ALLOW FOR
PLACEMENT IN THE OFFICER'S
IMPD GENERAL ORDERS MANUAL


## TABLE OF CONTENTS

Mission Statement ........................................................................................ 3

Values that Guide our Actions ..................................................................... 3

Glossary ...................................................................................................... 5

Police Officer's Bill of Rights ...................................................................... 9

Statement of Rights Form (Internal Affairs) ............................................... 12

Assumption of Defense in Police Liability Cases ....................................... 13

Rules and Regulations ................................................................................. 15

Disciplinary Process .................................................................................... 21

Definition of Disciplinary Actions ............................................................... 25

Authority to Discipline .................................................................................. 27

Disciplinary Board of Captains .................................................................... 29

Appeals ......................................................................................................... 33

Internal Affairs .............................................................................................. 35

Complaint Review Board ............................................................................... 35

PAGE INTENTIONALLY LEFT BLANK


# Indianapolis Metropolitan Police Department

## MISSION STATEMENT

We are dedicated to upholding the highest professional standards while serving the community in which we work and live. We are committed to the enforcement of laws to protect life and property, while also respecting individual rights, human dignity, and community values. We are committed to creating and maintaining active police/community partnerships and assisting citizens in identifying and solving problems to improve the quality of life in their neighborhoods.

## VALUES THAT GUIDE OUR ACTIONS

- The protection and preservation of life is our fundamental objective. We will only use deadly force when absolutely necessary to protect the life of a citizen or officer when no other options are available.

- We are committed to developing a partnership with the community, employing creativity, patience, persistence, and an appreciation of diversity both in the police department and in the community.

- We shall perform our duties with an unwavering commitment to integrity and professionalism.

- We will be accountable to those we serve for our decisions and actions.

- We will accomplish our mission with empathy, compassion, and sensitivity at all times, with the highest regard for individual and constitutional rights.

- We recognize that each member of this department is valuable, and we accept our obligation to each other and to the community to provide the maximum opportunity for each person to achieve his or her professional potential.

PAGE INTENTIONALLY LEFT BLANK


# GLOSSARY

When a word or term is not defined, the proper and fitting definition, as used within the context, or the generally accepted definition, as defined by the context, shall be used. When a male pronoun is used, the female pronoun is implied. When a singular word or term is used, the plural is implied unless otherwise specified.

**Agency** – The Indianapolis Metropolitan Police Department.

**Appointed Police Administrator** – Non-sworn person with statutory authority over members of the department (e.g., the merit board members).

**Chain of Command** – Line of authority (up and down) commencing with one's immediate supervisor and/or immediate subordinate.

**Confidential** – Not to be revealed except to authorized persons.

**Demotion** – Disciplinary action taken by the chief of police as a result of department rule, regulation, order, policy, or standard operating procedure violation which includes reduction of the member's permanent rank by one level.

**Department** – The Indianapolis Metropolitan Police Department

**Discharge** – Disciplinary action recommended by the chief of police as a result of department rule, regulation, order, policy, or standard operating procedure violation which, if upheld by the Merit Board, results in termination of employment.

**Disciplinary Action Report** – The Disciplinary Action Report is the official reporting document to the chief of police of any department rule, regulation, order, policy, or standard operating procedure violation which shall include a citation and narrative description of the violation, and shall be signed by the disciplined officer to acknowledge initiation of the action.

**Equipment** – All wearing apparel and items issued to or used by a member which are necessary in the performance of his duties.

**Gross Misconduct** – Gross misconduct shall be any intentional act or behavior committed outside the scope of a member's employment that is so far removed from accepted professional practice or societal expectation that it egregiously violates the public trust, the oath of office, or the chief's ability to maintain good order and discipline, to the point of presumptively rendering the member unfit for continued employment with the department.  This behavior may or may not be criminal in nature.  A charge of gross misconduct shall not be applied to any action taken within the performance of a member's official duties or responsibilities, whether on-duty or off-duty, in furtherance of the business of the police department.

<u>Note</u> – The definition above shall not apply if the conduct at issue is already specifically addressed by the Rules and Regulations and/or the General Orders of the department unless the penalty under that Rule and Regulation and/or General Order is clearly deficient in light of the extraordinary severity and magnitude of the conduct at issue.



## GLOSSARY
*- Continued -*

**Firearm** – Any handgun, shotgun, or rifle authorized by the department for use by its members.

**Immediate Supervisor** – Person to whom one is directly responsible (no one intervening).

**Inter-Department** – Inter-department communication which is used for any everyday flow of information.

**Insubordinate** – Not submitting to authority; disobedient; disrespectful.

**Leave** – Excused absence from duty.

**Line of Duty** – Any action taken by a member while acting in his official capacity as a police officer for the Consolidated City of Indianapolis.

**Member** – Any sworn police officer of the department.

**Metropolitan Law Enforcement Agency** – The Indianapolis Metropolitan Police Department

**Necessary Force** – Any force used by a member to affect an arrest or subdue someone which is reasonable under all the circumstances.

**Neglect** – Failure to perform.

**Obey** – Must comply or perform.

**Off Duty** – That period of time when a member is not scheduled in normal assigned duties as a police officer.

**Off-Duty Employment** – Any service rendered outside the department for work during the off duty period which is voluntary or for which goods, services, or pay are received in return.

**Officer** – A duly sworn member of the department.

**On Duty** – On duty shall begin at that time when a member reports for a scheduled work period as designated by the department, whereby that member performs duties as a police officer for the Consolidated City of Indianapolis. It shall also include such times any member is ordered to duty by the chief of police. It shall also pertain to those periods of time when any member of the Indianapolis Metropolitan Police Department acts in an official capacity as a police officer, even while technically off duty, if that member is enforcing a law of the State of Indiana, Consolidated City of Indianapolis, or while performing those duties in the protection of life and property.

**Order** – Any directive, verbal and/or written, issued by a department supervisor or member who has been directed to give orders.

**Overtime** – The time worked in excess of the regular tour of duty.

**Plain Clothes Duty** – Assigned to duty in clothing other than the departmental uniform.



# GLOSSARY
*- Continued -*

**Police Action** – Activity expected or required by law, order, rule, regulation, and/or procedure.

**Regulation** – Order, policy, standard operating procedure, and/or rule of the department.

**Rule** – All specifically enumerated categories regulating conduct within the Rules & Regulations of the department.

**Shall** – Must perform or comply.

**Standard Operating Procedure** – Detailed directive specifying procedures for performance of various tasks within the department.

**Substandard Performance** – Below the acceptable level of performance as defined by policy or work standards.

**Supervisor** – Any member with the rank of sergeant or above.

**Suspension** – Disciplinary action taken as a result of department rule, regulation, order, policy, or standard operating procedure violation which may include loss of police powers and monetary loss.

**Violation** – Action or inaction that is contrary to rule, regulation, order, policy, or standard operating procedure.

**Weapons** – Any department issued instrument used by a member for defense or to control a crowd or individual, or to effect a lawful arrest, e.g., handgun, baton, chemical repellent.

**Working Day** – A member's regular shift or tour of duty.

**Written Reprimand** – Disciplinary action taken as a result of department rule, regulation, order, policy, or standard operating procedure violation for which there is no loss of pay or police powers.

———————————————

**This Shall Be The Official Departmental Glossary**

Additions and deletions may be made from time to time at the direction of the chief of police

PAGE INTENTIONALLY LEFT BLANK


## I.   POLICE OFFICER'S BILL OF RIGHTS

**Section 1.**  As used in this Chapter, "police officer" shall mean all persons who are sworn members of the Indianapolis Metropolitan Police Department.

**Section 2.**  There is hereby created a Police Officer's Bill of Rights which applies to all police officers, after completion of a required probationary period.

**Section 3.**  Except when on duty or when acting in an official capacity, no police officer shall be prohibited from engaging in political activities or be denied the right to refrain from engaging in political activities, provided such activities do not impede or impair the efficient operation of the department.

**Section 4.**  Whenever a police officer is under investigation and subjected to interrogation by Internal Affairs, the following procedures shall apply:

A.  The interrogation shall be conducted at a reasonable hour, preferably at a time when the police officer is on-duty, unless, in the judgment of the interrogating officer(s), the seriousness of the investigation is of such a degree that an immediate interrogation is required.

B.  The interrogation shall take place either at the office of Internal Affairs or an equivalent office setting as designated by the interrogating officer.

C.  Prior to such interrogation of any police officer, he shall be provided a "Statement of Rights."

D.  The police officer being interrogated shall be informed of the name, rank, and assignment of the officer in charge of the investigation, the interrogating officer(s), and all persons present during the interrogation.

E.  In non-criminal cases, once an officer is scheduled for interrogation by Internal Affairs, he will be provided a copy of the complaint where one exists. In criminal cases, the officer will be informed of the nature of the complaint. In neither case will the name of the complainant necessarily be disclosed.

F.  Interrogation sessions shall be for reasonable periods of time and shall allow for such personal necessities and rest periods as are reasonably necessary.

G.  The interrogation of a police officer by Internal Affairs shall be tape recorded upon the request of either party. A written transcript of the tape shall be provided to the officer upon request and at no cost to the officer.

H.  If the police officer under interrogation is under arrest or is likely to be placed under arrest, he shall be completely informed of all of his rights under Miranda prior to the commencement of the interrogation.

I.  Questions posed to a police officer under investigation shall specifically, directly, and narrowly relate to the performance of the police officer's official duties or fitness for serving as a police officer. Under no circumstances shall the police officer being investigated be required to waive his immunity with respect to the use of the police officer's answers or the fruits thereof in a criminal prosecution.



J.  At the request of the police officer under interrogation by Internal Affairs, he shall have the right to have an attorney or a representative of his choice from within the department present during such interrogation whenever the interrogation relates to the officer's continued fitness for law enforcement service. At the officer's request for representation, he shall be provided a reasonable period of time to obtain such representation, which shall not exceed seventy-two (72) hours, unless agreed upon by both parties. The attorney or representative shall not participate in the interrogation except to advise the police officer.

K.  Only in criminal and corruption matters under department investigation, or as a condition of assignment to certain sensitive positions as provided in the General Orders, may a police officer be required to submit to a polygraph examination or voice stress analysis test. The questions comprising such tests shall specifically, directly, and narrowly relate to the performance of the police officer's official duties or continued fitness to serve as a police officer. Under no circumstances shall the police officer being investigated be required to waive his immunity with respect to the use of the police officer's answers or fruits thereof in a criminal prosecution. The results of such an examination shall not be used in any subsequent criminal court action without the consent of the police officer.

**Section 5.** Whenever a police officer is ordered to appear for a hearing before a board of captains as directed by the chief in accordance with Indiana Code, the following procedures shall apply:

A.  The hearing shall be administrative in nature.

B.  The hearing shall be conducted at a reasonable hour, and the officer shall receive proper notice to appear.

C.  The hearing shall take place either in the chief's conference room or an equivalent setting as designated by the board of captains.

D.  Prior to such hearing, the officer shall be provided a "Statement of Rights."

E.  The police officer shall be informed of the name, rank, and assignment of the officer in charge of the hearing, the board members, and all persons present during the hearing.

F.  In non-criminal cases, once an officer is scheduled for a hearing, he will be provided a copy of the complaint where one exists. In criminal cases, the officer will be informed of the nature of the complaint. In neither case will the name of the complainant necessarily be disclosed.

G.  Hearing sessions shall be for reasonable periods of time and shall allow for such personal necessities and rest periods as are reasonably necessary.

H.  The board of captains hearing shall be tape recorded upon the request of either party. A copy of the tape shall be provided to the officer for the purpose of appeal to the Merit Board. The tape copy shall be at no cost to the officer.

I.  Questions posed to a police officer during the hearing shall specifically, directly, and narrowly relate to the performance of the police officer's official duties or fitness for serving as a police officer. Under no circumstances shall the police officer be required to waive his immunity with respect to the use of the police officer's answers or the fruits thereof in a criminal prosecution.


J.  At the request of the police officer, he shall have the right to have an attorney or a representative of his choice from within the department present at all times during such hearing whenever the hearing relates to the officer's continued fitness for law enforcement service. The attorney or representative shall be allowed to address the board, present evidence, and question witnesses to clarify testimony pursuant to the guidelines established by the board. The attorney or representative must abide by the policies, procedures, and rulings of the board. At the sole discretion of the board, counsel may be expelled or excluded from the hearing for cause. Such cause includes, but is not limited to, counsel's failure to follow the board's guidelines, policies, procedures, or rulings; or disruptive conduct. The board of captains shall have final authority and full responsibility for the hearing.

K.  Only in criminal and corruption matters under department investigation, or as a condition of assignment to certain sensitive positions as provided in the General Orders, may a police officer be required to submit to a polygraph examination or voice stress analysis test. The questions comprising such tests shall specifically, directly, and narrowly relate to the performance of the police officer's official duties or continued fitness to serve as a police officer. Under no circumstances shall the police officer being investigated be required to waive his immunity with respect to the use of the police officer's answers or fruits thereof in a criminal prosecution. The results of such an examination shall not be used in any subsequent criminal court action without the consent of the police officer.

L.  The officer shall have the right to appeal any decision/findings of the board of captains in accordance with the Indiana Code.

M.  The procedure contained in this Section (5) does not apply to administrative reviews by the board of captains.

**Section 6.**  No police officer shall be required, for purposes of assignment or other personnel action, to disclose any item of his property, income, assets, source of income, debts, or personal or domestic expenditures (including those of any member of his family or household), unless such information is obtained under proper legal procedures or tends to indicate a conflict of interest with respect to the performance of his official duties. This Section shall not prevent inquiries made by authorized agents of a tax collecting agency in accordance with acceptable and legally established procedures.

**Section 7.**  No dismissal, transfer, reassignment, or other personnel action which might result in loss of pay or benefits, or other punitive measures resulting in monetary loss, shall be taken against a police officer unless such police officer is notified of the action and the reason or reasons therefore prior to the effective date of such action.

**Section 8.**  No police officer shall be discharged, disciplined, or demoted; or denied promotion, transfer, or reassignment; or otherwise be discriminated against in regard to his employment; or be threatened with any such treatment by reason of his exercise of the rights granted in this Police Officer's Bill of Rights.

**Section 9.**  In the event a complaint has been dismissed or the complaint has resulted in an investigation and/or hearing where the police officer has been found innocent of the allegations, there shall be no record placed in the police officer's personnel file.

**Section 10.**  Modification of this document by the chief of police will not occur without entering into discussions with the President of Fraternal Order of Police, Lodge 86.



SAMPLE FORM

**INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT**

**STATEMENT OF RIGHTS**

I wish to advise you that you are being questioned as part of an official investigation of the Indianapolis Metropolitan Police Department. You will be asked questions specifically, directly and narrowly relating to the performance of your official duties as a police officer or concerning your fitness for service as a police officer. You have the constitutional right not to incriminate yourself.

Under no circumstances will the results of this investigation or your statement be used in any subsequent criminal court action against you. However, factual information contained in the Internal Affairs file on this investigation, including your statement, is generally discoverable in civil rights litigation filed in either Federal court or in a State court, and may be used to impeach your testimony in such a suit.

I further wish to advise you that if you refuse to testify, or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to Departmental charges which could result in your dismissal from the Indianapolis Metropolitan Police Department.

_____

IMPD

Internal Affairs Investigator

I have read the above and understand it fully. I sign this statement having been advised of the above rights before any questions have been asked of me.

_____

Police Officer, Indianapolis

Metropolitan Police Department

Signed at _____O'clock ___.M. this _____ day of _____, 20_____, at Indianapolis, Indiana.

(Form Reduced From Actual Size)


## II.  ASSUMPTION OF DEFENSE IN POLICE LIABILITY CASES

Assumption of Defense in Police Liability Cases – Certain standards are to be applied by the Office of Corporation Counsel with respect to civil cases where the county, city, the department, and/or a member of the department is named as a party defendant.

A.  The standards provide, in substance, that the Office of Corporation Counsel will provide counsel and assume any costs of defense in the following instances:

    1.  Where an Indianapolis Metropolitan Police Department officer is on duty and engaged in conduct within the scope of his appointment as a police officer for the Consolidated City of Indianapolis. Any conduct within the scope of the officer's employment which generally benefits the citizens of Marion County would be included.

    2.  Where the officer is off duty but is engaged in conduct in the line of duty, which, in the opinion and discretion of the Office of Corporation Counsel, generally benefits the citizens of Marion County and which would be within the scope of his employment if he had been on duty. The most common example of this situation is where an off duty officer observes a crime in progress and makes an arrest which subsequently results in the filing of suit by the arrestee.

    3.  Where an officer is employed on a part time basis as a security guard by a private employer, said employer will be responsible for defending and indemnifying the officer if suit is filed against the officer for conduct which is within the scope of his responsibilities as a police officer and which was undertaken in the course of his employment as a security guard. The employer will be responsible for providing the officer with counsel, paying the cost of the defense, and for any liability resulting from a judgment. Nevertheless, if the employer refuses to provide the defense and indemnification for the officer, the Office of Corporation Counsel, in consultation with the chief of police as may be determined appropriate under the circumstances, may agree to assume the cost of defense of the police officer subject to an action back against the employer to recoup the cost of litigation and defense.

B.  The Office of Corporation Counsel will neither provide counsel nor assume liability for the costs of defense in the following circumstances, as set forth in Chapter 292 of the "Revised Code of the Consolidated City and County."

    1.  Where the officer is engaged in conduct of a personal nature outside the scope of his employment, even though such conduct takes place during on duty hours.

    2.  Where the officer has engaged in conduct in violation of the Rules and Regulations of the department, disciplinary action has been taken with respect to such conduct, and such violation is the basis upon which liability is alleged. However, if the officer has engaged in conduct in violation of the Rules and Regulations of the department and such conduct is not the basis for liability in the alleged incident, the City will, nevertheless, accept the defense. For example, assume the officer was a party defendant in a suit alleging the plaintiff was unlawfully arrested. Further assume the officer was found by the department to be carrying an unauthorized weapon. Since the carrying of the unauthorized weapon is not the basis for liability, the Office of Corporation Counsel would assume the defense.

C.  The Consolidated City and County may not be liable for punitive damages. For this reason, an officer will need to procure his or her own counsel to defend against a claim for punitive damages, even in cases where the Office of Corporation Counsel defends the officer against a claim for compensatory damages.

PAGE INTENTIONALLY LEFT BLANK



## III. RULES AND REGULATIONS

**Section I.**     Violation of any Rule, Regulation, or Order of the Department

A.  Members shall obey all written and oral orders, rules, regulations, policy, and standard operating procedures of the department.

B.  Members who are off duty, or on suspension, or on leave shall conform to the department's rules, regulations, orders, policies, and standard operating procedures to the same extent as if they were not off duty, or on suspension, or on leave.

**Section II.**     Any Breach of Discipline

A.  Members shall not conduct themselves in a manner which is detrimental to the efficient operation and/or general discipline of the department.

B.  Members shall improve performance, conduct, or attitude following disciplinary action concerning same.

C.  Members shall not have a record of continued and/or intentional violations of department policies and/or directives.

D.  Members shall treat the official business, communications, records, and data of the department as confidential. Information regarding official business, communications, records, and data shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures.

E.  Members shall not take, destroy, or tamper with any official document, report or record of the department except in accordance with departmental procedures.

F.  Members shall not divulge the identity of persons giving confidential information except as required to do so by law.

G.  Members shall not criticize the department or any of its officers if that criticism is in any way defamatory, obscene, or unlawful, or tends to impair the efficient operation of the department.

H.  Members shall not make untruthful comments on the official action of a supervisor or any other member of the department.

I.  Members shall not commit any act or engage in any behavior that would constitute gross misconduct.

J.  Members shall not remove or copy any official document, report, or record of the department, except in accordance with departmental procedures.



**Section III.** Insubordination

A. Members shall not be insubordinate or act with disrespect to any supervisor or appointed police administrator.

B. Members shall not circumvent the chain of command unless otherwise authorized by departmental order.

C. Members shall promptly obey any lawful order of a supervisor or appointed police administrator.

**Section IV.** Neglect of Duty

A. Members shall report for duty at the assigned time and place with all necessary equipment and properly attired to perform their duties.

B. Members shall devote full time to their duties during the time they are working for the department. Members shall not engage in any activities or personal business which would cause them to be inattentive to duty.

C. Members shall not leave their assigned duty unless properly relieved, or by permission of a supervisor, or unless authorized to do so by Communications.

D. Members shall not sleep while on duty.

E. Members shall not feign illness or injury, falsely report themselves ill or injured, or otherwise deceive or attempt to deceive any official of the department as to the condition of their health.

F. Members shall report for duty at the time and place required by assignment or orders, and shall be physically and mentally fit to perform their duties.

G. Members shall not take unauthorized sick leave or be absent excessively.

H. Members shall not deliberately restrict their work output or the work output of others.

I. Members shall take proper action when they observe wrongful or negligent behavior by departmental members.

J. Supervisors shall take prompt action when they observe wrongful or negligent behavior by department members.

K. Members shall utilize all department equipment and public property only for its intended purpose, in accordance with established departmental procedures. Members shall maintain such equipment and property and ensure it is in good working condition and/or proper order.

L. Members shall not negligently abuse, damage or lose department-issued equipment or public property.



M.  Members shall not negligently abuse, damage or lose department-issued firearms.

N.  Members shall keep and maintain all essential information on any police investigation for which they have primary responsibility.

O.  Members shall make and turn in all reports promptly, accurately, and completely in conformity with departmental orders.

P.  Members making arrests or otherwise coming into control of a prisoner shall make an immediate and thorough search of the prisoner and surrounding area as defined by law and department policy.

Q.  Members who recover or come into possession, custody, or control of any lost, stolen, seized, or abandoned property shall secure and transport it to the Property Branch in conformity with law and department policy.

R.  Members shall not testify in any court case, civil or criminal, or administrative hearing except where required by law, or departmental order, or when subpoenaed.


**Section V.**     Immoral Conduct

A.  Members shall not conduct themselves in an immoral and/or indecent manner which impairs their ability to perform as police officers or causes the department to be brought into disrepute.


**Section VI.**     Conduct Unbecoming an Officer

A.  When dealing with the public, members shall not use language or gestures which are rude, demeaning or affronting.

B.  When dealing with the public, members shall not use language or gestures which are lewd, obscene or indecent.

C.  Members shall not act with disrespect to any other employee of the department, sworn or civilian.

D.  Members shall not use any controlled substance or dangerous drug unless prescribed by someone permitted by law to prescribe such drugs.

E.  Members shall not report for full-duty status, or perform said duty, when the use of any drug or medication impairs their effectiveness.

F.  Members shall not partake of any intoxicating beverage while on duty, except in the performance of their duty, nor shall any member report for duty under the influence of intoxicants to any degree whatsoever.

G.  Members while in uniform shall not consume alcoholic beverages or engage in any activity that would be demeaning to the uniform and the department.

H.  Members shall not mistreat persons who are in their custody and shall handle such persons in accordance with law and departmental order.



I. Members shall not mistreat animals that are in their custody and shall handle such animals in accordance with law and departmental order.

J. Members shall not use more force in any situation than is reasonably necessary under the circumstances. Members shall use force in accordance with law and departmental order.

K. Members shall only use their weapons in accordance with state law and department order.

L. Members shall not enter into official departmental correspondence or official verbal communication with anyone, except in performance of their official duty.

M. Members shall not intervene in the assigned case of another member without permission of their commanding officer, but shall give assistance when and where necessary.

N. Members shall not officially recommend or suggest the service of any person, company, or other organization doing business for profit.

O. Members shall not use their official position, badge, or credentials for personal advantage nor to solicit goods, services, or gratuities.

P. Members shall not use their official position, badge, or credentials to avoid the consequences of an illegal act.


**Section VII.**   Substandard Performance

A. Members shall perform their duties in a manner which will maintain satisfactory standards of efficiency in carrying out the objectives of the department.

B. Members shall conform to established work standards according to their rank or position. Non-conformity shall include, but not be limited to, inability or unwillingness to perform assigned duties.

C. Supervisors or commanding officers shall not issue any orders which are contrary to law, or departmental rule or order.


**Section VIII.**   Violation, with the determination by the Chief based on a preponderance of the evidence, of any Federal, State, or local laws.

A. Members shall obey all federal, state, or local laws.

B. Members shall obey all laws of any state or local jurisdiction where the member is present.



**Section IX.**     Failing to Cooperate or Be Truthful

A.  Members shall be cooperative and truthful when testifying in any court or administrative hearing or internal investigation, in accordance with the "Police Officer's Bill of Rights."

B.  Members shall be truthful in all official reports and correspondence.

C.  Upon the order of the chief of police or his designee, or a supervisor, members shall answer truthfully all questions specifically, directly, and narrowly relating to the performance of their official duties or their fitness for serving as a police officer.

**Section X.**     Financial Responsibility

A.  Members with a financial interest that they believe, or reasonably should have believed, may be affected by actions of the department shall disclose the precise nature and value of such interest. The  disclosure shall be made in writing and shall be submitted to the chief of police.

**Section XI.**     Gambling

A.  No game of chance or wagers in violation of any law shall be played by any member.

B.  Members shall not place any legal gambling wagers (including the lottery, bingo, etc.) while wearing a department uniform.

**Section XII**.     Vice

A.  Members shall not knowingly visit any place of questionable character, such as a house of prostitution, gambling establishment, or any place frequented by criminals, except in an official capacity, and if a member becomes aware of such a place, he shall report it to a supervisor immediately.

**Section XIII.**     Public Appearance

A.  A member shall obtain the permission of his Division Commander prior to appearing as a representative of the department for the purposes of making a speech, participating in a panel discussion, or other similar functions.

PAGE INTENTIONALLY LEFT BLANK


## IV.    DISCIPLINARY PROCESS

### I.  PURPOSE

This manual is designed to outline the disciplinary process for the Indianapolis Metropolitan Police Department. The policies and procedures relating to this process shall be established in accordance with Sec. 279-237 of the "Revised Code of the Consolidated City and County" (As added G.O. No. 110, 2005)  This manual is to serve as a guide for all members to enable them to understand and comply with the process. As an administrative guide, it shall outline the scope of duties and responsibilities for members and for the review, investigative, and hearing boards. This manual shall attempt to establish procedural review and due process within the framework of departmental policy, and City, State, and Federal Law.

II. SEC. 279-237 of the "Revised Code of the Consolidated City and County," as added G.O. No. 110, 2005, reads as follows:

(a)  The civilian police merit board of the metropolitan law enforcement agency shall establish disciplinary policies for use in all disciplinary matters of the agency. The merit board, in conjunction with the chief, subject to the approval of the Director of Public Safety, shall establish the rules and regulations for the agency. All disciplinary charges shall be based on these rules and regulations.

(b)  Disciplinary actions within the agency shall be in one (1) of the following forms:

  (1)  Written reprimand;
  (2)  Suspension without pay;
  (3)  Demotion;
  (4)  Discharge.

(c)  An officer may be placed on leave with pay for up to thirty (30) calendar days by the chief pending determination of final disciplinary action. Such leave with pay shall be considered a duty status and not a punishment.

(d)  The chief shall have the ultimate authority to discipline any member of the agency, subject only to the restrictions outlined below. In making his determination, the chief may refer the matter to a disciplinary board of captains for recommendation. Following his determination in a disciplinary matter, the chief may:

  (1)  Issue a written reprimand.

  (2)  Suspend an officer without pay for up to six (6) calendar months. If the suspension is for more than ten (10) working days, the officer may appeal that portion of the suspension greater than ten (10) days to the merit board. Such appeal must be made within thirty (30) calendar days of notice of the action.

  (3)  Demote the officer in rank by one (1) merit rank. Any demotion may be appealed to the merit board within thirty (30) calendar days of notice of action.

  (4)  Recommend discharge of the officer to the merit board. Upon referral of the matter to the merit board, the merit board shall conduct a de novo administrative hearing of record. Pending determination by the merit board, the officer shall be placed on suspension without pay.



*(Continued from previous page)*

(5) Reinstate with pay any officer who previously was suspended without pay.

Provided, however, that the chief shall consult with the Director of Public Safety regarding any discipline exceeding a ten (10) day suspension.

(e) Departmental superiors shall have the authority to discipline subordinate officers as outlined below. However, these superiors may recommend any of the above disciplinary actions to the chief through
the chain of command.

The assistant chief, deputy chiefs, and majors may: (1) issue a written reprimand or (2) suspend an officer for not more than ten (10) working days without pay. The chief of police may delegate additional disciplinary authority to the assistant chief(s) and deputy chiefs.

Captains may: (1) issue a written reprimand or (2) suspend an officer for not more than three (3) working days without pay.

Lieutenants may: (1) issue a written reprimand or (2) suspend an officer for not more than two (2) working days without pay.

Sergeants may (1) issue a written reprimand or (2) suspend an officer for one (1) working day without pay.

(f) Officers in non-merit appointed ranks who are classified by the agency as exempt executive, administrative or professional employees pursuant to the provisions of the Fair Labor Standards Act are not subject to unpaid disciplinary suspensions other than for violations of safety rules of major significance unless the suspension is for the period of an entire workweek or a specified number of full workweeks.

(g) All disciplinary actions taken by anyone except the chief shall be forwarded in writing to the disciplinary board of captains through the chain of command within three (3) working days of the action. The disciplinary board of captains shall ensure due process and consistency of discipline throughout the department. This disciplinary board may conduct an administrative review of the matter, request further investigation by Internal Affairs or other appropriate personnel, or hold a hearing on the matter.

(h) If a hearing is held by the disciplinary board of captains the officer charged shall be notified in writing of the charges and the time and date for the hearing. In such hearings, and pursuant to departmental policy, the officer shall have the right to have counsel present and to have witnesses subpoenaed by the board of captains to testify in his or her behalf upon advance notice to the board. All testimony before the captains' board shall be under oath, and any individual appearing before the board shall cooperate fully and answer all questions truthfully and directly. The hearing before the captains' board shall be conducted in accordance with the written directives of the chief and the merit board. After the hearing, the board of captains shall, upon majority vote, reduce to writing its findings of either guilty or not guilty.

(i) The disciplinary board of captains shall report the results of its review and/or hearing to the chief for determination. Included in this report shall be the disciplinary board's findings and recommendations. If the finding is "guilty," the disciplinary board shall also make its recommendations for punishment. The chief may concur with the captain's board in full or in part or may fully or partially reverse its recommendations.


*(Continued from previous page)*

(j) The disciplinary board of captains shall consist of three (3) officers holding the permanent merit rank of captain, who shall serve for a period of three (3) months. Each captain shall be selected at random. The names of the captains shall be drawn from a list of all eligible captains by the police officer ranking first on the most current sergeant's promotion list who shall serve for a period of three (3) months and who shall then be succeeded by the next highest ranking officer on such list who shall serve for a three-month period and so forth. If a vacancy occurs on the board of captains by reason of a board member becoming unable to perform his duties and serve on such board, the vacancy shall be filled in the same manner in which the board was selected.

(k) Disciplinary actions addressed by the merit board on appeal from the officer shall be handled through administrative hearing. This hearing shall be de novo and shall be a hearing of record. In making an appeal, the officer shall submit a written request for appeal to the merit board within thirty (30) calendar days of notice of disciplinary action. The merit board then shall schedule the hearing, providing the officer with at least fifteen (15) calendar days' notice prior to the hearing date. The evidence before the merit board shall consist of the written charges and action taken on such charges, the findings of fact and recommendations from the chief and/or the disciplinary board of captains, and any other evidence requested by the merit board or presented by the charged officer.

(l) The officer requesting an appeal and the chief may be represented by legal counsel before the merit board.

(m) After hearing the evidence, the merit board shall, by majority vote, reduce its findings and decision to writing. The merit board may fully or partially affirm or reverse any portion of the chief's determination which is appealable. In addition, the merit board may remand the action for further review by the chief.

(n) If the officer is found not guilty by the merit board, any pay he or she may have lost due to suspension, or any rank lost due to demotion, shall be returned to the officer.

(o) Any officer who disagrees with the findings of the merit board shall have the right to file a verified petition to the superior or circuit court of Marion County for a review of the decision. The petition for review must be filed within thirty (30) calendar days after the written decision of the board. The City of Indianapolis shall be the sole defendant in the petition for review. Within thirty (30) calendar days after receipt of a summons, the city shall cause the merit board to file a true and complete copy of the transcript of the hearing with the court. The court, without jury, shall review the record and render its decision as in other administrative reviews. The clerk of the court shall send a copy of the court's decision to the metropolitan law enforcement agency and the appealing officer. Either party may appeal the decision of the court.

(p) For the purpose of all hearings before the disciplinary board of captains and the merit board, each shall have subpoena power enforceable by the circuit or superior court of the county.

(q) A copy of any disciplinary action taken and of the findings of fact and recommendations of the board shall be forwarded to the charged officer. In addition, if an officer is found guilty, notice of the action shall be forwarded to the merit board and made a permanent part of the officer's personnel record.

PAGE INTENTIONALLY LEFT BLANK



## V.   DEFINITION OF DISCIPLINARY ACTIONS

### A.   Written Reprimand

Disciplinary action taken as a result of department rule, order, or policy violation. Documentation of the violation is forwarded to the disciplinary board of captains for review, except when the chief's authority to discipline is involved. The disciplinary board of captains shall report its findings and recommendations to the chief. Copies of the findings of the disciplinary board of captains and the chief's determination shall be forwarded to the charged officer, the Director of Public Safety, and the merit board. If sustained by the chief, a copy of the findings and recommendations of the disciplinary board of captains and/or the chief's determination shall be made a permanent part of the member's personnel file. There is no loss of police powers or monetary loss, only written documentation. Written reprimands should be used to document misconduct, or as a step in progressive discipline. Counseling should be made by the supervisor initiating the written reprimand.

In response to a written reprimand issued by a supervisor other than the chief of police, the officer receiving the written reprimand may attach an inter-department to the disciplinary action report. This inter-department shall explain the reasons for the conduct leading to the disciplinary action and any other pertinent information concerning the conduct.

### B.   Suspension

Disciplinary action taken as a result of department rule, order, or policy violation which may include loss of police powers and monetary loss. A copy of the written documentation of the suspension is sent to the disciplinary board of captains, within three (3) working days, for review, except where the chief's authority to discipline is involved. The disciplinary board of captains shall report its findings and recommendations to the chief. Copies of the findings of the disciplinary board of captains and of the chief's determination shall be forwarded to the charged officer, the Director of Public Safety, and the merit board. If the suspension is sustained by the chief, a copy of the findings and recommendations of the disciplinary board of captains and/or the chief's determination shall be made a permanent part of the member's personnel file.

In designating the actual dates of an officer's suspension, the chief and/or the board of captains shall consider the officer's work schedule and letter day rotation. The chief's determination and/or the findings of the board of captains shall list the calendar dates of the suspension as well as the number of working days suspended. An officer shall forfeit pay for working days suspended only. Police powers shall be forfeited for the entire calendar day period.

In response to a suspension issued by a supervisor other than the chief of police, the officer receiving the suspension may attach an inter-department to the disciplinary action report. This inter-department shall explain the reasons for the conduct leading to the disciplinary action and any other pertinent information concerning the conduct. In addition, the disciplinary board of captains will hold a hearing on the suspension at the request of the charged officer.

If the suspension is for more than ten (10) working days, the officer may appeal that portion of the suspension over ten (10) working days to the merit board. Such appeal must be made within thirty (30) calendar days of notification of the action.



### C. Demotion

Disciplinary action taken by the chief as a result of department rule, order, or policy violation which results in reduction of the member's permanent rank. The chief may refer the matter to the disciplinary board of captains for recommendation. The disciplinary board of captains shall report its findings and recommendations to the chief. Copies of the findings of the disciplinary board of captains and the chief's determination shall be forwarded to the charged officer, the Director of Public Safety, and the merit board. Copies of the findings and recommendations of the disciplinary board of captains and/or the chief's determination shall be made a permanent part of the member's personnel file. A demotion may be appealed to the merit board within thirty (30) calendar days after the member receives notification of the demotion.

Any Indianapolis Metropolitan Police Department officer reduced in rank will become ineligible for promotion for three years following the date of demotion. This does not, however, preclude a reduced officer from participating in any promotional process.

### D. Discharge

Disciplinary action recommended by the chief as a result of department rule, order, or policy violation, which includes loss of police powers and monetary loss, pending hearing before the merit board. The chief may refer the matter to the disciplinary board of captains for recommendation. The disciplinary board of captains shall report its findings and recommendations to the chief. Copies of the findings of the disciplinary board of captains and the chief's determination shall be forwarded to the charged officer, the Director of Public Safety, and the merit board. Copies of the findings and recommendation of the disciplinary board of captains and/or the chief's determination shall be made a permanent part of the member's personnel file. A recommendation for discharge is automatically heard by the merit board the same as an appeal hearing.


# VI.    AUTHORITY TO DISCIPLINE

## A.  Chief of Police

The Chief of Police may:

1.  Issue a written reprimand; or

2.  Suspend an officer without pay for up to six (6) calendar months. If the suspension is for more than ten (10) working days, the officer may appeal that portion of the suspension greater than ten (10) days to the merit board. Such appeal must be made within thirty (30) calendar days of notice of action.

3.  Demote the officer in rank by one merit rank. Any demotion may be appealed to the merit board within thirty (30) calendar days of notice of the action.

4.  Recommend discharge of the officer to the merit board. Upon referral of the matter to the merit board, the merit board shall conduct a de novo administrative hearing of record. Pending determination by the merit board, the officer shall be placed on suspension without pay.

5.  Reinstate with pay any officer who previously was suspended without pay.

    Provided, however, that the chief shall consult with the Director of Public Safety regarding any discipline exceeding a ten (10) day suspension.

## B.  Assistant Chief, Deputy Chief, or Major

Any assistant chief, deputy chief, or major may :

1.  Issue a written reprimand; or

2.  Suspend any subordinate for up to ten (10) working days without pay and without a hearing before the merit board. The documentation regarding said action shall be forwarded to the disciplinary board of captains for review, investigation, and/or hearing. The board of captains shall report its findings and recommendations to the chief who may affirm, revise, or reverse said action. Copies of the findings and recommendations of the disciplinary board of captains and the chief's determination are sent to the charged officer, the Director of Public Safety, and the merit board. In addition, if an officer is found guilty, notice of the action shall be forwarded to the merit board and made a permanent part of the officer's personnel file.

The chief may delegate additional disciplinary authority to the assistant chief(s) and deputy chiefs.

All disciplinary actions taken by anyone except the chief of police shall be forwarded in writing to the disciplinary board of captains through the chain of command within three (3) working days of the action.



**C. Captain**

Any captain or above may:

1. Issue a written reprimand; or

2. Suspend any subordinate for up to three (3) working days without pay and without a hearing before the merit board. The documentation regarding said action shall be forwarded to the disciplinary board of captains for review, investigation, and/or hearing. The board of captains shall report its findings and recommendations to the chief, the Director of Public Safety, and the merit board. The chief may affirm, revise, or reverse said action. Copies of the findings and recommendations of the disciplinary board of captains and the chief's determination are sent to the charged officer. In addition, if an officer is found guilty, notice of the action shall be forwarded to the merit board and made a permanent part of the officer's personnel record.

**D. Lieutenant**

Any lieutenant or above may:

1. Issue a written reprimand; or

2. Suspend any subordinate for two (2) working days without pay and without a hearing before the merit board. The documentation regarding said action shall be forwarded to the disciplinary board of captains for review, investigation, and/or hearing. The board of captains shall report its finding to the chief, the Director of Public Safety, and the merit board. The chief may affirm, revise, or reverse said action. Copies of the findings and recommendations of the disciplinary board of captains and the chief's determination are sent to the charged officer. In addition, if an officer is found guilty, notice of the action shall be forwarded to the merit board and made a permanent part of the officer's personnel record.

**E. Sergeant**

Any sergeant or above may:

1. Issue a written reprimand; or

2. Suspend any subordinate for one (1) working day without pay and without a hearing before the merit board. The documentation regarding said action shall be forwarded to the disciplinary board of captains for review, investigation, and/or hearing. The board of captains shall report its findings and recommendations to the chief, the Director of Public Safety, and the merit board. The chief may affirm, revise, or reverse said action. Copies of the findings and recommendations of the disciplinary board of captains and the chief's determination are sent to the charged officer. In addition, if an officer is found guilty, notice of the action shall be forwarded to the merit board and made a permanent part of the officer's personnel record.



## VII.    DISCIPLINARY BOARD OF CAPTAINS

### A. Selection of the Board

Pursuant to Sec. 279-237, Subsection (j) of the "Revised Code of the Consolidated City and County," "The disciplinary board of captains shall consist of three (3) officers holding the permanent merit rank of captain, who shall serve for a period of three (3) months. Each captain shall be selected at random. The names of the captains shall be drawn from a list of all eligible captains by the police officer ranking first on the most current sergeant's promotion list who shall serve for a period of three (3) months and who shall then be succeeded by the next highest ranking officer on such list who shall serve for a three-month period and so forth. If a vacancy occurs on the board of captains by reason of a board member becoming unable to perform his duties and serve on said board, the vacancy shall be filled in the same manner in which the board was selected."

Members of the disciplinary board of captains shall serve for three (3) months. After serving the three (3) month term, the selected members shall be exempt from the drawing for the remainder of the calendar year.

The chief may excuse or dismiss any member of the board of captains for cause. The vacancy would then be filled in the same manner in which the board is selected.

### B. Duties Of The Disciplinary Board Of Captains

All disciplinary actions, except those involving the chief's authority to discipline (direct or delegated) shall be forwarded in writing to the disciplinary board of captains through the chain of command within three (3) working days of the action. The disciplinary action report shall include a citation and narrative description of the Rule violation, and it shall be signed by the disciplined officer to acknowledge initiation of the action. Each level of supervision within the chain of command shall attach their recommendation with respect to the action, and the total disciplinary action taken through the chain of command shall not exceed the maximum authorized for the highest ranking supervisor in the chain of command. However, additional discipline may be recommended in accordance with Sec. 279-237, Subsection "e" of the "Revised Code of the Consolidated City and County."

Any officer being disciplined may attach a separate inter-department to the disciplinary action report, explaining the reasons for the conduct leading to the disciplinary action and any other pertinent information concerning the conduct.

The disciplinary board of captains shall automatically review every disciplinary recommendation taken by anyone except the chief of police. This board shall ensure due process and consistency of discipline throughout the department:

Where the recommended discipline is a written reprimand, the disciplinary board of captains may, at its discretion, either conduct an administrative review of the matter, request further investigation by Internal Affairs or other appropriate personnel, or hold a hearing on the matter.

Where the recommended discipline is a suspension, the disciplinary board of captains shall, at the request of the officer, hold a hearing on the matter. If the officer does not request such a hearing, the board may, at its discretion, either conduct an administrative review of the matter, request further investigation by Internal Affairs or other appropriate personnel, or hold a hearing on the matter.


*(Continued from previous page)*

Disciplinary referrals may be made by any supervisor of the department, Internal Affairs, the Accident Review Board, or the Firearms Review Board. However, no discipline is considered final until the board of captains has presented its findings to the chief and the chief has taken an action.

1. Administrative Review

   Any time a member is disciplined by a supervisor, except where the chief's authority to discipline (direct or delegated) is involved, the documentation of the discipline shall be sent to the disciplinary board of captains for administrative review. The review shall include analysis of the action in terms of disciplinary authority, process consistency, the past record of the disciplined member, etc. The review may result in affirmation, revision, or reversal of the action; further investigation; or a hearing regarding the matter. A written report of the board's findings and recommendations shall be submitted to the chief (or his designee), the Director of Public Safety, and the merit board. The chief (or his designee) may concur with, revise, or reverse any part or all of the board's recommendations.

2. Investigation

   In making its determination in disciplinary matters, the disciplinary board of captains may request further investigation of a case by Internal Affairs or other appropriate personnel. The disciplinary board of captains shall review the investigation and shall report to the chief (or his designee), the Director of Public Safety, and the merit board its findings and recommendations (i.e., whether charges should be placed against the member, and, if so, what charges; concurrence, revision, or reversal of a disciplinary action already taken; a hearing should be scheduled; etc.) The chief (or his designee) may concur with the board's finding and recommendations, or he may revise or reverse any part or all of them.

3. Hearing

   After receiving the finding and recommendations of the disciplinary board of captains, the chief (or his designee) may charge a member with any rule, order, or policy violation, including any recommended by the disciplinary board of captains, and order said member to appear before the disciplinary board of captains for a hearing. Alternatively, the hearing may be initiated at the request of the officer in response to a suspension issued by a supervisor other than the chief of police.

   The hearing shall be conducted at a reasonable hour, and the member shall receive written notification of the charges, time, date, and location of the hearing.

   The hearing shall take place either in the chief's conference room or an equivalent setting as designated by the board of captains, and shall be administrative in nature.

   The charged member shall have the right to have witnesses subpoenaed by the disciplinary board of captains pursuant to advance notice to, and approval by, the disciplinary board of captains.

   At the request of the member, he shall have the right to have an attorney or a representative of his choice from within the department present at all times during such hearings, whenever such hearings relate to the member's continued fitness for law enforcement service. The attorney or representative shall be allowed to address the disciplinary board of captains, present evidence, and question witnesses to clarify testimony, pursuant to the guidelines established by the disciplinary board of captains.


*(Continued from previous page)*

The attorney or representative must abide by the policies, procedures, and rulings of the disciplinary board of captains. At the sole discretion of the disciplinary board of captains, counsel may be expelled or excluded from the hearing for cause. Such cause includes, but is not limited to, counsel's failure to follow the disciplinary board of captains' guidelines, policies, procedures, and rulings; or disruptive conduct. The disciplinary board of captains shall have final authority and full responsibility for the hearing.

In non-criminal cases, once a member is scheduled for a hearing, he will be provided a copy of the complaint where one exists. In criminal cases, the member will be informed of the nature of the complaint. In neither case, will the name of the complainant necessarily be disclosed.

The disciplinary board of captains' hearing shall be tape-recorded upon the request of either party. A copy of the tape shall be provided to the member for the purpose of appeal to the merit board. The tape copy shall be at no cost to the member.

Prior to the hearing, the member shall be provided a "Statement of Rights." The member shall be informed of the name, rank, and assignment of the officer in charge of the hearing, the members of the disciplinary board of captains, and all persons present during the hearing.

Hearing sessions shall be for reasonable periods of time, and shall allow for such personal necessities and rest periods as are reasonably necessary.

All testimony before the disciplinary board of captains shall be sworn. Questions posed to a member during the hearing shall specifically, directly, and narrowly relate to the performance of the member's official duties or his fitness for serving as a police officer. Under no circumstances shall the member be required to waive his immunity with respect to the use of the member's answers, or the fruits thereof in a criminal prosecution.

When a member is charged in a non-criminal matter for violation of any rule, order, or policy violation, the member shall answer truthfully, all questions concerning the matter posed to him by the board of captains. When the member refuses to answer such question, he will be informed that refusal to answer can become the subject for disciplinary action.

After concluding the hearing, the disciplinary board of captains shall reduce to writing its finding of either guilty or not guilty. If the finding is guilty, it shall also make recommendations for punishment. The disciplinary board of captains' report shall be forwarded to the chief (or his designee), the Director of Public Safety, and the merit board, and shall be made available to the charged member.

The chief (or his designee), after receiving the report from the disciplinary board of captains, may concur with the board or may revise or reverse the disciplinary board of captains in full or in part. The chief (or his designee) shall notify the charged member, in writing, of his determination and shall include a copy of the disciplinary board of captains' report. A copy of the chief's (or his designee's) determination shall also be sent to the Director of Public Safety and the merit board. If the charged member is found guilty, copies of the finding and recommendations of the disciplinary board of captains and the chief's determination are included in the member's personnel file.

PAGE INTENTIONALLY LEFT BLANK


## VIII.   APPEALS

### A. Merit Board

Any member may appeal, in writing, that portion of any suspension, without pay, exceeding ten (10) working days, or any demotion in rank to the merit board within thirty (30) calendar days after receipt of notification by the chief (or his designee) of his determination. Any recommendation by the chief for discharge of a member is automatically forwarded to the merit board for a hearing.

An appeal should be submitted, in writing, to the merit board.

The member shall be notified, by registered letter, of the date, time, and location of the hearing before the merit board.

The hearing shall be conducted at a reasonable hour and shall take place either in the chief's conference room or an equivalent setting, as designated by the merit board.

The member shall be given at least fifteen (15) days notice prior to the hearing before the merit board. The member may have witnesses subpoenaed on his behalf and may be fully represented by counsel. The chief shall be represented by the city attorney or his designee.

The hearing before the merit board shall be an administrative hearing, be de novo, and shall be a hearing of record.

The merit board shall consider the findings and recommendations of the disciplinary board of captains, the written charges, and the determination of the chief (or his designee), and other evidence requested by the merit board or presented by the charged member.

The merit board, after hearing evidence, shall make its decision, by majority vote, and thereafter reduce its findings and decision to writing. The merit board may fully or partially affirm, revise, or reverse any portion of the chief's determination which is appealable. In addition, the merit board may remand the action for further review by the chief of police. The merit board may demote a member only one (1) permanent rank at a time. The merit board may order a member reinstated with pay for any suspension or demotion appealable by law, and it also may recommend that the chief reinstate pay to an officer for that portion of an appealed suspension that is under ten (10) days.

If the merit board partially reduces the number of days in an appealable suspension, the merit board shall calculate calendar days and working days reduced in accordance with the officer's work schedule and letter day rotation.

Copies of the merit board's findings and decision shall be forwarded to the chief, the charged member, the Director of Public Safety, the merit board, and the member's personnel file.

### B.   Review by Superior or Circuit Court

Pursuant to Sec. 279-237, Subsection (o), of the "Revised Code of the Consolidated City and County," "any officer who disagrees with the findings of the merit board shall have the right to file a verified petition to the superior or circuit court of Marion County for a review of the decision. The petition for review must be filed within thirty (30) calendar days after the written decision of the board. The Consolidated City/County shall be the sole defendant in the petition for review.  Within thirty (30) calendar days after receipt of a summons, the city shall cause the merit board to file a true and complete copy of the transcript of the hearing with the court.  The court, without jury, shall review the record and render its decision as in other administrative reviews. The clerk of the court shall send a copy of the court's decision to the metropolitan law enforcement agency and the appealing officer.  Either party may appeal the decision of the court."

PAGE INTENTIONALLY LEFT BLANK



## IX.    INTERNAL AFFAIRS

The purpose of the Internal Affairs Office is to investigate allegations of misconduct by sworn and civilian members of the department, and to perform other investigations as assigned by the chief of police, assistant chiefs, divisional chiefs, the Executive Director of the citizen's police complaint office, and the Office of Corporation Counsel.

Internal Affairs shall review complaints made by citizens, or by sworn or civilian members of the department. The commander of Internal Affairs shall evaluate the complaints and determine to what extent they should be investigated. Complaints of a minor nature may be referred to the commanding officer of the member in question for proper action, or may be disposed of by the commander of the Internal Affairs Office. The commander of Internal Affairs shall maintain a record of investigations sent to members' commanders to ensure each complaint is properly disposed of and a record of the investigation is maintained.

More serious complaints are assigned to an investigator, who shall obtain all pertinent information regarding the complaint, including statements, reports, photographs, tape recordings, etc. Upon completion of the investigation, the investigator shall forward his report to the Internal Affairs commander. The investigative report shall include the opinion of the commander of the Internal Affairs Office and shall be given a disposition classification.

The Internal Affairs commander shall forward to the chief or his designee the investigative report with the disposition classification of the case. If the complaint is classified as sustained, the chief or his designee may take disciplinary action, send the case to the involved member's commander for action, or refer the case to the disciplinary board of captains, in which case the procedures under Section VII herein shall be followed.

The Internal Affairs Office shall also provide support, cooperation, and investigative assistance on complaints taken by the Citizens Police Complaint Office, established in accordance with Section 281-631 of the "Revised Code of the Consolidated City and County." (As added G.O. No. 110, 2005)

In addition, the Internal Affairs Office, when requested, shall gather all pertinent information, including statements, reports, photographs, tape recordings, etc. with respect to civil cases where the county, city, and/or department is named as a party defendant. Said information is provided for use by the Office of Corporation Counsel.

## X.    COMPLAINT REVIEW BOARD

Refer to "Revised Code of the Consolidated City and County." **Sec. 281-631 at et. seq.**

End of Document