UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

THE ESTATE OF PAUL DANIELS, by   )
Personal Representative Kay Stover,   )
                )
   Plaintiff,        )
                )
   v.           )   Case No. 1:20-cv-02280-JRS-MJD
                )
CITY OF INDIANAPOLIS, et al.,    )
                )
   Defendants.      )

## AFFIDAVIT

I, Stephen Guynn, Jr., being duly sworn and under oath, state as follows:

1.  I am over the age of 18 and competent to testify in this case.

2.  I am employed by Indianapolis Metropolitan Police Department ("IMPD") as a Detective.

3.  I have personal knowledge of the facts asserted in this affidavit.

4.  Before working for the Indianapolis Metropolitan Police Department ("IMPD"), I worked as a law enforcement officer for the Indianapolis Public Schools ("IPS").

5.  I worked for IPS for about 10 years before starting at IMPD on June 2, 2014.

6.  When I started working for IMPD, I completed about six months of law enforcement officer training at IMPD's Training Academy.

7.  There, I was trained on what force officers may use under state and federal law.

8.  I was also trained that IMPD only authorizes officers to use reasonable force to accomplish lawful objectives.

9.  At IMPD's Training Academy, I also learned how state and federal law governs the authority that officers possess while they work in a law enforcement capacity.

10.     Additionally, I learned to understand and follow IMPD's directives, including its General Orders as well as its Rules and Regulations, while I was at IMPD's Training Academy.

11.     After attending IMPD's Training Academy, I completed IMPD's Field Training Officer ("FTO") program.

12.     When completing this program, I spent about 16 weeks working with veteran officers to ensure that I understood and followed IMPD's directives as well as the training that I received at IMPD's Training Academy.

13.     IMPD General Order 2.2 identifies how IMPD's directives work.

14.     A copy of General Order 2.2 is attached as Exhibit A to this affidavit.

15.     Under General Order 2.2, officers are accountable for all material contained in IMPD's directives that is relevant to their job function, responsibilities, and assignment.

16.      Officers may be disciplined, up to and including termination, if they violate IMPD's directives.

17.     Officers are required to read and understand these directives.

18.     IMPD published a directive governing the use of force before I encountered Paul Daniels on September 1, 2018.

19.     This directive, IMPD General Order 1.30, went into effect on August 10, 2016.

20.     I read and understood this directive before I encountered Mr. Daniels.

21.     A copy of this directive is attached as Exhibit B to this affidavit.

22.     Under this version of General Order 1.30, officers were permitted to use reasonable force if they reasonably believed the force was necessary given the totality of the circumstances.

23.     It required officers to obtain medical assistance as soon as practical for any person who, as a result of an officer's use of force, sustained visible injury or serious bodily injury, or who expressed a complaint of injury or continuing pain.

24.     It advised officers that suspects who exhibit (1) extreme agitation, (2) violent, bizarre, or irrational behavior, (3) profuse sweating, (4) extraordinary strength, (5) unusual pain tolerance, and (6) protracted physical resistance to officers may be at an increased risk of sudden death. Thus, they should receive emergency medical services as soon as possible.

25.     IMPD also published a directive concerning how officers should interact with subjects displaying symptoms of a mental health disorder before I encountered Mr. Daniels.

26.     This directive, IMPD General Order 4.7, went into effect on December 17, 2015.

27.     I read and understood General Order 4.7 before I encountered Mr. Daniels.

28.     A copy of General Order 4.7 is attached as Exhibit C to this affidavit.

29.     General Order 4.7 defines a mental illness as a "psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. This includes intellectual disability, alcoholism, and addiction to narcotics or dangerous drugs."

30.     General Order 4.7 instructs officers on what signs to look for when determining whether they have cause to perform an immediate detention under Indiana law.

31.     It also instructs officers how to communicate with an individual who may have a mental illness or who is experiencing a crisis.

32.     Additionally, General Order 4.7 requires officers to report when they believe mental illness was a contributing factor during an incident using the offense code "Mental Investigation", "Immediate Detention", or "Mental Writ".

33. I also learned about how to deal with people displaying symptoms of a mental health disorder when completing Crisis Intervention Training while working for IMPD.

34. IMPD also published a directive concerning positional asphyxiation before I encountered Mr. Daniels.

35. This directive, IMPD General Order 8.1, went into effect on April 22, 2015.

36. I read and understood General Order 8.1 before I encountered Mr. Daniels.

37. A copy of General Order 8.1 is attached as Exhibit D to this affidavit.

38. Section III of General Order 8.1 informs officers that subjects who are placed on their stomach with their legs and hands restrained behind their back may have trouble breathing.

39. General Order 8.1 also informs officers that they should not leave subjects on their chest or stomach for any period of time that is longer than absolutely necessary regardless of what restraint is used on the subject.

40. General Order 8.1 requires officers to move subjects onto their side as soon as possible.

41. General Order 8.1 also requires officers to carefully observe subjects and to summons medical assistance immediately to evaluate a subject's health.

42. I understood and followed these directives after they were published by IMPD.

43. I recall encountering Paul Daniels when I was working in an on-duty capacity for IMPD on September 1, 2018.

44. At around 11:10 a.m. on September 1, 2018, Officer Eli Raisovich and I were dispatched to check on the welfare of an older black male dressed in red clothing that was walking and stumbling in the street near the intersection of 56th Street and Cooper Road.

45.     When I arrived at the intersection of 56th Street and Cooper Road, I had to stop for a red traffic light.

46.     I noted that I was on scene when I was stopped at the red light at 11:15 a.m.

47.     While I was stopped at the intersection, I observed Mr. Daniels walking northbound in a northbound lane of traffic on Cooper Road.

48.     I watched Mr. Daniels walking in the road while I was stopped at the intersection and continued to watch him after the light turned green at the intersection.

49.     Since there were vehicles passing Mr. Daniels while he was walking in the road, Mr. Daniels was endangering himself and others while he was walking in the road.

50.     Mr. Daniels walked into the grassy area east of Cooper Road and back into the road numerous times before I attempted to speak with him.

51.     When I observed Mr. Daniels walking in and out of traffic, I believed that he may have been intoxicated because he was staggering as he walked.

52.     I also believed that Mr. Daniels was intoxicated because he had red, glossy eyes.

53.     Since I was concerned that Mr. Daniels was going to get hit by a car when I observed him walking in and out of Cooper Road, I wanted to speak to him to ensure he was okay.

54.     I parked my vehicle behind Mr. Daniels and spoke to him after I observed him repeatedly walking in and out of Cooper Road.

55.     I decided to park behind Mr. Daniels and speak to him because I did not want to startle him when I spoke to him.

56.     I believe that Mr. Daniels heard me when I spoke to him because he responded to me with profanity and told me to leave him alone.

57.     After I spoke to Mr. Daniels, I returned to my marked police vehicle, drove next to Mr. Daniels, and spoke to him again.

58.     I believe that Mr. Daniels heard me when I spoke to him this second time because he responded with profanity and told me to leave him alone.

59.     I then drove my vehicle in front of Mr. Daniels, parked, and exited my vehicle.

60.     I parked in front of Mr. Daniels and approached him from the front because I wanted him to see that I was a police officer.

61.     I believe that Mr. Daniels was able to see that I was a police officer because I was in my IMPD police uniform when I approached him.

62.     I spoke to Mr. Daniels a third time and I believe that he heard me because he once again responded to me with profanity and told me to leave him alone.

63.     When Mr. Daniels then walked from Cooper Road back into the grassy area east of the northbound lane of traffic, I grabbed his left arm and tried to speak to him.

64.     I waited until Mr. Daniels was in the grassy area before grabbing his arm because I did not want to get into any physical altercation with him while he was in Cooper Road.

65.     Since Mr. Daniels staggered when he was walking in the road, I thought that there was a risk that he would fall in the road if I grabbed his arm when he was walking in the road.

66.     I also grabbed Mr. Daniels's left arm when he was in the grassy area because I was concerned that he would continue walking back into the road if I did not attempt to stop him.

67.     I wanted to stop Mr. Daniels because he posed a threat to himself and others when he was walking in the road because there were numerous vehicles driving on the road and there was a high risk that Mr. Daniels would get hit by a vehicle if he continued walking into the road.

68.     I also wanted to stop Mr. Daniels because he appeared to be intoxicated in a public place when he was endangering himself and others while walking in the street.

69.     As I grabbed Mr. Daniels's arm, he turned and swung his fist at my face.

70.     Mr. Daniels struck my sunglasses with his fist when he swung his fist at my face.

71.     Mr. Daniels then began shifting his body to swing his other fist at me.

72.     I then used my leg to displace Mr. Daniels's balance and take him to the ground.

73.     The maneuver that I used to displace Mr. Daniels's balance is called a leg sweep.

74.     I displaced Mr. Daniels's body and took him to the ground because I believed that he posed a threat to me, himself, and others while he was on his feet.

75.     Since Mr. Daniels had been walking in the road, I was concerned that he would walk into the road and get hit by a vehicle if he evaded my attempt to stop him in the grassy area.

76.     I was also concerned that one of us might get pushed or fall into the road if I attempted to engage with him in a physical altercation while we were both on our feet by the road.

77.     Mr. Daniels also posed a greater threat to me while he was fighting me on his feet because he had better leverage when he was throwing punches at me while he was on his feet.

78.     I knew that it would be easier to handcuff Mr. Daniels when he was on the ground.

79.     I also knew that the threat that Mr. Daniels would pose to me, himself, and others would be reduced once he was in handcuffs.

80.     Furthermore, I believed that the risk that Mr. Daniels would get injured during our encounter would be reduced if I were able to get him on the ground and handcuffed quickly.

81.     Therefore, I believed that the best way for me to protect Mr. Daniels and others was to take him to the ground after he began fighting with me in the grassy area by Cooper Road.

82.     The leg sweep maneuver that I used to take Mr. Daniels to the ground is a maneuver that I was taught when I was trained how to use reasonable force at IMPD's Training Academy.

83.     This maneuver is used because it allows officers to take advantage of a suspect's momentum and use a minimal level of force when taking suspects to the ground.

84.     Since I was concerned that Mr. Daniels may try to stand up and flee after I took him to the ground, I also went to the ground with Mr. Daniels to control his body on the ground.

85.     I did not straddle Mr. Daniels when he was on the ground.

86.     Instead, my body was positioned next to Mr. Daniels when I was on the ground.

87.     My body weight was against the ground and I used my arms to control him.

88.     I was able to place one of Mr. Daniels's wrists in my handcuffs very quickly.

89.     I then attempted to gain control of Mr. Daniels's second wrist to place it in handcuffs while he flailed his arm, attempted to spin his body towards me, and resisted my attempts to restrain him.

90.     I was able to remain positioned next to and behind Mr. Daniels with my body weight against the ground while I attempted to gain control of his second wrist.

91.     It took me several seconds to get control of Mr. Daniels's second wrist because he was resisting my efforts to handcuff him the entire time that I tried to get control of this wrist.

92.     Mr. Daniels had rolled to his stomach when I gained control of his second wrist and placed it in handcuffs.

93.     My body weight remained against the ground and I used my arms to control Mr. Daniels the entire time that I was placing him in handcuffs.

94.     I was trained how to avoid injuring suspects when placing them in handcuffs when I attended IMPD's Training Academy.

95.     I was also trained how to properly handcuff suspects and how to avoid using more force than what is necessary when handcuffing suspects at IMPD's Training Academy.

96.     I used only the amount of force that was necessary to place Mr. Daniels in handcuffs when I placed him in handcuffs on September 1, 2018.

97.     Mr. Daniels continued trying to turn his body towards me, pulling away from me, and resisting my attempts to restrain him after he was handcuffed.

98.     I attempted to keep Mr. Daniels lying on his left side as he struggled on the ground.

99.     I was trying to keep Mr. Daniels on his left side because this is called the recovery position and I believed this would be the best position to keep him in when he was on the ground.

100.    I also positioned myself behind Mr. Daniels because he was kicking his legs and I did not want him to kick me.

101.    Additionally, I positioned myself behind Mr. Daniels because I was concerned that he may try to spit on me.

102.    I remained behind Mr. Daniels with my body weight against the ground as I attempted to keep Mr. Daniels in the recovery position while he struggled with me on the ground.

103.    Mr. Daniels struggled against my attempts to keep him on his side, kicked his legs, and tried to turn his body towards me while I tried to hold him on his side in the recovery position.

104.    He continued to forcibly resist my attempts to restrain him the entire time that I was alone with him on the side of Cooper Road on September 1, 2018.

105.    After Mr. Daniels was handcuffed, I used my radio to report that I had a resistor.

106.    I made this report at 11:20 a.m.

107.    I made this report because I knew that a supervisor would have to respond to the scene to investigate the force that I had used during my encounter with Mr. Daniels.

108. IMPD officers must request that a supervisor respond to the scene to investigate all force that they use during an encounter that exceeds the handcuffing of a compliant suspect.

109. Since I used force to prevent Mr. Daniels from walking into the road and then to take him to the ground after he began throwing punches at me, I was required to have a supervisor respond to the scene to investigate my uses of force during that encounter.

110. IMPD also requires that a Blue Team report be completed if officers use any force that exceeds handcuffing a compliant suspect.

111. Mr. Daniels kicked his feet and attempted to pull his arms out of my handcuffs after I placed him in handcuffs.

112. He also attempted to break free from my grip, rolled, and tried to turn towards me.

113. I held Mr. Daniels on the ground to prevent him from fleeing, kicking me, or breaking free from my grip.

114. I did not place my body weight on Mr. Daniels as I held him on the ground.

115. Instead, I simply used my arms to control him while he was on the ground.

116. Officer Eli Raisovich arrived on the scene shortly after I handcuffed Mr. Daniels.

117. Mr. Daniels attempted to kick him and continued trying to break free from my grip after Officer Raisovich arrived on the scene.

118. Officer Raisovich told Mr. Daniels that he needed to calm down.

119. He also told Mr. Daniels that he would have to restrain his legs if Mr. Daniels did not stop trying to kick Officer Raisovich.

120. Mr. Daniels responded to Officer Raisovich with profanity, he told Officer Raisovich to leave him alone, and he kept trying to kick Officer Raisovich.

121. Officer Raisovich then positioned himself near Mr. Daniels's legs and attempted to restrain is legs while I attempted to prevent him from breaking free from my grip.

122. I tried to keep Mr. Daniels lying on his left side while he kicked at Officer Raisovich and resisted my attempts to control his body.

123. Mr. Daniels continued resisting my attempts to restrain him the entire time that I attempted to hold him on his left side while only Officer Raisovich and I were at the scene.

124. I did not place my body weight on him when I tried to keep him on his left side.

125. Officer George Rossman arrived on the scene shortly after Officer Raisovich.

126. Officer Rossman had some oversized cuffs that could be used to restrain Mr. Daniels's legs.

127. Mr. Daniels continued using profanity and telling us to leave him alone after Officer Rossman arrived on the scene.

128. Mr. Daniels also continued kicking his legs and fighting with us after Officer Rossman arrived at the scene.

129. Officers Raisovich and Rossman positioned themselves by Mr. Daniels's legs and attempted to restrain them while I focused my attention on trying to control his upper body.

130. Mr. Daniels continued kicking his legs and fighting with us while Officers Raisovich and Rossman tried to restrain his legs.

131. I was concerned that Mr. Daniels may harm us if he broke free from my grip.

132. As Mr. Daniels continued to physically resist our attempts to restrain him, Officers Raisovich and Rossman were able to place his legs in Officer Rossman's oversized cuffs.

133. Mr. Daniels's demeanor began to change after his legs were placed in handcuffs.

134. He then began to say that we did not care about him and started to cry.

135.     But Mr. Daniels continued to struggle and physically resist my attempts to control his body as his demeanor began to change.

136.     Therefore, I continued to have concerns about our safety as Mr. Daniels's demeanor began to change.

137.     Mr. Daniels remained on his side as his demeanor began to change.

138.     But I was not placing my body weight on Mr. Daniels to control his body.

139.     Shortly after Mr. Daniels's legs were cuffed, my supervisor, Sergeant T. Michael Wilson, arrived at the scene.

140.     Sgt. Wilson helped Officers Raisovich and Rossman ensure that Mr. Daniels's ankles were restrained.

141.     He then advised us to move Mr. Daniels to a seated position.

142.     Mr. Daniels was breathing when he was moved to a seated position.

143.     I asked a control operator to dispatch a medic to the scene when he was moved.

144.     Since there were numerous officers at the scene, I stepped away from Mr. Daniels to catch my breath.

145.     Mr. Daniels was monitored by officers while we waited on medics to respond.

146.     I was not aware of any disabilities or medical conditions that Mr. Daniels suffered from when I encountered him on September 1, 2018.

147.     I did not have notice of Mr. Daniels's medical needs or the seriousness of his needs.

148.     I did not hear Mr. Daniels make any requests for medical treatment at any point on September 1, 2018.

149.     I did not do anything to prevent any medic or other person from providing Mr. Daniels with medical treatment at the scene.

150.     I used only the amount of force that was necessary to place Mr. Daniels in handcuffs and to keep him restrained while he attempted to fight officers at the scene on September 1, 2018.

151.     I used this force to restrain Mr. Daniels because he was a danger to himself and others when he was fighting with officers at the scene on September 1, 2018.

152.     Mr. Daniels was moved to a seated position as soon as he stopped trying to fight officers and stopped resisting attempts to restrain him on September 1, 2018.

153.     Mr. Daniels was told that he would be moved to a seated position when he stopped trying to fight officers and resisting attempts to restrain him.

154.     He was moved to a seated position as soon as it was safe to move him.

155.     It would not have been safe to move him to a seated position before he was moved to a seated position because he was a flight risk and a risk to officer safety prior to that point.

156.     I did not use any force to restrain him after he was moved to a seated position.

157.     I did not use more force than was necessary to restrain Mr. Daniels.

158.     I also did not witness any officer use more force than was necessary to restrain him.

159.     I did not have an opportunity to stop anyone from using excessive force on him.

## **AFFIRMATION**

I hereby swear and affirm under the penalties of perjury that the foregoing representations are true and accurate to the best of my knowledge and belief.

Date: 08-31-21

Stephen Guynn, Jr

# Exhibit A



# Indianapolis Metropolitan Police Department

## DIRECTIVES

## POLICY

The Indianapolis Metropolitan Police Department (IMPD) continually develops and maintains formal written directives to provide department personnel with a clear understanding of the constraints and expectations relating to the performance of their duties. Written directives outline policies, procedures, rules and regulations regarding matters that affect the entire department or a portion thereof.  The written directives system also provides department personnel with rapid access to individual policies, procedures, rules and regulations.

The department's written directives shall be in compliance with applicable law and meet or exceed the standards for law enforcement agencies in the United States, as established by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA).

## VIOLATIONS AND ENFORCEMENT OF DIRECTIVES

Violations of directives including rules, regulations, general orders or other orders as explained herein may be considered sufficient cause for disciplinary action, up to and including termination.

Department personnel are accountable for all material contained in the written directives relevant to their job function, responsibilities and assignment.  Supervisors shall enforce the provisions of the department's written directives which include, but are not limited to, the Rules and Regulations and General Orders.

## DEFINITIONS

Policy:  A broad declaration of agency intent, objectives, goals and overall mission.

Directive:   Any communication, whether oral or written, used to guide or affect the performance or conduct of department personnel.  All directives are authorized by the chief of police or designee and are contained in the IMPD Rules and Regulations Manual and IMPD General Orders Manual.

Executive Staff:  The chief of police and all appointed ranks.

## TYPES OF DIRECTIVES

I.   Rules and Regulations – Apply throughout the department.  They specifically enumerate the categories regulating conduct through orders, policy, standard operating procedures and/or rules of the department and provide for the disciplinary process of the department (remain valid until rescinded).

II.   Orders – Used to convey policy and procedures.

    A.   General Orders – Apply throughout the entire department.  They are intended to provide long-term guidelines relating to department-wide issues (remain valid until rescinded).

    B.   Division Orders - Apply to one division or part of one division.  They must be reviewed annually by the issuing division commander to ensure they are up to date (remain valid until rescinded).

**WILLIAM D. LORAH**

CHIEF OF POLICE

**Supersedes IMPD General Order 2.2,
Effective 02/29/2008**

Effective:  **APRIL 25, 2012**

Page **1** of 5



III. <u>Special Orders</u> – Used to announce one-time events, programs, special circumstances or temporary assignments. Special orders have a self-cancelling date or self cancel in one year from the date of issue. Special orders will be placed into two categories, (1) Special Orders (2) Traffic Detail Orders.

IV. <u>Procedural Notices</u> – Used to change or update procedures in general orders or other written directives. Material contained in a Procedural Notice will be incorporated into the next revision of the affected general order.

V. <u>Standard Operating Procedures</u> (SOP) – Provide procedural guidelines which include, but may not be limited to, step-by-step procedures or detailed instructions. SOPs explain how a policy will be implemented.

**PROCEDURE**

I. **Authority of the Chief of Police**

A. The chief of police or designee has the ultimate responsibility for issuing, modifying, approving or canceling a written directive (except Rules and Regulations) and for the complete discharge of all duties as set forth by applicable law. (See Revised Code of the Consolidated City/County 279-221 and Indiana Code 36-3-1-5.1)

B. Directives will be reviewed as determined by the chief of police or designee. All department orders and standard operating procedures have precedence over division orders and division standard operating procedures.

II. **Lawful Orders**

A. An order is a directive, verbal and/or written, issued by a department supervisor or member who has been authorized to give orders.

B. All orders, when issued by a superior, are presumed to be lawful. All department personnel shall obey orders promptly and willingly.

C. No supervisor shall knowingly and willfully issue an order in violation of any law, city/county ordinance, general order, policy, procedure, rule or regulation of the department.

1. Should a supervisor make a conscious decision to issue an order, for any reason, contrary to general orders or any department policy, the supervisor shall complete and submit a memorandum to their commander via chain of command prior to the end of their shift with a thorough explanation of the circumstances and justification for the issuance of the order.

2. The supervisor's commander shall determine whether further department action is required and document the incident in the supervisor's personnel file.

D. The failure, or deliberate refusal, of any employee/member to obey an order given by a superior officer of the department shall be deemed insubordination and subject to discipline.

E. Flouting the authority of any superior officer by wanton disrespect or by disputing their order, shall be deemed insubordination and subject to discipline.


### III. Conflicting Orders

A. In the event of conflicting orders, the most recent order given shall be followed, unless retracted or modified.

    1. Department personnel receiving orders from different ranking supervisors shall comply with the order from the highest ranking supervisor.

    2. The supervisor giving the conflicting order shall then determine which order shall be followed and shall advise the subordinate employee/member accordingly. In all cases, the subordinate employee/member shall promptly obey such order and the responsibility for such order shall rest with the supervisor, and not with the subordinate employee/member.

    3. Department personnel receiving conflicting orders from supervisors of the same rank shall inform the supervisor giving the most recent order of the conflict. Contradictory orders issued by supervisors of the same rank shall be subject to administrative review at an appropriate time.

B. Department personnel who disagree with department directives shall abide by Rules and Regulations Section II F. "Members shall not criticize the department or any of its officers if that criticism is in any way defamatory, obscene, or unlawful, or tends to impair the efficient operation of the department." Disagreements of this nature shall be dealt with through the proper chain of command (i.e., the aggrieved employee/member may discuss the issue with his/her supervisor).

### IV. Functional Communication

A. In order to establish the communication, coordination and cooperation vital for effective law enforcement, functions and personnel, all supervisors are encouraged to attend roll call, supervisor staff and other meetings to exchange information.

B. Information can also be forwarded by e-mail, voice mail, car-to-car communications via mobile data computers and by use of the daily information sheet.

### V. Written Directives System

A. The Professional Standards Division, Accreditation and Policy Section commander will manage the development and maintenance of written directives, which includes, but is not limited to, the following activities.

    1. Maintaining a master policy file of all written directives.

    2. Administering the review, indexing, updating and purging of all written directives.

    3. Initiating the distribution of all written directives.

### VI. Creation of Written Directives

A. The chief of police or designee has the ultimate authority to issue, modify, approve or rescind all written directives. No written directive shall take effect until it is approved and distributed in accordance with the procedures set forth herein.

B. The Professional Standards Division, Accreditation and Policy Section commander is responsible for the research and drafting of all written directives.


C. If a department employee/member desires to create, modify or delete a written directive, the following procedure shall apply:

1. The employee/member shall write a memorandum to the chief of police describing the proposed written directive. The memorandum shall be transmitted through the chain of command.

2. Each level of the chain of command shall forward the memorandum with comments and/or suggestions to the chief of police. Recognizing that the department's employees/members are its greatest asset, the intent of such procedure is to provide employees at all levels of the department a method to have direct input in the creation and modification of written directives.

3. The chief of police or designee shall review the proposal and determine whether to approve or deny the formal drafting of the proposed written directive.

4. If the chief of police or designee approves, the proposal will be forwarded to the Professional Standards Division, Accreditation and Policy Section commander for completion of a formal draft. A draft will be completed with input from the appropriate division commander and/or department subject matter expert and the employee/member originating the proposal. A final draft shall be submitted to the chief of police for approval.

5. Upon approval of a final draft by the chief of police, the Professional Standards Division, Accreditation and Policy Section commander shall distribute the written directive to all affected employees. If the written directive is a general order, the Professional Standards Division, Accreditation and Policy Section commander shall incorporate the written directive into the department's General Orders Manual. All other written directives will be maintained in the appropriate master file.

6. Special orders shall be reviewed by the Professional Standards Division, Accreditation and Policy Section commander at (30) day intervals and shall be either rescinded or implemented on a permanent basis after (90) days.

**VII. Directive Format**

A. Each written directive shall be drafted in an outline form as approved by the Professional Standards Division, Accreditation and Policy Section commander and shall contain a minimum of three sections as follows:

1. Policy – This section consists of one or two paragraphs designed to provide a statement of organizational philosophy regarding a particular issue.

2. Definitions – This section is optional and may be used to define certain terms or phrases contained within the directive.

3. Procedure – This section consists of procedural matters and describes the application of the policy.

## VIII. Distribution of Policy and Procedure Operations Manuals

A. The department's General Orders Manual, as well as copies of all Division and Special Orders shall be made available in an electronic format and distributed through the department's electronic e-mail system to all department personnel. Printed hard copies shall also be maintained in the following locations:

1. Office of the Chief of Police
2. Professional Standards Division Office
3. Each Police District Roll Call Briefing Room

## IX. Dissemination of Directives

A. Every office (division, section, branch, unit, roll-call etc.) will designate a location for posting all new or revised written directives. Supervisors and/or ranking officers will read and review new or revised written directives with their subordinates at all roll calls and in all offices for four consecutive days and then post the directive(s) in the designated location for at least 30 days. Informational publications will be read at roll calls and offices for the number of days stated on each. They will then be posted until the expiration date given.

B. The Professional Standards Division, Accreditation and Policy Section shall utilize an electronic written directives management system to distribute new or newly revised written directives.

C. All new or revised general orders, department policies, procedures, rules and regulations and other department directives shall be presumed known and understood by all department personnel on the first working day after issuance.

D. In addition to reading and reviewing new or revised directives for four consecutive days as outlined above in Section A., all department supervisors and or ranking officers shall document the completion of this required procedural update for their assigned subordinates. Documentation will include the signature of each subordinate, date and confirmation that each subordinate received and read the new or revised written directive. The completed documentation will be recorded on an inter-department memorandum and will be signed and attested to by the subordinate's supervisor and/or ranking officer and placed in the subordinate's personnel file maintained by the supervisor and/or ranking officer.

## X. Review of Directives During Department-Required Employee Evaluation

A. All department supervisors and/or ranking officers shall direct their subordinates to review all required general orders, department policies, procedures, directives, memoranda and rules and regulations as listed on the *IMPD Supplemental Information to Employee's Evaluation Report* form during the midyear and end-of-year performance appraisal process.

B. The *IMPD Supplemental Information to Employee's Evaluation Report* form will be signed and attested to by the subordinate's supervisor after completion by the subordinate, and will be placed in the subordinate's personnel file maintained by the supervisor and/or ranking officer.

# Exhibit B



# Indianapolis Metropolitan Police Department

## USE OF FORCE – PRINCIPLES

---

**POLICY**

This policy provides Indianapolis Metropolitan Police Department (IMPD) officers with guidelines for the reasonable use of force. The department authorizes reasonable force to accomplish lawful objectives. All officers shall exercise good judgment at all times when the use of force is necessary.

Officers may use reasonable force if the officer reasonably believes the force is necessary given the totality of the circumstances.

Officers may use deadly force <u>only if the officer</u>:

    A.  Reasonably believes that the force is necessary to prevent the commission of a forcible felony; or

    B.  Has probable cause to believe that the deadly force is necessary to effect an arrest of a person who the officer has probable cause to believe poses a threat of serious bodily injury to the officer or third person; and

    C.  Has given a warning, if feasible, to the person against whom the deadly force is to be used.


**DEFINITIONS**

<u>Deadly Force</u> – Defined by IC 35-31.5-2-85: "Deadly force" means force that creates a substantial risk of serious bodily injury.

<u>Forcible Felony</u> – Defined by IC 35-31.5-2-138: "Forcible felony" means a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being.

<u>Involved Officer(s)</u> – Those officers who directly applied force.

<u>Reasonable Belief</u>- The facts or circumstances the officer knows, or should know, are such as to cause an ordinary and prudent person to act or think in a similar way under similar circumstances.

<u>Serious Bodily Injury</u> – Defined by IC 35-31.5-2-292: "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes: (1) serious permanent disfigurement; (2) unconsciousness; (3) extreme pain; (4) permanent or protracted loss or impairment of the function of a bodily member or organ; or (5) loss of a fetus.


**PROCEDURE**

  I.  **Medical Attention for Injuries Sustained Using Force**

    A.  Medical assistance shall be obtained as soon as practical for any person who, as a result of an officer's use of force, has sustained visible injury or serious bodily injury, or who has expressed a complaint of injury or continuing pain. Based upon the officer's initial assessment of the nature and extent of the subject's injuries, medical assistance may consist of examination by IMPD personnel, firefighters, paramedics, hospital staff, or medical staff at the Arrestee Processing Center (APC) or jail. If any such

---

**TROY RIGGS**
CHIEF OF POLICE

Supersedes IMPD General Order 1.30,
Effective Date July 6, 2012

Effective: **AUGUST 10, 2016**

Page **1** of 5



individual refuses medical attention, such refusal shall be fully documented in related reports and, whenever practical, should be witnessed by another officer and/or medical personnel. If an audio recording is made of the contact or an interview with the individual, any refusal should be included if possible.

B. Persons who exhibit any combination of the following factors may be at an increased risk of sudden death and shall be examined by emergency medical services (EMS) as soon as possible:

1. Extreme agitation;
2. Violent, bizarre, or irrational behavior;
3. Profuse sweating;
4. Extraordinary strength beyond physical characteristics;
5. Unusual high tolerance to pain; and/or
6. Require a protracted physical encounter with multiple officers to bring under control.

C. Electronic Control Devices (ECD)

1. Following ECD deployment, the subject should be carefully observed for signs of distress. Should the subject exhibit signs of distress he/she should be provided with immediate medical evaluation. Officers should familiarize themselves with the following acute symptoms:

   a. Distress symptoms of over-exertion or exhaustion may indicate potential impairment of full ability to breathe.

   b. Symptoms of excited delirium may indicate an acute medical condition associated with sudden death. In addition to the factors listed above, officers should also look for the following excited delirium symptoms: shouting, paranoia, panic, and hyperthermia.

2. After the initial evaluation of the subject, the deploying officer shall notify Communications of the ECD deployment and request a district supervisor.

3. The deploying officer may remove the probes from the subject unless the probes are so embedded they cannot be easily dislodged.

4. To safely remove the probes, officers shall firmly grab the probe and quickly pull straight out of the skin. The probes should be treated as "sharps" and biohazard protocol should be followed (including the officer wearing protective gloves).

5. Officers shall inspect the probes after removal to ensure no part of a probe has been broken off under the subject's skin. If no additional injuries are discovered the subject may be transported to the APC.

6. When the probes become embedded and cannot be easily dislodged (exceeds ¼ inch), EMS shall be called to the scene to evaluate and/or treat the subject. If:

   a. EMS removes the embedded probe(s); and

   b. Minor bleeding is controlled and bandaged, and no other injuries or symptoms exist; then

   c. A signature of release (SOR) may be obtained from the subject and hospital transport will not be required.

7. Officers shall request EMS transportation of the subject to Eskenazi hospital and <u>shall not</u> remove the probes in the circumstances listed below. Eskenazi hospital personnel will remove the probes when:

   a. One or both probes are found to be broken off under the skin;

   b. One or both probes are embedded in sensitive tissue areas, to include the eyelid/globe of eye, neck, face, groin/genital area or a woman's breast; or

   c. One or both probes are deeply embedded or cannot be easily removed by either the officer or EMS.

8. If the subject is transported to Eskenazi hospital, the accompanying officer will inform the attending physician or medical person(s) treating the suspect that the individual has been exposed to electrical current from an ECD and provide relevant details with regard to:

   a. Potential primary and secondary injuries;

   b. Officer's knowledge of substance(s) influencing the subject; and

   c. Any suspected or confirmed mental health considerations.

D. Chemical Spray Systems

1. Normal reactions to exposure to chemical spray may include mild difficulty breathing and irritation of the eyes and skin.

2. Should an arrestee develop an <u>abnormal</u> reaction at any time while in custody, he/she should be transported to the nearest hospital or treated by emergency medical personnel at the scene.

3. When practical, individuals contaminated with chemical spray should have their face and eyes flushed with cool bottled or purified water, removed to an area of uncontaminated air, and faced into the wind prior to being transported.

4. Any person on whom chemical spray was used should be taken directly to the APC. The medical staff at the APC will evaluate the person for any necessary treatment. The arresting officer must notify the transporting officer, who in turn must notify APC personnel upon arrival that chemical spray was used on the person.

## LESS LETHAL FORCE

**II. Guidelines**

A. The department authorizes the use of chemical spray, ECDs, handcuffs, and batons. Use of other extended range impact weapons and chemical agents shall be governed by unit-specific SOPs.

B. In the absence of an imminent threat to an officer or third person, control devices shall not be used on a person who is handcuffed or secured for transportation.

C. Any less lethal option may be utilized against aggressive animals.

D. A person's head, neck, throat, spine, heart, kidneys, and groin should not be intentionally targeted with a baton except when deadly force is justified.



E. The use of chemical spray or other chemical agents by Mobile Field Force (MFF), Event Response Group (ERG) or Special Weapons and Tactics (SWAT) shall be governed by the current training guidelines, standard operating procedures, and/or approved tactics of the respective unit.

## III. Electronic Control Devices (ECD)

A. Every application of an ECD is a separate use of force requiring independent justification.

B. The act of fleeing, without other factors involved, does not justify the use of an ECD.

C. Except in exigent circumstances, officers <u>shall not</u> use an ECD in the following circumstances:

1. On a known pregnant person;
2. On the elderly or children;
3. On subjects riding on a self-propelled device;
4. On an individual who could fall from a significant height; or
5. On an individual in, or who could fall into, a body of water that poses a hazard of drowning.

D. Officers shall warn the subject and other officers at the scene of the intended use, should the subject not submit to lawful authority, if feasible.

E. The ECD shall not be intentionally targeted at an individual's head, neck, chest, groin, area around the heart, or at known pre-existing injury areas.

F. Reasonable efforts should be made to target below the chest or heart area, or from the shoulders downward on the rear of the body.

G. Officers shall not deploy an ECD when there is reason to believe the subject has a flammable substance upon his/her skin or clothing or is in a flammable or explosive environment.

H. An ECD is not authorized for use:

1. As a prod or escort device;
2. To rouse unconscious, impaired, or intoxicated individuals; or
3. To stop suspects from swallowing potential evidence or to retrieve evidence a suspect is attempting to swallow.

I. The preferred method of deployment of the ECD is in probe mode. Officers should not use the ECD in drive stun mode as a pain compliance technique. Officers using the ECD against a subject posing an immediate threat may supplement the probe mode with a drive stun to create a complete and larger incapacitation circuit.

J. Officers should utilize the five (5) second ECD cycle and handcuff the subject while he/she is affected by the ECD.

## DEADLY FORCE

While the use of a firearm is expressly considered deadly force, other force might also be considered deadly force if the force applied will create a substantial likelihood of causing death or serious bodily injury.

## IV. Firearms Use and Discharge

A. Nothing in this directive precludes an officer from un-holstering a firearm in a dangerous or life-threatening situation, such as serving a high-risk warrant, building search, high-risk vehicle stop, or other situations where the presentation of a firearm is a reasonable use of force.

B. Pointing a firearm at a person is a use of force that must be objectively reasonable in the circumstances.

C. All discharges from department-authorized firearms, on-duty or off-duty, except for training and/or qualification purposes, shall be immediately reported to an on-duty supervisor by the involved officer in the most expedient method possible. The on-duty supervisor shall make appropriate notification to his/her district commander or designee, respond to the scene of the incident, and conduct an investigation.

D. If an uninvolved department member has knowledge of an unreported shooting incident, he/she shall report the known facts to a supervisor.

E. Shooting at or from moving vehicles or occupants is prohibited.

F. Warning shots are prohibited.

| NOTE | Any deviation from the provisions of this policy shall be examined on a case by case basis. The involved officer must be able to clearly articulate the reasons for the use of force. |
|---|---|

# Exhibit C



# Indianapolis Metropolitan Police Department

## GENERAL ORDER

## MENTAL WRITS/IMMEDIATE DETENTIONS

## 4.7

**POLICY**

During the normal course of duty, members of the Indianapolis Metropolitan Police Department (IMPD) may come into contact with individuals who display symptoms of a mental disorder. It is the policy of this department to train officers to work effectively with such individuals and treat them and their families with dignity and respect.

**DEFINITIONS**

Dangerous - As used in this general order, 'dangerous' shall be defined as:

1. An individual who presents an imminent risk of personal injury to themselves or to another individual; or

2. An individual who may present a risk of personal injury to themselves or to another individual in the future and the person:

   a. Has a mental illness (as defined in IC 12-7-2-130) that may be controlled by medication, and the person has not demonstrated a pattern of voluntarily and consistently taking medication while not under supervision; or

   b. Has documented evidence that would give rise to a reasonable belief that the person has a propensity for violent or emotionally unstable conduct.

| **NOTE** | The fact that a person has been released from a mental health facility or has a mental illness that is currently controlled by medication, does not establish the individual as dangerous. |
|---|---|

Emergency Detention/Mental Writ – An emergency detention order, up to seventy-two (72) hours, that can be initiated by law enforcement officer, emergency medical personnel, family, friend, or anyone who believes the individual is:

1. Mentally ill;

2. Dangerous or gravely disabled; and

3. In need of immediate restraint.

Emergency Detention/Mental Writ requires a signed application, confirmation of receiving hospital, and signed physician's statement. This application is then submitted to the Marion County Superior Court Probate Division for approval and signature of the judge.


<u>Gravely Disabled</u> **–** A condition in which an individual, as a result of mental illness, is in danger of being harmed because the individual is:

1. Unable to provide food, clothing, shelter, or other essential human needs; and

2. Has a substantial impairment or an obvious deterioration of judgment, reasoning, and/or behavior.

<u>Immediate Detention</u> **–** A hold for up to twenty-four (24) hours, that can be initiated by a law enforcement officer, having reasonable grounds to believe an individual is:

1. Mentally ill;

2. An imminent danger to themselves or others or gravely disabled; and

3. In immediate need of hospitalization and treatment.

The individual will be apprehended and transported to the nearest appropriate medical facility.

<u>Mental Illness</u> **–** A psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. This includes intellectual disability, alcoholism, and addiction to narcotics or dangerous drugs.


**PROCEDURE**

**I.  Operational Responsibilities**

A. An officer who has reasonable grounds to believe a person qualifies for an Immediate Detention, as defined above, may place that person under Immediate Detention. Signs that can lead to reasonable grounds include, but are not limited to, the following:

1. General Appearance (Manner of dress and type of clothing, personal hygiene, avoiding eye contact or staring, etc.);

2. Speech (Is the rate slow, fast, or halting? What is the volume? Is it flat or excited?);

3. Mood (What is the individual's response to the question, "How are you doing?" What is their expression and attitude?);

4. Any mention or threat of suicide (including gestures and/or attempts);

5. Any threat or action to harm another individual;

6. Observed violent or reckless behavior (including property destruction);

7. Extreme agitation, anxiety, propensity for violence, or panic;

8. Immobilized by some type of disorder (i.e. depression, improper medication, psychotic episodes, etc.) and unable to care for themselves;

9. Extremely irrational, confused, illogical, or paranoid; and/or

10. Alcohol/drug intoxication or withdrawal that could present an immediate health risk.

B. When communicating with an individual who may have a severe mental illness and/or is experiencing a crisis, certain tactics, attitudes and demeanors work best. Officers should attempt to:

1. Use the individual's name;

2. Speak calmly and quietly;

3. Keep a reasonable and safe distance;

4. Be honest, respectful, and helpful;

5. Respond to rage with quiet and calm reassurances;

6. Slow down the pace of the situation and be patient;

7. Give firm, clear, and simple directions;

8. Be willing to repeat yourself;

9. Ask, "Are you taking your medication?";

10. Ask, "What medications are you supposed to be taking?";

11. Listen carefully and do not interrupt;

12. Maintain a non-threatening stance;

13. Do not challenge delusions or hallucinations;

14. Use "**I**" statements (i.e. I understand); and/or

15. Make no sudden movements.

| NOTE | Although compassion must be used, officers must be cautious while handling an individual suffering from mental disorders. |
|---|---|

C. When an officer encounters an individual who they believe is dangerous, the officer has a lawful right to access and seize any firearms.

1. The probable cause section of the incident report must be completed detailing why the officer believes the individual is dangerous (see Section I, sub-section A. above).

2. The Firearms Investigative Unit will then screen the probable cause affidavit with the Marion County Prosecutor's Office (MCPO), and the case will be set for a hearing.

3. All firearms will be placed in the Property Section with the notation "Firearms seized from Dangerous Person" and shall be held as evidence.


| NOTE | Indiana Code permits an officer to obtain a search warrant for the seizure of firearms possessed by a dangerous individual. The probable cause affidavit for seizure of the firearms should be screened by the MCPO. |
|---|---|

## II. Immediate Detention

A. Officers may have situations where an individual needs to be placed under Immediate Detention for his/her own safety or the safety of others.

B. When taking an individual into custody for Immediate Detention, officers will adhere to the following guidelines:

1. The individual shall be restrained in accordance with procedures outlined in General Order 8.1 - *Prisoner Handling, Transportation, & Escape.*

2. An individual taken into custody under Immediate Detention status shall be handcuffed behind the back *unless exigent circumstances* exist.

C. A search of an individual and their possessions shall be conducted for weapons and/or items that would constitute an obvious threat to the safety of the individual, officer, or the public.

D. Officers must complete an *Immediate Detention* Form, IMPD Form No. 6-5-24 R4.

| NOTE | Mental health professionals do not have access to incident reports; therefore, it is crucial that the Immediate Detention Form contain all pertinent information. This includes but is not limited to the presence of weapons, use of SWAT, officer concerns, contact name and numbers for witnesses and family members. |
|---|---|

E. Officers will also complete an incident report using the offense "Immediate Detention" and detail the circumstances under which the individual was taken into custody. Officers will also complete and attach the IMPD CIT form within the incident report in InterAct.

F. Individuals placed under Immediate Detention shall be transported as soon as possible to the hospital or appropriate facility via wagon (if available), unless emergency medical treatment and continuous medical care is warranted.

1. If an individual is currently in treatment at a specific facility (e.g., VA hospital), they will be transported to that facility.

2. If the individual is transported by ambulance, an officer shall either follow the ambulance to the hospital in their department vehicle or, at the request of the medic, ride in the ambulance.

3. The individual must be transported to the hospital or appropriate facility, where they may be held up to twenty-four (24) hours for psychiatric assessment, along with a copy of the completed Immediate Detention Form.

| NOTE | If a question arises as to the appropriate method of transportation (e.g. police vehicle, wagon, ambulance, etc.) a supervisor shall be called to the scene to determine the appropriate method. |
|---|---|

G. Officers will close out their run with the CAD disposition "RPTCIT" for immediate detentions.



### III. Immediate Detention and Arrest

A. When an individual is placed under Immediate Detention and arrest, the individual will be transported to Eskenazi Hospital Detention Facility, even if Eskenazi Hospital is on diversion.

B. Officers will close out their run with the CAD disposition "ARCIT" when outright criminal offenses are charged against a person in addition to an immediate detention.

### IV. Mental Writs/Emergency Detention

A. The IMPD is responsible for serving court-ordered Mental Writs/Emergency Detention (ED) when necessary.

1. An individual taken into custody on IMPD's jurisdiction by a court-ordered Mental Writ/ED is to be transported by Marion County Sheriff's Office (MCSO) wagon to the mental health facility designated on the Mental Writ/ED order.

2. When an individual is taken into custody on IMPD's jurisdiction by a court-ordered Mental Writ/ED and is to be transported to a location outside of Marion County, MCSO wagon will transport the individual to Eskenazi Hospital and the MCSO will handle the transportation to the designated facility.

3. A copy of the Mental Writ/ED should be left with the treatment facility staff.

B. Marion County Superior Court, Probate Division is the issuing court for Mental Writs/ED and Orders for Apprehension and Return.

1. Marion County Superior Court, Probate Division will fax all Mental Writs/ED and Orders for Apprehension and Return to Marion County Sheriff's 911 Center. Fax (317) 327-3586.

2. Communications will then type a pending run on the appropriate district and notify the on-duty shift supervisor. Communications can email or fax the Mental Writ/ED or Orders for Apprehension and Return to the shift supervisor.

3. The shift supervisor is responsible for providing the next shift with the Mental Writ/ED or Orders for Apprehension and Return. If the individual was not located, the run shall be left open until service is complete.

4. In the event of a bad address or updated information reference a Mental Writ/ED or Orders for Apprehension and Return, officers shall contact the Marion County Superior Court, Probate Division Coordinator at Denise.Safford@indy.gov.

C. Officers will also complete an incident report using the offense "Mental Writ" and detail the circumstances under which the individual was taken into custody.

D. Officers will close out their run with the CAD disposition "RPTCIT" for mental writs that are served.



## V. Other reporting

When documenting incidents in which the officer believes a mental illness is a contributing factor, officers will use the offense code "Mental Investigation" when the offense codes "Immediate Detention" or "Mental Writ" were not applicable. Officers will also attach and complete the IMPD CIT form within the incident report in InterAct.

## VI. Mental Illness Referrals

A. In cases where there is not a need for an Immediate Detention and mental illness is suspected, officers can refer to the National Alliance on Mental Illness (NAMI) Indianapolis website at www.namiindy.org or call 317-257-7517.

B. NAMI Indianapolis contains a list of community mental health programs, resources, and facilities.

C. Officers should attempt to make contact with family or mental health facilities on behalf of the individual in need, when possible.

## VII. Training

A. While attending the IMPD Academy, recruit officers will receive training on how to deal with individual(s) with a mental illness.

B. Officers shall also receive state-mandated in-service training on the subject annually.

## VIII. Crisis Intervention Team

A. The Crisis Intervention Team (CIT) is a community partnership that includes law enforcement and health care providers providing assistance to mental health individuals and their families.

B. CIT officers receive advanced training in handling individuals with a mental illness and will become part of a specialized team.

  1. These officers become 'first responders' for calls involving individuals with mental illness who are experiencing a mental health crisis.

  2. CIT officers will work with the community to help restore individuals to a 'pre-crisis' level of functioning.

C. CIT training consists of multiple curriculums that are provided by local mental health providers, legal experts, and family advocates. Training to become a CIT officer shall include, but not be limited to, the following:

  1. Case Management;
  2. Legal issues;
  3. Special populations;
  4. Psychopharmacology;
  5. De-escalation techniques; and
  6. Effective use of community resources.

# Exhibit D



# Indianapolis Metropolitan Police Department

## POLICY

Prisoner handling and transportation are very important aspects of law enforcement. Prisoners must be treated humanely, with dignity, and must not be ridiculed, harassed, or mistreated in any way. As a matter of course, all prisoners should be monitored frequently by both the arresting and transporting officers to ensure their well-being. All members of Indianapolis Metropolitan Police Department are responsible for ensuring this policy is enforced.

| **NOTE** | **Nothing in this directive prohibits an officer from conducting a 'pat-down' search of any person for officer safety.** |
|---|---|

## DEFINITIONS

<u>Juvenile</u> - A person who has been captured, detained and held in confinement and who is under the age of eighteen and has not been waived to an adult court.

<u>MCSO</u> - Marion County Sheriff's Office

<u>Prisoner</u> - A person who has been captured, detained and held in confinement.

<u>Positional Asphyxia</u> - A condition in which an extreme decrease in the amount of oxygen in the body is accompanied by an increase of carbon dioxide which may lead to loss of consciousness or death.

<u>Restraint Device</u> - Equipment used to restrain the movement of a person in custody, such as handcuffs, flex-cuffs, waist chains, ankle chains, etc.

## PROCEDURE

### I. Prisoner Handling

A. Any officer making a custodial arrest or otherwise coming into control of a prisoner must make an immediate and thorough search of the prisoner, including footwear, and all property under the prisoner's control (bags, purses, backpacks, etc.) prior to transportation to a detention facility.

B. When the individual in custody is of the opposite gender of the arresting officer, the officer may conduct only a "pat-down" search of the person and clothing for weapons or contraband.

1. The arresting officer must request an officer of the same gender as the prisoner respond to the scene of the arrest to conduct the search.



2. If an officer of the same gender is not available, the arresting officer must use the backside of their hand when searching the prisoner.

| **NOTE** | **An officer must conduct a prompt and thorough search of the prisoner before transporting the prisoner to a detention facility.** |
|---|---|

C. All prisoners must be handcuffed behind the back as soon as possible with the handcuffs double-locked.

D. Officers requiring transportation of prisoners or subjects, (e.g. arrests, CHINS cases, or immediate detention) are responsible for ordering appropriate transportation, including:

1. MCSO Jail wagon (except CHINS cases);

2. Victim Assistance Unit (CHINS cases);

3. Ambulance; or

4. Personally transporting the person to the appropriate facility.

E. Violent prisoners may have legs restrained by use of any appropriate restraint device, if available, or as authorized by an on-scene supervisor (e.g. officer deems it necessary for the safety of officers and the prisoner, or to prevent damage to vehicles, etc.).

F. Prisoners will be transported by MCSO jail wagons. If a jail wagon is unavailable, an IMPD vehicle shall be used.

G. The arresting officer is responsible for the preparation of all paperwork and necessary reports. The transporting officer will hand-carry the paperwork, if not submitted electronically by the arresting officer, to the place of detention and deliver it to the appropriate facility (receiving area, prosecutor's drop box, etc.).

## II. Prisoner Transportation

A. Officers transporting, or assuming custody of a prisoner, must complete the following prior to transport:

1. Promptly conduct a second, thorough search of the prisoner and all clothing, including footwear, and property (bags, purses, etc.).

2. If the transporting officer is of the opposite gender of the prisoner, the officer must ensure that a thorough search has been made by an officer of the same gender as the prisoner, prior to transporting.

3. If an officer of the same gender as the prisoner is not readily available within a reasonable amount of time, the prisoner can be transported to the appropriate detention facility after a "pat-down" search by the transportation officer.  The detention facility staff must be advised that a thorough search of the prisoner has not been made.

B.  Officers are prohibited from transporting any prisoner in any vehicle other than a department vehicle, unless being transported by an ambulance (refer to Section VIII).

   1.  If an MCSO jail wagon is unavailable and an IMPD vehicle must be utilized, prisoners shall be handcuffed with hands behind the back, and the handcuffs 'double-locked.' The following measures shall also be taken to minimize the opportunity of exit or escape by the prisoner:

      a.  The prisoner shall be placed in the passenger side of the rear seat away from the transporting officer;

      b.  The prisoner shall be secured with a seatbelt with the officer 'locking' the seatbelt in place;

      c.  The officer shall engage the 'Child Safety Lock' on the rear doors so the rear door may not be opened from the inside; and

      d.  The officer shall engage the window lock so the prisoner is unable to roll down the rear windows.

   2.  If prisoners are transported by a patrol vehicle, no more than two (2) adults or three (3) juveniles can be transported in one (1) vehicle.

   3.  Prisoners must not be left unattended in any sedan-type patrol vehicle.

   | **NOTE** | **Prisoners are prohibited from riding in the front seat of any vehicle.** |
   |---|---|

C.  All prisoners must be transported directly to the appropriate detention facility (Arrestee Processing Center, Eskenazi Receiving Ward, etc.).

   1.  The transporting officer shall not initiate or become involved with any vehicle pursuit while transporting a prisoner.

   2.  Only where the risk to a third party is both clear and grave, and the risk of escape or injury to the prisoner is minimal should an officer stop to render assistance or take other enforcement actions.

   3.  Transporting officers must remain at the facility and assist receiving personnel until the prisoner is secured.

D.  The officer must notify Communications when preparing to transport any passenger in a police vehicle, other than a pre-approved ride-along passenger. This includes witnesses, victims, etc., as well as suspects or prisoners. The information relayed to dispatch shall include the reason for the transportation, the beginning location and mileage, and the final destination and mileage once the officer arrives at the destination.

E.  Prisoners who were subjected to CS/OC or pepperball projectile must be taken directly to APC for treatment by medical staff without undue delay.

   1.  The medical staff at the APC will evaluate the prisoner for any necessary treatment.



2. The transporting officer must notify APC personnel upon arrival that CS/OC or pepper ball projectiles were used on the subject.

| NOTE | This policy shall in no way prohibit an officer from calling for medical assistance at the scene if the officer feels such medical assistance is appropriate and/or necessary. |
|------|------|

F. Officers transporting prisoners must not transport adult males, adult females, or juveniles together unless they are co-defendants in the same incident, or are transported in a police vehicle of such design that they are physically separated.

G. All individuals arrested for a crime or taken into custody and believed to be suffering from a mental illness must be transported in a separate compartment of the transportation vehicle away from other prisoners.

H. At the beginning of each duty shift, and prior to placing a prisoner in a transporting any vehicle, the transporting officer must visually inspect the vehicle's interior to ensure no weapons or other potentially hazardous materials are available to the prisoner.

I. The transporting officer has discretion to give permission to the prisoner to communicate with other individuals prior to transport.

1. Safety aspects during transport require that the prisoner's ability to communicate with attorneys and others will not normally be permitted during the period the prisoner is being transported.

2. However, there may be no physical contact and the conversation must take place in the presence of the officer.

J. After the prisoner has been delivered to the appropriate facility, the transporting officer must re-inspect the vehicle to ensure no weapons or contraband were left or hidden within the transportation vehicle by the prisoner.

## III. Positional Asphyxia

A. Officers must be aware of the warning signs that could result in death by positional asphyxia. A subject placed on their chest or stomach, with the legs and arms restrained behind the back, may have difficulty breathing, leading to serious injury or death.

1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used.

2. The subject should be moved onto their side, allowing less interference with normal breathing, as soon as possible.

3. The subject should then be carefully observed and medical assistance should be summoned immediately to evaluate the subject's health.



B. The signs listed below, especially high fever and shivering, may indicate a state of hypothermia resulting from excited delirium, a potentially dangerous condition. If a subject is suffering from any of the signs listed below, and placed in a prone position that interferes with breathing, there is a greatly increased risk of positional asphyxia.

1. Bizarre, aggressive, violent behavior outside the norm;

2. Shouting and screaming, especially at inanimate objects;

3. Violence toward objects, especially glass;

4. Profuse sweating;

5. High fever;

6. Unexpected physical strength;

7. Thrashing after restraint;

8. Shivering;

9. Dilated pupils;

10. Hallucinations;

11. Paranoia;

12. Tightness or pain in the chest;

13. Nausea;

14. Shortness of breath; and/or

15. Known drug overdose.

C. Any detained subject exhibiting some or all of the above symptoms must be closely monitored, especially if maximal restraint is used. Officers must make sure the subject is alert, conscious and can sit and speak on their own before transporting.

> **NOTE** Obese subjects are more at risk for positional asphyxiation, but death can result from anyone being improperly restrained.

## IV. Transportation for Other Agencies

If there are no MCSO jail wagons available, IMPD may transport prisoners of other law enforcement agencies, businesses, or security personnel when the arrest occurs within the IMPD jurisdiction. It is the responsibility of the arresting officer to complete an OAR and required incident reports. In extreme situations an officer may be dispatched to transport prisoners from other law enforcement jurisdictions which will be determined by a shift supervisor.

## V. Adult Prisoners

A. All adult prisoners who do not meet the criteria set forth in Section VIII., must be received through the vehicle sally port of the Arrestee Processing Center (APC), 752 East Market Street.

B. Upon arrival at the APC, the transporting officer shall notify the APC Control Room/Operator via the call box. APC staff will inform the transporting officer when they are ready for the officer to bring the prisoner into the receiving area.

C. No vehicles will be allowed into or out of the APC vehicle sally port until all prisoners are inside the secured area.



D. No firearms will be allowed in the prisoner receiving area. Officers must place their weapon in the gun locker before unloading the prisoner. There are several firearm lockers provided in the sally port area and in two additional areas in the APC, if needed.

E. Prisoners should be handcuffed with their hands behind their back. Arrestee Processing Officers will remove restraining devices inside the secured area once the prisoner has been searched. Officers will receive their restraining devices back through the pass-through door. When the prisoner is turned over to the Arrestee Processing Officer, the transporting officer shall notify them of any known existing medical problems or security hazards.

## VI. Juvenile Prisoners

A. All juvenile prisoners, regardless of the charges against them, will be transported to the Receiving, Screening and Release (RSR) unit at the Juvenile Detention Center at 2451 N. Keystone Avenue.

B. Juvenile prisoners are received in the prisoner-unloading bay at the Juvenile Justice Complex. To transfer a prisoner to the Juvenile Justice Complex, officers must:

1. Use the call-box on the parking lot to have the overhead door opened;

2. Pull into the bay and turn the engine off, overhead door will be closed;

3. Place weapons in the lock-box; and

4. Unload prisoner and transfer to receiving personnel.

> **NOTE** Refer to General Order 1.17 – Juvenile Arrest Procedures, for further guidance.

## VII. Sick, Injured, or Disabled Prisoners

A. Sick, injured or disabled prisoners (adult or juvenile) must be transported to the Marion County Sheriff's Office Detention Ward at Eskenazi Hospital by ambulance or by the transporting officer if the following symptoms are present:

1. When the prisoner has lost consciousness or is unconscious;

2. When the prisoner cannot stand unassisted (except if caused by physical handicap);

3. When the prisoner has suffered a serious or life-threatening injury;

4. When complaining of physical injury or illness with observable symptoms, (e.g., bleeding, swelling, distorted limbs, vomiting, pale, clammy skin, or cramping);

5. When juvenile prisoners show any significant signs of impairment by drug or alcohol intoxication or when tested by Juvenile intake personnel, the juvenile has a .08 BAC or above;

6. When a juvenile prisoner was subdued by use of a Taser, OC, or CS; or

7. When a juvenile prisoner was involved in car accident (PD or PI); or


8. When a supervisor or medical personnel determines it is necessary to transport the prisoner in an ambulance for the well-being of the prisoner or others (e.g., prisoner is suspected to be infectious or contagious and needs to be quarantined from others, or requires special attention provided by medical personnel).

> **NOTE**    **Officers must make notification to Eskenazi prior to bringing the prisoner to the Marion County Sheriff's Office Detention Ward.**

B. If prisoners are transported by ambulance, arresting officers must consult with the medical personnel on the scene to determine the proper method of restraint within the ambulance to ensure security of the prisoner and protection of the ambulance personnel.

C. Ambulances transporting IMPD prisoners to a detainment facility must be followed by an officer in possession of the appropriate paperwork (OAR, Juvenile Fact Sheet, Immediate Detention Form, etc.). Upon arrival at the detainment facility, the officer must accompany the prisoner until properly received by a correction officer, deputy, or other authorized official.

D. If medical personnel on scene advise the prisoner can be transported by MCSO jail wagon, the Medic number, name and ID must be entered into the CAD and Transportation CAD. A prisoner only mildly ill, intoxicated or suffering minor injuries shall be transported directly to the APC by MCSO jail wagon to receive care by medical personnel at the APC. If the prisoner is evaluated at the APC and requires care beyond what can be provided, the prisoner will be transported to the hospital by Sheriff's personnel using an appropriate transportation vehicle.

E. If a prisoner is disabled and the disability prevents the use of a MCSO jail wagon for transporting the prisoner, the officer shall request a supervisor to assist in arranging appropriate transportation.

1. The application of restraint devices on a disabled prisoner is governed by the subject's physical capabilities, the seriousness of the charges against the prisoner, and the threat level of the prisoner.

2. Prisoners with disabilities may require special procedures. In these instances, the transporting officer shall:

   a. Ensure any special equipment required by the prisoner is transported along with the prisoner and request assistance when needed in order to make the transportation safe for both the prisoner and the officer;

   b. Request an ambulance to assist in transportation of the prisoner when medically appropriate; and

   c. Ensure that prosthetic devices are left with the prisoner only after being searched thoroughly for weapons and/or contraband.

F. If a prisoner arriving at a detention facility is determined to be medically unacceptable by the receiving officer due to illness or injury, the transporting officer must:

1. Obtain a duplicate OAR or Juvenile Fact Sheet leaving the original at the detention facility;

2. Allow the receiving officer to place the prisoner's thumb prints on both copies of the OAR.


3. Immediately transport the prisoner to the Marion County Sheriff's Detention Ward at Eskenazi Hospital and present all necessary paperwork to the receiving deputy at the ward.

| **NOTE** | **If it is determined that the prisoner requires transportation by ambulance, it is IMPD's responsibility to provide escort for the protection of ambulance personnel.** |
|---|---|

## VIII.    Personal Property

A. All personal property (except contraband), which would fit in someone's pockets, wallet, or purse, may be sent with the prisoner.

| **NOTE** | **No knives, mace, or any other item that could be a weapon will be accepted at the Juvenile Center.** |
|---|---|

B. Personal property, including belts and currency less than $500.00, must be packaged in heat seal or self-seal bags for transport to the Arrestee Processing Center.

C. An Arrestee Personal Property List form must be completed and placed inside the prisoner's property bag.

D. All large items (e.g., suitcases, bags, or boxes) must be placed in the Property Section under the category "safekeeping."

## IX. Reporting Procedures

A. A supervisor must be notified and the reporting officer shall include details in the narrative section of the incident report when:

1. A full arm and leg restraint is used;

2. Property is removed from an unconscious prisoner; and/or

3. There is a complaint of injury to either the prisoner or officers.

B. When an adult prisoner is sent to the Sheriff's Detention Ward at Eskenazi Hospital, prior to going to the APC, the original OAR will be presented to MCSO personnel by the transporting officer and the OAR will remain with the prisoner at all times.

| **NOTE** | **MCSO personnel will send a copy of the OAR to the APC.  It will no longer be necessary for the arresting officer to transport a copy to the APC.** |
|---|---|

C. When a juvenile is delivered to Eskenazi Hospital for treatment before being sent to Juvenile, the transporting officer shall immediately fax a copy of the fact sheet to Juvenile Intake.

1. The Juvenile Receiving fax number is 327-8306.

2. The transporting officer shall immediately telephone Juvenile Receiving at 327-8780 to advise them of the fax and the juvenile's name.

3. A fax machine and telephone are available for use in the Eskenazi Emergency Room.

### X. Prisoner Escape

In the event a prisoner or person in the control of Indianapolis Metropolitan Police personnel should escape from police custody, the procedure listed below must be followed:

A. The officer in control of the prisoner must immediately notify the communications center providing the location of the escape, direction and mode of travel, escapee's name, physical description, charges against the subject, and other appropriate information. (i.e., is the prisoner handcuffed, etc.).

B. Communications shall issue a general broadcast describing the escapee, location, direction of travel and offenses the escapee is charged with.

C. The officer's immediate supervisor must prepare an inter-department communication describing in detail the incident and circumstances contributing to the escape. This special report must be prepared within twenty-four (24) hours of the incident and distributed through the chain-of-command to the following:

   1. Chief of Police (original);

   2. Officer's division deputy chief; and

   3. Officer's district commander.

D. The officer last in control of the prisoner must include an account of the escape in the narrative section in an Incident Report.

   1. If the escape occurs before the transporting officer has left the scene of the prisoner transfer, the details may be included in the original Incident report by the arresting officer.

   2. If the escape occurs after the transporting officer has left the scene of the prisoner transfer, separate Incident Report must be created by the transporting officer.

> **NOTE** If a prisoner escapes from an MCSO Jail Wagon, an IMPD supervisor is not responsible for submitting any of the reports.