UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF PAUL DANIELS, by | ) | |
| Personal Representative Kay Stover, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-02280-JRS-MJD |
| | ) | |
| CITY OF INDIANAPOLIS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## Brief in Support of Defendants' Renewed Motion for Summary Judgment

The Estate of Paul Daniels claims that Indianapolis Metropolitan Police Department

("IMPD") Officers Stephen Guynn, Eli Raisovich, and George Rossman ("Defendant Officers")

violated Daniels's Fourth, Eighth, and Fourteenth Amendment rights when they allegedly used

excessive force to seize him on September 1, 2018. It also claims that the City of Indianapolis is

liable because it caused them to violate his rights. These Officers are entitled to qualified

immunity because the force that they used to seize Daniels was objectively reasonable and they

did not violate his clearly established rights. The City is not liable because it caused no one to

violate Daniels's rights and his rights were not violated. IMPD is not liable because it is not a

proper party. Thus, Defendants are entitled to summary judgment on all claims.

## I.     Statement of Material Facts Not in Dispute

### A.  IMPD trains Defendant Officers to understand and follow its directives.

Officer Raisovich started at the Marion County Sheriff's Department ("MCSD") in 1997.

(Raisovich Aff. at 1, ⁋ 5, ECF No. 56-5 at 1). In 2006, Officer Rossman began working for the

Indianapolis Police Department ("IPD"). (Rossman Aff. ⁋⁋ 4–6, ECF No. 56-6 at 1). IPD and

MCSD then completed joint training when they were preparing to consolidate their agencies into

a newly formed IMPD in 2006. (Young Aff. ¶ 9, ECF No. 111-1 at 2). Officers Raisovich and Rossman were trained to understand and follow IMPD policies at that time. *Id*.

In 2014, Officer Guynn began working for IMPD and completed about six months of training at its training academy. (Guynn Aff. ¶¶ 4–6, ECF No. 56-4 at 1). There, he received about 50 hours of de-escalation training. (Young Aff. ¶ 9, ECF No. 111-1 at 2). This training helps preserve the safety of officers and citizens while protecting citizens' rights. *Id*. He also completed hundreds of hours of use-of-force and scenario-based training, 60 hours of search-and-seizure training, and 20 hours of mental-illness-awareness and immediate-detention training. (Young Aff. ¶¶ 12–16, ECF No. 111-1 at 3). He learned how IMPD's directives limit the use of force and demonstrated that he understood these directives. *Id*.

Officer Guynn then completed IMPD's Field Training Officer ("FTO") program. (Guynn Aff. ¶ 11, ECF No. 56-4 at 2). During this program, he spent about 16 weeks working with veteran officers to ensure that he understood and followed IMPD's directives. (Guynn Aff. ¶ 12, ECF No. 56-4 at 2). Then, a summary of his performance was prepared for IMPD's Chief of Police and Director of Training. (Young Aff. ¶¶ 19–20, ECF No. 111-1 at 3–4).

Defendant Officers receive at least 14 hours of in-service training on firearms and the use of force annually. (Young Aff. ¶ 21, ECF No. 111-1 at 4). They also receive training from supervisors during roll calls and at least 10 more hours of in-service training annually. (Young Aff. ¶ 22, ECF No. 111-1 at 4). In 2016, Defendant Officers completed in-service training on responding to people with mental illness. (Young Aff. ¶ 23, ECF No. 111-1 at 4). They then completed in-service training on autism, first responders, public safety, and mental health first aid in 2017. (Young Aff. ¶ 24, ECF No. 111-1 at 4).

Before September 1, 2018, Defendant Officers were trained on how to deal with people who display symptoms of mental health disorders when completing Crisis Intervention Training. (Young Aff. ⁋ 27, ECF No. 111-1 at 4–5); (Raisovich Aff. ⁋ 16, ECF No. 56-5 at 2). They were also trained on how state and federal law governs their law enforcement authority and uses of force before 2018. (Guynn Aff. ⁋ 7–9, ECF No. 56-4 at 1); (Raisovich Aff. ⁋⁋ 6–8, ECF No. 56-5 at 1); (Rossman Aff. ⁋ 9, ECF No. 56-6 at 1).

**B. Defendant Officers read and understand IMPD's directives.**

IMPD works with the Commission for the Accreditation of Law Enforcement Agencies ("CALEA") to ensure that its directives meet and exceed national standards for best practices in law enforcement. (Griffith Aff. ⁋ 5, ECF No. 56-3 at 1). IMPD develops and maintains formal written directives to provide officers with a clear understanding of the constraints and expectations governing the performance of their duties. (Griffith Aff. ⁋ 9, ECF No. 56-3 at 2). IMPD's directives comply with applicable law and meet or exceed the standards for law enforcement agencies in the United States established by CALEA. (Griffith Aff. ⁋ 10, ECF No. 56-3 at 2). Defendant Officers had to read and understand materials in IMPD's directives that was relevant to their job functions before September 1, 2018. (Griffith Aff. ⁋ 15, ECF No. 56-3 at 2). IMPD's supervisors were tasked with enforcing these directives. (Griffith Aff. ⁋ 16, ECF No. 56-3 at 3). A violation of any directive was cause for disciplinary action, up to and including termination. (Griffith Aff. ⁋ 17, ECF No. 56-3 at 3).

In 2018, IMPD's General Order Manual was available in electronic format and sent to all officers. (Griffith Aff. ⁋ 19, ECF No. 56-3 at 3). Hard copies of this manual were also kept at the Chief of Police's office, the Professional Standards Division's office, and each police district roll call's briefing room. (Griffith Aff. ⁋ 20, ECF No. 56-3 at 3).

IMPD required its supervisors and ranking officers to read and review new or revised written directives with their subordinates for four consecutive days before posting them in a designated location for at least 30 days. (Griffith Aff. ⁋ 21, ECF No. 56-3 at 3). All new and newly revised directives were presumed known by all department personnel on the first working day after issuance. (Griffith Aff. ⁋ 23, ECF No. 56-3 at 3). Supervisors could also require their subordinates to review directives during their midyear and end-of-year performance appraisal process. (Griffith Aff. ⁋ 24, ECF No. 56-3 at 4).

### C. IMPD requires Defendant Officers to comply with its use-of-force directive.

General Order 1.30 governed Defendant Officers' uses of force on September 1, 2018. (Griffith Aff. ⁋ 24, ECF No. 56-3 at 4). Defendant Officers read and understood this directive before September 1, 2018. (Guynn Aff. ⁋ 20, ECF No. 56-4 at 2); (Raisovich Aff. ⁋ 19, ECF No. 56-5 at 2); (Rossman Aff. ⁋ 20, ECF No. 56-6 at 2).

Under General Order 1.30, Defendant Officers could only use reasonable force if they reasonably believed it was necessary given the totality of the circumstances. (Griffith Aff. ⁋ 29, ECF No. 56-3 at 4). They had to obtain medical care if anyone sustained visible or serious bodily injury or complained of injury or pain after a use of force. (Griffith Aff. ⁋ 30, ECF No. 56-3 at 4). And they needed to know that suspects who exhibit (1) extreme agitation, (2) violent, bizarre, or irrational behavior, (3) profuse sweating, (4) extraordinary strength, (5) unusual pain tolerance, or (6) protracted physical resistance to officers may be at an increased risk of sudden death. (Guynn Aff. ⁋ 24, ECF No. 56-4 at 3).

### D. IMPD requires uses of force to be reported and investigated.

General Order 1.31 governed use-of-force investigations and reports in 2018. (Griffith Aff. ⁋ 32, ECF No. 56-3 at 5). Officers had to read and understand this directive. (Griffith Aff. ⁋

32, ECF No. 56-3 at 5). And they had to know that use-of-force incidents would be consistently and thoroughly investigated. (Griffith Aff. ⁋ 35–36, ECF No. 56-3 at 5).

Under General Order 1.31, Defendant Officers were required to notify a supervisor via Communications, as soon as practical, if they used force to detain a non-compliant suspect. (Griffith Aff. ⁋ 38, ECF No. 56-3 at 5). If they used force that caused or allegedly caused serious bodily injury, injury, or a complaint of pain, they were also required to report this use of force to a supervisor as soon as practical. (Griffith Aff. ⁋ 40, ECF No. 56-3 at 6).

Further, Defendant Officers were expected to document all uses of force that exceeded un-resisted handcuffing. (Griffith Aff. ⁋ 41, ECF No. 56-3 at 6). When documenting this force, they had to describe how the force was applied, whether it was effective, and any resulting injuries to anyone in their incident report and Blue Team entry. (Griffith Aff. ⁋ 43, ECF No. 56-3 at 6). Blue Team entries were then forwarded to the investigating supervisor within 72 hours. (Griffith Aff. ⁋ 44, ECF No. 56-3 at 6). Also, photos were taken of all alleged injuries, whether visible or not. (Griffith Aff. ⁋ 45, ECF No. 56-3 at 6).

Under General Order 1.31, Defendant Officers knew that a supervisor must respond to the scene and conduct a preliminary investigation regarding any use of force that exceeded un-resisted handcuffing. (Griffith Aff. ⁋ 46, ECF No. 56-3 at 6). During these investigations, supervisors interviewed the officers, suspects, and witnesses, and documented relevant evidence. (Griffith Aff. ⁋ 47, ECF No. 56-3 at 6–7). Supervisors would review the accuracy and sufficiency of Blue Team entries. (Griffith Aff. ⁋ 48, ECF No. 56-3 at 7). They provided a disposition of in compliance or not in compliance, comments about their investigations and the reasons for this disposition, and noted further action taken or recommendations for further action when reviewing Blue Team entries. (Griffith Aff. ⁋ 49, ECF No. 56-3 at 7).

Under General Order 1.31, IMPD maintained records of all use-of-force incidents that resulted in or allegedly resulted in serious bodily injury, injury, or a complaint of pain. (Griffith Aff. ¶ 52, ECF No. 56-3 at 7). Its Professional Standards Branch maintains these records. (Griffith Aff. ¶ 53, ECF No. 56-3 at 7). This Branch conducts an annual analysis of these records and reviews incidents to identify patterns or trends that could indicate necessary training or policy modifications. (Griffith Aff. ¶ 54, ECF No. 56-3 at 7–8). If modifications are necessary, the Professional Standards Branch notifies the Training Division Commander and the Planning and Research Section for evaluation and implementation. (Griffith Aff. ¶ 55, ECF No. 56-3 at 8). On September 1, 2018, IMPD was unaware of trends that showed its use-of-force training or policies were deficient. (Young Aff. ¶ 31, ECF No. 111-1 at 5).

**E. IMPD's directives prepared Defendant Officers to interact with the mentally ill.**

In 2018, General Order 4.7 governed Defendant Officers' interactions with subjects who displayed symptoms of a mental health disorders. (Griffith Aff. ¶ 56, ECF No. 56-3 at 8). Defendant Officers read and understood this directive before September 1, 2018. (Guynn Aff. ¶ 27, ECF No. 56-4 at 3); (Raisovich Aff. ¶ 19, ECF No. 56-5 at 2); (Rossman Aff. ¶ 20, ECF No. 56-6 at 2). General Order 4.7 identified signs to look for when determining whether they may perform an immediate detention. (Griffith Aff. ¶ 60, ECF No. 56-3 at 8). It also identified how to communicate with mentally ill subjects. (Griffith Aff. ¶ 59, ECF No. 56-3 at 8). And General Order 4.7 required them to report when they believed mental illness contributed to an incident. (Guynn Aff. ¶ 32, ECF No. 56-4 at 3).

**F. IMPD's directives prepared Defendant Officers to avoid positional asphyxia.**

General Order 8.1 informed Defendant Officers of the risks of positional asphyxia and how to avoid it. (Griffith Aff. ¶ 63, ECF No. 56-3 at 9). They read and understood this directive

before September 1, 2018. (Guynn Aff. ⁋ 36, ECF No. 56-4 at 4); (Raisovich Aff. ⁋ 19, ECF No. 56-5 at 2); (Rossman Aff. ⁋ 20, ECF No. 56-6 at 2).

Under General Order 8.1, Defendant Officers had to be aware of the warning signs of positional asphyxia. (Griffith Aff. ⁋ 66, ECF No. 56-3 at 9). They were informed that subjects may have trouble breathing if they are placed on their stomach with their legs and hands restrained behind their back. (Griffith Aff. ⁋ 67, ECF No. 56-3 at 9). They could not leave subjects on their chest or stomach for longer than necessary. (Griffith Aff. ⁋ 68, ECF No. 56-3 at 9). They were required to move subjects to their side, allowing less interference with normal breathing, as soon as possible. (Griffith Aff. ⁋ 69, ECF No. 56-3 at 9). They were also required to carefully observe subjects and request medical assistance immediately to evaluate a subject's health whenever necessary. (Griffith Aff. ⁋ 70, ECF No. 56-3 at 9).

Under General Order 8.1, officers must look for symptoms of excited delirium and understand the risk that this condition might cause positional asphyxia. (Griffith Aff. ⁋ 71, ECF No. 56-3 at 10). They must also closely monitor subjects who exhibit those symptoms to make sure they remain alert, conscious, and able to sit or speak on their own before they are transported from a scene. (Griffith Aff. ⁋ 72, ECF No. 56-3 at 10). Officers must have sick, injured, or disabled subjects transported to Eskenazi Hospital if they lose consciousness during an arrest. (Griffith Aff. ⁋ 73, ECF No. 56-3 at 10). They must also have them transported to Eskenazi Hospital in an ambulance if their supervisor or medical personnel find that it is necessary to do so. (Griffith Aff. ⁋ 74, ECF No. 56-3 at 10).

**G. IMPD required officers to prevent and report violations of its directives.**

Before September 1, 2018, Defendant Officers were trained to immediately report all violations of IMPD's directives. (Young Aff. ⁋ 32, ECF No. 111-1 at 5–6). They were also

trained to take proper action when they witness violations of IMPD's directives. *Id*. For instance, if they could safely intervene to stop violations of IMPD's policies, they were trained to do so. *Id*. IMPD's Rules and Regulations also required them to take proper action when they observe wrongful or negligent behavior by departmental members. (Griffith Aff. ⁋ 80, ECF No. 56-3 at 11). An example of proper action would be an officer intervening to stop the use of excessive force or a violation of IMPD's directives. (Griffith Aff. ⁋ 84, ECF No. 56-3 at 11). Another example of proper action would be an officer reporting a violation of IMPD's directives or a use of excessive force to a supervisor, the Professional Standards Branch, or the Chief of Police. (Griffith Aff. ⁋ 85, ECF No. 56-3 at 11).

Under IMPD's Rules and Regulations, supervisors must take prompt action when they observe wrongful or negligent behavior by department members. (Griffith Aff. ⁋ 81, ECF No. 56-3 at 11). Defendant Officers must not mistreat subjects in their custody and must handle subjects in accordance with law and departmental order under IMPD's Rules and Regulations. (Griffith Aff. ⁋ 82, ECF No. 56-3 at 11). And they may not use excessive force in any situation under IMPD's Rules and Regulations. (Griffith Aff. ⁋ 83, ECF No. 56-3 at 11).

IMPD allowed Defendant Officers to report violations of its directives to their supervisor, the Professional Standards Branch, or to the Chief of Police. (Griffith Aff. ⁋ 86, ECF No. 56-3 at 11). IMPD also allowed the public to report violations of IMPD's directives. (Griffith Aff. ⁋ 87, ECF No. 56-3 at 11). These reports may be made by electronic means, by telephone, or in person. (Griffith Aff. ⁋ 88, ECF No. 56-3 at 11).

**H.  IMPD investigates all allegations that officers have violated its directives.**

IMPD investigates all complaints concerning alleged violations of its directives. (Griffith Aff. ⁋ 89, ECF No. 56-3 at 11). It began investigating these complaints at least five years before

September 1, 2018. (Griffith Aff. ℙ 75, ECF No. 56-3 at 10). IMPD's Internal Affairs Unit ("IA") investigates alleged violations of its directives. (Griffith Aff. ℙℙ 90–92, ECF No. 56-3 at 12). A district-level investigation may also be conducted if IMPD needs to gather additional information about a complaint. (Griffith Aff. ℙ 93, ECF No. 56-3 at 12). If these investigations raise concerns about an incident, the complaint may then be transferred to IA for an investigation. (Griffith Aff. ℙℙ 94–107, ECF No. 56-3 at 12–13).

IMPD did not encourage the violation of its directives on or before September 1, 2018. (Griffith Aff. ℙ 116, ECF No. 56-3 at 14). Instead, it investigated complaints concerning alleged violations and disciplined officers who violated its directives. (Griffith Aff. ℙ 117, ECF No. 56-3 at 14). It generated monthly data reports and on-demand reports concerning its discipline and trends. (Griffith Aff. ℙ 7, ECF No. 56-3 at 1). And it maintained an early warning system that allowed it to proactively monitor officers' professional health by analyzing their uses of force and complaints. (Griffith Aff. ℙ 8, ECF No. 56-3 at 2). IMPD used this system to ensure officers met its high expectations. (Griffith Aff. ℙ 8, ECF No. 56-3 at 2).

### I. IMPD lacks notice of any policy or training deficiencies.

IMPD has no reports that suggest that deficiencies in its policies or practices have caused its officers to improperly position detainees. (Griffith Aff. ℙ 121, ECF No. 56-3 at 15). It did not discipline any officer for improperly positioning a detainee in a way that could have led to positional asphyxia or for violating of General Order 8.1 Section III in the years before 2018. (Griffith Aff. ℙ 122, ECF No. 56-3 at 15). Investigators did not sustain any complaints concerning violations of General Order 8.1 Section III or the improper placement of detainees that lead to asphyxia, death, or serious bodily injury in the years before 2018. (Griffith Aff. ℙℙ 123–24, ECF No. 56-3 at 15). IMPD had no evidence of trends or incidents that would have

triggered a reassessment of its policies or practices regarding IMPD officers positioning detainees in a manner that leads to death. (Griffith Aff. ℙ 125, ECF No. 56-3 at 15).

Also, IMPD did not have any evidence of trends or incidents that would have triggered a reassessment of its policies or practices regarding encounters with disabled individuals that lead to death. (Griffith Aff. ℙ 126, ECF No. 56-3 at 15). IMPD also had no data that suggested that any policy or practical deficiencies could lead to disabled individuals being detained in a reckless manner. (Griffith Aff. ℙ 121, ECF No. 56-3 at 15). Indeed, IMPD did not have data or reports that would have provided it with notice that its training or policies would cause officers to position detainees in a manner that violates their rights or treat the mentally ill in a manner that might lead to their death. (Griffith Aff. ℙ 130, ECF No. 56-3 at 16).

**J. Officer Guynn responds to a run involving a man walking in the road.**

Officer Guynn encountered Daniels when working for IMPD on September 1, 2018. (Guynn Aff. ℙ 43, ECF No. 56-4 at 4). At around 11:10 a.m., he and Officer Raisovich were dispatched to check on the welfare of an older black male dressed in red clothing who was walking and stumbling in the street near the intersection of 56th Street and Cooper Road. (Guynn Aff. ℙ 44, ECF No. 56-4 at 4). When responding to this run, Officer Guynn stopped at a red traffic light at 56th Street and Cooper Road. (Guynn Aff. ℙ 45, ECF No. 56-4 at 5). He then noted that he was on scene at 11:15 a.m. (Guynn Aff. ℙ 46, ECF No. 56-4 at 5). He saw Daniels walking northbound in the right, northbound lane of traffic on Cooper Road. (Guynn Aff. ℙℙ 47–48, ECF No. 56-4 at 5). Daniels endangered himself and others as he walked in the road because vehicles were passing him. (Guynn Aff. ℙ 49, ECF No. 56-4 at 5).

Daniels walked from the road to a grassy area east of Cooper Road and back into the road several times before Officer Guynn spoke to him. (Guynn Aff. ℙ 50, ECF No. 56-4 at 5). Officer

Guynn believed that he may have been intoxicated because he staggered as he walked in and out of traffic. (Guynn Aff. ⁋ 51, ECF No. 56-4 at 5). He also believed Daniels was intoxicated because he had red, glossy eyes. (Guynn Aff. ⁋ 52, ECF No. 56-4 at 5). He wanted to speak to Daniels to ensure he was okay. (Guynn Aff. ⁋ 53, ECF No. 56-4 at 5).

Thus, Officer Guynn parked his vehicle behind Daniels and spoke to him. (Guynn Aff. ⁋ 54, ECF No. 56-4 at 5). He parked behind Daniels because he did not want to startle him when he spoke to him. (Guynn Aff. ⁋ 55, ECF No. 56-4 at 5). Officer Guynn believed that Daniels heard him because Daniels responded to Officer Guynn with profanity and told him to leave him alone. (Guynn Aff. ⁋ 56, ECF No. 56-4 at 5).

After Officer Guynn spoke to Daniels, he returned to his vehicle, drove next to Daniels, and talked to him again. (Guynn Aff. ⁋ 57, ECF No. 56-4 at 6). Officer Guynn believed that Daniels heard him this second time because he responded with profanity and told Officer Guynn to leave him alone. (Guynn Aff. ⁋ 58, ECF No. 56-4 at 6). Officer Guynn then drove his vehicle in front of Daniels, parked, and exited his vehicle. (Guynn Aff. ⁋ 59, ECF No. 56-4 at 6). He parked in front of Daniels and approached him from the front because he wanted Daniels to see he was a police officer. (Guynn Aff. ⁋ 60, ECF No. 56-4 at 6). He thought Daniels saw that he was a police officer. (Guynn Aff. ⁋ 61, ECF No. 56-4). He the spoke to him a third time. (Guynn Aff. ⁋ 62, ECF No. 56-4).

**K. Officer Guynn seizes Daniels when he walks back into the grassy area.**

When Daniels walked from Cooper Road back into the grassy area east of the road, Officer Guynn grabbed his left arm and tried to speak to him. (Guynn Aff. ⁋ 63, ECF No. 56-4 at 6). Officer Guynn waited until Daniels was in the grassy area before grabbing his arm because he did not want to get into a physical altercation with him while he was in Cooper Road. (Guynn

Aff. ⁋ 65, ECF No. 56-4 at 6). He thought there was a risk that Daniels would fall in the road because Daniels was staggering as he walked. (Guynn Aff. ⁋ 43, ECF No. 56-4 at 4).

Officer Guynn grabbed Daniels's left arm because he thought Daniels would walk back in the road if he did not attempt to stop him. (Guynn Aff. ⁋ 66, ECF No. 56-4 at 6). Walking onto the road would have been dangerous because of passing traffic and the fact that Daniels appeared to be intoxicated. (Guynn Aff. ⁋ 68, ECF No. 56-4 at ¶¶ 6, 7).

When Officer Guynn grabbed Daniels's arm, Daniels turned and swung at Officer Guynn's face. (Guynn Aff. ⁋ 69, ECF No. 56-4 at 7). Daniels knocked off Officer Guynn's sunglasses when he hit him. Daniels then began to shift his body to hit Officer Guynn with his other fist. (Guynn Aff. ⁋ 71, ECF No. 56-4 at 7). Before Daniels could hit him again, Officer Guynn used a leg sweep to take Daniels to the ground. (Guynn Aff. ⁋ 72, ECF No. 56-4 at 7).

Officer Guynn used a leg sweep because a struggle with Daniels could have resulted in one of them falling onto the road where traffic continued to pass by. Also, Daniels posed a greater threat while he was on his feet because he would have better leverage when throwing punches. (Guynn Aff. ⁋ 77, ECF No. 56-4 at 7). Officer Guynn knew that it would be easier to handcuff him when he was on the ground and once handcuffed, Daniels would be less of a threat. (Guynn Aff. ⁋ 78, ECF No. 56-4 at 7). Thus, he decided that the best way to protect Daniels, himself,  and others was to take Daniels to the ground and handcuff him. (Guynn Aff. ⁋⁋ 80–81, ECF No. 56-4 at 7).

The leg sweep that Officer Guynn used is a maneuver that he learned at IMPD's Training Academy. (Guynn Aff. ⁋ 82, ECF No. 56-4 at 8). It allows officers to take advantage of a suspect's momentum and use a minimal level of force to get the suspect on the ground. (Guynn Aff. ⁋ 83, ECF No. 56-4 at 8).

Officer Guynn went to the ground with Daniels to control his body because he was concerned that Daniels may try to stand up and flee. (Guynn Aff. ℙ 84, ECF No. 56-4 at 8). He did not straddle Daniels. (Guynn Aff. ℙ 85, ECF No. 56-4 at 8). Instead, he knelt next to him. (Guynn Aff. ℙ 86, ECF No. 56-4 at 8). His body weight was against the ground, and he used his arms to control Daniels. (Guynn Aff. ℙ 87, ECF No. 56-4 at 8).

Officer Guynn placed one of Daniels's wrists in handcuffs very quickly. (Guynn Aff. ℙ 88, ECF No. 56-4 at 8). He then tried to gain control of Daniels's other wrist to place it in handcuffs while Daniels attempted to spin his body towards him. (Guynn Aff. ℙ 89, ECF No. 56-4 at 8). Officer Guynn remained positioned next to and behind Daniels with his body weight against the ground while he attempted to gain control of the other wrist. (Guynn Aff. ℙ 90, ECF No. 56-4 at 8). It took Officer Guynn several seconds to get Daniels' other wrist into cuffs because of his resistance but he succeeded when Daniels rolled to his stomach. (Guynn Aff. ℙ 91, ECF No. 56-4 at 8). Officer Guynn's body weight remained against the ground during the struggle as he used his arms to control Daniels as he cuffed him. (Guynn Aff. ℙ 93, ECF No. 56-4 at 8).

Guynn's actions were entirely consistent with IMPD policy. Officers are trained to avoid injuring suspects when handcuffing them, and Officer Guynn used that training with Daniels. (Guynn Aff. ℙ 94, ECF No. 56-4 at 8). After Daniels was handcuffed, he tried to turn his body towards Officer Guynn, he pulled away from him, and he resisted efforts to restrain him. (Guynn Aff. ℙ 97, ECF No. 56-4 at 9). As Daniels continued to fight, Officer Guynn tried to keep Daniels lying on his left side. (Guynn Aff. ℙ 98, ECF No. 56-4 at 9). He did this because he believed this would be the best position to keep Daniels in when he was on the ground. (Guynn Aff. ℙ 99, ECF No. 56-4 at 10). Officer Guynn positioned himself behind Daniels because

Daniels was kicking his legs and he did not want Daniels to kick him or spit on him. (Guynn Aff. ¶¶ 100–01, ECF No. 56-4 at 9). Officer Guynn did all he could to keep Daniels safe during Daniels' resistance. (Guynn Aff. ¶¶ 102–04, ECF No. 56-4 at 9).

Officer Guynn called for assistance as soon as Daniels was handcuffed. (Guynn Aff. ¶ 105, ECF No. 56-4 at 9). He made this report at 11:20 a.m. because he knew that IMPD policy required a supervisor to come to the scene given his struggle with a resistor. (Guynn Aff. ¶¶ 108–10, ECF No. 56-4 at 10).

Officer Guynn held Daniels on the ground while waiting for assistance to prevent him from fleeing, kicking him, or breaking free from his grip. (Guynn Aff. ¶¶ 111–13, ECF No. 56-4 at 10). Officer Guynn did not place his body weight on Daniels. (Guynn Aff. ¶ 114, ECF No. 56-4 at 10). Instead, he used his arms to control him. (Guynn Aff. ¶ 115, ECF No. 56-4 at 10).

**L. April Woodson sees Officer Guynn encounter and seize Daniels.**

April Woodson saw Officer Guynn encounter Daniels when she drove north on Cooper Road. (Woodson Dep. Tr. at 9–17, ECF No. 56-14 at 9–17). She saw him try to get Daniels out of the road. (Woodson Dep. Tr. at 10:17–22, ECF No. 56-14 at 10). She saw him follow Daniels as he walked from one side of the road to the other. (Woodson Dep. Tr. at 11:9–14, ECF No. 56-14 at 11). She saw several cars pass them as they walked in the road. (Woodson Dep. Tr. at 14:15–17, ECF No. 56-14 at 14). She saw Daniels throw a punch at Officer Guynn and knock his glasses off. (Woodson Dep. Tr. at 14–16:25–8, ECF No. 56-14 at 14–16). She saw Officer Guynn take Daniels to the ground and watched as Daniels fought against being handcuffed. (Woodson Dep. Tr. at 15:13–18, ECF No. 56-14 at 15). She said Officer Guynn did not strike Daniels. (Woodson Dep. Tr. at 15:19–21, ECF No. 56-14 at 15). She drove off once Daniels was handcuffed. *Id.*

**M. Officers Raisovich arrives and helps Officer Guynn restrain Daniels's legs.**

Officer Raisovich arrived on the scene shortly after Officer Guynn handcuffed Daniels. (Guynn Aff. ℙ 116, ECF No. 56-4 at 10). He saw Daniels lying on his side in the grass next to the northbound lane of Cooper Road. (Raisovich Aff. ℙ 22, ECF No. 56-5 at 3). Officer Guynn was kneeling in the grass behind Daniels. (Raisovich Aff. ℙ 21, ECF No. 56-5 at 2). Officer Raisovich used visual and audible de-escalation techniques to try to calm Daniels down. (Raisovich Aff. ℙ 24, ECF No. 56-5 at 3).

But those efforts were unsuccessful. *Id*. Instead, he tried to kick Officer Raisovich in the knees and shins when he approached him (Raisovich Aff. ℙ 25, ECF No. 56-5 at 3). He also continued trying to break free from Officer Guynn's grip. (Guynn Aff. ℙ 117, ECF No. 56-4 at 10). Officer Raisovich told Daniels that he needed to calm down. (Guynn Aff. ℙ 118, ECF No. 56-4 at 10). He also told him that he would have to restrain his legs if he did not stop trying to kick him. (Guynn Aff. ℙ 119, ECF No. 56-4 at 10). Daniels responded with profanity and tried to kick Raisovich. (Guynn Aff. ℙ 120, ECF No. 56-4 at 10).

Officer Raisovich positioned himself near Daniels's legs and tried to restrain them with a bungie cord to slow or stop his kicks while Officer Guynn tried to prevent Daniels from breaking free from his grip. (Guynn Aff. ℙ 121, ECF No. 56-4 at 11); (Raisovich Aff. ℙ 25, ECF No. 56-5 at 3). He tried to restrain his legs because he believed that Daniels was a danger to the officers and himself while he was kicking at them and struggling. (Raisovich Aff. ℙℙ 25–26, ECF No. 56-5 at 3). But, he could not get the bungee cord around Daniels's legs because he was struggling too hard. *Id*. Daniels yelled profanity, struggled, and rolled as Officer Raisovich tried to calm him down and restrain his legs. (Raisovich Aff. ℙ 28, ECF No. 56-5 at 3). Officer Raisovich stood next to him when he attempted to restrain his legs. *Id*.

Officer Guynn tried to keep Daniels lying on his left side while he kicked. (Guynn Aff. ¶ 122, ECF No. 56-4 at 11). Daniels struggled the entire time Officers Guynn and Raisovich were the only officers present at the scene. (Guynn Aff. ¶ 123, ECF No. 56-4 at 11). Officer Raisovich said that they should try to keep Daniels off his stomach because he had received a lot of training on how to prevent positional asphyxiation when working for MCSD. (Raisovich Aff. ¶ 31, ECF No. 56-5 at 4). He knew that it was best to keep subjects on their side when they are restrained with handcuffs behind their backs. *Id.* Although Daniels continuously struggled, rolled around, and kicked at officers, he was on his stomach no longer than a minute the entire time that Officer Raisovich was at the scene. *Id.*

### N. Officer Rossman arrives and helps the officers restrain Daniels's legs.

Officer Rossman arrived on scene at around 11:23 a.m. (Wilson Dep. Tr. at 35:18–20, ECF No. 56-11 at 18). Daniels kept hurling profanity at the officers and told them to leave him alone. (Guynn Aff. ¶ 127, ECF No. 56-4 at 11). Daniels kept kicking at the Officers after Officer Rossman arrived. (Guynn Aff. ¶ 128, ECF No. 56-4 at 11).

Officer Raisovich told Officer Rossman that he could not restrain Daniels's legs with his cord. (Raisovich Aff. ¶ 29, ECF No. 56-5 at 3–4). Officer Rossman then retrieved a pair of oversized cuffs from his vehicle and brought them to where Daniels was lying in the grass. *Id.* Daniels was still kicking, struggling, and yelling when Officer Rossman approached him with his oversized cuffs. (Raisovich Aff. ¶ 30, ECF No. 56-5 at 4). Officer Rossman then placed his oversized cuffs on Daniels's ankles. (Raisovich Aff. ¶ 30, ECF No. 56-5 at 4). This took a matter of seconds. (Raisovich Aff. at 4, ¶ 30, ECF No. 56-5 at 4).

**O.  Officers move Daniels to a seated position and monitor him until medics arrive.**

Sergeant T. Michael Wilson, a supervisor, arrived shortly after Daniels's ankles were cuffed. (Guynn Aff. ⁋ 139, ECF No. 56-4 at 12). Daniels was lying face down when he arrived. (Wilson Dep. Tr. at 20:4, ECF No. 56-11 at 7). He replaced the oversized cuffs with his shackles. (Wilson Dep. Tr. at 23–24:21–14, ECF No. 56-11 at 10–11). Daniels was "immediately moved" to a recovery position on his side. *Id.* Next, he was moved to a seated position. *Id.*

This was the earliest point that it was safe to move Daniels. (Guynn Aff. ⁋ 153, ECF No. 56-4 at 13). It was not safe to move him to a seated position before this point because he was a risk to officer safety while he kicked and fought with the officers as his legs were unrestrained. (Guynn Aff. ⁋ 155, ECF No. 56-4 at 13). The officers did not use force to restrain Daniels after he was moved to a seated position. (Guynn Aff. ⁋ 156, ECF No. 56-4 at 13).

Daniels was breathing when he was moved to a seated position. (Guynn Aff. ⁋ 141, ECF No. 56-4 at 12). Officer Guynn then asked a control operator to dispatch a medic to the scene. (Guynn Aff. ⁋ 143, ECF No. 56-4 at 12). Medics were dispatched at 11:28 a.m. (Craighill Aff. ⁋ 5, ECF No. 56-2 at 1). Officers Raisovich monitored Daniels while they waited on the medics to arrive at the scene. (Raisovich Aff. ⁋ 33, ECF No. 56-5 at 4).

**P.  Daniels is stable when he is moved to the ambulance for medical care.**

Medics arrived on scene at 11:31 a.m. (Craighill Aff. at 1, ⁋ 6, ECF No. 56-2 at 1). Medic Michelle Haywood then saw Daniels sitting with an IMPD officer behind him. (Haywood Dep. at 21:1–5, ECF No. 56-13 at 21). Daniels was breathing when he was moved to a cot and taken to the ambulance. (Haywood Dep. at 9:6–14, ECF No. 56-13 at 9). And he continued breathing for over a minute after he was placed on the cot and transferred to the ambulance. (Haywood Dep. at 10–11:20–13, ECF No. 56-13 at 10–11). He was stable once he was in the ambulance.

(Haywood Dep. at 23:12–23, ECF No. 56-13 at 23). He then stopped breathing and his heart stopped in the ambulance. (Haywood Dep. at 11–12:8–16, ECF No. 56-13 at 11–12).

Medics initiated Advanced Life Support protocols in the ambulance. (Haywood Dep. at 24:1–13, ECF No. 56-13 at 24). They administered oxygen and performed chest compressions. (Haywood Dep. at 26:7–9, 29:2–7, ECF No. 56-13 at 26, 29).

Medics may fracture a patient's ribs when doing chest compressions. (Haywood Dep. at 26:21–24, ECF No. 56-13 at 26). Marion County Coroner's Office Chief Forensic Pathologist, Dr. Christopher Poulos, found that seven of Daniels's ribs were fractured and he sustained a "very minimal hemorrhage" when paramedics tried to resuscitate him. (Autopsy Report Evidence of Medical Intervention, ECF No. 56-7 at 4); (Poulos Dep. at 30:9–23, ECF No. 56-9 at 23). But he saw no evidence of a shoe or boot print on the chest before the autopsy. (Autopsy Report at 4, ECF No. 56-7 at 4); (Poulos Dep. at 70:1–18, ECF No. 56-9 at 51). Haywood did not recall seeing any signs that Daniels was struck by any officer. (Haywood Dep. at 28:5–8, ECF No. ****4 at 28).

Dr. Poulos saw evidence that Daniels suffered from mild hypertensive cardiovascular disease during his autopsy. (Autopsy Report at 3, Note, ECF No. 56-7 at 3); (Poulos Dep. at 15–16:8–14, ECF No. 56-9 at 8–9). This disease, caused by high blood pressure or hypertension, can kill via "congestive heart failure or a sudden cardiac arrhythmia." (Poulos Dep. at 15:8–13, ECF No. 56-9 at 8). Daniels also "had a borderline enlarged heart with other evidence of hypertension. This has been associated with sudden cardiac death." *Id*.

Daniels also suffered from steatosis. (Autopsy Report at 3, Note, ECF No. 56-7 at 3). This "is fatty change of the liver." (Poulos Dep. at 18:3–13, ECF No. 56-9 at 11). It can be associated with sudden death. (Poulos Dep. at 26:11–20, ECF No. 56-9 at 19).

Daniels also had a reported history of schizophrenia. (Poulos Dep. At 28:2–22, ECF No. 56-9 at 21). Dr. Poulos did not diagnose this condition; he noted that schizophrenia is associated with sudden death and schizophrenics "have an increased incidence of death due to heart disease." (Poulos Dep. at 14–15:5–4; 65:14–15, ECF No. 56-9 at 7–8).

Dr. Poulos *did not* observe evidence of significant traumatic injury, choke hold use, electrical weapon deployment, chemical agent deployment, or of fist/baton strikes administered to the decedent when completing his autopsy. *Id*. He also testified that he "didn't find anything from law enforcement interaction that was definitively a cause of death." (Poulos Dep. at 27:1–3, ECF No. 56-9 at 20). He saw "minimal chest wall hemorrhage" caused by the medics' resuscitation efforts. (Poulos Dep. at 31:2–23, ECF No. 56-9 at 24). He also saw some redness on Daniels's shoulders. (Poulos Dep. at 32–33:1–1, ECF No. 56-9 at 25–26). He testified that this indicated that there was "not a huge amount of force applied to those shoulders" and that the redness indicated less force was used than force that might cause a bruise. *Id*.

Dr. Poulos also found that positional asphyxia *did not* "significantly contribute[] to" or cause Daniels's death. (Poulos Dep. at 52:11–23; 55–56:22–25; 63–64:11–5, ECF No. 56-9 at 33, 36–37, 44–45). He testified that it was unlikely that positional asphyxia led to his death because Daniels was still breathing when medics arrived. (Poulos Dep. at 58:7–18, ECF No. 56-9 at 39). He also testified that, in "studies involving healthy volunteers maintained in a prone position, there was not significant impairment of respiration." (Poulos Dep. at 55:13–21, ECF No. 56-9 at 36). He does not believe he has ever had "a case of positional asphyxia definitively with law enforcement officers[.]" (Poulos Dep. at 58–59:25–2, ECF No. 56-9 at 39–40).

Dr. Poulos could not determine whether Daniels's health conditions or his encounter with officers caused his death. *Id*. He testified that Daniels's medical conditions could be a cause of

sudden death. (Poulos Dep. at 26–27:11–18, ECF No. 56-9 at 19–20). But he could not "say that any one of them per se caused the death." *Id*. Thus, he concluded that the manner of Daniels' death was undetermined. *Id*.; (Autopsy Report Note, ECF No. 56-7 at 3).

Defendant Officers did not know whether Daniels suffered from any disabilities or medical conditions when they encountered him. (Guynn Aff. ¶ 144–149, ECF No. 56-4 at 12); (Raisovich Aff. ¶ 37–40, ECF No. 56-5 at 5); (Rossman Aff. ¶ 31–34, ECF No. 56-6 at 3). They did not have notice of his medical needs or the seriousness of his needs. *Id*. They did not hear him make any requests for medical treatment. *Id*. And they never prevented anyone from providing him with medical treatment. *Id*.

## II.     Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if the designated admissible evidence would not allow a reasonable trier of fact to find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## III.     Argument

Defendant Officers are "entitled to qualified immunity unless two disqualifying criteria are met." *Day v. Wooten*, 947 F.3d 453, 460 (7th Cir. 2020), *reh'g denied, cert. denied*. "First, the evidence construed in the light most favorable to the plaintiff must support a finding that [they] violated the plaintiff's constitutional right." *Id*. "Second, that right must have been clearly established at the time of the violation." *Id*. Defendant Officers used objectively reasonable force to seize Daniels and they did not violate his clearly established rights. Thus, they are entitled to qualified immunity and summary judgment.

The City is also entitled to summary judgment for several reasons. First, Daniels did not suffer a constitutional injury. Second, the City did not take municipal action with "deliberate indifference" as to its known or obvious consequences. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). Third, the City was not the "moving force" behind the Plaintiff's injury. *Id*. at 408. Thus, the City is entitled to summary judgment on all claims.

The Estate's Statement of Claims did not bring a claim against IMPD. Also, IMPD is not a proper party under Indiana law. Thus, IMPD is entitled to summary judgment.

### A. Defendant Officers used objectively reasonable force to seize Daniels.

The Estate claims Defendant Officers violated Daniels's Fourth, Eighth, and Fourteenth Amendment rights when they allegedly used "excessive force in restraining [him] on September 1, 2018[.]" (ECF No. 45, ⁋ 1). Defendant Officers are not liable under the Eighth and Fourteenth Amendment for allegedly using excessive force during his arrest though because "[c]laims that officers used excessive force in seizing a person are evaluated under the Fourth Amendment's reasonableness standard." *See Rightsell v. Ind. State Police*, 2021 WL 2686152, at *4 (S.D. Ind. June 30, 2021) (quoting *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010)).

Here, "the reasonableness of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Estate of Biegert v. Molitor*, 968 F.3d 693, 698 (7th Cir. 2020) (cleaned up). "The court addresses several factors to determine the reasonableness of an officer's actions under the circumstances[.]" *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015). "However, the court's ultimate goal in examining these factors is to determine 'whether the force used to seize the suspect was excessive in relation to the danger he posed… if left unattended.'" *Id*. citing *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011). "[I]f there are sufficient undisputed material facts to establish that the officer acted reasonably

under the circumstances, then the court must resolve the issue as a matter of law, rather than allow a jury to 'second-guess' the officer's actions." *Id.*

Officer Guynn used force to seize Daniels when he grabbed his left arm. (Guynn Aff. ¶ 63, ECF No. 56-4 at 6). At that moment, Daniels would have posed considerable danger to himself and others if he was left unattended because he had been walking in and out of Cooper Road repeatedly. (Guynn Aff. ¶ 49–51, ECF No. 56-4 at 5). Officer Guynn thought Daniels may have been intoxicated because he staggered as he walked in and out of traffic. (Guynn Aff. ¶ 51, ECF No. 56-4 at 5). He also believed that Daniels was intoxicated because he had red, glossy eyes. (Guynn Aff. ¶ 52, ECF No. 56-4 at 5). Thus, he had reason to detain Daniels under Indiana Code § 7.1-5-1-3 and § 12-26-4-1. This Court has ruled that Indiana law allows officers "to take reasonable steps to apprehend [suspects] for [their] own safety and the safety of others." *Jordan v. City of Indianapolis*, 2002 WL 32067277, at *4 (S.D. Ind. Dec. 19, 2002). And under the Fourth Amendment, "a mental-health seizure is lawful if there is probable cause to believe that the person seized is a danger to herself or others." *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015). Here, Officer Guynn acted reasonably when he grabbed Daniels's arm.

Next, Officer Guynn used force to take Daniels to the ground after Daniels threw a punch at him, knocked his sunglasses off his face, and started to throw another punch at him. (Guynn Aff. ¶¶ 70–73, ECF No. 56-4 at 7). Officer Guynn used this force because he knew that Daniels would pose a greater threat to himself and others while he was on his feet. (Guynn Aff. ¶¶ 74–77, ECF No. 56-4 at 7). Indeed, the risk that Daniels would injure himself or others was very high when he began fighting Officer Guynn on his feet. *Id.* Officer Guynn also used force to take Daniels to the ground because it was easier to handcuff him on the ground and he was less

dangerous when he was handcuffed. (Guynn Aff. ₱₱ 76–81, ECF No. 56-4 at 7). Officer Guynn acted in an objectively reasonable manner when he took Daniels to the ground.

Officer Guynn got on the ground with Daniels because he was concerned that Daniels might try to stand up and flee. (Guynn Aff. ₱ 84, ECF No. 56-4 at 8). He then used his arms to gain control of Daniels's wrists and handcuff them. (Guynn Aff. ₱₱ 88–92, ECF No. 56-4 at 8). After Daniels was handcuffed, he tried to turn his body towards Officer Guynn, he pulled away from him, and he resisted efforts to restrain him. (Guynn Aff. ₱ 97, ECF No. 56-4 at 9). Officer Guynn tried to keep Daniels lying on his left side as he struggled because this was the best position to keep him in. (Guynn Aff. ₱₱ 98–104, ECF No. 56-4 at 9–10). Officer Guynn held Daniels on the ground in this position to prevent him from fleeing, kicking him, or breaking free from his grip. (Guynn Aff. ₱₱ 98–113, ECF No. 56-4 at 9–10). Since Daniels posed a threat to himself and others while he kicked and fought on the ground, Officer Guynn used objectively reasonable force when he handcuffed him and held him on the ground.

Officer Raisovich also used objectively reasonable force during this encounter. First, he used visual and audible de-escalation techniques to try to calm Daniels down. (Raisovich Aff. ₱ 24, ECF No. 56-5 at 3). But Daniels tried to kick Officer Raisovich in the knees and shins when he approached him (Raisovich Aff. ₱ 25, ECF No. 56-5 at 3). Officer Raisovich told Daniels that he would have to restrain his legs if he did not stop trying to kick him. (Guynn Aff. ₱ 119, ECF No. 56-4 at 10). Daniels responded with profanity and tried to kick him. (Guynn Aff. ₱ 120, ECF No. 56-4 at 10). Officer Raisovich reasonably tried to restrain his legs with a bungie cord to slow or stop his kicks because Daniels was a danger to himself and others when he kicked at them and struggled. (Raisovich Aff. ₱ 25–27, ECF No. 56-5 at 3).

Officer Rossman, likewise, used objectively reasonable force to restrain Daniels. When he arrived, Daniels was still kicking, fighting, and swearing. (Guynn Aff. ¶¶ 127–28, ECF No. 56-4 at 11). Officer Rossman retrieved a pair of oversized cuffs from his vehicle after he was told Officer Raisovich could not restrain Daniels's legs and he placed them on Daniels's ankles as he kicked, struggled, and yelled. (Raisovich Aff. ¶¶ 29–30, ECF No. 56-5 at 3–4).

When Sgt. Wilson arrived, he replaced the oversized cuffs on Daniels's ankles. (Wilson Dep. Tr. at 23–24:21–14, ECF No. 56-11 at 10–11). Daniels was then "immediately moved" to a recovery position on his side. *Id*. Next, he was moved to a seated position. *Id*. He was then monitored. (Raisovich Aff. ¶ 33, ECF No. 56-5 at 4). But Defendant Officers did not use force to restrain him after he was moved. (Guynn Aff. ¶ 156, ECF No. 56-4 at 13).

The Seventh Circuit recently held that officers who used analogous force were entitled to qualified immunity. *Turner v. City of Champaign*, 979 F.3d 563, 568 (7th Cir. 2020) (affirming summary judgment for officers). In *Turner*, officers used force during an encounter with a homeless man, Turner, who officers had interacted with for decades and who had experienced mental health problems. *Id*. at 565. There, officers decided to detain Turner after they saw him repeated walking in and out of traffic. *Id*. Turner ran and officers chased him down an alley. *Id*. When Turner would not stop, an officer grabbed his shoulder. *Id*. Turner then shoved an officer, and a struggled ensued. *Id*. Officers responded by pulling Turner to the ground and placing him on his stomach. *Id*. An officer placed a knee on Turner's shoulder. *Id*. Another placed knees and hands on his flailing legs. *Id*. Three officers then worked to restrain Turner's hands and legs while he kicked at them. *Id*. Turner stopped breathing shortly after his legs were restrained. *Id*. Medics arrived minutes later and could not revive Turner. *Id*.

In *Turner*, the Seventh Circuit held that the officers had probable cause to detain Turner for his own safety and that of others. *Id*. at 568. It noted that their authority to detain him came with the authority to use reasonable force to accomplish the detention. *Id*. at 569. "Accordingly, [an officer] did not violate the Fourth Amendment when he caught up with Mr. Turner and grabbed his shoulder to stop his flight." *Id*. "The officers then took Mr. Turner to the ground, where Mr. Turner kept resisting and trying to pry himself away from the officers." *Id*. "The officers all testified that this resistance continued throughout the encounter." *Id*. "Even after Mr. Turner was handcuffed, they needed a hobble because he kept kicking his legs." *Id*. "The hobble had to be attached twice because Mr. Turner's flailing legs broke free on the first attempt." *Id*.

The court noted that the facts in *Turner* were analogous to a case decided in 1997 that involved a suspect who died after officers handcuffed him and placed him face down on the floor. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 587 (7th Cir. 1997). It then held that "the escalating force against Mr. Turner was a constitutionally permissible response to his continued resistance." *Turner*, 979 F.3d at 570. According to the court, the "officers placed Mr. Turner in a prone position, pinned down his shoulder, handcuffed him, and hobbled him." *Id*. But "each of these actions was reasonable under the Fourth Amendment." *Id*. "After Mr. Turner shoved Officer Wilson and continued resisting, it was reasonable to place him in a prone position to handcuff him." *Id*. "Placing a knee on Mr. Turner's shoulder was also not excessive given the undisputed evidence of his continued resistance on the ground." *Id*. "Finally, pinning down Mr. Turner's legs and attaching a hobble were reasonable given the undisputed testimony that he kept kicking and that he maneuvered out of the hobble when it was first applied." *Id*.

"Unfortunately, also as in *Estate of Phillips*, that force, it turned out, when combined with Mr. Turner's other health problems, resulted in his death." *Id*. (cleaned up). "But legally, it was

not deadly force because it did not carry a substantial risk of causing death or serious bodily harm." *Id*. "Rather, at each step of the encounter, the undisputed facts show that the officers used a reasonable amount of force." *Id*. "Critically, Mr. Turner's body showed no signs of suffocation or trauma from the officers' force." *Id*. "[T]he officers did not hogtie, choke or transport Mr. Turner. Nor were his medical conditions (an enlarged heart, an enlarged thyroid, Graves' disease and a thyroid storm), which were contributing factors to Mr. Phillips' death, observable to the untrained eye." *Id*. "In situations like this, where an officer's force causes unexpectedly severe injuries due to a hidden condition, reasonableness is assessed objectively based only on what the officer knew at the time force was applied." *Id*.

*Turner* clearly establishes that Defendant Officers used objectively reasonable force to detain Daniels. Like the officers in *Turner*, Officer Guynn used objectively reasonable force when he grabbed Daniels's arm, took him to the ground, put him in handcuffs, and held him on the ground. Officer Raisovich used objectively reasonable force when he tried to restrain Daniels's legs with a bungie cord. Officer Rossman used objectively reasonable force when he used oversized cuffs to restrain his legs. The designated evidence would not allow a jury to find that Defendant Officers violated Daniels's rights. Thus, they are entitled to summary judgment.

### B. Defendant Officers did not violate Daniels's clearly established rights.

"Even when a public official's actions have violated a plaintiff's constitutional rights, the official can escape liability if the right was not clearly established at the time of the violation." *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). Generally, this means

"existing precedent must have placed the ... question beyond debate." *Id.* "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.*

The Court must not "define clearly established law at a high level of generality." *Id.* "The dispositive question is whether the violative nature of particular conduct is clearly established." *Id.* (cleaned up). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (cleaned up). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (cleaned up). "The plaintiff bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred." *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017). The Estate cannot meet this burden. Indeed, the *Turner* decision shows that the force Defendant Officers used was objectively reasonable and it is not clearly established that officers cannot use objectively reasonable force.

*Turner* shows that officers may grab suspects by the arm if suspects do not stop for them when they are conducting mental-health seizures. *Turner*, 979 F.3d at 566. Officers may then take suspects to the ground and place them on their stomachs while handcuffing them if they actively resist the officers' efforts to seize them. *Id.* They may also use force to prevent suspects from moving when they are on the ground. *Id.* And they may restrain suspects' legs if they kick at them while they are on the ground. *Id.* Three officers may use this level of force at the same time if suspects actively resist them during these seizures. *Id.* The force that Defendant Officers used to restrain Daniels does not differ in any material respect from the force that the officers used in *Turner*. Here, the Estate cannot show that Defendant Officers were on notice that the force that they used violated clearly established law if it was deemed reasonable in *Turner*.

The *Turner* decision is not an anomaly. Instead, "[m]any decisions hold that there is no clearly established rule forbidding a clean takedown to end mild resistance ... ." *Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019). The Seventh Circuit has also held that no precedent clearly establishes the right of "an out-of-breath arrestee to not have his hands cuffed behind his back after he complains of difficulty breathing." *Day*, 947 F.3d at 463–64. Here, as in *Day*, "handcuffs were used in a manner that would not have harmed an average arrestee, and there is no evidence the officers were aware the handcuffs were causing [any] breathing trouble." *Id*. at 464. Defendant Officers' "conduct under the circumstances was not obviously unlawful." *Id*. Thus, Defendant Officers are entitled to qualified immunity.

### C. IMPD is not a proper party and no claims were asserted against it.

IMPD is entitled to summary judgment because (1) IMPD is not a proper party, *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011); (2) the claim against IMPD is redundant, *McGivern v. City of Indianapolis*, 2003 WL 21989996, at *5 (S.D. Ind. Aug. 11, 2003); and (3) the Statement of Claims does not assert a claim against IMPD. *Harris v. Carrier Corp.*, 2017 WL 4037658, at *2 (S.D. Ind. Sept. 13, 2017).

### D. The City did not cause Daniels to suffer a constitutional injury.

The Estate must satisfy a strict burden of proof to prevail under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). "*Monell* liability is difficult to [prove] precisely because of the care the law has taken to avoid holding a municipality responsible for an employee's misconduct." *J.K.J. v. Polk Cty.*, 960 F.3d 367, 377 (7th Cir. 2020) (*en banc*). "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989)

(emphasis in original); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("[U]nder § 1983, local governments are responsible only for their *own* illegal acts." (emphasis in original)).

To hold the City liable, the Estate must first prove that a municipal policy or custom caused the constitutional injury at issue in this case. *Id.* "The critical question under *Monell* . . . is whether a municipal ... policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). This requirement may be met by pointing to either municipal action or inaction that caused a constitutional deprivation. *See J.K.J.*, 960 F.3d at 377.

"The most straightforward *Monell* claims are those in which a plaintiff alleges that an affirmative municipal action is itself unconstitutional." *Id.* A municipal action can have three forms: (1) an express policy, (2) a widespread custom or practice, and (3) an action by a final decisionmaker. *Id.* Here, there is no evidence that an express policy, widespread custom or practice, or action of a final decisionmaker caused Daniels to suffer a constitutional injury. And the Estate's Statement of Claims does not allege otherwise.

Instead, the Estate's Statement of Claims merely alleges that the City failed to act. Thus, the Estate may only proceed on its *Monell* claim if it is able to prove that this alleged inaction caused Daniels to suffer a constitutional injury. According to the Seventh Circuit, "the path to *Monell* liability based on inaction is steeper because, unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous." *J.K.J.*, 960 F.3d at 378.

Here, the designated evidence refutes the Estate's claim that the City failed to act. Indeed, IMPD worked with CALEA to ensure that its directives met and exceeded national standards for best practices in law enforcement. (Griffith Aff. ⁋ 5, ECF No. 56-3 at 1). It developed and

maintained directives to provide its officers with a clear understanding of the constraints and expectations governing the performance of their duties. (Griffith Aff. ¶ 9, ECF No. <u>56-3</u> at 2). IMPD required its officers to read and understand its directives and it required its supervisors to enforce its directives. (Griffith Aff. ¶¶ 15–16, ECF No. <u>56-3</u> at 3).

Under General Order 1.30, Defendant Officers could only use reasonable force if they reasonably believed it was necessary given the totality of the circumstances. (Griffith Aff. ¶ 29, ECF No. <u>56-3</u> at 4). Here, General Order 1.30 only permitted Defendant Officers to use reasonable force if it was necessary to enforce the law and effect a lawful arrest. In other words, IMPD permitted them to use the same level of force that they were permitted to use to effect a lawful arrest under Indiana law. Ind. Code § 35-41-3-3 ("A law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to enforce a criminal law or to effect a lawful arrest."). "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law. If the language and standards from *Monell* are not to become a dead letter, such a 'policy' simply cannot be sufficient to ground liability against a municipality." *Surplus Store & Exch., Inc. v. City of Delphi*, 928 F.2d 788, 791–92 (7th Cir. 1991). Thus, IMPD cannot be held liable for its policy of allowing its officers to use reasonable force to effectuate a lawful arrest.

Under General Order 1.30, Defendant Officers were required to know that suspects who exhibit (1) extreme agitation, (2) violent, bizarre, or irrational behavior, (3) profuse sweating, (4) extraordinary strength, (5) unusual pain tolerance, or (6) protracted physical resistance to officers may be at an increased risk of sudden death. (Guynn Aff. ¶ 24, ECF No. <u>56-4</u> at 3). General

Order 1.30 shows that IMPD was not deliberately indifferent to the possibility that its officers might encounter suspects who might be at an increased risk of sudden death.

IMPD informed officers that use-of-force incidents would be consistently and thoroughly investigated. (Griffith Aff. ¶ 35–36, ECF No. 56-3 at 5). It made them notify a supervisor if they used force to detain a non-compliant suspect or if they used force that caused or allegedly caused serious bodily injury, injury, or a complaint of pain. (Griffith Aff. ¶¶ 38–40, ECF No. 56-3 at 6). It made them document all uses of force that exceeded un-resisted handcuffing. (Griffith Aff. ¶ 41, ECF No. 56-3 at 6). It made supervisors respond to scenes to investigate uses of force. (Griffith Aff. ¶ 46, ECF No. 56-3 at 6). It maintained records of use-of-force incidents resulting in or allegedly resulting in serious bodily injury, injury, or complaints of pain. (Griffith Aff. ¶ 52, ECF No. 56-3 at 7). It conducted an annual analysis of these records and reviewed incidents to identify patterns or trends that could indicate necessary training or policy modifications. (Griffith Aff. ¶ 54, ECF No. 56-3 at 7–8). If modifications are necessary, it notified its Training Division and Planning and Research Section. (Griffith Aff. ¶ 55, ECF No. 56-3 at 8). It did not hide its head in the sand. It looked for deficiencies and addressed them.

IMPD also taught officers how to interact with mentally ill subjects and made them report when mental illness contributed to an incident. (Griffith Aff. ¶ 59, ECF No. 56-3 at 8); (Guynn Aff. ¶ 32, ECF No. 56-4 at 3). It made them look for warning signs of positional asphyxia. (Griffith Aff. ¶ 66, ECF No. 56-3 at 9). It taught officers that subjects may have trouble breathing if they are placed on their stomach with their legs and hands restrained behind their back. (Griffith Aff. ¶ 67, ECF No. 56-3 at 9). IMPD did not allow its officers to leave subjects on their chest or stomach for longer than necessary and made them move subjects to their side as soon as possible. (Griffith Aff. ¶¶ 68–69, ECF No. 56-3 at 9). It required its officers to carefully

observe subjects and summon medical assistance immediately to evaluate a subject's health whenever necessary. (Griffith Aff. a ❡ 70, ECF No. 56-3 at 9). IMPD made its officers look for symptoms of excited delirium and understand the risk that this condition might cause positional asphyxia. (Griffith Aff. ❡ 71, ECF No. 56-3 at 10). It made them closely monitor subjects who exhibit those symptoms to make sure they remain alert, conscious, and able to sit or speak on their own before they are transported from a scene. (Griffith Aff. ❡ 72, ECF No. 56-3 at 10). There is nothing unconstitutional about any of these policies.

Defendant Officers were trained to read and understand IMPD's policies when they began working for IMPD. (Young Aff. ❡ 9, ECF No. 111-1 at 2); (Guynn Aff. ❡ 12, ECF No. 56-4 at 2). And they were trained to read and understand directives that went into effect after they began working for IMPD. (Griffith Aff. ❡ 21–23, ECF No. 56-3 at 3). They were trained to immediately report violations of IMPD's directives. (Young Aff. ❡ 32, ECF No. 111-1 at 5–6). They were also trained to intervene to stop excessive force and violation of IMPD's directives and to report violations and excessive force to a supervisor, the Professional Standards Branch, or the Chief of Police. (Griffith Aff. ❡ 84–85, ECF No. 56-3 at 11).

IMPD then investigated all alleged violations of its directives and disciplined officers who violated its directives. (Griffith Aff. ❡ 89; ❡ 117, ECF No. 56-3 at 11, 14). IMPD generated monthly data reports and on-demand reports about discipline and trends. (Griffith Aff. ❡ 7, ECF No. 56-3 at 1). IMPD maintained an early warning system to proactively monitor its officers' professional health and uses of force. (Griffith Aff. ❡ 8, ECF No. 56-3 at 2). It was not indifferent to the possibility that any officer would violate any of its policies or training.

But even if the City were inactive, which it was not, "[i]dentifying municipal action—or, as it were, inaction—is only part of the requisite inquiry under *Monell*." *J.K.J.*, 960 F.3d at 379.

"The Supreme Court has made plain that a failure to act amounts to municipal action for *Monell* purposes only if the [City] has notice that its [policies or training] will cause constitutional violations." *Id*. "Demonstrating that notice is essential to an ultimate finding and requires a 'known or obvious' risk that constitutional violations will occur." *Id*. There is no evidence that IMPD had notice that its training or policies were deficient or that it was deliberately indifferent to a known or obvious risk that these deficiencies would cause the deprivation of anyone's rights.

Here, the designated evidence establishes that IMPD was unaware of trends that showed its use-of-force training or policies were deficient. (Young Aff. ¶ 31, ECF No. 111-1 at 5). Also, IMPD has no reports that suggest that deficiencies in its policies or practices have caused its officers to improperly position detainees. (Griffith Aff. ¶ 121, ECF No. 56-3 at 15). It did not discipline any officer for improperly positioning a detainee in a way that could have led to positional asphyxia or for violating General Order 8.1 Section III in the years before 2018. (Griffith Aff. ¶ 122, ECF No. 56-3 at 15). Investigators did not sustain any complaints concerning violations of General Order 8.1 Section III or the improper placement of detainees that lead to asphyxia, death, or serious bodily injury in the years before 2018. (Griffith Aff. ¶¶ 123–24, ECF No. 56-3 at 15). IMPD had no evidence of trends or incidents that would have triggered a reassessment of its policies or practices regarding IMPD officers positioning detainees in a manner that leads to death. (Griffith Aff. ¶ 125, ECF No. 56-3 at 15).

Further, IMPD did not have any evidence of trends or incidents that would have triggered a reassessment of its policies or practices regarding encounters with disabled individuals that lead to death. (Griffith Aff. ¶ 126, ECF No. 56-3 at 15). IMPD also had no data that suggested that any policy or practical deficiencies could lead to disabled individuals being detained in a reckless manner. (Griffith Aff. ¶ 121, ECF No. 56-3 at 15). Indeed, IMPD did not have data or

reports that would have provided it with notice that its training or policies would cause officers to position detainees in a manner that violates their rights or treat the mentally ill in a manner that might lead to their death. (Griffith Aff. ¶ 130, ECF No. 56-3 at 16).

"The plaintiff must also show a direct causal connection between the policy . . . and his injury, in other words that the policy or custom was the 'moving force [behind] the constitutional violation." *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (quotation omitted). "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Bryan Cty.*, 520 U.S. at 398. "A failure to apply stringent culpability and causation requirements raises serious federalism concerns, in that it risks constitutionalizing particular [policy or training] requirements that States have themselves elected not to impose." *Id.*

The Estate cannot prove that the City's policies or training were the moving force behind a use of force that violated Daniels's rights because Daniels was not subjected to a used of force that violated his rights. There cannot be a direct causal link between the City's action or inaction and a deprivation or injury that did not occur. The Seventh Circuit reiterated this well-established point recently when it held that "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Gaetjens v. City of Loves Park*, 4 F.4th 487, 495–96 (7th Cir. 2021), *reh'g denied* (Aug. 12, 2021) (citation omitted).

*Turner* shows the force that Defendant Officers used to detain Daniels was objectively reasonable. *Turner*, 979 F.3d at 570. It shows that officers may grab suspects by the arm when conducting mental-health seizures. *Id.* at 566. They may take them to the ground and place them on their stomachs while handcuffing them if they actively resist efforts to seize them. *Id.* They may use force to prevent suspects from moving when they are on the ground. *Id.* And they may

restrain suspects' legs if they kick at them while they are on the ground. *Id*. Thus, Officer Guynn used objectively reasonable force when he grabbed Daniels's arm, performed a leg sweep, put him in handcuffs, and held him on the ground. Officer Raisovich used objectively reasonable force when he tried to restrain Daniels's legs. And Officer Rossman used objectively reasonable force when he restrained Daniels's legs with his oversized cuffs. Since Daniels was not subjected to excessive force, the City did not cause anyone to subject him to the use of excessive. Thus, it is entitled to summary judgment because it is not liable under *Monell* or 42 U.S.C. § 1983.

## IV.    Conclusion

For the foregoing reasons, Defendants respectfully request that the Court grant them summary judgment on all claims pending against them and for all other relief that is just and proper.

Respectfully submitted,

FROST BROWN TODD LLC

By:  */s/ Anthony W. Overholt*
Anthony W. Overholt, #16481-49
Amy S. Johnson, #16257-49

*Attorney for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was electronically filed on this 9th day of March, 2022. Service of this filing will be made on all ECF registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Adam Scott Willfond
Andrew J. Upchurch
Office of Corporation Counsel
City of Indianapolis
200 E. Washington Street, Suite 1601
Indianapolis, IN 46204

Craig Robert Karpe
Karpe Litigation Group
19 W. 19th Street
Indianapolis, IN 46202

Edward J. Merchant
John F. Kautzman
Martin A. Brown
Ruckelshaus Kautzman Blackwell Bemis
    Duncan & Merchant, LLP
135 N. Pennsylvania Street, Suite 1600
Indianapolis, IN 46204

/s/ *Anthony W. Overholt*
Anthony W. Overholt

FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN 46244-0961
317-237-3800
Fax: 317-237-3900
aoverholt@fbtlaw.com
asjohnson@fbtlaw.com