```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA
                  INDIANAPOLIS DIVISION
             CASE NO. 1:20-cv-02280-JRS-MJD
```

THE ESTATE OF PAUL DANIELS, by      )
Personal Representative Kay Stover  )
                                    )
                  Plaintiff         )
                                    )
        -vs-                        )
                                    )
CITY OF INDIANAPOLIS, et al.        )
                                    )
                  Defendants        )


                DEPOSITION OF APRIL WOODSON

    The deposition upon oral examination of

APRIL WOODSON, a witness produced and sworn

before Kathleen Andrews, Notary Public in and

for the County of Hamilton, State of Indiana,

taken on behalf of the Plaintiff at the offices

of Associated Reporting, Inc., 251 East Ohio Street,

Suite 940, Indianapolis, Marion County, Indiana,

at 1:15 p.m. on July 22, 2021, pursuant to the Indiana

Rules of Trial Procedure.


               ASSOCIATED REPORTING, INC.
           251 EAST OHIO STREET, SUITE 940
               INDIANAPOLIS, INDIANA 46204
                     (317) 631-0940
                www.associated-reporting.com

APPEARANCES

FOR THE PLAINTIFF:

Craig R. Karpe
Karpe Litigation Group
19 West 19th Street
Indianapolis, IN 46202

FOR THE DEFENDANTS:

Andrew J. Upchurch
Office of Corporation Counsel
200 East Washington Street
Room 1601
Indianapolis, IN 46204

EXAMINATION

|  | PAGE |
|---|---|
| EXAMINATION BY MR. KARPE | 3 |
| EXAMINATION BY MR. UPCHURCH | 14 |
| EXAMINATION BY MR. KARPE | 16 |

```
 1            APRIL WOODSON, the witness herein,
 2       having been first duly sworn to tell the truth,
 3       the whole truth, and nothing but the truth,
 4       testified as follows:
 5  EXAMINATION,
 6       QUESTIONS BY MR. KARPE:
 7  Q.   Can you please state your full name for the record.
 8  A.   April Michelle Woodson.
 9  Q.   All right, Ms. Woodson.  What is your date of
10       birth?
11  A.   ███████████.
12  Q.   All right.  And what is your current address?
13  A.   ████ ████ ████ ███████ ██████████ ████████
14       ████████ ██████████ ████████
15  Q.   Okay.  Thank you for coming in.  As you know, we
16       are here regarding Paul Daniels in an incident that
17       you observed on September 1, 2018.
18            Before I get into that, I've got some
19       preliminary questions.  Have you ever done a
20       deposition before?
21  A.   No.  This is my first one.
22  Q.   Okay.  Well, let me tell you a little bit about how
23       it goes.  I don't think we'll run but about ten or
24       fifteen minutes because all you really know is what
25       you saw at the time, so I'm not going to get too
```

```
 1            deep into things with you.
 2     A.     Okay.
 3     Q.     But if you don't understand my questions for any
 4            reason, please ask me to rephrase them.  I'm happy
 5            to repeat them.  Or if I'm mumbling or whatever,
 6            it's fine, I'll rephrase it for you.
 7     A.     Okay.
 8     Q.     And if you do answer, is it fair to assume that you
 9            understand the question, then?
10     A.     (Nodding.)
11     Q.     Then that's the next thing.  You need to answer
12            verbally so she can take it down.
13     A.     Okay.  Not shake my head, yes, okay.
14     Q.     So your answer to my last question was yes?
15     A.     Yes.
16     Q.     And then the other important thing is that we don't
17            talk over each other.  You know, normal
18            conversation, people banter back and forth and talk
19            over each other, but that makes it very difficult
20            to keep a clear record for the court reporter.  So
21            I'll try to wait until you finish your answers, and
22            please try to wait until I finish my questions.
23            Okay?
24     A.     Yes.
25     Q.     Is there any reason that you wouldn't be able to
```

```
 1        answer questions today, either a health issue or
 2        any kind of prescription medication or anything
 3        else that could interfere with your ability to
 4        understand my questions?
 5   A.   No.
 6   Q.   All right.  What do you do for a living, April?
 7   A.   I'm a Family Support Specialist for Healthy
 8        Families HealthNet.
 9   Q.   Okay.  Do you have any knowledge, prior to
10        September 1, 2018, of Paul Daniels?
11   A.   No.  Actually, today is the first time I heard his
12        name.
13   Q.   Okay.  Or anybody in the Daniels family, then;
14        correct?
15   A.   No.
16   Q.   Do you know Officer Raisovich?
17   A.   No.
18   Q.   Have you ever heard of Officer George Rossman?
19   A.   No.
20   Q.   Okay.  And have you ever heard of Officer Stephen
21        Guynn Jr.?
22   A.   No.
23   Q.   All right.  Have you had any involvement with
24        either working for or friends with or anything like
25        that with the Indianapolis Police Department or
```

| | | |
|---|---|---|
| 1 | | Marion County Sheriff? |
| 2 | A. | No. |
| 3 | Q. | All right.  And prior to today, tell me everybody |
| 4 | | that you've spoken to about the events that you |
| 5 | | witnessed on September 1, 2018. |
| 6 | A. | Just WTHR when they, when I had posted -- when I |
| 7 | | saw the news article, the news thing on WTHR when |
| 8 | | they had reported the incident, I just made a |
| 9 | | comment on their, the what you call it -- |
| 10 | Q. | Facebook page? |
| 11 | A. | Page, yes.  I made a comment.  One of the |
| 12 | | reporters, I cannot think of his name, but he |
| 13 | | reached out to me and asked if he could come over |
| 14 | | to interview, you know, to interview me.  And I |
| 15 | | told him yes.  And I met him at my mother's house, |
| 16 | | but not my apartment. |
| 17 | Q. | I see. |
| 18 | A. | Then the detective found, then the following day I |
| 19 | | believe it was a detective, he reached out, well, |
| 20 | | he came to my mother's address, looking for me, and |
| 21 | | questioned me about what I saw. |
| 22 | Q. | Was that Detective Craighill? |
| 23 | A. | Yes. |
| 24 | Q. | If you recall his name.  Do you actually remember |
| 25 | | his name? |

```
 1   A.   I don't recall his name.
 2   Q.   And you gave a statement to him; is that correct?
 3   A.   Yes.
 4   Q.   And you are aware he recorded that statement?
 5   A.   Yes, I do remember he told me he was recording.
 6   Q.   Okay.  And then is there anybody since then that
 7        you've talked to about this?
 8   A.   No.  Actually, I was shocked when someone called me
 9        about it.  I don't know.  Was it you that called me
10        about the deposition?
11   Q.   Well, I talked to you a couple of days ago.
12   A.   About the deposition.
13             MR. UPCHURCH:  That was me.
14   A.   That was you, okay.
15   Q.   I think we both talked to you on the phone.
16   A.   Yeah, about the deposition.  I was real shocked it
17        even came.  I was like September 1, okay, yes.
18   Q.   And I'm going to represent to you that the first
19        call came from Mr. Andrew Upchurch, who is sitting
20        across from me here, representing the City of
21        Indianapolis.
22   A.   Okay.
23   Q.   And I made the second call to find out if you could
24        attend today.
25   A.   Yes, okay.
```

1 Q. And then regarding that first call, what do you
2 recall about that conversation?
3 A. From?
4 Q. The first call, that would be from Andrew.
5 A. Oh, he just was letting me know that I would be
6 receiving about the deposition and asked me would I
7 be available.
8 Q. Okay.
9 A. Yeah.
10 Q. All right. Just to be clear about what we talked
11 about when I talked to you on the phone, what did
12 we say?
13 A. You asked me was I available to come today at
14 one o'clock.
15 Q. Okay. And did we go into the details of the events
16 or anything?
17 A. Oh, no. We didn't talk about what happened or
18 nothing.
19 Q. All right. Very good. So then let's talk about
20 September 1, 2018. You were in your car when you
21 observed this; right?
22 A. Right. I was in my car.
23 Q. And where were you coming from?
24 A. From my apartment. My apartment is, right now -- I
25 don't know what they was called. They done changed

```
 1            names since then.  Right now they are called Aurora
 2            Apartments.  They are on 39th and Kessler.
 3                 I was driving from 39th and Kessler, and
 4            Kessler turns into Cooper Road.  As you cross 56th
 5            Street, it switches over.
 6                 So I was coming from 39th and Kessler, going
 7            towards 62nd, because I was going to Kroger.  I
 8            won't forget that.  I was going to Kroger.
 9     Q.     That was going to be my next question, but go
10            ahead.  Maybe you can make this a little shorter.
11     A.     Okay.  I was going to Kroger.  So it's a church
12            that sits on the right side of Cooper Road.  So I
13            stopped right there on Cooper Road.  It was an
14            officer and a gentleman.  I do know they both were
15            African male.
16     Q.     Okay.  Let me stop you right here.  You stopped at
17            Cooper Road.  You were going which direction?
18     A.     Let's see.  I was going this way, so that would be
19            going I would say north, going north.
20     Q.     So you were going north on Cooper?
21     A.     Yeah, because if I was going back, it would be
22            south.  I was going north.
23     Q.     Were you at the intersection, or had you passed --
24     A.     I was past the light.
25     Q.     So you were up close to the Eastern Star Church?
```

1    A.    Yes, right there at the church.
2    Q.    Okay. Tell me what you saw as you were going
3       through there.
4    A.    So as I passed the church, right there at the
5       church I had to stop. They were in the middle of
6       the intersection, like in the street, actually in
7       the street.
8          And the officer was trying to handcuff him or
9       get him out of the street, so they was going back
10       to some houses or some on this side of the road.
11       Then the church was on the right -- let me make
12       sure -- on the right side because I was going
13       north. On the right side is the church. On the
14       left side is, it's a house or a field. I can't
15       think. Depending on how far you go down on Cooper
16       Road.
17    Q.    Okay. So the first thing you saw was an officer
18       trying to handcuff --
19    A.    He was trying to get him out of the road. They was
20       in the middle of the road, so I couldn't drive
21       because they were actually in the street in front
22       of my car.
23    Q.    All right.
24    A.    So my windows was up, so I could not hear what was
25       being said.

```
 1   Q.   Uh-huh.  What did you see take place?
 2   A.   I just saw him following the guy back and forth,
 3        trying to get him.
 4   Q.   Let me stop you here.  Who is him?  Would that be
 5        the police officer or the civilian?
 6   A.   Okay.  The police officer was following the
 7        civilian.  Is that how you want it?
 8   Q.   Yeah, sure.
 9   A.   The police officer was following the civilian, like
10        trying to get him out of the street and trying to,
11        you know, they was going one side of the road to
12        the next side of the road.  And he was trying to
13        handcuff him.  The civilian was swinging on the
14        officer several times.
15   Q.   Okay.
16   A.   I do remember him swinging on him.
17   Q.   And can you describe this?  Was it, did he look
18        like a fighter, or was it just somebody wildly
19        swinging arms, or what was happening there?
20   A.   He was like, I do remember the officer having
21        glasses on, and he hit him where his glasses like
22        flew off.  I do remember that part because I was
23        like, hey, I was thinking to myself he didn't tase
24        him or nothing, but.  So I thought that was okay.
25   Q.   Then what happened after that?
```

```
 1   A.   So when they got to the church side of the thing,
 2        he finally did get him down.
 3   Q.   So the officer got the civilian down?
 4   A.   The civilian down, and he was able to handcuff him.
 5   Q.   All right.
 6   A.   But while he was handcuffing him, before he could
 7        get, like he had one hand behind his back, he was
 8        still able to hit him, you know, with his other
 9        hand before he got his other hand handcuffed.  Once
10        he got him handcuffed, I drove off once I saw he
11        was handcuffed.
12   Q.   Okay.  And then tell me what was the last thing you
13        saw?  What position was the civilian in when you
14        drove off?
15   A.   He was handcuffed.
16   Q.   Was he on the ground, laying on the ground?
17   A.   Yeah, he was laying on the ground and like
18        handcuffed.
19   Q.   Okay.  Was he laying, in what position was he
20        laying?  How was his body oriented?
21   A.   He was flat.
22   Q.   On which side?  Front or back?
23   A.   Front.
24   Q.   So he was, did you ever see him move from that
25        position after he was handcuffed?
```

```
 1   A.   No.  I took off after he was handcuffed, so I
 2        didn't see like.
 3   Q.   How long do you think you saw that before you took
 4        off?
 5   A.   Just a few seconds because as soon as I saw that
 6        the officer was able to handcuff him and stuff, I
 7        was on my way.
 8   Q.   The show was over, and you were on your way?
 9   A.   Yeah.  I was on my way so, you know.
10   Q.   Okay.  Did you see the officer look up and give you
11        a thumbs up or smile or anything?
12   A.   No.  He didn't do none of that, no.
13   Q.   All right.  But the last thing you saw was Paul
14        Daniels on his stomach, handcuffed?
15   A.   Yeah.
16   Q.   The civilian?
17   A.   Yeah, because I didn't know his name.  I don't
18        think it was ever in the paper, his name.  I didn't
19        look it up.  I never searched like who it was or
20        nothing because I never knew his name until today.
21   Q.   Okay.  Is there anything else that stands out in
22        your mind other than what I've asked you about
23        today?
24   A.   No.  And the only reason I had commented was
25        because I was shocked that the gentleman had
```

```
 1            passed.
 2                  MR. KARPE:  Yeah, okay.  That's all the
 3            questions I have, Andrew.  Do you have any
 4            questions?
 5                  MR. UPCHURCH:  I just have a few here.
 6       EXAMINATION,
 7            QUESTIONS BY MR. UPCHURCH:
 8       Q.   So when the officer and the civilian were in the
 9            road, did you see any cars?  Were they driving in
10            the road at that time?
11       A.   Like everybody was like stopped.  Because it was
12            like, because it was, I think it was Labor Day
13            weekend that weekend so, you know, people would
14            stop and wait until like they could get through,
15            and then they would go.  So there was several cars
16            like passing by, like once they was, because, you
17            know, they was going back and forth.  So when it
18            felt safe, I think the drivers would pass by.  So I
19            waited and then I left, you know, because there was
20            cars behind me.
21       Q.   And I apologize, I should have said before I
22            started asking questions, my name is Andrew.  I
23            represent the City as well as the officers.
24       A.   Okay.
25       Q.   So you had mentioned that Mr. Daniels was, I want
```

```
 1        to get your words correctly, swinging on the
 2        officer.  When you say that, was he like throwing
 3        punches, did it look like?
 4   A.   Yeah.  He was, they was landing.  Like I said, he
 5        knocked his glasses off.
 6   Q.   And did at any time, did it ever look like the
 7        civilian tried to kick the officer?
 8   A.   I just know, I can remember like, I mean, I do
 9        remember him and them glasses, like, because I was
10        like why he ain't tasing this man.  You know, but
11        he didn't use no deadly force, you know, tasing or
12        pull out nothing, so.
13   Q.   Okay.  When, so when they were on the ground, did
14        it look like was the civilian, was he kind of
15        struggling?  Was he kicking at any point when he
16        was on the ground?
17   A.   He was still fighting before he got both hands.
18        Yes, he was still fighting.
19   Q.   And did you ever see the officer strike the
20        civilian?
21   A.   No, I didn't.
22            MR. UPCHURCH:  Okay.  Those are all the
23        questions that I have.  Thank you.
24            MR. KARPE:  I have one follow-up.
25    EXAMINATION,
```

1       QUESTIONS BY MR. KARPE:
2   Q.  Mr. Upchurch asked you whether the civilian was
3       punching the officer, and I believe your answer was
4       along the lines of yeah, he was hitting him.  Were
5       these like open hand hits, closed hand hits, or do
6       you recall?
7   A.  Oh, he had, he was punching.  Like where his
8       glasses flew off, he was punching him, yeah.
9           MR. KARPE:  Okay.  All right.  That's the only
10      question that I have.  I thank you very much for
11      coming in.
12          MR. UPCHURCH:  Thank you so much for coming
13      in.
14          MR. KARPE:  Hopefully, we don't have to bother
15      you anymore with this.
16          THE REPORTER:  What about signature?
17          MR. KARPE:  Yeah.  You have a right to review
18      the transcript, see if anything has been
19      transcribed wrong.  And you don't have to do that.
20      Usually they are pretty good about taking it down,
21      but you can if you want.  And then you'll be
22      required to sign off on it then, and either provide
23      an errata sheet that states any mistranscriptions
24      you find or stating that you didn't find any.  What
25      would you like to do?

```
 1                THE WITNESS:  Oh, that's fine.
 2                MR. KARPE:  Do you want to review and sign, or
 3      do you want to waive signature?
 4                THE WITNESS:  I can just waive it.  That's
 5      fine.
 6      AND FURTHER THE DEPONENT SAITH NOT.
 7
 8                (Signature waived.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

STATE OF INDIANA    )
                    ) SS:
COUNTY OF HAMILTON  )

    I, Kathleen Andrews, Notary Public in and for said county and state, do hereby certify that the deponent was by me sworn to tell the truth in the aforementioned matter;

    That the deposition was taken on behalf of the Plaintiff at the time and place heretofore mentioned, with counsel present as noted;

    That said deposition was taken down in Stenograph notes, reduced to typewriting under my direction, is a true record of the testimony given by said deponent; and that the reading and signing by the deponent were waived, the witness being present and consenting thereto.

    I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of any of the parties or otherwise interested in the event of this action, and am not in the employ of the attorneys for the respective parties.

    IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this _____day of _____, 2021.


_____
KATHLEEN ANDREWS, Notary Public



My commission expires March 22, 2023
My county of residence is Hamilton