## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA INDIANAPOLIS DIVISION

THE ESTATE OF PAUL DANIELS, by    )
Personal Representative Kay Stover,    )
    )
    Plaintiff,    )
    )
    v.    )
    )
CITY OF INDIANAPOLIS and    )    Case No. 1:20-cv-02280-JRS-MJD
INDIANAPOLIS METROPOLITAN    )
POLICE DEPARTMENT,    )
    )
STEPHEN GUYNN JR.,    )
in his individual and official capacity,    )
    )
GEORGE ROSSMAN,    )
in his individual and official capacity,    )
    )
ELI RAISOVICH,    )
in his individual and official capacity,    )
    )
    Defendants.    )

## REPORT AND AFFIDAVIT OF DR. ROY TAYLOR

Dr. Roy Taylor, under penalties of perjury, deposes and says:

1. I am 59 years of age. This statement is made based on my personal knowledge, education, professional experience, and review of the following materials regarding Paul Daniels:

> Officer Rossman Deposition
>
> Officer T. Michael Wilson Deposition
>
> Officer Raisovich Deposition
>
> Officer Guynn Deposition
>
> Michelle Haywood Deposition

1

Post-mortem Ultraviolet Photography of Paul Daniels

IMPD reports regarding Paul Daniels

Deposition of April Woodson

Deposition of Christopher Polous

Statements taken by IMPD

IMPD General Orders and Policies

Discovery produced by the Defendants to Craig Karpe

In Custody Transportation, NC BLET July 2014 (see Appendix C).

2.   Appendix A is a true and accurate statement of my curriculum vitae including my education and experience as a law enforcement officer, investigator, supervisor, trainer, and expert witness.

3.   Appendix B is a list of every case I have provided expert witness services.

4.   Officer Stephen Guynn Jr. is an on-duty law enforcement officer for the Indianapolis Metropolitan Police Department.

5.   On September 1, 2018 at 11:09 AM Officer Guynn was dispatched to check on the welfare of a black male who was walking in and out of traffic.[i]

6.   Officer Guynn arrived at the intersection of 56th Street and Cooper Rd. and stopped at the traffic light. He observed a subject matching the description staggering in and out of traffic.[ii]

7.   Officer Guynn pulled up behind the black male, later identified as Mr. Paul Daniels, and parked the patrol car.[iii]

8.   Officer Guynn got out of his patrol car and verbally tried to get Mr. Daniels attention to determine if he was OK. Mr. Daniels replied "fuck you" in a hostile manner.[iv]

9.	Based on Mr. Daniels statements and the way he was walking made Officer Guynn think Mr. Daniels was either intoxicated or had something mentally going on.[v]

10.	Mr. Daniels continued to walk north bound so Officer Guynn got back into his patrol car, rolled its passenger window down and pulled up next to Mr. Daniels. Officer Guynn attempted to engage Mr. Daniels in conversation but was told "fuck you." Officer Guynn then drove past Mr. Daniels and parks the patrol car on the side of the road. [vi]

11.	Officer Guynn again attempted to ask Mr. Daniels if he was OK. Mr. Daniels again said "fuck you" and walked past the Officer.[vii]

12.	Officer Guynn then started walking behind Mr. Daniels who was still weaving into the road.[viii]

13.	Officer Guynn grabbed Mr. Daniels left arm[ix] and Mr. Daniels immediately turned and swung at Officer Guynn, knocking the sunglasses off of the top of his head.[x]

14.	Officer Guynn described Mr. Daniels to be off balance after he swung at the officer and that there was an opening to take him down.

15.	Officer Guynn believed he was now in a fight[xi] and wanted to get Mr. Daniels handcuffed as quickly as possible, because he still believed he was intoxicated.[xii]

16.	Officer Guynn testified that he wasn't overly concerned that Mr. Daniels was going to do him any harm.[xiii] So, when the opening came to take Mr. Daniels down Officer Guynn did so.[xiv]

17.	Officer Guynn decided to do a quick takedown. He said he lowered his body and grabbed Mr. Daniels around the waist and swept his leg causing him to fall.[xv]

18.	Officer Guynn stated Mr. Daniels fell on his left shoulder, arm, elbow, and that region of his body.[xvi]

19.     Officer Guynn was able to get one handcuff on quickly. But Mr. Daniels was flailing around with his other arm. Officer Guynn said it took several seconds to get the other wrist secured.[xvii]

20.     Officer Guynn testified that he then positioned Mr. Daniels on his left side after the handcuffs were on.[xviii]

21.     Officer Guynn stated he noticed that motorists had stopped and were watching the incident. He said he gave them a thumbs up and they continued on their way.[xix]

22.     Ms. April Woodson testified at deposition  she was driving North on Cooper Rd. and observed an African American male and a police officer in the middle of the road.[xx]

24.     The officer was trying to handcuff the man or get him out of the road.[xxi]

25.     Ms. April Woodson saw the man hitting the officer in the face and caused his glasses to fly off.[xxii]

26.     According to Ms. Woodson the officer was able to get the down on the ground and handcuff him. Ms. Woodson then drove off once she saw Mr. Daniels was handcuffed and lying flat on the front of his body.[xxiii]

27.     Officer Guynn radioed control, at 11:20:11 AM, and advised that he had a "mild resister."[xxiv]

28.     Officer Eli Raisovich was the first backup to arrive on the scene. Officer Guynn added that Mr. Daniels though he was cuffed was kicking his feet as if he was trying to stand up. So, Officer Guynn stated he was holding him down on the side to make sure he didn't get up.[xxv]

29.     Officer George Rossman was the third officer to arrive on scene at 11:22 AM.[xxvi]

30.     Officer Rossman testified that when he arrived Mr. Daniels was in a prone position.[xxvii]

31.     Officer Rossman stated that Mr. Daniels was in the grass, handcuffed, but kicking his legs.[xxviii]

32.     Officer Rossman told Mr. Daniels, "Hey you need to calm down and stop kicking and we'll roll you over."[xxix]

33.     Officer Rossman initially went to Mr. Daniels feet and tried to restrain them. The officer used his shin on one leg and his hands on the other.[xxx]

34.     Officer Guynn was up toward Mr. Daniels shoulder to prevent him from rolling over on his back where it would make it easier to kick.[xxxi]

35.     The officers used a pair of large handcuffs on Mr. Daniels ankles to restrain his legs.

36.     Sergeant (Sgt.) T. "Michael" Wilson testified that when he arrived on scene, he observed Officer Guynn was on Mr. Daniels right side facing east, Officer Raisovich was on his left side standing with a hand on Mr. Daniels shoulder blade, and Officer Rossman was kneeling on Mr. Daniels calves. Mr. Daniels was on the ground face down with his head facing to the East.[xxxii]

37.     Sgt. Wilson stated that he observed Officer Guynn using his elbows and arms across the upper back and shoulders to hold Mr. Daniels down.[xxxiii]

38.     Sgt. Wilson had actual leg shackles. He took off the handcuffs and replaced them with the shackles.[xxxiv] Sgt. Wilson said that Mr. Daniels was still face down at that time.

39.     The officers then placed Mr. Daniels in a recovery position. He believed on his left side.[xxxv]

40.     Sgt. Wilson instructed the officers to sit Mr. Daniels up and expressed concern over positional asphyxia.[xxxvi]

41.     Mr. Daniels had stopped resisting, but was also unresponsive.[xxxvii]

42.     When the officers sat Mr. Daniels up, he was unresponsive and his head tipped down. "So we had his head tipped up."[xxxviii] Sgt. Wilson described him as somewhat limp.[xxxix]

43.     Sgt. Wilson testified that it appeared Mr. Daniels had stopped breathing. Before that he would describe his breathing as labored at best.[xl]

44.     Officer Guynn radioed for an ambulance.[xli]

45.     Medic 12 and EMS 1208 arrived at 11:32:03 AM.[xlii]

46.     Mr. Daniels was unhandcuffed and placed on a gurney. Sgt. Wilson said Mr. Daniels was still breathing, although labored when the medics took over his care.[xliii]

47.     Mr. Daniels was pronounced dead a short time later.

48.     Sgt. Wilson stated having someone who is face down for a prolonged time who was acting erratically, who was walking in and out of traffic, you begin to start thinking about excited delirium and positional asphyxiation, so you correct that as soon as possible.[xliv]

49.     Sgt. Wilson added that he and Officers Guynn, Rossman, and Raisovich had been trained on excited delirium and positional asphyxia.[xlv]

50.     IACP model policy on arrest states, "When restraining individuals on the ground, officers should position the subject in a manner that will assist breathing, such as placement on his or her side, and avoid pressure to the chest, neck, or head.

51.     Positional asphyxiation occurs when the body position of an individual interferes with their respiration resulting in asphyxia, or unconsciousness or death due to a lack of oxygen.

52.     Individuals who resist arrest or who are combative and are subsequently handcuffed and placed in a face down position are prone to positional asphyxiation.

(1) Due to the physical exertion and anxiety that an individual experiences while he is resisting an officer, the body will naturally demand an increased supply of oxygen.

(2) When the person is lying face down, with his hands behind him, it puts more weight on his chest, thereby limiting the normal chest expansion that occurs during breathing. The result is a diminished supply of oxygen which in turn can lead to asphyxia.[xlvi]

53. Prevention of asphyxiation of persons in custody requires the following actions:

    a. Continuously check for change in breath and change in level of consciousness.

    b. No person in custody should be placed in a face down position.

    c. Do not transport in 'hog-tie' position.

    d. Transport all inmates in upright vertical position.

    e. All suspects who are in officer custody are the officers' responsibility. Any individual who loses consciousness or is not breathing must be given immediate emergency care. *Id.*

54. In my opinion as a police procedure expert, Officers Guynn, Raisovich, and Rossman failed to adhere to nationally accepted police practices and training in restraining Mr. Paul Daniels, and in failing to promptly move him from a prone position to a recovery or recumbent position and administer aid. Once Mr. Daniels had mechanical restraints on his wrists and ankles, his struggles no longer presented a substantial danger to himself or others. He was no longer a flight risk. Holding Mr. Daniels down in a prone position at this point was not necessary for safety, and carried a substantial risk of causing death or serious bodily harm. In my opinion, holding Mr. Daniels down prone after he was mechanically restrained at the wrists

and ankles, and the failure of the defendant officers to administer life saving first aid after Mr.

Daniels became unresponsive caused the death of Mr. Paul Daniels.

55. To date I have been paid $5,000.00 for my expert services herein. My fee

schedule can be found at https://taylorconsultinggroup.org/expert-law-rate-schedule/.

[i] Guynn Deposition Pg. 26 lines 6-14
[ii] Guynn Deposition Pg. 30 lines 2-12
[iii] Guynn Deposition Pg. 31 lines 5-13
[iv] Guynn Deposition Pg. 31 lines 14-25
[v] Guynn Deposition Pg. 32 lines 17-15
[vi] Guynn Deposition Pg. 34 lines 10-13
[vii] Guynn Deposition Pg. 35 lines 5-8
[viii] Guynn Deposition Pg. 35 lines 14-25
[ix] Guynn Deposition Pg. 36 lines 22-25
[x] Guynn Deposition Pg. 37 lines 2-15
[xi] Guynn Deposition Pg. 39 lines 23-25
[xii] Guynn Deposition Pg. 40 lines 2-16
[xiii] Guynn Deposition Pg. 40 lines 17-24
[xiv] Guynn Deposition Pg. 40 line 25
[xv] Guynn Deposition Pg. 41 lines 11-25
[xvi] Guynn Deposition Pg. 48 lines 2-4
[xvii] Guynn Deposition Pg. 51 lines 6-13
[xviii] Guynn Deposition Pg. 51 lines 18-21
[xix] Guynn Deposition Pg. 52 lines 1-9
[xx] Woodson Deposition Pg. 10 lines 4-7
[xxi] Woodson Deposition Pg. 10 lines 8-10
[xxii] Woodson Deposition Pg. 11 lines 9-24
[xxiii] Woodson Deposition Pg. 12 lines 6-23
[xxiv] Guynn Deposition Pg. 52 lines 10-16
[xxv] Guynn Deposition Pg. 53 lines 6-11
[xxvi] Guynn Deposition Pg. 83
[xxvii] Rossman Deposition Pg. 19 lines 10-12
[xxviii] Rossman Deposition Pg. 13 lines 3-24
[xxix] Rossman Deposition Pg. 14 lines 1-5
[xxx] Rossman Deposition Pg. 14 lines 11-19
[xxxi] Rossman Deposition Pg. 14 lines 21-25
[xxxii] Wilson Deposition Pg. 19 lines 18-25
[xxxiii] Wilson Deposition Pg. 52 lines 9-19
[xxxiv] Wilson Deposition Pg. 23 lines 21-25
[xxxv] Wilson Deposition Pg. 24 lines 6-10
[xxxvi] Rossman Deposition Pg. 19 lines 13-18
[xxxvii] Rossman Deposition Pg. 19 lines 19-25
[xxxviii] Rossman Deposition Pg. 20 lines 1-6
[xxxix] Wilson Deposition Pg. 24 lines 11-14
[xl] Wilson Deposition Pg. 24 lines 17-23
[xli] Wilson Deposition Pg. 26 lines 6-9
[xlii] Wilson Deposition Pg. 28 lines 5-10
[xliii] Wilson Deposition Pg. 28 lines 17-25
[xliv] Wilson Deposition Pg. 54 lines 7-15
[xlv] Wilson Deposition Pg. 57 lines 10-25
[xlvi] In Custody Transportation, NC BLET July 2014 (see Appendix C).

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

SIGNATURE _____          DATE: April 7, 2022
              Roy Taylor

STATE OF ___NC___ )
                ) SS
COUNTY OF __Wake__ )

On ___4-7-2022___, the above affidavit was subscribed, sworn, and acknowledged as a free act, before me as a Notary Public for said county and state, by Roy Taylor, whose identity I verified as the person described above.

_____
Notary Public

My commission expires: 4-8-2022

_____

DARCY LYNN DUGUID
NOTARY PUBLIC
GRANVILLE COUNTY, NC

9



## Roy G. Taylor, Ph.D.
## Criminal Justice and Security Consultant

9650 Strickland Rd. Suite 103-162        (919) 697-1995
Raleigh, NC 27615        e-mail: roy@taylorconsultinggroup.org

---

### Qualifications Summary

Professional law enforcement manager with over 40 years of experience in various federal, state, local, and private Police Chief positions. Areas of expertise include: law enforcement training; use of force & firearms instruction; recruiting, employee selection, assignment, supervision, evaluation, and retention; curriculum development; policies and procedures design and implementation; anti-terrorism, operation security, force protection, physical security, canine utilization; budgeting; public relations; and emergency management.

### Professional Experience

- **Adjunct Professor** Meredith College – 12/2021 to Present
- **Use of Force Director** Compliant Technologies – 9/2020 to Present
- **Chief of Police Blue Ridge Public Safety** – 4/2014 to Present
- **Litigation Consultant** 12/2013 to Present
- **President/CEO** Signal 88 Security of Charlotte – 7/2012 to 7/2018
- **President/CEO** Capitol Special Patrol – 2/2012 to Present
- **Chief of Police** Capitol Special Police – 8/2002 to Present
- **Lt. Colonel –** Army Reserve – 6/17 to 3/2022
- **Lt. Colonel** – Army National Guard – 3/2000 to 5/2017
- **Antiterrorism/Emergency Management Branch Chief** DoD – 4/2007to 4/2014
- **Task Force Officer** FBI Joint Terrorism Task Force – 10/2007 to 6/2011
- **Chief of Police** National Geospatial Intelligence Agency – 3/2006 to 2/2007
- **Emergency Response Coordinator** Weston Solutions @ Nortel – 2/2000 to 6/2005
- **Chief of Police** Dorothea Dix Hospital Police – 11/1998 to 11/1999
- **Manager of External Affairs** NC Governor's Highway Safety – 3/98 to 11/1998
- **Chief of Police** Liberty, NC - 9/1997 to 12/1997
- **Chief of Police** Norwood, NC - 4/1996 to 9/1997
- **Chief of Police** Bladenboro, NC - 2/1994 to 4/1996
- **Deputy Sheriff K-9** Wake County Sheriff's Office - 11/1990 to 2/1994
- **Law Enforcement Specialized Instructor** Durham Technical College 11/2002 to 12/03
- **Law Enforcement Specialized Instructor** Wake Technical College 2/1990 to 12/2003
- **Police Officer Special Operations/K9 Cary**, NC – 7/1986 to 11/1990
- **Fire Fighter/EMT** Sandusky, OH -6/1984 to 6/1986
- **Police Officer** Plymouth, OH – 9/1984 to 6/1986
- **Police Officer** Olmsted Township, OH – 5/1983 to 6/1986
- **Police Officer** Twinsburg Township, OH – 12/1982 to 8/1984

### Military

- **State Emergency Preparedness Liaison Officer** US ARNORTH CMD 3/2019 to 3/2022
- **Detachment Commander** 138th MP Det. (TDRC), Ft. Bragg, NC 6/2018 to 3/2019
- **Detachment Commander** 346th MP Det. (DCL), Nashville, TN 12/2017 – 5/2018
- **Force Protection Officer** US Forces Command, Ft. Bragg, NC 6/2017 – 11/2017

- **Deputy Asst. Adj. General** Personnel & Manpower, VA National Guard 10/16 – 5/2017
- **Provost Marshal** Joint Civil Support Task Force, Joint Chiefs of Staff –7/2014 to 9/2016
- **Provost Marshal,** VA Army National Guard, Joint Forces Headquarters, Sandston, VA 5/2010-6/2014
- **Company Commander,** VA Army National Guard, 329th Regional Support Group, Virginia Beach, VA 23451, 2/2008-5/2010
- **Executive Officer,** VA Army National Guard, Joint Forces Headquarters, Ft. Pickett, VA 7/2006 – 2/2008
- **Platoon Leader**, NC Army National Guard, Jefferson, NC. Active Duty in support of Operation Iraqi Freedom 1/15/2004 to 4/10/2005
- **Host Nation Transportation Officer**, NC Army National Guard, Durham, NC 9/2002-12/2003
- **Counter Intelligence Agent**, NC Army National Guard, Morrisville, NC 4/2000-3/2001
- **Security Police/Explosive Detection Dog Handler**, USAF Ellsworth AFB, SD 2/80-5/82

## Education

- Ph.D. Criminal Justice, Walden University, Minneapolis, MN 2020
- Master of Philosophy Criminal Justice, Walden University, Minneapolis, MN 2020
- Command and General Staff College, US Army, Fort Leavenworth, KS 2014
- Master of Science Occupational Safety, East Carolina University, Greenville, NC 2003
- Bachelor of Science Criminal Justice, Mount Olive College, Mt. Olive, NC 1997

## Certifications

- Compliant Technologies Master Instructor, APB Consulting Solutions
- G.L.O.V.E. CEW Instructor, Compliant Technologies
- Integrate Communications and Tactics, Train the Trainer, Police Executive Research Forum
- Mental Health First Aid, National Council for Behavioral Health
- Crisis Intervention Team, National Alliance of Mental Illness
- Advanced Force Science Specialist, Force Science Institute
- NC Law Enforcement Officer, Advanced Certificate
- NC Criminal Justice Instructor Certification (firearms, physical fitness, hazardous materials & first responder)
- NC Private Protective Services, Armed and Unarmed Guard Instructor
- TASER Instructor, Axon Technologies
- NC Concealed Handgun Instructor
- VA Private Investigator
- VA Department of Criminal Justice Services Instructor (Special Conservator, Firearms, Armed and Unarmed Guard)
- Physical Security Inspector, Department of Defense
- Certified Homeland Security Specialist III, American College of Forensic Examiners International
- Certified Manager, Institute of Professional Managers
- Command & General Staff - Complex Incident Management IS 400
- Intermediate Emergency Medical Technician
- Cardio Pulmonary Resuscitation (CPR) Instructor, American Heart Association

## Affiliations

- Member – NC Crisis Intervention Team Advisory Board
- Member – Meredith College Master's in Criminal Justice Advisory Board

- President – Company Police Association of North Carolina
- Member – Community Policing Board, International Assoc. of Chiefs' of Police
- Chairman – Business, Education and Technical Support Committee, Wake Co. Local Emergency Planning Committee
- Member – Virginia Association of Chiefs of Police
- Member - North Carolina Chiefs of Police Association
- Member – Fraternal Order of Police, Lodge 81
- Member - International Association of Chiefs of Police
- Member – International Law Enforcement Trainers & Educators Association
- Member – International Law Enforcement Firearms Instructor Association
- Member – American Society for Industrial Security
- Member – Professional Investigators and Security Association

### Publications

- Taylor, R.G. Summer 1997. "Ethically Correct." *The Journal, The Voice of Law Enforcement 35-39.*
- Taylor, R.G. Mar/Apr 1998. "Creating an Ethical Atmosphere." *Community Policing Consortium 3-5.*
- Taylor, R.G. & Tucker, M. Oct 2015. "Action Always Beats Reaction – Or Does It". International Law Enforcement Educators and Trainers Association Journal 7-9.
- Taylor, R.G. Nov 2020. "Crisis Intervention Team Training: Full Implementation.

### Criminal Justice Consulting

- WRAL Channel 5 Raleigh, NC
- WTVD Channel 11 Raleigh, NC
- WSB-TV Channel 2 Atlanta, GA
- News & Observer Raleigh, NC
- Spectrum News Channel 17 Raleigh, NC
- Fox 46 Charlotte, NC

### Litigation Services

- Arkansas
- Arizona
- Florida
- Illinois
- Indiana
- Kentucky
- Louisiana
- Maine
- Maryland
- Nevada
- New Mexico
- North Carolina
- Ohio
- Pennsylvania
- South Carolina
- South Dakota
- Texas
- Virginia

- West Virginia
- Wyoming

**Awards and Recognitions**

- Order of the Long Leaf Pine, NC Governor's Office (2022)
- Meritorious Service Medal, US Army (2022)
- Defense Meritorious Service Medal, US Dept. of Defense (2016)
- Meritorious Service Medal, US Army (2005)
- Bronze Star Medal with Valor device, US Army (2005)
- National Community Policing Award, National League of Cities (1997)
- Law Enforcement Leadership Award, Mothers Against Drunk Drivers (1995)
- Law Enforcement Officer of the year for State of NC, Veterans of Foreign Wars (1995)
- Governor's Crime Prevention Award (1994)
- Honor Graduate, Basic Law Enforcement Training, NC Justice Academy (1986)
- Honor Graduate, Fire Fighter Academy, Ohio Fire Training Academy (1984)
- Honor Graduate, Security Police Academy, USAF (1979)

**Training**

- TASER Instructor re-certification, Axon Academy (2021)
- Integrate Communications and Tactics, Train the Trainer, PERF (2020)
- Compliant Technologies Conducted Energy Weapons Instructor (2020)
- Combat Veteran's Crisis Intervention Team,  National Alliance of Mental Illness (2019)
- Mental Health First Aid, USA, National Council for Behavioral Health (2019)
- CIT International Training Conference (2019)
- Crisis Intervention Team, National Alliance of Mental Illness (2019)
- 1911 Armorers Course, Springfield Armory (2019)
- International Assoc. of Law Enforcement Firearms Regional Trng Conference (2019)
- 2018 NC General Instructor Update: Instructional Leadership, NC Justice Academy
- International Assoc. of Law Enforcement Firearms Regional Trng Conference (2018)
- Body Worn Cameras and other recordings used in law enforcement, Force Science Institute (2018)
- Principals of Training, Learning, and Performance, Force Science Institute (2018)
- Communication Skills with Persons in Crisis – De-escalation Techniques, NCJA (2018)
- Mass Fatalities Planning & Response, FEMA (2017)
- Advanced Specialist Behavior Analysis in Force Encounters, Force Science Institute (2017)
- Force Science Certification, Force Science Institute (2016)
- Firearms Instructor Conference, Int. Assoc. of LE Firearms Instructors (2015)
- Incident Command and Emergency Operations Center Interface, VDEM (2013)
- Predictive Analysis, VA State Police (2013)
- IS 400 General & Command Staff Complex Incident Management, FEMA (2013)
- Defense Support of Civil Authorities, Joint Doctrine Command (2013)
- IS 800 National Response Framework, FEMA (2012)
- IS 700 National Incident Management System, FEMA (2012)
- Basic Army Instructor, Regional Training Institute (2012)
- Bomb-Making Materials Awareness Program, DHS, (2011)
- Antiterrorism Officer Course (recertification), US Army Military Police School (2011)
- IS 100 Introduction to Incident Command, FEMA (2011)
- Taser Instructor recertification, Taser International (2011)
- Counterterrorism Course, FBI, Charlottesville, VA (2010)
- Outlaw Motorcycle Gang & Juggalo awareness, VA Gang Association (2010)
- Counterfeit Goods, VA Attorney General's Office (2009)
- Special Agent Course, VA State Police (2008)
- Operations Security Officer Course, HQ Dept. of Army, Ft. Belvoir, VA (2008)
- Advanced Criminal Intelligence Analysis to Prevent Terrorism, DHS (2008)
- Incident Response to Terrorist Bombings, New Mexico Tech. (2008)
- Survival Awareness In-Service, FBI Academy, Quantico, VA (2007)
- Strategic Islamic Source Development, FBI Professional Development Unit (2007)
- Counterintelligence Asset Development and Validation, FBI (2007)
- Security Engineering Training, US Army Corps of Engineers, Ft. Belvoir (2007)
- Physical Security Inspector, National Guard Bureau, Professional Ed Ctr. AR (2007)
- Anti-terrorism Officer Advanced Course, US Army MP School, Ft. Leonard Wood (2007)
- Anti-terrorism Officer Basic Course, US Army MP School, Ft. Leonard Wood (2007)
- Federal Law Enforcement Manager Training Program, FLETC Glynco, GA (2006)
- Police Law Institute, Durham Technical College (2005)
- Instructor Training Update, NC Justice Academy (2005)
- Taser Instructor Training, Taser International (2005)
- In-Service Training Coordinator, NC Justice Academy (2005)
- Advanced Firearms Training, Wake Technical Community College (2003)

- Emergency Response to Terrorism, Incident Mngmnt, National Fire Academy (2001)
- Tactical Pistol II, Blackwater Training Center (2001)
- Hazardous Materials Emergency Operations, Environmental Resource Center (2000)
- Specialized Physical Fitness Training Update, NC Justice Academy (2000)
- Explosive and Hazardous Material Instructor Update, Wilson Community College (2000)
- Patrol Techniques Update, Wake Technical Community College (2000)
- Regional Firearms Training Conference, International Assoc. of Law Enforcement Firearms Instructors (2000)
- Criminal Intelligence Analysis Techniques, Wake Technical Community College (1999)
- Alcohol Screening Tests Device, NC Dept. of Health & Human Services (1999)
- Juvenile Sex Offenders, NC Prof Society on the Abuse of Children (1999)
- Drug, Alcohol & Impaired Driving Training, Intl Assoc. of Chiefs of Police (1998)
- Executive Seminar, Natl Assoc. of Governors' Highway Safety Representatives (1998)
- NHTSA Safe Communities, U.S. Dept. of Transportation (1998)
- Community Policing Instructor, US Department of Justice (1997)
- NC Law Enforcement Specialized Firearms Instructor Certification (1997)
- Internal Affairs Training, Law Enforcement Training Ctr Western Piedmont College (1997)
- Firearms Recertification Long Gun, Randolph Community College (1997)
- Glock Armorer's Course, Wake Co. Sheriff's Dept. (1997)
- NCJA Officer Survival Instructor Certification (1997)
- Counter Drug Investigation, US Army Military Police School (1995)
- Orientation for Law Enforcement Administrators (1995)
- Search Warrant Training, NC Justice Academy (1995)
- Police Cyclist Course, Robeson Community College (1995)
- High Risk Dynamic Entry Tactics, South Eastern Community College (1995)
- High Risk Apprehensions, South Eastern Community College (1995)
- Hostage Rescue Pistol Training, Singleton International (1995)
- Law Enforcement Executive Management Program, NC Institute of Government (1995)
- Computer Networking, Law Enforcement Executive Program (1995)
- NC Law Enforcement Specialized Physical Fitness Instructor (1994)
- PPCT Defensive Tactics Instructor Training, Robeson Community College (1994)
- PPCT Defensive Tactics, Bladen Community College (1994)
- Community Oriented Policing Training, US Dept. of Justice (1994)
- O.C. Pepper Spray Instructor, Bladen Community College (1994)
- First-Line Supervision, Wake Technical Community College (1993)
- Courtroom Security, NC Justice Academy (1993)
- NC Limited Lecturer Certification, First Aid, CPR, & Medical Care in the Jail (1993)
- Defensive Tactics, Wake Technical Community College (1992)
- ASP Baton/Tactical Flashlight, Wake Technical Community College (1992)
- Officer Survival, Wake Technical Community College (1992)
- Civil Process and Supplemental Custody Procedures, Wake Co. Sheriff's Office (1991)
- Field Training Officer, NC Justice Academy (1990)
- NC Specialized First Responder Instructor (1990)
- Law Enforcement Instructor Training, NC Justice Academy (1990)
- Defensive and Precision Driving, NC Highway Patrol (1990)
- Patrol/Narcotics Canine Training, Triad K9 (1988)
- Computerized Speed Detection-Radar, Wake Technical Community College (1987)
- Drug Investigation, Wilson County Technical College (1987)
- Basic Criminal Investigation, Wilson County Technical College (1987)
- Basic Law Enforcement Officer Training, NC Justice Academy (1986) Honor Graduate
- Ohio Peace Officer Training, Cleveland Metro Parks Ranger Academy (1984)
- Ohio Advanced Emergency Medical Technician (1982)
- National Registered Emergency Medical Technician - Intermediate (1981)

- Patrol Dog Explosive Detection Course, US Air Force (1980)
- Patrol Dog Handler Course, US Air Force (1980)
- Law Enforcement Specialist Course (1979)

**Litigation Experience**

1. <u>Wanda Norton as Personal Representative of the Estate of Reshard Vernard Morrell, a minor deceased v. the Tallahassee Alumni Chapter of Kappa Alpha Psi Fraternity, Inc. et al.</u>
   Circuit Court, 2nd Judicial Circuit
   Leon County, Florida
   Case No.: 2012-CA-003594
   Report/Defendant


2. <u>Darlene Talley, individually, and as *guardian ad litem* of Tanisha Williams, an incompetent person City of Charlotte; Wayne Goode III, both individually and in his official capacity as a law enforcement officer with the CMPD; and, Joseph White, both individually and in his Official capacity as a law enforcement officer for the CMPD, John Doe, both individually and in his Official capacity as a law enforcement officer for the CMPD</u>
   United States District Court
   Western District of North Carolina
   Charlotte Division
   Civil Action No. 3:14-CV-683
   Deposition/Plaintiff


3. <u>State of North Carolina v. Jason Simmons</u>
   General Court of Justice, Superior Court Division
   Rockingham County, North Carolina
   Case No.: 13CRS 51254-6 & 13CRS 51259
   Trial/Defendant


4. <u>William Thomas, Administrator of the estate of Destin Allan Thomas, deceased v. City of Columbus, Ohio, et al.</u>
   United States District Court
   Southern District of Ohio
   Eastern Division
   Civil Action No. 2:14-CV-00906
   Deposition/Plaintiff


5. <u>Herbert L. Bryant, Plaintiff v. Village of Bald Head Island, North Carolina; Calvin Peck, in His Individual Capacity; and Caroline Mitchell, in Her Individual Capacity, Defendants</u>
   United States District Court
   Eastern District of North Carolina
   Wilmington Division
   Civil Action No. 7:14-CV-223
   Report/Plaintiff

6. Vicki McKenney, individually and Vicki McKenney, as Next Friend of Stephen McKenney and as Personal Representative of the Estate of Stephen McKenney, Plaintiff vs. Nicholas Mangino, Cumberland County Sheriff's Office and Windham Police Department, Defendants
United States District Court
District of Maine
Case No.: 2:15–CV–0073-JDL
Deposition/Plaintiff

7. State of South Carolina v. Steven Barnes
South Carolina General Sessions Court
Edgefield County, South Carolina
Case No.: 2008-GS-19-00011
Trial/Defendant

8. Jesse Conner, Thomas Cannon, Donald Koons, & Nicholas Terrell, Plaintiffs v. Village of Bald Head Island, North Carolina; Calvin Peck, in His Individual Capacity; and Caroline Mitchell, in Her Individual Capacity, Defendants
United States District Court
Eastern District of North Carolina
Wilmington Division
Civil Action No.
Report/Plaintiff

9. John D. Poetzsch, as Administrator of the Estate of Spencer R. Mims, III
General Court of Justice, Superior Court Division
Mecklenburg County, North Carolina
Case No.: 2014-CVS-23815
Report/Plaintiff

10. State of North Carolina v. Robert M. George
General Court of Justice, Superior Court Division
Catawba County, North Carolina
Case No.: 14 CRS 1482
Report/Defendant

11. David L. Robinson, Jr. an individual; Dennia Robinson, individually and as Executor of the Estate of David L. Robinson, deceased Plaintiff v. N. Las Vegas Police Dept., Defendant.
United States District Court
For the District of Nevada
Southern Division
Civil Action No. 2:14-CV-1912-JCM-VCF
Deposition/Plaintiff

12. <u>Kimberly McNeil, Plaintiff v. Joel D. Greenway, Defendant</u>.
    United States District Court
    For the Eastern District of Virginia
    Civil Action No. 3:16cv269
    Report/Defendant

13. <u>Christian, Plaintiff v. ABM Parking Services, and the City of Charleston, SC, Defendant</u>.
    South Carolina Court of Common Pleas Ninth Judicial Circuit
    Civil Action No. 2015-CP-10-2642
    Report/Plaintiff

14. <u>Juan Perez, Plaintiff v. City of Sweetwater, et al., Defendants</u>.
    United States District Court
    For the Southern District of Florida
    Civil Action No. 1:16-CV-24267
    Trial/Plaintiff

15. <u>Michael Smith, Plaintiff v. Elliot Boyd, Defendant</u>.
    Virginia: In the Circuit Court for the City of Portsmouth
    Civil No. CL 16-528
    Deposition/Plaintiff

16. <u>Jamie Nelson, Plaintiff v. City of Elizabethtown, et al., Defendants</u>.
    United States District Court
    For the Western District of Kentucky
    Civil Action No. 3:16-CV-429-DJH
    Deposition/Plaintiff

17. <u>Traci Ferrell, Plaintiff v. Town of Lillington, et al., Defendants</u>.
    United States District Court
    For the Eastern District of North Carolina
    Civil Action No. 5:15-CV-677-BO
    Report/Plaintiff

18. <u>Dustin Patrick, Plaintiff v. City of Aiken and William Cue, Defendants</u>.
    United States District Court
    For the District of South Carolina
    Civil Action No. 1:16-3496-JMC-PJG
    Report/Plaintiff

19. <u>Genger Poole, Administrator of the Estate of William Dean Poole, Plaintiff v. Gaston County, NC, et al., Defendants</u>.
    United States District Court
    For the District of North Carolina
    Civil Action No. 3:15-CV-309-DCK

Deposition/Plaintiff

20. <u>Karras C. Cohen, Jr., Plaintiff v. Spartanburg County Sheriff's Office, et al., Defendants.</u>
United States District Court
For the District of South Carolina
Civil Action No. 7 :17-CV-005130-HMH-KFM
Deposition/Plaintiff

21. <u>Reginald Bruce, Plaintiff v. Florence County Sheriff's Office, et al., Defendants</u>
United States District Court
For the District of South Carolina
Civil Action No. 4:17-cv-00615-RBH-TER
Report/Plaintiff

22. <u>DaZhawn Williams, Plaintiff v. City of Seat Pleasant, et al. Defendants</u>
In the Circuit Court of Prince George's County, MD
Case No. CAL16-38696
Report/Plaintiff

23. <u>Avery C. Vanderhurst, Plaintiff v. CPL Neil Mohardt, Defendant</u>
United States District Court
For the District of Maryland
Case No. 13-CV-02143-PWG
Deposition/Plaintiff

24. <u>Chris Fields, Plaintiff v. Town of Walterboro, et al. Defendants</u>
United States District Court
For the District of South Carolina
Case No. 2:17-cv-01741-DCN-BM
Deposition/Plaintiff

25. <u>Jean Suarez, Representative of the Estate of Daniel Tyson, Deceased, Plaintiff v. City of Hollywood, FL et al. Defendants</u>
United States District Court
Fort the District of Southern Florida
Case No. 16-62215-cv-WPD
Deposition/Plaintiff

26. <u>Kevin Jennings, Plaintiff v. Jonathan Iseman, Defendant</u>
United States District Court
For the District of South Carolina
Case No. 3:17-cv-03009-JMC-PJG
Report/Plaintiff

27. Christopher Jamon Byrd, Plaintiff v. Charles "Chuck" L. Wright in his official capacity as the Sheriff of Spartanburg County, Spartanburg County Sheriff's Department, Spartanburg County, John Shafer, and Curtis Norwood, Defendants
United States District Court
For the District of South Carolina
Case No: 7:17-cv-02436-TMC-JDA
Report/Plaintiff

28. Rashawn Quaneece Middleton, as Personal Representative of the Estate of Roy Howard Middleton, Sr., deceased, Plaintiff v. Sheriff David Morgan, in his official capacity as Sheriff of Escambia County, Florida, Deputy Wayne Wright, Deputy Sheriff Jeremiah Meeks, & Sergeant Matthew White individually, and in their official capacity, as Deputy Sheriffs of Escambia County, Florida, Defendant.
United States District Court
For the District of Northern Florida
Case No: 3:17-cv-00346-MCR-GRJ
Report/Plaintiff

29. Torrence "little boosie" Hatch; Larry Anderson; Tyeon Givens; and Nathia Enice Daniels and Peyton Nicole Daniels, minors, by and through their parent and next friend, Tyeon Givens, Plaintiffs v. Dillard's, Inc.; Jim Wilson & Associates, LLC; Weiser Security Services, Inc.; City of Biloxi, Mississippi; and John Does 1–10, Defendants.
United States District Court
For the Southern District of Mississippi
Case No: 1:17-CV-307-HSO-JCG
Report/Plaintiff

30. Cutrena Parker & Tyronne Williams, Sr., Plaintiffs v. Ernie Coleman, David E. Tyson, Daniel Martin, Christopher Emanuel, Beaufort County Sheriff and Deputies, The Ohio Casualty Insurance Company, as Surety, Defendants.
United States District Court
For the Eastern District of North Carolina
Case No: 4:17-cv-157-BO
Report/Plaintiff

31. Alexis Lewis v. City of Laurens, Laurens County Sheriff's Office, Greenwood County Sheriff's Office, South Carolina Dept. of Public Safety, and Quest Hallman, Defendants.
State of South Carolina
County of Greenwood
Case No. 2017-CP-24-01322
Report/Plaintiff

32. Tanya Brown, Administrator of the Estate of Brandon Jones, Plaintiffs v. Alan Buford, Greg King and City of Cleveland, Defendants.
United States District Court
For the Northern District of Ohio
Case No: 1:16-cv-00921
Report/Plaintiff

33. Linda Hanna and Gary Hanna, Plaintiffs v. Dillon Police Department, Corporal Brian Genwright, Individually and as an employee of Dillon Police Department, Defendants.
United States District Court
For the District of South Carolina
Florence Division
Civil Action No. 4:17-cv-3273-RBH-KDW
Report/Plaintiff

34. Lamar Wright, Plaintiff, v. City of Euclid, Police Officer Kyle Flagg, and Police Officer Vashon Williams, Defendants.
United States District Court
For the Northern District of Ohio
Case No: 1: 17-cv-02503
Report/Plaintiff

35. Thomas Napier, Plaintiff, v. Lincoln County Sheriff's Office, and Zachary Sowards, in his official and individual capacity, Defendants.
United States District Court
For the Southern District of West Virginia
Case No: 2:18-cv-11111
Report/Plaintiff

36. William D. Bartell, Individually and as Personal Representative of the Estate of Virginia M. Bartell, deceased, Plaintiff, v. York County, City of Rock Hill, Doug Echols, Individually and in his official capacity, Rock Hill Police Department, Chris Watts, Individually and in his official capacity, Benjamin Glynn, Individually and in his official capacity, and Luke Boling, Individually and in his official capacity, Defendants.
United States District Court
District of South Carolina
Case No: 0:18-cv-00422-MGL
Report/Plaintiff

37. Johnny O. Love, Plaintiff v. Chief Nathan Blevins, Individually and in his official capacity; War Police Department, and the City of War, a Political Subdivision of the State of West Virginia, Defendants.
Circuit Court of McDowell County, West Virginia
Case No: 18-c-13
Deposition/Plaintiff

38. James Howard Allen, Plaintiff v. City of Gastonia, North Carolina and Officer Josh Lefevers in his official and individual capacity, Defendants.
In the General Court of Justice, Superior Court Division
Gaston County, North Carolina
Case No: 17-cvs-439
Report/Plaintiff

39. Justin Strolis, Plaintiff v. Lucas Heise, individually, and as a Deputy with the Richmond County Sheriff's Department, Defendants.
United States District Court
Southern District of Georgia
Case No: 1:18-cv-00137-JRH-BKE
Report/Plaintiff

40. Steven C. Crawley, Plaintiff v. City of Phoenix, Arizona, Phoenix Police Department, Officer Louis McAnany; Officer Henry Smith; Officer Dwayne Conklin; Officer Sean Holman; officer Adam Nelson; Officer Michael Morrissey, Defendants.
United States District Court
For the Southern Division of Arizona
Case No: 2:16-cv-04307-JJT-JFM
Report/Plaintiff

41. Xavier Davis, Plaintiff, v. City of Rock Hill, Doug Echols, Individually and in his official capacity, Rock Hill Police Department, Chris Watts, Individually and in his official capacity, Benjamin Glynn, Individually and in his official capacity, and Luke Boling, Individually and in his official capacity, Defendants.
United States District Court
District of South Carolina
Case No: 0:18-cv-02450-MGL
Report/Plaintiff

42. Amanda Kay Renfroe, individually, as the widow of Micheal Wayne Renfroe, deceased; and as the natural mother and adult next friend of S.W.R., her minor child, who are the sole heirs and wrongful death beneficiaries of Michael Wayne Renfroe, deceased, v. Robert Denver Parker, Randall Tucker, and Does 1-100, Defendants.
United States District Court
Southern District of Mississippi
Case No: 3:18-cv-00609-DPJ-LRA
Report/Plaintiff

43. Bridgett Taylor, Plaintiff v. Richland County Sheriff's Office, Defendants.
State of South Carolina
County of Richland
In the Court of Common Pleas
Case No : 2014-CP-40-6934
Trial/Plaintiff

44. Peter Klassen, Plaintiff v. Wallach Construction/PB Materials Holding, Inc, Walter Ziemann, Tyler Wallach, Johnny Neufeld, and Gaines County Texas and Gaines County Deputy Sheriff's Ken Ketron, and Clint Low, Defendants.
State of Texas
Gaines County
106th Judicial District
Cause No. 18-10-17955
Report/Plaintiff

45. Joshua M. Settle, Plaintiff v. Nathan S. Stepp, Individually as a member of the West Virginia State Police, Defendant.
United States District Court
Southern District of West Virginia
Case No. 2:18-cv-01177
Report/Plaintiff

46. John Givens, Leland Dudley & Bernice Strong Administrator of the Estate of David Strong, Plaintiff v. City of Chicago, Defendants.
Circuit Court of Cook County, Illinois
County Department of Law Division
Case No. 16 L 10768
Trial/Defendant

47. Paterson Brown, Sr. & Kathy Brown, Co-Administrators of the Estate of Paterson Brown, Jr., Deceased, Plaintiff v. David Cobb, Individually and in His Official Capacity as a Police Officer for the City of Richmond, Virginia and the City of Richmond, Defendants.
United States District Court
Eastern District of Virginia
Case No. 3:17-CV-00627
Report/Defendant

48. David Bruce Sanders, Jr., Plaintiff v. Robert H. Taylor, Chris Morrow, T. Woodward, Chuck Wright, both individually and in his official capacity as the Sheriff of Spartanburg County Sheriff's Office, Spartanburg County Sheriff's Office and Spartanburg County
United States District Court
For the District of South Carolina
Case No. 7:18-CV-01471-JDA
Report/Plaintiff

49. Ishmael Lateef, Plaintiff v. B.J. Barnes, and M.B. Stewart, Defendants
United States District Court
Middle District of North Carolina
Case No. 1:18-cv-00571
Report/Plaintiff

50. Estate of David Cutler, Plaintiff v. Pima County, et al., Defendants
United States District Court
District of Arizona
Case No. 18-cv-0383-FRZ
Report/Plaintiff

51. Delton Jasper and Bakari Sellers, as Co-Personal Representatives of the Estate of Delvin Tyrell Simmons, Deceased, Plaintiffs v. Spartanburg Methodist College, Spartanburg Methodist College Campus Safety Department, and Andrew Tomlinson, Individually and/or in his Official Capacity, Defendants
State of South Carolina
County of Spartanburg
In the Court of Common Pleas
Case No : 2017-CP-42-04000
Deposition/Plaintiff

52. Bruce Parker and wife Joanne Parker, Plaintiffs, v. Cole Properties & Investments, Inc., Defendants
State of North Carolina
Mecklenburg County
In the General Court of Justice, Superior Court Division
Case No : 18-CvS-15095
Report/Defendant

53. James Barnett, Plaintiff v. City of Laurel, Bryce Gilbert, Wade Robertson, and Does 1 – 100, Individually, and in Their Official Capacities as Employees, Agents, Officials and Contractors for the City of Laurel, and/or Political Subdivisions of the State of Mississippi, Defendants
United States District Court
Southern District of Mississippi
Case No : 2:18-cv-92-KS-MTP
Report/Plaintiff

54. Joleen Youngers, Personal Representative of the Estate of Steven Marquez, Karen Marquez, and Michael Leonard Marquez, Plaintiffs v. City of Las Vegas, Elias Rael, Caleb Marquez, and Joseph Mascarenas, Defendants
First Judicial District Court
State of New Mexico
County Of Santa Fe
Case No. D-412-cv-2018-00183
Report/Plaintiff

55. Mother Doe, Individually and as the Mother and Natural Guardian for Jane Doe, a Minor, Plaintiff v. Richland County School District 2, Sheriff of Richland County in his Official Capacity, d/b/a Richland County Sheriff's Department, John E. Ewing & Jamel Bradley, Defendants
United States District Court
District of South Carolina
Case No : 3:18-cv-02731-CMC
Deposition/Plaintiff

56. Robert Cornelius, Plaintiff v. City of Mount Washington, et. al, Defendants
United States District Court
Western District of Kentucky
Louisville Paducah Division
Case No : 3:18-cv--CV-341-DJH
Report/Plaintiff

57. Ylovy Fleurant, and Hernite Fleurant, as Personal Representatives of the Estate of Samson Fleurant, Deceased, Plaintiff v. City of Port St. Lucie, Florida, a Florida Municipal Corporation, Colin Duncombe, in his individual capacity, Stephanie Moo, in her individual capacity, Kenneth Frid, in his individual capacity, and Leon Niemczyk, in his individual capacity, Defendants
United States District Court
Southern District of Florida
Fort Pierce Division
Case No: 2:19-cv-14032
Deposition/Plaintiff

58. <u>Latrent Redrick and Jamon Pruiett, Plaintiffs v. City of Akron, Ohio, et al., Defendants</u>
United States District Court
Northern District of Ohio
Eastern Division
Case No : 5:18 CV 02523
Report/Plaintiff

59. <u>Estate of Aquones Cathery, Deceased, Plaintiff v. City of Chicago, et al. Defendants</u>
Circuit Court of Cook County, Illinois
County Department, Law Division
Case No: 18L 2421
Deposition/Defendant

**60.** <u>Brittany M. Jester, Individually and as Personal Representative for the Estate of Clayborn Dallas Jester, deceased, Plaintiff v. The South Carolina Department of Transportation, the South Carolina Department of Public Safety, the City of Greenville Public Works, the Greenville Police Department, and the City of Greenville, Defendants</u>
State of South Carolina
County of Greenville
In the Court of Common Pleas
Case No : 2017-CP-23-07759
Report/Plaintiff

61. <u>Cleo Murdock, Administratix of the Estate of Russell Elswick, Deceased, Defendants v. Kenneth Mack Gaddy, Christopher David Lyons, and Kanawha County Sheriff John Rutherford, Defendants.</u>
United States District Court
Southern District of West Virginia
Case No : 2 :18-cv-01339
Deposition/Plaintiff

62. <u>Mary Gail Whaley, Individually, and as Administratrix of the Estate of Clarence Clemmons Layfield, Jr. Deceased, Plaintiff v. Trooper 1st Class Christopher T. Speece, individually and in his official capacity; and the West Virginia State Police, a division of the State of West Virginia, Defendants.</u>
Circuit Court of Kanawha County
West Virginia
Case No : 18-C-124
Report/Plaintiff

63. Cruz Rodriguez and Aurea Rodriguez, Plaintiffs. v. City of Chicago, Illinois, and
    Chicago Police Officers Chad Smith, Scott Konior, Michael Fergus, John Swarbrick,
    Marco Mendoza, Luis Reyes, Marty Ridge, and Geoffrey Baker, Defendants.
    United States District Court
    Northern District of Illinois
    Case No : 16-cv-5720
    Deposition/Defendant

64. April Marie Adkins, Plaintiff v. Louis Roberts, III Individually and in his official
    capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester,
    Individually, Defendants.
    United States District Court
    Northern District of Florida
    Case No : 5 :18-cv-271-MCR-MJF
    Report/Defendant

65. Lance C. Sellers, Plaintiff v. Louis Roberts, III Individually and in his official capacity as
    Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually,
    Defendants.
    United States District Court
    Northern District of Florida
    Case No : 5 :18-cv-275-MCR-MJF
    Report/Defendant

66. Karonisha Ramsey, on her own behalf and as Special Administrator of the Estate of
    Kajuan Raye, Deceased, Plaintiff v. SGT. John Poulos, individually, and the City of
    Chicago, a municipal corporation, Defendants.
    United States District Court
    Northern District of Illinois
    Case No : 1:2016cv10913
    Trial/Defendant

67. Scott Kuck, as Personal Representative of the Wrongful Death Estate of Sarah Lee Circle
    Bear, Deceased, Plaintiff v. Sheriff Mark Milbrandt, Brown County, Sheriff Jay Tasa,
    Roberts County, Deputy Andy Miller, Trooper Jerry Kastein in his individual capacity,
    Jillyn Brooks, Joelle Thomas, Harmony Mattson, John/Jane Doe Supervisors 1-5,
    Jennifer White, Nicole Leslie, Brian Bahr, Joe Embury, John/Jane Doe Officers 5-10,
    Individually and in their official capacity, Lisa Meier, Northeastern Mental Health
    Center, John/Jane Doe Medical Staff 2-5, Defendants.
    United States District Court
    Northern District of South Dakota
    Case No : 1:18-cv-1014-CBK
    Report/Plaintiff

68. Kenneth Shaw, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00512-TKW-MJF
Report/Defendant

69. Vikki Stephens, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00515-MCR-MJF
Report/Defendant

70. Scotty Williams, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00514-MCR-MJF
Report/Defendant

71. Kimberly Nicole Wood, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00505-MCR-MJF
Report/Defendant

72. Trevor Day, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00506-MCR-MJF
Report/Defendant

73. Darrell Watkins, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00517-MCR-MJF
Report/Defendant

74. <u>Abranda Ward, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00527-MCR-MJF
Report/Defendant

75. <u>Willie Sims, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00513-MCR-MJF
Report/Defendant

76. <u>Patrick Themar, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00523-MCR-MJF
Report/Defendant

77. <u>Donnie Shores, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00526-MCR-MJF
Report/Defendant

78. <u>John Raines, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00510-MCR-MJF
Report/Defendant

79. <u>Willie Pippin, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00521-TKW-MJF
Report/Defendant

80. <u>Lora Penn, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00511-TKW-MJF
Report/Defendant

81. <u>Cole Padgett, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00509-MCR-MJF
Report/Defendant

82. <u>Tillman McCroan, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00507-MCR-MJF
Report/Defendant

83. <u>Kimberly Hazelwood, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00508-MCR-MJF
Report/Defendant

84. <u>Hansford Griffis, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00525-MCR-MJF
Report/Defendant

85. <u>James Fears, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00524-MCR-MJF
Report/Defendant

86. <u>Richard Driggers, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00504-MCR-MJF
Report/Defendant

87. <u>Tyler Daniels, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00518-MCR-MJF
Report/Defendant

88. <u>State of Wyoming v. Daryl Kisch</u>
Superior Court, Goshen County
Case No. CR-2019-31
Trial/Defendant

89. <u>Justin Creamer, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00496-MCR-MJF
Report/Defendant

90. <u>John Coulliette, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00530-MCR-MJF
Report/Defendant

91. <u>Joshua Clennen, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00499-MCR-MJF
Report/Defendant

92. <u>Timothy Bruner, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants</u>.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00501-TKW-MJF
Report/Defendant

93. Michael Brady, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00500-MCR-MJF
Report/Defendant

94. Benjamin Bowling, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00497-MCR-MJF
Report/Defendant

95. Derek Benefield, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00498-MCR-MJF
Report/Defendant

96. Hope Adkinson, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00494-MCR-MJF
Report/Defendant

97. Jason Sherrod, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00242-TKW-MJF
Report/Defendant

98. Teresa Odom, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00253-TKW-MJF
Report/Defendant

99. James Coffelt, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, and (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00246-TKW-MJF
Report/Defendant

100. Christopher Marr, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, and Trevor Lee, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00519-MCR-MJF
Report/Defendant

101. Monica Willis, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00516-MCR-MJF
Report/Defendant

102. Joan McCue, Plaintiff v. Louis Roberts, III in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, Defendants.
United States District Court
Northern District of Florida
Case No : 5:19-cv-00520-MCR-MJF
Report/Defendant

103. Jonathan Price et al. Plaintiff v. City of Kings Mountain; Kings Mountain Police Department; Jonathan Price, in his individual capacity; and JONATHAN PRICE, in his capacity as a Kings Mountain Police Officer, Defendants.
United States District Court
Western District of North Carolina
Case No : 3:19-cv-00352
Report/Plaintiff

104. Christian Topete, Plaintiff v. Mesa Police Department et al., Defendants.
United States District Court
District of Arizona
Case No : 2:18-cv-03127-ROS-ESW
Report/Plaintiff

105. <u>Dr. Kristen Decina, Plaintiff v. Horry County Police Department and Amos Berry,</u>
<u>Defendants.</u>
United States District Court
District of South Carolina
Case No: 4:19-cv-02079-DCC-KDW
Deposition/Plaintiff

106. <u>Taylor Quinn, Plaintiff v. Lt. Christopher K. Zerkle, the West Virginia State Police,</u>
<u>Sgt.Paxton Lively, Sgt. Rick keglor, Deputy Brandon Kay, Deputy Jamie Miller, and the</u>
<u>Kanawha County Commission, Defendants.</u>
Circuit Court Of Kanawha County
West Virginia
Case No: 20-c-320
Report/Plaintiff

107. <u>Rebeca Sable, Individually as surviving spouse and as personal representative, et al. Plaintiffs</u>
<u>v. Baltimore County Government, Defendant.</u>
Circuit Court Of Maryland
Baltimore County
Case No: C-03-CV-19-002696
Report/Plaintiff

108. <u>Betiersten R. Wade and Vernice Robinson, Individually and on behalf of all the Heirs at law</u>
<u>and wrongful death beneficiaries of George Robinson, Deceased, Plaintiffs v. City of</u>
<u>Jackson, Mississippi; Anthony Fox (In his individual and official capacities); Desmond</u>
<u>Barney (In his individual and official capacities); Lincoln Lampley (In his individual and</u>
<u>official capacities); and American Medical Response, Inc., Defendants.</u>
United States District Court
Southern District of Mississippi
Case No: 3:19-cv-00897-CWR-FKB
Report/Plaintiff

109. <u>Kenneth Brown, Plaintiff v. Broward County Sheriff's Office, Sheriff Scott Israel, and</u>
<u>the Unidentified Officers of the Broward County Sheriff's Office, Defendants.</u>
In the Circuit Court for the 17th Judicial Circuit,
In and for Broward County, Florida
Case No. 17-CA-003689
Report/Plaintiff

110. Jacqueline Crane, as Statutory Plaintiff and surviving mother of Ethan Robinson v. County of Pinal, a political subdivision of the State of Arizona ; Pinal Co. Sheriff's Office ; Deputy T. Farnsworth and Jane Doe Farnsworth, husband and wife ; Does I through V, inclusive ; ABC Partnerships I through V, inclusive, Defendants.
Superior Court of the State of Arizona
In and for the County of Pinal
Case No. S1100-cv-202000241
Report/Plaintiff

111. Francisco Olvera, Plaintiff v. City of Walhalla, SC, et al., Defendants.
United States District Court
District of South Carolina
Case No:
Report/Plaintiff

112. Patricia Hicks, Plaintiff v. Cook County Sheriff's Office, Officer Murphy, Star #566, Officer Murphy, Star #566, Officer Mousel, Star #388, Officer Dwyer, Star #32, Officer Doyle, Star #332, Officer Mears, Star #192, Officer O'Mally, Star #5, Officer Gosling, Star #712, Defendants.
United States District Court
Northern District of Illinois
Case No : 15-cv-6852
Report/Defendant

113. Renee Armenta, Plaintiff v. City of Goodyear, AZ ; Matthew Ross, a married man ; Goodyear Police Department ; et al., Defendants.
United States District Court
District of Arizona
Case No: 2:19-cv-05186-SMB
Deposition/Plaintiff

114. Farid Saleh & Miraj Bibi, Plaintiff v. Officer Irman Farooq, A/K/A Irman Farooq, & Fairfax County, Defendants.
United States District Court
Eastern District of Virginia
Case No: 1:19-cv-1546
Report/Plaintiff

115. Darryl Reynolds, Plaintiff v. City of North Charleston, Defendants.
State of South Carolina
County of Charleston Court of Common Pleas
For the Ninth Circuit
Case No: 2019-CP-10-4788
Deposition/Plaintiff

116. <u>Antonio Johnson-Fulwood, Plaintiff v. Horry Co. Police & Matthew Hill In His Official Capacity, Defendants.</u>
State of South Carolina
County of Horry Court of Common Pleas
For the Fifteenth Circuit
Case No: 2019-CP-2605895
Report/Plaintiff

117. <u>Timothy Davis, Plaintiff v. City of Columbus Ohio, et al. Defendants.</u>
United States District Court
Southern District of Ohio
Case No: 2 :17-cv-00823
Trial/Plaintiff

118. <u>Christina Prince, Individually, and as Personal Representative Of the Estate of David M. Prince Jr., Deceased, Plaintiff v. City of Deming, New Mexico, et al. Defendants.</u>
State of New Mexico
County of Luna
Sixth Judicial District
Case No: D-619-CV-2018-00406
Report/Plaintiff

119. <u>Lisa Tyree and Tim Tyree, as co-administrators of the Estate of Jeffrey Tyree Deceased, Plaintiff v. Bradley Colas and N. Tuft-Williams, Defendants.</u>
Commonwealth of Virginia
Circuit Court of Virginia Beach
Case No:
Trial/Plaintiff

120. <u>Cardell Vance II, as Personal Representative of the Estate of Cardell Vance, III Deceased, Plaintiff v. Sheriff Homer Deloach, City of Crescent, Florida, Daniel Taylor and Chad Ward, in their individual capacities, Defendants.</u>
United States District Court
Middle District of Florida
Jacksonville Division
Case No: 3 :19-cv-00999-J-39MCR
Report/Plaintiff

121. <u>Armond White and Johnny Thomas, Plaintiffs v. City of Chicago ; and Chicago Police Officers Escobedo, Brandt, Soto Diaz, Zaragoza, Cueller, Espinoza, Bernaciak, and Brink, Defendants</u>.
United States District Court
Northern District of Illinois
Eastern Division
Case No: 18-cv-1404
Report/Plaintiff

122. <u>Andricka Williams, Plaintiffs et al. v. City of Baton Rouge, et al., Defendants</u>.
19th Judicial District Court
Parish of East Baton Rouge
State of Lousiana
Docket No. : 659,090 Sec. 24
Review/Defendants

123. <u>Catherine Bradley, Plaintiff v. Nathan R. Burger, John Does 1-3, Darlene Wilson, Wal-Mart, Inc., Wal-Mart Stores East, L.P., Defendants</u>.
United States District Court
District of South Carolina
Rock Hill Division
Case No. : 0 :20-cv-03360-JFA-PJG
Report/Plaintiff

124. <u>Brittany Todd, et al. v. South Carolina Department of Corrections, et al</u>.
Court of Common Pleas
Ninth Judicial Circuit
State of South Carolina
Case No. : 2020-CP-10-00620
Deposition/Plaintiff

125. <u>State of North Carolina v. Robert Granato</u>
General Court of Justice, Superior Court Division
Forsythe County, North Carolina
Case No.: 19CR8192-93
Report/Defendant

126. <u>Antwan Smith, Antwan Smith, Jr., Camilla Reeves, Iyana Smith, and Nyla Smith, Plaintiffs v. City of Port St. Lucie, Joshua Saffomilla, Benjamin Thayer, and John Delacroce, Defendants</u>.
United States District Court
Southern District of Florida
Fort Pierce Division
Case No. : 2 :20-Civ-14252-DMM
Report/Plaintiff

127. <u>Gizelle Cooper, Plaintiff v. Florence Co. Sheriff's Dept. and Shane Keith, Defendants</u>.
    United States District Court
    District of South Carolina
    Florence Division
    Case No.: 4:20-CV-3530-SAL-KDW
    Report/Plaintiff

128. <u>Thomas Dent, Guardian for Karlee Dent, and as a Guardian for J.A.M., the minor child of Karlee Dent, Plaintiffs v. City of Parkersburg, a West Virginia Municipality, County Commission of Wood County, a Corporation, West Virginia State Police, a State Law Enforcement Agency, John Does 1-10, and Joel Seth Echard, Defendants</u>.
    Circuit Court of Wood County
    West Virginia
    Case No.: 19-C-236
    Deposition/Plaintiff

129. <u>Maria Dominique Turner, Plaintiff v. Louis Roberts, III, Individually and in his official capacity as Sheriff of Jackson Co. Florida, (former) Deputy Zachary Wester, Individually, Defendants</u>.
    United States District Court
    Northern District of Florida
    Case No: 5:20-cv-00199-MCR-MJF
    Report/Defendant

130. <u>William Allen Means, Plaintiff v. E.M. Peterson, D. Harvey, and The City of South Charleston, Defendants.</u>
    United States District Court
    Southern District of West Virginia
    Case No: 2:20-cv-11111
    Deposition/Plaintiff

131. <u>Tiffany and Jameal Green, Plaintiffs v. Carolina Restaurant Group, Inc., DBA Wendy's, Defendants.</u>
    United States District Court
    State of South Carolina
    Case No: 3:20-cv-03111-SAL-SVH
    Report/Defendant

132. <u>Mildred Crowder as a personal representative of Timothy Johnson, Deceased, Plaintiffs v. City of Manila, Arkansas, Jared Camp, individually, and Jackie Hill, individually, Defendants.</u>
    United States District Court
    Eastern District of Arkansas
    Case No: 3:18-cv-00131-DPM
    Deposition/Plaintiff

133. <u>Estate of Roscoe Wright, Sr. & Roscoe Wright, Jr., Plaintiffs v. Inlivian, Defendant</u>.
Case review
Report/Defendant

134. <u>James C. Kaminski, Plaintiff v. Georgetown County Sheriff's Office, Defendant</u>.
United States District Court
District of South Carolina
Charleston Division
Case No.: 2:20-cv-00710-MBS-MGH
Report/Plaintiff

135. <u>Ramone Williams, Plaintiff v. City of Goose Creek and Madeline Mungin, Defendants</u>.
State of South Carolina
County of Berkeley
In the Court of Common Pleas
Case No.: 2019-CP-0803172
Report/Plaintiff

136. <u>The Estate of Scott Schultz, William Schultz, and Lynne Schultz, Plaintiffs v. Board of Regents of the University System of Georgia By and on behalf of Georgia Institute of Technology and Tyler Austin Beck, Defendants</u>.
United States District Court
Northern District of Georgia
Atlanta Division
Case No.: 1:19-cv-4083-JPB
Report/Plaintiff

137. <u>Vickie J. McCree, As Personal Representative of the Estate of Ariane McCree, Plaintiff v. Chester Police Department; City of Chester; John Doe Officer #1, in his individual capacity; John Doe Officer # 2, in his individual capacity; John Doe Officer #3, in his individual capacity; Walmart Inc.; and Walmart East, L.P., Defendants</u>.
United States District Court
District of South Carolina
Rock Hill Division
Case No.: 0:20-cv-00867
Report/Plaintiff

138. <u>Connie Partridge Personal Representative of the Estate of John Partridge, Plaintiff v. City of Marana, a municipal entity; State of Arizona, a governmental entity; Centurion Detention Health Services, LLC, et al., Defendants</u>.
Superior Court of the State of Arizona
In And For The County of Pima
Case No.: C20204074
Report/Plaintiff

139. David G. Seabrook, Plaintiff v. City of North Charleston and Charleston Co. EMS, Defendants.
    In the Court of Common Pleas
    For the Ninth Circuit
    County of Charleston
    Case No.: 2019-CP-10-3484
    Report/Plaintiff

140. Cody S. Mayhew, Plaintiff v. Roger Harris, Sheriff Spotsylvania County, Deputy John Kcraget, and Deputy Steve Noakes, Defendants.
    In the Circuit Court of Spotsylvania
    Commonwealth of Virginia
    Case No.: CL17-490
    Report/Plaintiff

141. Sophia Pheap, as Administratix and Personal Representative of the Estate of Channara Pheap, Plaintiff, v. City of Knoxville, Tennessee, a governmental entity: Chief Eve M. Thomas, individually; Dylan M. Williams, individually, and John and Jane Does 1-5, individually, Defendants.
    United States District Court
    Eastern District of Tennessee
    Northern Division
    Case No.: 3:20-cv-00387
    Report/Plaintiff

142. Jimmie and Brandie Zappier, individually, as parents and next of kin Anthony Zappier, deceased, and as Co-Administrators of the Estate of Anthony Zappier, Plaintiff v. Hamblen County, Tennessee, a government entity; Esco R. Jarnagin, individually; Dewey Edward Horner, Jr. individually; and John and Jane Does 1-5, individually, Defendants.
    United States District Court
    Eastern District of Tennessee
    Northern Division
    Case No.: 2:20-cv-00221
    Deposition/Plaintiff

143. Gregory Donald McKee and Terri McKee, Plaintiffs v. North Carolina Department of Transportation, Defendant.
    North Carolina Industrial Commission
    I.C. No. TA-27096
    I.C. No. TA-27349
    Trial/Plaintiff

144. Kathleen L. Oberhart, individually, and as Personal Representative of the Estate of Daniel D. Oberhart and the Estate of Riley J. Oberhart, and as Guardian for Macy M. Oberhart, Plaintiff v. City of Anderson, an Indiana municipality, Officer Nicholas Durr in his official capacity, and the Estate of Gary L. Agnew, Defendants.
Madison Circuit Court 1
County of Madison
State of Indiana
Case No.: 48C01-1812-CT-00180
Report/Plaintiff

145. Lydia Major, Individually and as Parent and Next Friend of K.M., a minor under the age of eighteen (18) years old, Plaintiffs v. 8465 Patriot Boulevard L.P. d/b/a Meridian at Appian Way and Asset Management & Consulting Services, Inc., Defendants.
In the Court of Common Pleas
Ninth Judicial Circuit
County of Charleston
State of South Carolina
Case No.: 2019-CP-10-5029
Report/Plaintiff

146. David Pedraza, Plaintiff, v. City of Las Cruces, et al., Defendants.
United States District Court
District of New Mexico
Case No.: 21-cv-00167-RB-GBW
Report/Plaintiff

147. Neil Eichman, as Personal Represetative of the Estate of Megan R. Eichman, Plaintiff, v. Austin Rissanen, in his individual capacity; Charleston Co. Sheriff's Office: and the Town of James Island, Defendants.
In the Court of Common Pleas
For the Ninth Circuit
County of Charleston
Case No.: 2020CP100451
Report/Plaintiff

148. Barbara McDougald, v. Sheriff Ralph Kersey, in his official capacity as Sheriff of the Scotland Co. Sheriff's Office; Jessica Sadovnikov in her official capacity s a deputy sheriff or the Scotland Co. Sheriff's Office, and in her individual capacity; and Fidelity and Deposit Company of Maryland, Defendants.
In the United States District Court
For the Middle District of North Carolina
Case No.: 1:20-cv-666
Report/Plaintiff

149. Christian Seus, Plaintiff v. University of Tennessee Medical Center et al., Defendants.
In the Circuit Court of Knox County
Tennessee
Case No.: 1-377-18
Report/Defendant

150. Stephanie Bottom, Plaintiff v. City of Salisbury, NC et al., Defendants.
United States District Court
For the Middle District of North Carolina
Case No.: 1:21cv322
Report/Plaintiff

151. Mark Toon as Personal Representative of the Estate of Eric Toon, Plaintiff v. Lt. Christopher Zerkle, WV State Police in his Individual and Official Capacity, et al., Defendants
United States District Court
For the Southern District of West Virginia
Case No.: 2:21-cv-00427
Deposition/Plaintiff

152. Brandon Spencer, Plaintiff v. Martin Block, Defendant.
United States District Court
For the Northern District of Ohio
Case No.: 1:20-cv-01953-CAB
Report/Plaintiff

153. State of Texas v. Juan Pedro Delacruz.
183rd Judicial District Court
Harris County
Report/Prosecution

154. Zebrian White v. 787 Bar & Grill, et al.
State of South Carolina
In the Court of Common Pleas
Ninth Judicial Circuit
Case No.: 2018-CP-10-05106
Report/Plaintiff

155. Angel Salcido, Personal Representative of the Wrongful Death Estate of Cristal Cervantes, Wanda Martinez, Plaintiffs v. City of Las Vegas, New Mexico, et al., Defendants.
State of New Mexico
County of San Miguel
Fourth Judicial District Court
Case No.: D-412-cv-2021-00313
Report/Plaintiff

156. <u>State of North Carolina v. Jeremy A. Phifer, Defendant.</u>
County of Gaston
In the General Courts of Justice
Superior Court Division
Report/Defendant

157. <u>Adela Gibson and Richard Moore, Plaintiffs, v. City of Mesa Arizona, et al.
Defendants.</u>
United States District Court
For the District of Arizona
Case No.: CV-21-01729-PHX-JJT (ESW)
Report/Plaintiff

# *In-Custody Transportation*

BLET: 24L

TITLE: IN-CUSTODY TRANSPORTATION

Lesson Purpose:    To present to the student processing and security procedures to follow when transporting arrestees or escorting in-custody inmates.

Training Objectives:    At the end of this block of instruction, the student will be able to achieve the following objectives in accordance with information received during the instructional period:

1.    Given pertinent data, complete a DCIN arrest form.

2.    Identify and discuss all safety and security precautions which should be taken by a transportation officer prior to departure and during transport.

3.    Explain the proper procedure for conducting a thorough transport vehicle search, utilizing all safety precautions and documenting any items of found contraband.

4.    Discuss the significance of adhering to department and facility policies and procedures as they relate to transporting outside of the facility.

5.    Identify the required security equipment and discuss the security procedures to follow when escorting an inmate in the following environments:

    a.    Courtrooms
    b.    Hospitals
    c.    Elevators

6.    Define the term "contraband" and discuss three rules of conduct that apply to any search.

7.    Following all safety requirements, demonstrate in a practical exercise, the proper procedure for conducting an in-custody search and make appropriate documentation of any item of contraband found.

8.     In writing, discuss in detail the correct procedure for conducting a strip search.

9.     Discuss universal precautions as it applies to:

a.     Personal protective equipment
b.     Handwashing
c.     Pat and frisk
d.     Disposal of sharps
e.     Contaminated clothing

10.    In a practical exercise, demonstrate the proper procedure for applying and removing the following types of restraints:

a.     Handcuffs
b.     Leg restraints
c.     Flexcuffs
d.     Waist chains

11.    Define the term "positional asphyxiation" and discuss proper procedures to follow to avoid its occurrence while transporting inmates.

12.    Given samples of the following forms, determine if they are valid and properly completed:

a.     Affidavit and Petition for Involuntary Commitment
b.     Findings and Custody Order - Involuntary Commitment
c.     Examination and recommendation  to determine necessity for involuntary commitment

13.    Discuss "use of force" options and identify when and if they can be applied when transporting a patient for involuntary commitment.

14.    Discuss the procedures for transporting a person in custody for involuntary commitment in reference to:

a.     Facility of confinement
b.     Officer's dress
c.     Vehicle

            d.      Restraints

| | |
|---|---|
| Hours: | Eight (8) |
| Instructional Method: | Discussion/Lecture/Practical Exercise |
| Required Equipment and Training Aids: | Audio-visual classroom equipment<br>Handcuffs<br>Leg restraints<br>Waist chains<br>Flexcuffs<br>Mats<br>Padlocks/keys<br>Items of clothing<br>Copies of the DCIN Arrest Report<br>Various props (e.g., rubber knives, contraband, personal jewelry, etc.)<br>Video:<br>    *High Risk Transport*, Lockup USA (1991) |

References:

Bosarge, Betty B., DPA, ed. *First/Second Line Jail Supervisor's Training Manual*. Washington, DC: National Sheriff's Association, 1994.

Burch, Andrea M., *Arrest-Related Deaths, 2003-2009 Statistical Tables*. U.S. Department of Justice, Bureau of Justice Statistics, November 2011. [On-line]. Available at: http://bjs.ojp.usdoj.gov/content/pub/pdf/ ard0309st.pdf [June 2012].

Combs, John, Jennifer Fisher, and BLET Revision Committee. "Subject Control/Arrest Techniques." *Basic Law Enforcement Training*. Salemburg, NC: North Carolina Justice Academy, 2011.

DOCC Revision Committee. "Contraband Searches." *Detention Officer Certification Course.* Salemburg, NC: North Carolina Justice Academy, August 2012.

DOCC Revision Committee. "Processing Inmates." *Detention Officer Certification Course.* Salemburg, NC: North Carolina Justice Academy, February 2012.

DOCC Revision Committee. "Transportation of Inmates." *Detention Officer Certification Course.* Salemburg, NC: North Carolina Justice Academy, August 2011.

Rector, Gary. "Transportation of Prisoners." *Basic Law Enforcement Training Manual.* Salemburg, NC: North Carolina Justice Academy, 1990.

Rees Jr., Thomas A. "When Kids Aren't Kids." *The Police Marksman* (January/February 1993): 6-9.

Ross, Darrell L. "Prisoner Transports, Officer Safety, and Liability Issues." Correctionsone.com, March 2009. [On-line]. Available at: http://www.correctionsone.com/pc_print.asp?vid=1843670 [June 2012].

Smith, Michael R. *Jail Operations Manual Development Guide.* Chapel Hill, NC: Institute of Government, 1991.

Prepared By:

Georgia Cloutier
Instructor/Coordinator
North Carolina Justice Academy

Col. Rodney Midgett
Dare County Sheriff's Office

Sgt. Kim Martin
Buncombe County Sheriff's Office

Gerald Mitchell
Wake Technical Community College

Capt. Randall Ray
Buncombe County Sheriff's Office

Date Prepared:

August 1997

Reviewed By:

Kathy Moore
Agency Legal Specialist
North Carolina Justice Academy

Date Reviewed:

December 1998
January 2000
November 2000
October 2001

## In-Custody Transportation

Revised By:                     Jon Blum
                                Instructor/Coordinator
                                North Carolina Justice Academy

Date Revised:                   November 2001

Revised By:                     Robert B. Yow
                                BLET Curriculum Coordinator
                                North Carolina Justice Academy

Date Revised:                   January 2007
                                July 2007
                                January 2008
                                July 2008
                                January 2009
                                July 2009
                                July 2010

Revised By:                     BLET Revision Committee

Date Revised:                   July 2011

Revised By:                     Jennifer H. B. Fisher
                                BLET Curriculum Coordinator
                                North Carolina Justice Academy

Date Revised:                   January 2013

Revised By:                     Gary Dudley
                                Training Manager
                                North Carolina Justice Academy

Date Revised:                   July 2013

Revised By:                     Jennifer H. B. Fisher
                                BLET Curriculum Coordinator
                                North Carolina Justice Academy

Date Revised:                   July 2014

TITLE:  IN-CUSTODY TRANSPORTATION – **Instructor Notes**

1.      This lesson plan must be presented by an instructor currently certified by the North Carolina Criminal Justice Education and Training Standards Commission as a General Instructor.

2.      This block should always be taught prior to "Sheriff's Responsibilities: Courtroom Duties."

3.      Section A requires students to complete the DCIN Arrest Report (DCI-608). *DCIN Format Instructions for Incident/Investigation Report* is found as a handout in the "Field Notetaking & Report Writing" topic area.

4.      There is a practical exercise on how to conduct inmate searches included in this lesson.  Prior to the practical exercise(s), the instructor will review the safety briefing form with all participants, to include role-players and students.  The lead instructor and each participant must sign and date the safety briefing form.  The instructor shall retain signed copies of the forms in the student's permanent file signifying that the participants have reviewed and understood the safety instructions given.  Students are to be paired up, each hiding item(s) of contraband on their person for the other student to find.  Students will only use weapons and items of contraband provided by the instructor.  This exercise is a pat-down, frisk, or clothed body search.  Therefore, items should be hidden where the person searching the inmate is able to detect them.  All safety regulations must be followed.  All universal precautions should be followed where applicable.

5.      This lesson outlines various types of restraints and also requires a practical exercise.  Students are to pair off and are to demonstrate the ability to apply and remove leg restraints, waist chains, and handcuffs.

6.      This lesson outlines the involuntary commitment process and includes a practical exercise.  Instructors must provide students with examples of commitment orders and ask them to determine if they are valid.

7.      This lesson plan refers to several AOC forms.  The most current version of these and other AOC forms can be found at www.nccourts.org/Forms/FormSearch.asp.

8.      To promote and facilitate law enforcement professionalism, three (3) ethical dilemmas are listed below for classroom discussion.  At their discretion, instructors <u>must</u> provide students with each ethical dilemma listed below.

        Sometime during the lecture, instructors should "set the stage" for the dilemma prior to taking a break.  Instructors are encouraged to develop additional dilemmas as needed.

## *In-Custody Transportation*

a)      While transporting a suspect to jail he gets out of control.  Your partner handcuffs him to the door and shackles him to the floor.  What will you do?

b)      While transporting a suspect to jail your partner gets angry at the defendant for spitting on him.  He realizes that the suspect is not seat belted in and slams on the brakes, causing the suspect to go face first into the cage.  What will you do?

c)      Your agency policy is to always handcuff a suspect.  You arrest a beautiful young lady for DWI.  Should you handcuff her behind her back knowing how uncomfortable it feels?

TITLE:  IN-CUSTODY TRANSPORTATION

I.      Introduction

**NOTE:  Show slide, "In-Custody Transportation."**

A.      Opening Statement

Recent events throughout the nation have indicated that transportation is possibly, the single most dangerous function for an officer.  The restraining devices available to assist a transportation officer, when properly applied, can provide security to society and the officer.  The classification status of an inmate should be carefully considered to determine the appropriate device(s) to be used in each transportation incident.

B.      Training Objectives

**NOTE:   Show slides, "Training Objectives."**

C.      Reasons

"Knowledge of the emotional impact of being restrained and transported provides a necessary perspective on an inmate's behavior.  The movement of persons in custody is dangerous.  A professional officer should carefully consider each incident and choose only that degree of restraint that is necessary to complete the task.  The choice and application of restraints shall not be done with malice."[1]

"Inmate transportation is defined as the controlled movement of a person or persons in custody from one point to another.  In order to perform this task successfully, specific equipment and skills are necessary.  The equipment necessary is the physical restraint equipment (cuffs, leg restraints, etc.) and the transporting vehicle.  The skills include knowledge and ability of the transporting officer to follow and implement established departmental guidelines.  The way an officer feels about transporting persons under restraint or the way the person or persons feel who are being transported is important and must be considered a factor.  These attitudes help determine whether transportation is easy and safe or difficult and dangerous.

The transporting officer must be aware of his attitude, feelings, and their effect on security.  He must also be able to sense and evaluate the feelings and attitudes of the person or persons being transported."[2]  These attitudes often cause unwanted and unexpected reactions.

Some officers have invited trouble and sometimes disaster by considering an inmate transportation assignment as an opportunity for a vacation or sight-seeing trip. Such practice is extremely dangerous as it often permits untrained personnel with a casual attitude to be entrusted with a specialized and dangerous task. The transportation of inmates should be performed only by officers who have had the necessary training and experience.

"Every person who is physically restrained thinks of escape at one time or another. The process of transportation offers a greater opportunity to escape than any other situation in which an inmate may find himself. While an inmate is in transit: 1) there is no cell, 2) no wall, 3) no observation tower, or 4) heavy gate to ensure custody. Instead, the transporting officer substitutes: 1) handcuffs, 2) restraint chains, 3) waist chains, 4) leg restraints, and 5) constant vigilance."[3]

II.    Body

A.    Completing the DCIN Arrest Report

**NOTE:  Show slide, "DCIN Arrest Report – Practical Exercise."**

**NOTE:  Conduct practical exercise, "DCIN Arrest Report," utilizing the instructions found in the "Field Notetaking & Report Writing" topic area.**

Some departments may not use the DCIN Arrest form; but whatever form a department chooses to use, it should contain the basic sections identified on the DCI-608.

B.    Commitment to the Detention Facility

**NOTE:  Show slide, "Commitment to the Detention Facility."**

Booking officers or detention facility intake officers must be familiar with court commitment orders and the process of committing persons in custody to the detention facility. The key persons in the process are the person in custody, the arresting officer, and the magistrate. Typically, before a person may be committed to the detention facility, a magistrate will determine the circumstances of the arrest from the arresting officer and interview the person in custody to determine if that person should be committed to the detention facility or released on his or her own recognizance or with bail. If the decision is to confine to the detention facility, the magistrate will complete AOC Form CR-200 "Release Order."

The AOC-CR-200 is the document used to track inmates through the system. It is imperative that officers understand the purpose of this form as well as develop an ability to determine if it is a valid document. Arresting officers will bring arrestees from the field to the magistrate's office where they will be formally charged and the AOC-CR-200 is filled out by the judicial officer. This form has three copies: the original is sent to the clerk of court's research division; a copy is given to the defendant; and one is given to the arresting officer to take to the detention facility. This is the legal document used to lawfully incarcerate the arrestee.

**NOTE: Show slide, "Handouts." Refer students to handouts, "AOC-CR-200" and "AOC-CR-201" forms. These forms can be downloaded from www.nccourts.org/Forms/FormSearch.asp.**

**NOTE: Show slide, "Once the Arrestee is at the Detention Facility, Either of Two Processes Will Occur."**

1.      Once the arrestee is at the detention facility, either of two processes will occur:

     a)      "The inmate will stay in custody until the case is finished. The release order continually flows back and forth between the detention center and the court until final sentencing or dismissal occurs. All transactions between the court and the detention facility must be documented on the back of the AOC-CR-200 in the appropriate space. Once disposition has been released, the AOC-CR-200 is sent to the clerk of court research division by the detention center to join the original copy and become part of the permanent record. OR

     b)      The inmate is released by one of five different ways:

          (1)      Cash bond

          (2)      Property bond

          (3)      Written promise

          (4)      Custody release

          (5)      Unsecured bond

          The AOC-CR-200 is sent by the detention center to the clerk of court records division to be held until final

disposition of the case. If the case is dismissed, it returns to clerk of court to become part of permanent records. If the inmate is sentenced, it is then sent back to the detention facility.

2.     Detention facility intake officers must be familiar with this form and must read this form as well as all forms, commitments, writs, detainers, etc., that are received in the detention facility. It is known by various names such as a release order, commitment paper, or 'Blue Sheet.'"[4]

**NOTE: Show slide, "Credentials/Identification."**

3.     "The persons bringing the inmate to the detention facility should furnish the booking officer with his credentials or identification card. A badge or uniform alone is not proper identification. If there is any doubt as to the identity, ask for identification. The best identification is recognition and most deputies will recognize local officers. Other officers such as SBI, ALE, ABC, ATF, FBI, and Federal Marshals are some of the persons who may not be recognized.

4.     G.S. 15A-521(c) provides that inmates must be delivered to the detention facility by law enforcement officers, which implicitly supports an identification requirement. If the admitting officer does not know an escorting officer, he should request proper identification. The admitting officer should not accept custody of a person from an unknown escorting officer if the officer fails to produce proper identification. The facts and circumstances surrounding a refusal to accept custody will be recorded. The admitting officer will reasonably attempt to verify the identity of inmates accepted into custody."[5]

C.     Safety and Security Precautions Prior to Transport

1.     Mental attitude[6]

**NOTE: Show slide, "Mental Attitude."**

The transportation officer's attitude directly impacts the successful operation of the inmate's movement. Law enforcement officers must be constantly aware of their surroundings, their emotions concerning the given assignment, and the attitude of the inmate being transported. They must be able to evaluate the inmate's attitude and emotional state and be ready to respond accordingly.

Remember that an assignment of this nature is not a vacation or relief from normal duty; it demands concentration and dedication. If possible, at least two officers should be assigned to an inmate's movement, even over short distances.  A female officer should be used to transport a female inmate, if possible.  Officers must be ready to defend themselves against violent attack and respond using the skills they have been taught.

2.    Identify the inmate and destination[7]

    a)    The officer should review the inmate's record for the following:

        **NOTE:  Show slide, "Inmate's Record."**

        (1)    History of escape or escape attempts

        (2)    Institutional discipline history

        (3)    History of assaults

        (4)    Outstanding charges or detainer

        (5)    Emotional or mental instability

        (6)    Medical history

        (7)    Gang member

        (8)    Previous charge(s)

        (9)    Any other factor that would impact on security and management of the inmate

        **NOTE:  Show slide, "Photograph."**

    b)    Obtain a recent photograph of the person or persons being moved.  Determine if the individual will be wearing an armband or other identification.

        **NOTE: Show slide, "Determining Your Route."**

    c)    Determine exactly where you are going and calculate the best route.  Remember that the best route for you and your inmate is not always the shortest.  Identify possible hazards

that you may confront along the way. Estimate amount of time for the transport and, if possible, attempt to make rest stops only at law enforcement facilities along your route.

3.      Obtain all necessary restraints

**NOTE: Show slides, "Security Equipment."**

a)      Transportation officers should obtain handcuffs, waist chains, and leg restraints for inmates being moved from location to location. Other possible security equipment:

(1)     Weapon/ammunition (firearms qualified personnel only)

(2)     Handcuff key

(3)     Soft body armor (if authorized)

(4)     Aerosol or other defensive spray (if authorized)

(5)     Baton (if authorized)

b)      Officers should check to ensure that all restraint locks and hinges work properly. Inspect waist chains and leg restraint chains for wear or damage. Verify that restraint locks open and double-lock properly by the officer's key.

c)      The transporting officer should have additional restraint keys available and hidden from the inmate.

d)      There are several products on the market today that will cover the key holes on handcuffs in order to guard against inmate tampering. The use of heavy grade masking tape or "duct tape" around keyholes and chain links will greatly increase transport security.

e)      Flexcuffs: disposable nylon straps may be utilized for emergencies or mass arrest situations. They also work well with individuals that have ankles too large for normal leg restraints.

4.      Obtain additional travel items

**NOTE: Show slide, "Additional Travel Items."**

a)      Proper law enforcement identification is a necessity even if transportation is conducted by uniformed officers.

b)      Inmate medication(s) should be secured and packaged. The transporting officers should control and administer medication(s) as directed by medical personnel.

c)      The officer should obtain travel forms, monetary advances, and credit cards prior to departure.

d)      Road maps and emergency phone numbers should be on hand so that you will have them nearby prior to departure.

e)      A portable cellular phone is a good emergency communication tool if available to your agency.

5.      Maintain an inventory of items such as keys, restraints, property, etc., so as to verify their return at the conclusion of the trip.

6.      Officers should ensure they have reloaded their weapons prior to leaving the facility and should keep them constantly protected from the inmate throughout the trip.  Firearms should never be within the reach of an inmate.  It is possible for an individual to fire a handgun while restrained, as well as run while wearing handcuffs and leg restraints.  **DO NOT** place complete faith in restraint devices.

7.      Wear body armor just as you would with any dangerous assignment.

D.      Preparing the Transport Vehicle

1.      Conduct a transport vehicle checklist to include the following:

**NOTE:  Show slide, "Vehicle Checklist."**

a)      Ensure fuel and other gauges are functioning properly.

b)      Check fluid levels for oil, radiators, etc.

c)      Test brakes.

d)      Examine belts.

     e)      Check tire pressure; ensure that a spare tire and correct jack are available.

     f)      Check wiper blades and fluid.

     g)      Ensure that lights, siren, and radio are working properly.

     h)      Make sure spare fuses are accessible and stored.

     i)      Ensure that a first aid kit and fire extinguisher are on board.

     j)      Determine when the last scheduled maintenance was performed.

     **NOTE:  Show slide, "Preparing the Transport Vehicle."**

2.     Be sure to test drive the vehicle to see if it is in working order.

3.     Search the vehicle passenger areas as well as the glove box and trunk compartments.

     a)      Look thoroughly for any missed contraband as well as any equipment left by the previous transporting officer.

     b)      Be sure that spare handcuff keys, ammunition, restraints, or weapons have not been left under the seat or in compartments.

     c)      Completely remove the rear seat, if necessary, to ensure there is no contraband in this area.

4.     Secure restraint keys in a separate location from ignition keys.  Do not advertise their whereabouts to the inmates.

5.     Vehicles used for transport should have an additional ignition key well hidden on the vehicle's outside area.

6.     Document your search and condition of the transport vehicle prior to departure.

E.     Preparing the Inmate for Transport

**NOTE:  Show slide, "Preparing the Inmate for Transport."**

1.     Identify yourself to the inmate.

2.      Verify the identity and condition of the inmate to be transported. Remember that the safety, security, and welfare of the inmate are the responsibility of the transporting officer once they accept custody.

3.      Inmates should be restrained with handcuffs or waist chains and leg restraints according to departmental policy.

4.      Inmates should be searched thoroughly prior to being placed into the vehicle. Any property being transported with the inmate will be secured in an area of the transport vehicle not accessible to the inmate.

F.      Safety and Security Precautions During Transport

**NOTE: Show slide, "Safety and Security Precautions."**

1.      Officer awareness

Fatigue and premature anticipation of a completed trip may lead to some escape attempts.

2.      Ambushes have occurred during an inmate movement. Do not be misled in believing that inmates do not know in advance where and when they are being moved from location to location.

3.      During transport, inmates **SHOULD NOT:**

**NOTE: Show slides, "Inmates Should Not . . ."**

a)      Be permitted to talk with anyone other than officers or other prisoners.

b)      Be permitted to select eating places, rest stops, routes of travel, or other areas to visit.

c)      Be unnecessarily exposed to public view.

d)      Have restraints removed unless absolutely necessary.

e)      Be permitted to make phone calls.

4.      Inmate seating during transport

# In-Custody Transportation

a)    Screened vehicles[8]

**NOTE:  Show slide, "Screened Vehicle Transport."**

(1)    Inmates must be secured in the vehicle prior to officers being seated.

(2)    All inmates should be secured with safety seat belt and shoulder harness if available.

(3)    Only inmates should occupy the rear screened area of the vehicle.

(4)    Officers should occupy the front seat area.

(5)    Up to three inmates can be transported by a screened vehicle.

(6)    Additional inmates may be transported by screened van-type vehicles.  Be sure there are sufficient law enforcement personnel to handle the numbers being transported.

b)    Non-screened vehicles[9]

**NOTE:  Show slides, "Non-Screened Vehicle Transport."**

(1)    Inmates must be seated and secured in the vehicle prior to officers being seated.

(2)    All inmates should be secured with a safety seatbelt and a shoulder harness, if available.

(3)    When transporting one inmate, the inmate should be seated in the right rear area and secured.

(4)    A second inmate may be seated in the center rear area and secured.

(5)    One of the transporting officers must ride in the rear passenger area with the inmates for security.  THIS OFFICER MUST NOT BE ARMED.  All weapons and ammunition should be secured in an area of the vehicle not accessible to inmates prior to entering

the vehicle. The officer should enter the vehicle from the left side and not cross over the seated inmates. The armed driver will enter the vehicle last.

(6)     It is recommended that no more than two inmates be transported in unscreened vehicles. However, if it becomes necessary for three inmates to be transported, the following modifications should be made:

   (a)     Prior to the escort officer sitting in the rear of the vehicle, the third inmate will be seated and secured in the right front passenger seat.

   (b)     The UNARMED escort officer will then be seated in the left rear passenger seat just as in the two inmate transport.

4.     Rest stops/meal breaks[10]

**NOTE:  Show slide, "Rest Stops/Meal Breaks."**

a)     Avoid stopping at rest areas along interstate highways.

b)     Select rest stops at random and check them carefully before removing inmates from the vehicle.

c)     Check restraints frequently while transporting inmates to ensure they are secure, especially before breaks or rest stops. Ensure that restraints are not too tight and are not cutting into the skin of the inmate.

d)     Inmates should eat in the vehicle with restraints on. Fast food restaurants provide the best choice for food that does not require utensils. Watch the inmate from the outside of the vehicle during their meal break. Be sure to retrieve all salt, pepper, hot sauces, etc., from the inmate after they have completed their meal. These ingredients may be used as weapons if thrown in an officer's face or eyes. It is best if the officer waits until the inmate has finished before eating. The officers may wish to bring their own food with them on the trip.

e)      Use law enforcement facilities whenever possible.

6.      Traffic accidents/emergencies

**NOTE:  Show slide, "Traffic Accidents/Emergencies."**

a)      Be especially alert around accidents and other road emergencies.  If necessary, contact local law enforcement agencies or the North Carolina Highway Patrol to summon assistance, if necessary.

b)      Use extreme caution in exiting the vehicle if involved in an accident or emergency.  Accidents have been staged in order to entice officers to exit the vehicle and drop their guard.  Contact the State Highway Patrol or other local agency immediately for assistance.

7.      Vehicle operation

**NOTE:  Show slide, "Vehicle Operation."**

a)      Remember that you represent your agency while transporting an inmate.

b)      Adjust mirrors so that inmates are in sight of transporting officers.

c)      Obey traffic laws and do not take unnecessary chances.  A traffic accident will only slow down the trip and expose the officer to risk.

d)      Maintain communication with law enforcement agencies throughout transportation assignment.

As previously stated, transporting arrestees to and inmates from detention facilities to other locations is one of the most dangerous and difficult roles of a law enforcement officer.  While a majority of inmate transports are accomplished without incident, inmates have escaped killing or injuring an officer, injured themselves, or been killed, and harmed or killed innocent citizens.[11]  In cases where someone was killed, whether it was an officer, inmate, or bystander, the majority of the inmates were males arrested for committing a violent offense.[12]  The successful completion of this law enforcement task is contingent upon an officer following established policies and procedures.  In addition, it is imperative that the transporting officer utilize all safety precautions prior to the move, during the trip, and

after the arrival at the destination. The transportation of arrestees, regardless of their age, sex, or crimes committed, is dangerous business.[13]

G.    Guarding Arrested Individuals Outside of Detention Facility

1.    Policies and procedures

**NOTE:  Show slide, "Policies and Procedures."**

a)    If an inmate attempts to escape, officers should follow carefully their departmental policies and procedures. State statute G.S. 15A-401 specifically addresses the use of force and the use of deadly force to prevent escape from custody. This statute does have room for interpretation; therefore, departmental policy must be followed. Officers should also be mindful of the important U.S. Supreme Court decision, *Tennessee v. Garner*. This case established the following rules with regard to the use of deadly force to prevent escape of felony suspects:

(1)    Where the suspect poses no immediate threat to the officer and no threat to others, the consequences of failure to apprehend him do not justify the use of deadly force to do so.

(2)    If the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime which involved the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape and if, where feasible, some warning has been given.

b)    Escapes from custody must be reported immediately to local law enforcement agencies. Officers should not try to locate an escapee on their own.[14]

c)    Officers should immediately notify their own department in the event of an escaped inmate.

2.    Significance of adhering to departmental and facility policies and procedures

a)    "Due to the unpredictable nature of the transport, anything may occur and officers and supervisor should be prepared

to reduce the risks when performing the duty. The old adage that desperate people will do desperate things applies."[15]

b)      "Following safety guidelines, policy, and training are critical for performing this assignment without incident. While training in safe methods for performing a transport is important and regular training in transportation procedures in maximizing officer safety should be ongoing, it is also important for officers and supervisors to be cognizant of the liability issues which emerge from transporting prisoners.

**NOTE: Show slides, "Considerations."**

c)      Consider the following major items involved in virtually every prisoner transport:

      (1)      Selection and preparation of the vehicle

      (2)      Possible vehicle accidents

      (3)      Securing and placement of the prisoner in the vehicle

      (4)      Acquiring prisoner information

      (5)      Transporting special needs prisoners

      (6)      Gender of the prisoner

      (7)      Restraint equipment used

      (8)      Searching the prisoner

      (9)      The number of prisoners to transport

      (10)      Nature of the transportation

      (11)      Distance and route of the transportation

      (12)      Medical purposes of the transportation

      (13)      Using commercial aircraft

(14)    Officer weapons involved

(15)    Number of officers required for the transport

(16)    Communications during the transport"[16]

3.    Unknown individuals should not be allowed access to inmates. Inmates should not be allowed to have visitors during transportation. Custody of the inmate is still the responsibility of the transporting officer.

4.    Restraints should only be removed when absolutely necessary and in accordance with departmental and facility rules and regulations.

H.    Arrival at Inmate's Destination

1.    Procedure for release of the inmates

**NOTE:  Show slide, "Procedure for Release of Inmates."**

a)    Scan the area for suspicious people or objects.

b)    Examine the restraints checking for damage, ensuring they are still secure.

c)    Search the inmate prior to releasing custody or moving from the vehicular area.

d)    Contact the individuals that will be assuming custody of the inmate.

e)    Verify the identity of the intake officer and check all necessary paperwork.

f)    Remove restraints only according to facility rules or directions.

g)    Release to the destination facility all property, medication, and other personal items of the inmate.

2.    Search transport vehicle

**NOTE:  Show slide, "Searching the Transport Vehicle."**

a)       Search the transport vehicle for contraband, personal property of the inmate, and other items of a security nature. Remove the rear seat if necessary.

b)       Document the search of the vehicle.

**NOTE: Show slide, "Equipment Inventory."**

3.       Inventory equipment to determine that all restraints, keys, weapons, etc., have been returned.

3.       Documentation of transport

**NOTE: Show slide, "Documentation of Transport."**

a)       Document the arrival at the destination.

b)       Account for all property and equipment.

c)       Note any problems or important facts of the trip.

d)       Make note of any expenditures or other items needed for departmental reimbursements and complete the necessary forms.

I.       Specific Destination

The preceding guidelines are applicable to <u>all</u> transportation assignments. In addition to those already discussed, there are some specific transport destinations which call for additional specific procedures.

1.       Court procedures

**NOTE: Show slides, "Transporting to Court."**

Normally, two officers are assigned the duty of escorting an inmate to court. One officer is designated as the officer in charge or transport officer (normally the senior). The other officer is the driver. Of course, the number of officers used may vary depending on the number of inmates that are escorted. "The proper authorization will be initiated by the institution and is generally self-explanatory. The transport officer will conduct the appropriate search of the inmate(s), according to departmental policy, and apply restraints. The transporting vehicle should be searched thoroughly for contraband before placing inmates in the

transport vehicle. The transport officer should identify the inmate(s) to assure they are transporting the correct inmate(s). It is recommended that the times of departure be varied and where possible, different routes be taken to the courthouse. At the courthouse, observe carefully for persons or objects that could interfere with the transport. Make sure the paperwork is signed by the proper authority.

Upon arrival at the courthouse, you will normally secure the inmate in the local lockup. Make sure that you secure your sidearm before entering the lockup to remove the restraining devices from the inmate. Before placing the inmate in the lockup, it must be searched. After the inmate is safely secured, you will deliver the necessary documents to the court clerk or to the assistant state's attorney. This information may be included as part of the authorization or can be obtained from the officer in charge of the lockup."[17] You will also want to check the courtroom and adjacent area for hidden weapons and contraband.

"When you are notified that court is to convene to hear the case, you will enter the lockup and handcuff the inmate before proceeding to the courtroom. Normally the restraining devices will be removed from the inmate prior to entering the courtroom. The inmate will sit at the defense table with his attorney.

Once the inmate is seated with his defense attorney, make a survey of the courtroom and decide where you are going to sit during the trial. Consider all possibilities, avenues of escape, unruly inmates, etc. Although there will probably be another officer in the courtroom, either from the sheriff's office or an assigned court officer, you are responsible for the inmate. The court officer's primary responsibility is to protect the judge and jury members.

In the event the trial becomes a lengthy one and you estimate it will last beyond your shift hours, call the department and inform them of this fact. Upon conclusion of the trial, prepare the inmate for transportation back to the detention facility. Before leaving the courtroom, handcuff the inmate and return to the lockup area where you can apply the remainder of the restraining devices. Search the vehicle again before the inmate enters. The reasons for this are obvious. Only when this procedure is completed will you transport the inmate back to the institution. Vary the times of departure from the courthouse and the routes back to the detention facility.

Unless directed otherwise, the inmate should be returned to the detention facility even if the outcome of the trial is a finding of 'Not Guilty.' You may or may not know whether or not the inmate has any detainers or other pending charges, and the inmate must retrieve his personal property.

2. Transfer to a correctional institution

**NOTE: Show slide, "Transfer to a Correctional Institution."**

The authorization will indicate necessary information in regard to the material which should accompany the inmate involved in transfer. The authorization will contain the inmate's name, number, purpose of movement and sentence, necessary files that are to accompany him such as his records (institution and medical), any writs, commitments, or indictment papers, and orders indicating whether or not personal property, valuables, or monies are to accompany the inmate. After delivering the inmate to his destination, obtain a receipt from the receiving institution.

3. Escort of inmate to the hospital or doctor's office

**NOTE: Show slide, "Transporting to Hospital."**

The proper authorization will indicate necessary information in regards to the materials necessary to accompany the inmate. Make sure you have inmate's medical records and appointment slip. While at the hospital, be alert – waiting rooms are crowded, seating space is limited, and in general, conditions are ideal for an attempted escape or for creating a disturbance that could lead to an escape. If the inmate's medical condition requires them to go into an examining room, you will need to accompany the inmate.

There may be rare instances where you will be required to escort an inmate who is incapacitated; it may be necessary to move that inmate by stretcher. In this instance, check your vehicle and assure that necessary and appropriate restraining equipment is available in the vehicle.

'If the inmate must take an elevator, when possible, use the patient's elevator. It is usually less crowded and is controlled by an elevator operator. Approach the area and stand to one side of the doors. Once the elevator arrives, the officer will determine if it is safe. The officer will guide the inmate into the elevator and position himself next to the inmate with his weapon opposite the

inmate's body. It is a good practice to have the inmate face the rear wall of elevator. If two officers are available, the second officer will also position himself near the inmate with his weapon opposite the inmate's body. In close quarters such as an elevator, the officers shall always cover their weapons with their hand or arm. When exiting the elevator, one officer will hold the door and check the outer area to see that all is clear so the officer and inmate can exit safely. The officer will exit the elevator with inmate in front of him. When escorting the inmate through the hospital hall/corridors, one officer should walk slightly behind the inmate at a 45 degree angle with the gun holstered on the side away from the inmate. The officer will give instructions to the inmate as needed while walking, i.e., turn left, turn right or stop, etc.

The second officer, if available, walks behind as close as 2-3 feet but not further than 6-8 feet to the rear and opposite side of his partner. The officer may grasp the security waist belt in the rear section while escorting, making sure his holster is on the far side away from the inmate. The security waist belt can now prevent the officer from touching the inmate's person.'"[18]

4.      Escorting to funeral home or critically ill relative

**NOTE: Show slides, "Escorting to Funeral Home or Critically Ill Relative."**

"The proper authorization will provide you with the necessary information as to the address of the funeral home. The length of time allotted to the inmate for the visit is prescribed by the institution. If possible, limit the visit to private family visit time. The inmate has the choice, if desired, not to use the full allotted time. You should conduct yourself in a serious, businesslike manner and remain polite and as unobtrusive as possible throughout the visit. In no case should you permit the inmate to be out of your sight, nor should you permit the inmate to receive any articles from any other person during the visit. You should not accept any monies, photographs or any other items during such visits. Nor should you accept any food or drink from any person during such a visit. Unless your policies and procedures differ, you should not remove restraints.

You should report, in writing, any unusual occurrences or circumstances which may transpire during the course of such a visit. If any disobedience, disorder, or disturbance by the inmate

or by other persons at the place of your visit occur, you should terminate the visit and return immediately to the institution.

In performing this escort duty, you must take into account the emotional impact of the circumstances surrounding such a visit. You must act with tact, diplomacy, understanding, and good judgment in dealing with both the inmate and the public at such events. At the same time, you must recognize the responsibility for the safety and security of the inmate and the general public. Search the transport vehicle and the inmate before the return trip."[19]

J.      Searching of Inmates

The general public may think that once a man or woman is incarcerated in an institution and the gates of freedom close behind them, he or she does not pass through those gates again until their sentence is completed. However, in the day-to-day operation of a detention facility, inmates leave for various reasons. Well established search procedures and policies are mandatory. The sheriff is responsible to maintain security of the detention facility. A segment of maintaining that security compels the use of various types of searches to include body searches. A primary responsibility of an officer is performing body searches of inmates in order to maintain the safety and security of both the detention facility and the inmates. Inherent in this responsibility is the need for such searches to be conducted in a professional manner and to prevent the introduction of contraband.

"Contraband is defined as any unauthorized item in an inmate's possession that threatens the security and safety of a facility, staff, and inmates. Contraband is manufactured and/or obtained and carried by inmates almost daily. Mandatory searches will reveal drugs, weapons, hordes of food, and at times other inmate's property."[20]

**NOTE: Show various articles of contraband recovered from inmates.**

1.      "Rules for conducting body searches

        **NOTE:  Show slide, "Search Rules."**

        a)      Work from top to bottom – Start with the hair and finish
                with the toes.  Things have a tendency to fall downward.

b)      Be thorough – You should examine or squeeze all clothing. If there is any doubt, repeat process.  Always look for sharp objects before you squeeze.

c)      Be systematic – Develop a system.  Search inmates the same way each time.  Have a co-worker observe and critique your performance.

d)      Take your time and concentrate – If you are not going to take the necessary time to perform a search according to established procedures or guidelines, then you are wasting your time.  Don't go through the 'motions.'  There is no such thing as a 'mini search' in a detention facility.

e)      Be objective – Complete a search without bias or prejudice. Remain emotionally detached.  Perform each search in a professional manner.  You may wish to explain the purpose of the search and give instructions, however, do not engage in a conversation with the inmate and be distracted from your goal.  Do not permit actions or statements to cause you to pass over any step required to reach your goal.

2.      Impact of searches

**NOTE:  Show slides, "Impact of Searches."**

Each agency must have clear written policies that outline when strip searches should be conducted.

Some circumstances to be considered are:

a)      Inmate returning from court

b)      Self-reporting inmate coming in for weekend

c)      Inmates who have left the detention facility security perimeter and have had contact with anyone other than detention officers

Thorough searches are an essential part of security.  Depending upon how they are handled, a search can be humiliating, dehumanizing, and often anger the person being searched.

When performing a search, be professional in your approach and manner.  Searches may not be performed as punishment.

3.      Types of body searches

**NOTE:  Show slide, "Clothed Body Search."**

a)      Clothed body search (sometimes called 'frisk search' or 'in custody search')

(1)     This is a method of contraband control involving searching an inmate with their clothes on.  All searches of inmates should be conducted with maximum respect to the inmate.  Officers should use only the amount of force necessary to conduct the search if an inmate resists.  When possible, no other inmates should be in the room or in a position to observe.

(2)     Procedures for conducting a clothed body search

**NOTE:  Departmental policy might require a pat and frisk of pockets or other hiding places prior to having inmates remove items from them in case the inmate has a weapon.**

(a)     Have inmate remove outer clothing (i.e., sweater, jacket), empty pockets of trousers, shirt, dress or skirt; place all items away from inmate.

(b)     Have inmate stand with his back to you, feet spread apart, and arms extended.

(c)     From behind, using both hands start at forehead and run large tooth comb (you may use your hands if you wish but be careful of possible health hazard, use surgical gloves) through inmates hair.  If you use a comb, you must use a different comb for each inmate.

**NOTE:  Discuss methods of searching inmate's hair without the officer touching the inmate's hair.  Discuss having the inmate use their own fingers to comb**

**through their hair while the officer is looking for indicators of contraband.**

(d)     Look thoroughly at the ears, nose, and mouth; ask the inmate to remove dentures, eye glasses, necklaces, jewelry, etc.

(e)     Turn up shirt collar and examine. Check seams, squeeze material. Be careful for sharp objects.

(f)     Check shoulder, arm pit, and continue down arm to hand; continue to use both hands.

(g)     Examine chest across and down the middle. Female inmates should unhook their bra, then lean over; officer should check bra straps and then pull on the front of the bra.

(h)     Move down to stomach. Then move to back. Check across and down the middle of the back. Check all pockets, seams, belt loops.

(i)     Check waist band (inside also). Be careful to look before you touch.

(j)     Proceed down to the legs and check groin area. Be sure to push up into the cheeks of buttocks. Push one hand up into groin area. Always check clothing patches and appliques. Sometimes they can be used to cover contraband.

(k)     Move both hands down each leg, checking cuffs. Have inmate remove shoes and socks. If females are wearing a dress, lift dress up and make visual inspection of legs.

(l)     All items removed from the inmate should be searched and retained or returned according to departmental policy. All items not returned should be recorded on inmate personal property inventory."[21]

(m) Most agency heads require male officers to search males and female officers should search females. Students must follow searching procedures outlined by their department.[22]

**NOTE: Discuss position of inmates when conducting pat and frisk.**

(n) "Officers must take safety precautions. Officers should not conduct any search (cell, pat and frisk, body search) without taking necessary safety precautions. Officers should wear gloves at all times when searching inmates or cells. Also, if they are searching several inmates at a time, gloves should be discarded after each inmate and a new pair put on. Also, any items of contraband that are considered contaminated should be disposed of in biohazard containers or bags and universal safety precautions should be followed. (See section on universal precautions.)"[23]

**NOTE: Show slide, "Practical Exercise – Pat and Frisk." Conduct practical exercise, referring to Instructor Notes at beginning of lesson plan.**

b) "Unclothed body search or strip search

**NOTE: Show slide, "Unclothed Body Search."**

This is a method of contraband control which involves an inmate removing some or all of their clothing and a detention officer visually inspecting the inmate's naked body for contraband. The search may include a visual inspection of an inmate's body cavities, and an inmate may be required to turn around and bend over during the search. Due to a recent Supreme Court ruling from the Third Circuit, jails can conduct a suspicionless strip search of arrestees no matter the circumstances. The ruling is that jails can now have a policy of strip searching all arrestees that enter the jail's general population, even without any suspicion.

This is a significant impact to the way we conduct searches. Previously, strip searches were to be performed if there is reasonable suspicion to believe that the inmate possesses contraband. Reasonable suspicion automatically exists to strip search new inmates charged with crimes that are commonly associated with the possession of drugs, weapons, or violence."[24]

The search must not be conducted in the presence of other inmates or in sight of others and with as few staff as mandated by circumstance.

(1)     "Procedures for conducting strip search

        **NOTE:  Show slide, "Procedures for Conducting a Strip Search."**

        (a)     Be certain no other inmates are present or are in position to observe.

        (b)     Search should begin with inmate's head using a systematic approach.  Check hair, using long-tooth comb or surgical gloves. Officers should refrain from touching inmate's hair; if a comb is used, officer must use a new comb for each inmate.

        (c)     Next examine ears and nose.  The officer should have inmate open his mouth and move his tongue all around.  Also, have the inmate lift his upper lip and to pull down his bottom lip to ensure he is not hiding anything.

        (d)     Inmate should remove all clothing.  The clothing should be placed to the side and searched.  Officers should not touch the inmate.

        (e)     Ask inmate to lift arms and examine armpits.

        (f)     Examine the inmate for tape or bandages that may conceal injuries or contraband.

Have the inmate remove any bandages. Then replace them with a clean one.

(g)    Make a visual inspection of the pubic area. Remember you are not authorized to make any body cavity search. If you suspect an inmate has contraband hidden in one of their body cavities, medical personnel must perform the search under the guidelines listed below.

(h)    Females should be instructed to lift breast and a visual inspection should be made.

(i)    Legs, toes, and bottom of feet should then be checked.

(j)    Officer should make a visual inspection of inmate from behind – checking trunk, buttocks, legs, and toes. The inmate should be asked to spread their cheeks of their buttocks or to squat and cough. Look for contraband.

(k)    Officers will not touch an inmate during a strip search, and they will not direct offensive personal remarks to the inmate.

**NOTE: This inspection should take place as part of the strip search, either before an inmate changes into a jail uniform or before they put their own clothes back on.**

(l)    Strip searches will be conducted by officers of the same sex as the inmate.

Note: Strip searches involve a much more significant invasion of privacy than frisk searches. For that reason they should be conducted by officers of the same sex as the inmate. The procedure might permit a waiver of the requirement in an emergency during which an officer of the same sex as the inmate is not readily available. It could require advance notification and approval by

the shift supervisor before a waiver is allowed. The American Correctional Association recommends that trained staff of the same gender as inmate perform the search unless there is an emergency."[25]

K.    Universal Precautions

**NOTE:  Show slide, "Universal Precautions."**

"Universal precautions, as established by the Center for Disease Control (CDC), provide the framework for an effective infection control policy. These precautions are not only comprehensive but also recognize that infectious disease control policies should be occupationally specific. For example, officers who work in infirmaries or who transport prisoners should take additional precautions that may not be necessary for victim services and drug/alcohol counselors, who do not routinely come into contact with contaminated blood. Universal precautions recognize that cardiopulmonary resuscitation (CPR) is not a method of HIV transmission but may be a mode of transmission of other infectious diseases. Thus, the precautions recommend that CPR masks with a one-way valve be made available to all personnel who may engage in emergency rescue responses.

Universal precautions apply to blood and other body fluids containing visible blood, semen, and vaginal secretions. Universal precautions do not apply to feces, nasal secretions, sputum, sweat, tears, urine, and vomitus unless they contain visible blood. However, good hygiene requires that the precautions be followed for all body fluids."[26]

1.    Handling of biohazardous evidence[27]

**NOTE:  Show slide, "Handling Biohazardous Evidence."**

Officers who transport inmates or who respond to crime, accident, or suicide scenes should be concerned with the safe handling of biohazardous evidence. Officers must be especially cautious when large amounts of blood and body fluids are present. Departments should implement policies which address all aspects of evidence collection and management to include crime, accident or suicide scene precautions and packaging of biohazardous evidence.

2.    "General procedures

a)    General guidelines

**NOTE: Show slides, "General Guidelines."**

(1)     All personnel should wear disposable gloves when they are or can anticipate handling persons, equipment, or materials contaminated with blood or other body fluids.

(2)     All personnel should use a pocket mask when administering CPR.

(3)     All contaminated materials, except sharp objects, should be disposed of in a clearly marked bag identified as a contaminated material bag.

(4)     Personnel who come into contact with blood or other body fluids, whether wearing disposable gloves or not, should wash their hands with warm water and soap as soon as possible following the contact.

(5)     Any open cuts or breaks in skin should be covered with a Band-Aid or other bandage and kept dry. If the protective covering gets wet, a new covering should be put on.

(6)     All personnel should handle any sharp object with extreme caution.

(7)     All sharp items should be placed in puncture resistant containers and clearly marked as containing sharp objects."[28]

b)     Disposable gloves

**NOTE: Show slides, "Disposable Gloves."**

(1)     Officers are responsible for having disposable gloves on their person while on duty.[29]

(2)     "Disposable gloves should be worn by personnel if they have uncovered open wounds or breaks in the skin on their hands.

(3) Disposable gloves should be worn when handling persons who are bleeding or who have open wounds or lesions.

(4) Disposable gloves should be worn when handling clothing, bedding, or other material contaminated by blood or other body fluids.

(5) Disposable gloves should be worn when handling equipment items contaminated by blood or other body fluids.

(6) Disposable gloves should be worn by personnel in any situation where they may be exposed to blood or other body fluids.

(7) Disposable gloves should be worn once and discarded. If the gloves have been contaminated by blood or other body fluids, they should be placed in a disposable bag that is clearly marked for contaminated items.

(8) When removing disposable gloves, there should be no contact with the mouth. The gloves should be pulled off inside out to prevent any contaminated fluid from having contact with the skin.

(9) Personnel should wash their hands as soon as possible after removing disposable gloves.

(10) Disposable gloves should never be worn for extended periods of time. Personnel should use a pair of gloves when warranted by the situation and then discard the gloves.

(11) Replacement disposable gloves should be readily available and easily accessible at the work location."[30] Officers in transport should carry extra.

c) Pocket masks

**NOTE: Show slide, "Pocket Masks."**

(1) Personnel are responsible for having their pocket masks on their person while on duty.[31]

(2)     "Pocket masks should be worn by personnel when administering CPR.

(3)     Pocket masks should be cleaned thoroughly after each use.  The masks can be cleaned with soap and water or wiped off with alcohol.  Either way is sufficient to decontaminate the mask.  Pocket masks should be dried thoroughly before being returned to the carrying case."[32]

d)     "Searches

(1)     General guidelines

**NOTE:  Show slide, "Search Guidelines."**

(a)     Personnel should never put their hands blindly into purses, bags, pockets, or any item that is not a clear container.

(b)     Personnel should always empty out the contents of purses, bags, or any item that is not in a clear container prior to searching."[33]

(2)     "Body searches

**NOTE:  Show slide, "Body Searches."**

(a)     Disposable gloves should be worn while conducting a body search because the searching officer may come into contact with blood or other body fluids.

(b)     Extreme caution should be exercised by the searching officer when searching the clothing of the person being searched to reduce the likelihood of being stuck by a sharp object that may be hidden in the clothing."[34]

(3)     Pat-down searches

**NOTE:  Show slides, "Pat-Down Searches."**

(a)     The officer should wear disposable gloves.

(b)     "Prior to conducting the search, the searching officer should ask the person being searched if there are any sharp objects on their person or clothing.  If yes, the searching officer should instruct the person being searched to remove the sharp objects from their person or clothing"[35] and put the item(s) on the counter.  The officer should step back away from the individual while the sharp item(s) is being removed.  Then, the searching officer should quickly secure the sharp item(s) by placing it in a container away from the individual.

(c)     "The person being searched should then be instructed to remove all remaining items from the pockets.

(d)     To provide safety for the searching officer, the person being searched should be directed to use the left hand to remove items from the right pockets and the right hand to remove items from the left pockets.

(e)     Before conducting any pat-down search, the searching officer should visually inspect the person to be searched for any noticeable bumps in their clothing that would indicate a hidden object.

(f)     While conducting any pat-down search, the searching officers should avoid rapidly sweeping movements with their hands down the arms, legs, and torso of the person being searched."[36]

e)     Sharp objects

**NOTE:  Show slide, "Sharp Objects."**

(1)     Officer should handle all sharp objects with extreme caution and all sharp objects should be assumed to be infectious.[37]

(2)     "Needles should never be bent, broken, or otherwise tampered with by department personnel.

(3)     Sharp objects should be placed in a puncture resistant container and clearly marked as containing sharp objects.

(4)     If puncture resistant containers are not available, officer should carefully wrap the sharp object in paper or cloth, place the wrapped sharp object in an envelope or bag, and clearly mark the envelope or bag as containing sharp objects."[38]

(5)     Items which are evidence of a crime should of course be handled and processed accordingly.

3.     "Clean-up procedures

**NOTE:  Show slides, "Clean-Up Procedures."**

a)     Clothing

(1)     Uniform clothing or any other clothing that becomes contaminated with blood or other body fluids should be removed as soon as possible and placed in a disposable bag for taking home.

(2)     Normal washing in hot water using regular detergents in a washing machine will decontaminate clothing.

(3)     Normal dry cleaning will decontaminate those uniform items that must be dry cleaned.

(4)     As an added precaution, heavily soiled clothing items should be washed separately from other wash items.

b)     Equipment

Equipment items that are contaminated with blood or other body fluids should be thoroughly cleaned after use.  A solution of 1 part household bleach to 10 parts water is a sufficient solution to decontaminate equipment items."[39]

L.      Restraining Devices

**NOTE:  Show slide, "Restraining Devices."**

"Custody of inmates must be a constant consideration for transporting officers and should not be compromised for any reason.  An inmate will take advantage of the weakest link in a chain of circumstances to effect an escape.  Inmates being transported, male or female, should be kept in necessary restraining equipment at all times to prevent escape.

Furthermore, the transporting officers should never assume that restraining devices cannot be removed by the inmate, and they should be checked at intervals to make certain they are secure.  The fact that the inmate has been in custody prior to you transporting him is no guarantee that they do not possess a weapon or some article which can be used to pick the locks.  Even after inmates are searched, they may obtain contraband during the trip.  Locks can be picked with a variety of common objects, and this can be accomplished even when double locked and the keyhole sealed with tape.

Standard restraining equipment includes:  1) handcuffs, 2) single and double waist chains, 3) leg cuffs, 4) padlocks, and 5) lead chains.  Anyone who undertakes the transportation of persons under restraint should have a good working knowledge of this equipment.

1.      Handcuffs

**NOTE:  Show slide, "Handcuffs."**

**NOTE: Show class different types of handcuffs.**

Handcuffs, while providing quick restraint, present some problems as well.  Because of their metallic composition they can be used as a lethal weapon.  When the officer is in the process of putting handcuffs on an inmate, he is most vulnerable to attack.  Therefore, caution should be employed.  Also, handcuffs serve only as a partial means of limiting the use of the inmate's hands.  They cannot be expected to prevent an attempt to run away.  Handcuffs should be placed on the inmate with care.  Each cuff should be tightened to a snug fit on the wrist, but enough space should be left between the wrist and cuffs to ensure proper blood circulation.  A general 'rule of thumb' is to place the end joint of the little finger between the cuff and wrist.  If this can be done, the cuffs are

usually tightened sufficiently as not to cause injury. As soon as the cuffs are placed on the inmate, they should be double locked."[40]

For inmate movement of short distances, if a waist chain is not employed, you should cuff the inmate with palms out behind his back.

"If a waist chain is available, it should be used in conjunction with handcuffs and leg restraints. Some agencies use the 'black box' or 'blue box' in conjunction with handcuffs and/or waist chains. These boxes are used in attempt to prevent inmates from tampering with or gaining access to the handcuffs.

When one pair of cuffs is used for two inmates, the practice of handcuffing one inmate's left hand to the other inmate's right hand allows both inmates the freedom of one hand to use as they see fit. By handcuffing one inmate's right hand to the other's right hand, the activity of both inmates is limited. If waist chains are available, each inmate should be secured separately."[41]

a)      Standard chain handcuffs

**NOTE:  Show slide, "Standard Chain Handcuffs."**

"Handcuffs are a restraining device that consists of two ratcheting jaws connected by a short chain. This device is attached to a person's wrist to restrict hand and arm movement.

Handcuffs have a double-lock function. This prevents the jaws from over tightening on the inmate's wrists and prevents the handcuffs from being opened by shoving a shim between the teeth on the jaw and the ratchet. On standard handcuffs, an officer can use the small point on the top of a handcuff key to depress or slide the double-locking pins on handcuffs. Once double-locked, the handcuffs cannot be tightened or shimmied. CAUTION: Striking the handcuffs on a hard surface can disengage the double-locking system.

An officer must release the double-locking system before removing the handcuffs.

b)      Hinged handcuffs

**NOTE: Show slide, "Hinged Handcuffs."**

Hinged handcuffs connect both jaws by a hinge rather than a chain. Except in situations where an inmate would be handcuffed behind his back, the hinged handcuff cannot be used with a standard handcuff. This is necessary because the standard waist chain will not accommodate the hinged handcuff.

Note: Officers should always consider their safety when applying handcuffs. The procedure outlined below is recommended for using with compliant inmates. However, if inmates are not submissive, officers could require inmates to kneel or to lie on the ground or floor. All officers should follow all departmental procedures when applying handcuffs."[42]

2.      Application of handcuffs

**NOTE: Show slide, "Application of Handcuffs."**

a)      "The officer approaches or maintains a position in the 4-5 Zone (this zone appears in the Subject Control/Arrest Techniques block of instruction). The subject is requested to place his hands behind his back with the palms up, lean forward at the waist and keep head up and look straight ahead.

b)      The officer grasps the subject's right hand by placing the palm of the officer's nonweapon hand against the back of the subject's hand. The subject's right hand is slightly rotated clockwise. The subject's arm is pulled slightly away from his back.

c)      Place the bottom handcuff on the radial bone (above the thumb) of the right wrist applying downward pressure so that the single blade 'cycles' to a lock position. Control of the right arm is effected by maintaining a fisted grip of the top (thumb side) handcuff.

d)      After placement of the bottom handcuff, the officer transfers the grip of his nonweapon hand to the subject's left hand. The palm of the officer's nonweapon hand is placed against the palm of the subject's left hand. The

subject's left hand is pulled slightly toward the subject's right hand.

e)      Immediately place the top (thumb side) handcuff on the radial bone (above the thumb) of the left wrist applying downward pressure so that the single blade 'cycles' to a lock position.

f)      Ensure that handcuffs are adequately closed and double locked.

g)      Conduct an appropriate search incident to the arrest or detention as the situation dictates."[43]

3.      "Removal of handcuffs

**NOTE:  Show slide, "Removal of Handcuffs."**

a)      When removing the handcuffs, the officer maintains a position in Zone 4.

b)      Instruct subject to spread his feet wide apart, pointing toes outward.

c)      With the weapon hand the officer grasps the left handcuff and chain, controlling the lock housing with the index finger and thumb.

d)      With the key in the support hand, remove the left handcuff first and have subject to place his left hand on the back of his head or straight out to the side with the palm facing to the rear.

e)      Close the handcuff.  With the handcuff closed, maintain control by keeping slight tension on closed handcuff by extending the handcuff and chain with left hand or thumb.

f)      Position the weapon hand at the subject's right wrist controlling the handcuff lock housing with the thumb and index finger.  Remove the right handcuff and secure the handcuff key.

g)      Close and secure the handcuff.

    h)      Place the support hand on the subject's shoulder. Fully extend the weak arm. The officer steps back turning the weapon side completely away while using the support hand to prevent suspect from turning. Subject is told to step forward. The officer establishes a defensive stance.

    i)      Use of a kneeling position or placing subject in a chair, on a bench, or on the floor increases the officer's safety during handcuff removal as it limits the subject's mobility, balance, and ability to kick. It also minimizes a subject's height and weight advantage."[44]

4.      Leg restraints

**NOTE: Show slide, "Leg Restraints."**

    a)      "Leg restraints are to be used on all inmates in transit, whether the movement is by car, bus, or train.

    b)      Before placing leg restraints on an inmate, the officer should always make sure the inmate is properly handcuffed and wearing a waist chain. This reduces the chance of injury to the officer should the inmate become violent.

    c)      The use of leg restraints does not, in itself, stop an inmate from running; they merely slow him down. In a crowded area, an inmate could run fast enough to escape. There are dangers involved in applying leg restraints, such as being kicked by inmates while putting them on.

           There are basically three methods for applying leg restraints:

**NOTE: Show slide and play video, *High Risk Transport* – "Leg Restraint Applications" (5 minutes).**

    (1)      Require the inmate to sit down and hold his legs out fully extended while leg restraints are being applied

    (2)      Require the inmate to kneel on the floor or in a chair as officer applies leg restraints

    (3)      Have the inmate lie on the floor face down as the officer applies leg restraints

d) The removal of leg restraints en route should only be done when absolutely necessary and when there is additional protection either by another officer standing by or in a secure building.

e) Leg restraints should be placed over the socks and then closed up snug, leaving room for circulation. As with handcuffs, the leg restraints should be double-locked with the key hole placed on the lower side toward the floor/ground.

f) Leg restraints may be used in the following ways: one pair of leg restraints to each individual inmate; one pair of leg restraints for two inmates; or, two pairs of leg restraints for three inmates. However, for the best security, use one pair of leg restraints for each individual."[45] (flexcuffs: disposable nylon straps may be used in place of leg restraints and handcuffs in emergency and mass arrest situations)

g) "Leg restraints have a double-lock feature and function in the same manner as the hinged and standard handcuff. The leg restraints also use a standard handcuff key.

h) Leg restraints can be used as handcuffs, if the inmate's wrists are too large for regular handcuffs. When using leg restraints as handcuffs, the chain between the leg restraints should be tied in a knot and threaded through the 'D-ring' on the waist chain. This serves to reduce the length of the chain and further restrict hand movement.

i) When in use, the key holes on leg restraints should face the ground and the double-locking pinholes should face the front of the inmate."[46]

5. "Weapons must be carried in such a way that they are never within the reach of the inmate. Every transporting officer should remember that the gun which he is carrying may take his own life. It is physically possible for an inmate who is restrained to fire a gun as well as run; therefore, you can never place complete faith in any type of restraining equipment.

During transit, handcuff keys and leg iron keys should not be carried on the same key ring as motor vehicle ignition keys and other general use keys. Handcuff keys swinging back and forth

from the ignition continually advertise the fact that very little lies between the inmate and freedom. The officer should make it a practice not to let the inmate know the location of the restraint keys. It is recommended that only one officer expose his key in putting on or removing restraints from an inmate."[47]

Additionally, a vehicle employed in the transportation of inmates should be equipped with a well concealed "hide out" ignition key. When thinking about a place to conceal this key, remember that a key hidden inside the vehicle will be of no use if you are locked outside the vehicle.

6.     Waist chains

**NOTE:  Show slide, "Waist Chains."**

a)     "A waist chain or belly chain consists of a large brass or steel shaped 'D-ring' attached to a length of chain. The waist chain was designed for the comfort of the inmate during long distance transport, while allowing for the security of the transporting officer. The inmate's hands are in front, making it more comfortable for him. The inmate's hands are attached to the chain by handcuffs, restricting hand and arm movement, and providing security for the transporting officer.

b)     Some waist chains have small clips on the end of the chain. This clip was originally designed to take up excess chain by attaching it to the link portion around the inmate's waist. This clip can be used by the inmate as a makeshift key to open handcuffs and leg restraints, and should be removed and discarded.

c)     Those most often used by law enforcement personnel are the single and double chains. The single chain is approximately four feet in length, of single-link construction, having an enlarged link at one end and a metal spring-type snap on the other. The double chain is of the same construction but approximately twice as long as the single chain with an enlarged link at each end.

d)     Chains are used as restraining devices only in conjunction with handcuffs. A waist chain serves to further reduce the inmate's use of his hands. While the inmate is in handcuffs

and fastened to a waist chain, he does not have the full use of his hands.

The following procedures should be followed in using chains:

**NOTE: Show slide, "Procedures When Using Chains."**

(1)     <u>Single chain</u>.  Encircle the inmate's waist, threading the chain through belt loops.  Pull the chain snug, put the snap link through the enlarged link, and pull snug again.  Insert the open handcuffs through the brass head link of the chain.  Take the loose end of the chain (there is normally some chain left dangling) and, after pulling it snug, snap it into the chain encircling the inmate's body.  A small padlock at the end of the chain will improve security and keep the end of the chain from dangling.

(2)     <u>Double chain</u>.  Using one end of the chain encircling the inmate's body, thread the chain through belt loops, pull it snug, and insert the enlarged link end through the chain link.  The chain should be snug.  Then thread the other end of the waist chain through the second inmate's belt loops repeating the above procedure.

Use two pairs of handcuffs, one for each inmate, inserting the open handcuffs through links of the chain encircling the inmate.  Fasten the handcuffs as described above.

In the event that the inmate's clothing has no belt loops, make sure the waist chain is drawn tight enough to prevent it from slipping below the inmate's hips.

e)     Inmates may be secured singularly by twos, or by threes, using a combination of one double chain and one single chain, or using a single chain for each inmate, with an additional single chain running from one waist to the next.

f)     If additional restraints are necessary, two pairs of handcuffs may be used for each inmate.  The second pair of handcuffs

is inserted through the waist chain in the same manner as the first.  Handcuffs and leg restraints must always be double-locked when in use.  Remember, the keyhole on handcuffs should face the inmate's body up towards the arms.  The keyhole on leg restraints should face the ground.  Also, remember, handcuffs should be secured tightly enough to reduce the possibility of slipping through an opening larger than the inmate's wrists.  The use of a heavy grade of masking tape or, preferably, 'duct' tape around keyholes and the chain link between the cuffs serves as ideal security and is strongly recommended."[48]

**NOTE:  Show slide, "Practical Exercise – Applying and Removing Leg Restraints, Handcuffs, and Waist Chains." Conduct practical exercise requiring each student to demonstrate proficiency in applying and removing: leg restraints, handcuffs, and waist chains.**

M.      Positional Asphyxiation

1.      "Positional asphyxiation occurs when the body position of an individual interferes with their respiration resulting in asphyxia, or unconsciousness or death due to a lack of oxygen.

**NOTE:  Show slide, "Positional Asphyxiation."**

a)      The body position of the inmate should be closely monitored whenever you are transporting someone to ensure that his airway stays open."[49]

b)      An individual who has been handcuffed with his hands behind his back is susceptible to blocking his airway if he should become unconscious.  If an inmate is seated in an upright position and losses consciousness, his head may tilt forward, blocking the airway.

c)      Individuals who resist arrest or who are combative and are subsequently handcuffed and placed in a face down position are prone to positional asphyxiation.

(1)      Due to the physical exertion and anxiety that an individual experiences while he is resisting an officer, the body will naturally demand an increased supply of oxygen.

(2)     When the person is lying face down, with his hands behind him, it puts more weight on his chest, thereby limiting the normal chest expansion that occurs during breathing.  The result is a diminished supply of oxygen which in turn can lead to asphyxia.

2.     Prevention

**NOTE:  Show slide, "Prevention."**

a)     "Continuously check for change in breath and change in level of consciousness.

b)     No inmate should be placed in a face down position.

c)     Do not transport in 'hog-tie' position.

d)     Transport all inmates in upright vertical position.

e)     Remember, all suspects who are in your custody are your responsibility.  Any individual who loses consciousness or is not breathing must be given immediate emergency care."[50]

N.     The Involuntary Commitment Process for Transportation Officers; Correct Forms to Be Used

You will discuss the requirements and procedures for obtaining the authority for the involuntary commitment of patients to state mental hospitals or other mental health facilities in the "Individuals With Mental Illness or Mental Retardation" block of instruction.  In this section, we will discuss those forms the transportation officer encounters most often and other essential information for the transporting of a respondent or patient for an involuntary commitment.  This block of instruction will not discuss the method for having an individual involuntarily committed, but it will discuss the legal documents that you will need to have in order to take custody of someone against their will and other considerations that you, as a law enforcement officer, must make when transporting to a medical or mental hospital.

"The involuntary commitment proceedings and the authority of law enforcement officers to take into custody a person against their will requires that very specific criteria be met, much like those required for a criminal arrest.  However, the involuntary commitment process is a civil

proceeding that requires a law enforcement officer to take custody of an individual, not only for the protection of himself, but often for the protection of others."[51]

For most involuntary commitment proceedings, a law enforcement officer will initially come into contact with two different forms, both of which must be correctly completed before the officer will have the legal authority to act. In addition, we will discuss these and other forms and proceedings below.

1.      "Affidavit and Petition for Involuntary Commitment, form number AOC-SP-300

        **NOTE: Show slide, "AOC-SP-300 – Affidavit and Petition for Involuntary Commitment," and demonstrate how to complete form. This AOC form can be downloaded from the website www.nccourts.org/Forms/FormSearch.asp.**

        The Affidavit and Petition for Involuntary Commitment is a form that will be completed by either a magistrate or the Clerk of Superior Court."[52]

        In the event that the respondent is subsequently transported to a 24-hour facility, the transporting officer must have the original of this form and three (3) copies that can be submitted to the facility upon arrival.

2.      "Findings and Custody Order Involuntary Commitment, form number AOC-SP-302

        **NOTE: Show slide and refer to "AOC-SP-302 – Findings and Custody Order." Demonstrate how to complete. This AOC form can be downloaded from the website www.nccourts.org/Forms/FormSearch.asp.**

        a)      The Findings and Custody Order is the court order that directs the law enforcement officer to take the respondent into custody for an examination by either an eligible psychologist or physician. Note that on the bottom of the order, it directs that the respondent shall be taken into custody within 24 hours after the date the order is signed.

        b)      The back page of the Findings and Custody Order Involuntary Commitment must be completed by the officer

who takes the respondent into custody and/or the officer who takes the respondent to the 24-hour facility."[53]

c) It is required that when a respondent is transported to a 24-hour facility that the transporting officer have the original of this form and three (3) copies that can be submitted to the facility upon arrival.

3. Examination and Recommendation to Determine Necessity for Involuntary Commitment, Form # DMH 5-72-01

**NOTE: Show slide and refer to "DMH 5-72-01 Examination and Recommendation Form." Demonstrate how to complete.**

a) Unless the respondent is being committed under the authority of an emergency commitment for substance abuse, this form must be completed by either a physician or psychologist.

b) It is required that when a respondent is transported to a 24-hour facility that the transporting officer have the original of this form and three (3) copies that can be submitted to the facility upon arrival. However, the signature of the examining physician or psychologist must be an original signature on all three of the copies.

O. Use of Force

**NOTE: Show slide, "Use of Force."**

1. When a law enforcement officer is attempting to take a respondent into custody or when the respondent is being transported, the officer may use reasonable force if it appears necessary to protect the officer, the respondent, or others.[54]

2. "The entire spectrum of force options may be used; however, it is stressed that the force must be reasonable in the given situation. You should keep in mind that the individual you are dealing with is possibly mentally ill, and it is recommended that if having additional manpower available would reduce the chance of the respondent or the officer being injured, that option should be exercised if at all possible."[55]

3. "In conjunction with the use of force issue, any restraint that is reasonable to use when transporting the respondent may be used.

When choosing the type of restraint to be used, consideration should be given to the length of time it will take to complete the transportation of the respondent to the 24-hour facility and the demeanor of the respondent.  A docile and compliant respondent may not require as much restraints, but a violent and combative respondent will.  In all cases, the officer should follow his agency's policies on the use of restraints for transporting a respondent."[56]

P.    Special Considerations for Law Enforcement Officers When Transporting Respondents

**NOTE:  Show slides, "Special Considerations."**

1.    "Confinement facilities

    a)    In the event that a physician or psychologist is not available to conduct an examination, or if the weather conditions preclude transporting a respondent to 24-hour facility, the respondent may be temporarily detained in an area facility.

    b)    If an area facility is not available, the respondent may be detained in his home, a clinic, or hospital if appropriate supervision is available.

    c)    A respondent may **not** be held at a detention facility or other detention center.

2.    Statutory requirements for transporting respondents

    a)    To the extent feasible, the transporting officer should be in plain clothes and travel in an unmarked vehicle.

    b)    One or more of the transporting officers must be of the same sex as the respondent, unless the officer allows a member of the respondent's family to accompany the officer in making the transport."[57]

    c)    Restraints should be required for potentially hostile individuals.

3.    When the respondent reaches the 24-hour facility, the staff at that facility will again examine the respondent.  If it is the opinion of the examiner that the respondent is not eligible under the governing statutes for admission into the facility, the respondent

will immediately be released and the transporting officer is required to return the respondent back to their residence.

4.  When inpatient treatment at the 24-hour facility is of no further benefit, the respondent will be released.

    a)  If the respondent cannot arrange transportation, the deputy sheriff must go back to the 24-hour facility and take the respondent to his residence.

    b)  The same requirements apply for the return to home that applied during the original transport.

        **NOTE:  Show slide, "Practical Exercise – Commitment Orders." Conduct practical exercise where students are given several commitment orders to determine if they are valid.**

III.  Conclusion

   A.  Summary

   Transporting (escorting) inmates is undoubtedly one of the most dangerous and difficult roles you will perform in your law enforcement career.  Along with the technique of searching inmates, it is a vital part of your training.

   Considering the large number of escapes and the variety of potentially dangerous people you will be handling, as well as the number of law enforcement (escorting) officers killed or injured each year, you may well conclude that transportation of inmates is a high risk area.  Transportation risks may be minimized if proper procedures are followed.

   The adoption of a permanent transportation policy ensures uniformity, reduces the necessity for officers to operate on judgment alone (which can be erroneous), and makes restraint more readily acceptable to inmates because it is uniform.

   The successful performance of any law enforcement role or duty depends on the individual officer's ability to effectively follow a variety of established rules and procedures.  Security in handling and transporting inmates is a highly specialized function which should be performed only by personnel with the mental and emotional stability, training, and physical adroitness to complete such a task.  Inmate transportation is the controlled movement of a person or persons in custody from one point to

another.  In order to perform this task successfully, specific equipment and skills are necessary.  The equipment necessary is the physical restraint equipment and the transporting vehicle.  The skills include knowledge and ability of which the attitudes and feelings of the transporting officers play a large part.

Many escape attempts have occurred near institutions.  Transportation officers sometimes have a tendency to relax somewhat as they near their destination.  This may result from cumulative fatigue, premature anticipation of a completed assignment, or the increased anxiety which suddenly grips many inmates when they see their point of destination.  Even an inmate who is firmly convinced that his sentence is justified and seems to accept his state of imprisonment, may become disturbed or excited as he nears the institution and may attempt to escape.

The transporting officer should be aware of these factors and, instead of relaxing, should become more alert as the point of destination is approached.  You may relax only after you have delivered the inmate.

**NOTE:  Show slides, "Training Objectives."**

B.    Questions from Class

**NOTE:  Show slide, "Questions."**

C.    Closing Statement

Every person who is physically restrained thinks of escape at one time or another.  The process of transportation offers a greater opportunity to escape than any other situation in which an inmate may find himself.  While an inmate is in transit, there is no cell, no wall, no observation tower or heavy gate to ensure custody.  Instead, the transporting officer substitutes handcuffs, restraint chains and waist chains, leg restraints, and constant vigilance.

Custody of inmates must be a constant consideration of transporting officers and should not be compromised for any reason.  An inmate will take advantage of the weakest link in a chain of circumstances to effect an escape.  Inmates being transported, male or female, should be kept in necessary restraining equipment at all times to prevent escape.  Furthermore, the transporting officer should never assume that restraining devices cannot be removed by the inmate and should be checked at intervals to make certain they are secure.  The fact that the inmate has spent the night in a detention facility is no guarantee that they do not possess a weapon or some article which can be used to pick the locks.

### NOTES

[1] DOCC Revision Committee, "Transportation of Inmates," *Detention Officer Certification Course* (Salemburg, NC:  North Carolina Justice Academy, August 2011), 6.

[2] Ibid., 7.

[3] Ibid., 7-8.

[4] DOCC Revision Committee, "Processing Inmates," *Detention Officer Certification Course* (Salemburg, NC:  North Carolina Justice Academy, February 2012), 11-12.

[5] Ibid., 12-13.

[6] DOCC Revision Committee, "Transportation of Inmates," *Detention Officer Certification Course* (Salemburg, NC:  North Carolina Justice Academy, August 2011), 6-7.

[7] Ibid., 9.

[8] Ibid., 33.

[9] Ibid., 32-33.

[10] Ibid., 33.

[11] Darrell L. Ross, "Prisoner Transports, Officer Safety, and Liability Issues," Correctionsone.com (March 2009) [On-line] Available at: http://www.correctionsone.com/ pc_print.asp?vid=1843670 [June 2012].

[12] Andrea M. Burch, *Arrest-Related Deaths, 2003-2009 Statistical Tables.*  U.S. Department of Justice, Bureau of Justice Statistics (November 2011) [On-line] Available at:  http://bjs.ojp.usdoj.gov/content/pub/pdf/ard0309st.pdf [June 2012].

[13] Thomas A. Rees, Jr., "When Kids Aren't Kids," *The Police Marksman* (January/February 1993): 6-9.

[14] DOCC Revision Committee, "Transportation of Inmates," 30.

[15] Ross.

[16] Ibid.

[17] DOCC Revision Committee, "Transportation of Inmates," 15-16.

[18] Ibid., 16-17.

[19] Ibid., 19-20.

[20] DOCC Revision Committee, "Contraband Searches," *Detention Officer Certification Course* (Salemburg, NC:  North Carolina Justice Academy, August 2012), 6.

[21] Ibid., 6-9.

[22] Ibid., 9.

[23] Ibid.

[24] Ibid., 11.

[25] DOCC Revision Committee, "Contraband Searches," 9-11.

[26] Betty B. Bosarge, DPA, ed., *First/Second Line Jail Supervisor's Training Manual* (Washington, DC:  National Sheriff's Association, 1994), 193.

[27] Ibid., 194.

[28] Ibid., 195.

[29] Ibid.

[30] Ibid., 195-196.

[31] Ibid., 196.

[32] Ibid.

[33] Ibid.

[34] Ibid.

[35] Ibid.

[36] Ibid., 196-197.

[37] Ibid., 197.

[38] Ibid.

[39] Ibid.

[40] DOCC Revision Committee, "Transportation of Inmates," 22.

[41] Gary Rector, "Transportation of Prisoners," *Basic Law Enforcement Training Manual* (Salemburg, NC: North Carolina Justice Academy), 1990.

[42] Ibid.

[43] John Combs, Jennifer Fisher, and BLET Revision Committee, "Subject Control/Arrest Techniques," *Basic Law Enforcement Training* (Salemburg, NC: North Carolina Justice Academy, 2011), 60.

[44] Ibid., 61-62.

[45] DOCC Revision Committee, "Transportation of Inmates," 28-29.

[46] Ibid., 30.

[47] Ibid., 29.

[48] Ibid., 30-32.

[49] Ibid., 34.

[50] Ibid.

[51] Ibid., 38.

[52] Ibid., 39.

[53] Ibid.

[54] Ibid., 13.

[55] Ibid., 14.

[56] Ibid.

[57] Ibid., 39-40.