IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA INDIANAPOLIS DIVISION

| | |
|---|---|
| THE ESTATE OF PAUL DANIELS, by Personal Representative Kay Stover, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| CITY OF INDIANAPOLIS and INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT, | ) Case No. 1:20-cv-02280-JRS-MJD<br>)<br>)<br>) |
| STEPHEN GUYNN JR., in his individual and official capacity, | )<br>)<br>) |
| GEORGE ROSSMAN, in his individual and official capacity, | )<br>)<br>) |
| ELI RAISOVICH, in his individual and official capacity, | )<br>)<br>) |
| Defendants. | ) |

## REPORT AND AFFIDAVIT OF PATRICK COCHRAN

Patrick Cochran, under penalties of perjury, deposes and says:

1. I am 60 years of age. This statement is made based on my personal knowledge, education, professional experience, and review of the following materials regarding Paul Daniels:

>Officer Rossman Deposition
>
>Officer T. Michael Wilson Deposition
>
>Officer Raisovich Deposition
>
>Officer Guynn Deposition
>
>EMT Michelle Haywood Deposition

1

Post-modem Ultraviolet Photography of Paul Daniels

IMPD reports regarding Paul Daniels

Affidavit of Craig Karpe

Discovery produced by the City of Indianapolis to Craig Karpe

2. Attached as Exhibit "A" is a true and accurate statement of my education and experience as a law enforcement officer, investigator, and supervisor.

3. During my law enforcement career I have supervised and participated in police investigation units handling domestic violence, sex crimes, child abuse, and the Critical Intervention Team. I was also supervisor over the Police Technology Unit.

4. One of the technologies we used to investigate violence against children and deceased victims is reflective ultraviolet photography of victims' bodies. In 2002 I drafted an article on the subject titled "Use of Reflective Ultraviolet Photography to Photo-Document Bruising to Children". This article was published in 2002, by Crime Scene Investigator Network, Crime Scene Resources, Inc., https://www.crime-scene-investigator.net/uvchildphoto.html, and is attached as Exhibit "B".

5. The aforementioned article describes in detail the proper equipment and technique I and other police detectives used in crime scene investigations to obtain reflective ultraviolet photography of bruising for evidence in criminal prosecutions. As I state therein,

> "Reflective ultraviolet (UV) photography records the reflection and absorption of long-wave UV light by the subject matter excluding exposure of the film by all visible light. Simply said, long-wave UV light penetrates deeper into the skin than does visible light. Therefore, by placing a specially designed filter over the camera lens, one which will only allow a specific wave-length of UV light (less than 400 nanometers), we can expose the film to only this light. Since UV light penetrates deeper into the skin, the film will pick up the image of a bruise or bite mark, which has been absorbed too deep into the skin to be able to be seen using visible light".

2

6. I have reviewed the post-mortem ultraviolet photographs taken of Paul Daniels obtained through the technique used by myself and other detectives as described in the attached article. In my opinion the three photographs attached as Exhibit "C" numbers 1, 2, and 3 show significant deep bruising of the decedent's left chest spanning from the lower to upper ribs.

7. Based on my experience and training with cardiopulmonary resuscitation, as well as the above description of the resuscitation efforts provided by EMT Michelle Heywood, the bruising observed on Paul Daniels' left chest in the UV photographs would not have been caused by the compressions applied to the center of the chest as cardiopulmonary resuscitation is normally performed. In the deposition of EMT Michelle Heywood I reviewed, she describes on page 32 the chest compressions given to Paul Daniels in the attempt to resuscitate him:

```
 4 Q Do you use a device for chest compressions or just
 5 your hand? I know that they -- I've been told that
 6 they manufacture like some kind of plastic thing
 7 that you can use to compress the chest.
 8 A We use our hands.
 9 Q Okay. And how would you place your hands? Do you
10 put them -- your fingers together, or do you cover
11 them one hand over the top of the other?
12 A Typically, it's one hand over the other.
13 Q I see. And where would the hands be placed on the
14 chest, in your training?
15 A It's hard to tell.
16 Q Is it right on the sternum?
17 A Like midsternum.
```

3

```
18  Q  Okay. So right on the sternum really would be
19     where your hands --
20  A  Yeah.
21  Q  -- would be placed? In the middle of the ribs
22     where they intersect with the sternum?
23  A  Correct.
```

8. My professional career and training have included extensive study and experience with appropriate methods of restraint to be used during an arrest, as well as the signs and risks of positional asphyxia with improper restraint. Positional asphyxia is especially likely when a subject is kept prone on a flat surface while cuffed and shackled, as was done to Paul Daniels.

9. In my experience and training, the bruising seen in the Daniels ultraviolet photographs would have been cause by pressure applied to the left chest. I note that Sergeant T. Wilson testified that when he arrived to the scene of Paul Daniels' apprehension on September 1, 2018, Mr. Daniels was prone face down on the ground, with Officer Guynn to Paul Daniels' side, with Guynn's elbows, upper arms, and hands on Paul Daniels' back. Officer Guynn testified that he weighed between 285 pounds and 300 pounds at the time. The chest bruising depicted in the ultraviolet photographs is consistent with the contusion I would expect to see from a sustained pressure caused by being pressed into the ground from above. In my training and experience such a pressure on the chest would cause positional asphyxia.

10. I have no other publications beyond those listed here. I have not testified as an expert witness in any case before, and I have not been paid anything for my expert opinion and testimony of behalf of the Estate of Paul Daniels.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

SIGNATURE _/s/ Patrick Cochran_____  DATE: 4-7-2022
Patrick Cochran

STATE OF  Texas  )
                 ) SS
COUNTY OF Hays  )

On April 7, 2022, the above affidavit was subscribed, sworn, and acknowledged as a free act, before me as a Notary Public for said county and state, by Patrick Cochran, whose identity I verified as the person described above.

_Nancy Arnwine_
Notary Public

_Nancy Arnwine_

My commission expires: 1-16-23

NANCY ARNWINE
Notary Public State of Texas
My Comm. Exp. 1/16/2023
Notary ID 28684-4
Notary Without Bond

6

Patrick Cochran
Operations Captain
Texas State University Police Department
Nueces Building
615 North L.B.J. Drive
San Marcos, Texas 78666
Phone: 512.245.2805

**Captain**
**Texas State University Police Department**
Mar 2019 – Present
San Marcos, Texas

As the Operations Captain for the university police department, supervised two Lieutenants who in-turn supervise patrol, investigations and the evidence room. Assisted emergency management coordinator with their functions.

**Assistant Director University Police/Emergency Management Coordinator**
**Texas State University Police Department**
Oct 2017 – Mar 2019
San Marcos, TX

As the Assistant Director at the University Police Department, supervised police communications, police records, Access Services (security cameras, locks, electronic entry for the campus), fleet, the security guard unit, the "Bobcat Bobbies" (security escort service), and "Cats on the Go" (injured student escort). In addition acted as the emergency management coordinator for the university.

**Commander of the Downtown Area Patrol Command (DTAC)**
**Austin Police Department**
Jan 2015 – Sep 2016
Austin, TX

Supervised the Downtown Area Command which includes the Austin Entertainment District, the southern area of the State Capital, and very low income, and very high income residential areas. Both of the main homeless shelters are within a block of the Entertainment District, and the University of Texas is a few blocks north of DTAC. Most skyscrapers and several very high end apartments and condos are also in DTAC. All subordinate officers were bike qualified and most either ride bikes or walk.

Directly supervised five Lieutenants and they supervise 10 Sergeants and one Civilian Supervisor. Units include eight patrol shifts, one district representative unit, one metro-tac unit, and one civilian Downtown Ranger unit. Total authorized Civilians, Officers, Corporals, Sergeants, and Lieutenants in DTAC is 141. Served as the alternate SWAT commander.

**Commander**
**Austin Police Department**
May 2013 – Jan 2015
Austin, TX

Supervised two Lieutenants and they supervised 8 Sergeants over the following investigative units: Domestic Violence, DVERT, two Sex Crimes units, two Child Abuse Units, Critical Intervention Team (CIT), and the Sex Offender Registration Team (SOAR). Most unit members are detectives except for CIT and SOAR and they do have officers for compliance.

Supervised the CRASH team. This is a proactive unit of officers assigned to the domestic violence detectives. There are currently 4 officers assigned to the team.

**Commander**
**Austin Police Department**
Feb 2013 – May 2013
Austin, TX

Supervised the Technology Command. This included 2 civilian mangers and one Lieutenant over the following units: Police Equipment, Fleet, and the Police Technology Unit (PTU). PTU is the only unit with officers and civilians, the other two units were all civilians. Responsible for preparing the department's technology budget and the five year forecast of technology needs.

**Lieutenant**
**Austin Police Department**
Dec 2009 – Feb 2013
Austin, TX

Supervisor over the Police Technology Unit. Supervised one Sergeant and two civilian Business Systems Analysts. My primary role was to act as the project manager for all technology projects. I was also the Terminal Agency Coordinator for DPS and served on numerous technology related city committees.

**Sergeant**
**Austin Police Department**
Child Abuse Investigations (2008 – 2009)
Austin, TX

Supervised 14 detectives as they conducted child Abuse and child death investigations. My primary role was to approve reports, search and arrest warrants, and assign cases.

**Sergeant**
**Austin Police Department**
Northwest Area Command (2005 – 2008)

Supervision 10 officers and one corporal in the NW area of the city. Primary role was direct supervision of all aspects of patrol work, including use of force investigations, complaint processing and both strategic as well as tactical supervision to officers.

**Detective**
**Austin Police Department**
Child Abuse Investigations (1998 – 2005)
Austin, TX

Investigated case of sexual and physical abuse of children. Developed a process for using UV photography to help reveal bruising on children and adult victims.

**Police Officer**
**Austin Police Department**
Uniformed Patrol (1994 – 1997)
High Tech Crime Investigations (1997 – 1998)

**Police Officer and Sergeant**
**City of Austin Brackenridge Hospital Police Department**
Patrol Officer (1986-1989)
Patrol Sergeant (1989 – 1994)

**US Air Force**
Senior Master Sergeant – Retired


**Education:**

Bachelor of Arts – BA Applied Arts
Texas State University - Austin
Dates attended 2018 – 2019

Associates of Arts Degree – Criminal Justice
Dates attended 1989 - 1992

**Publications:**

Use of Reflective Ultraviolet Photography to Photo-Document Bruising to Children, 2002, Crime Scene Investigator Network, Crime Scene Resources, Inc.,  https://www.crime-scene-investigator.net/uvchildphoto.html

[Articles ▾ (https://www.crime-scene-investigator.net/csi-articles.html)

　[Bloodstain (https://www.crime-scene-investigator.net/csi-articles.html#5)

　[Computer Forensics (https://www.crime-scene-investigator.net/csi-articles.html#2)

　[Crime Scene Investigation (https://www.crime-scene-investigator.net/csi-articles.html#9)

　[DNA (https://www.crime-scene-investigator.net/csi-articles.html#3)

　[Documentation (https://www.crime-scene-investigator.net/csi-articles.html#4)

　[Fingerprints (https://www.crime-scene-investigator.net/csi-articles.html#6)

　[Firearms, Toolmarks (https://www.crime-scene-investigator.net/csi-articles.html#7)

　[Footwear, Impressions (https://www.crime-scene-investigator.net/csi-articles.html#8)

　[Human Remains, Death Investigation (https://www.crime-scene-investigator.net/csi-articles.html#10)

　[Miscellaneous (https://www.crime-scene-investigator.net/csi-articles.html#1)

　[Packaging Evidence (https://www.crime-scene-investigator.net/csi-articles.html#11)

　[Photography (https://www.crime-scene-investigator.net/csi-articles.html#12)

[Videos (https://www.crime-scene-investigator.net/csi-video.html)
[College and University Programs (https://www.crime-scene-investigator.net/csi-training.html)
[Become a CSI (https://www.crime-scene-investigator.net/becomeone.html)
[Employment (https://www.crime-scene-investigator.net/employment.html)
[Forum (https://www.crime-scene-investigator.net/forum.html)
[Resources and Links (https://www.crime-scene-investigator.net/csi-resources.html)
[Advertise With Us (https://www.crime-scene-investigator.net/advertising.html)
[Search (https://www.crime-scene-investigator.net/search.html)

# Use of Reflective Ultraviolet Photography to Photo-Document

# Bruising to Children

**Detective Patrick Cochran**
**Austin (Texas) Police Department**
**Child Abuse Investigations**

# Definition

Reflective ultraviolet (UV) photography records the reflection and absorption of long-wave UV light by the subject matter excluding exposure of the film by all visible light.i Simply said, long-wave UV light penetrates deeper into the skin than does visible light. Therefore, by placing a specially designed filter over the camera lens, one which will only allow a specific wave-length of UV light (less than 400 nanometers), we can expose the film to only this light. Since UV light penetrates deeper into the skin, the film will pick up the image of a bruise or bite mark, which has been absorbed too deep into the skin to be able to be seen using visible light.

# Time frame

The time frame to obtain good results with this technique has never been fully explored. The earliest time in which these photos seem to show any image, is shortly after the bruise or bite mark is no longer visible. The longest time, in which there is literature, is at least 5 months after the injury.* I have personally taken photos of an infant's injuries (bruising) that were almost 3 months old and I was still able to see finger marks on the infant's chest, where there child had been shaken. Photos taken using this technique **will not** show bruises that are still visible.

> **Receive our free monthly newsletter and/or job posting alerts**
> Click to sign up

# The good news

Reflective UV photography will show bruising or bite marks that are no longer visible. Since tattoos, birth marks, and Mongolian spots are located deeper in the skin than UV light penetrates, these things can be "photographically removed" from your photos.** In other words, the photos taken with this technique will not show any tattoos, birth marks, or Mongolian spots. Therefore, bruising that would otherwise be hidden by this things **will** show up on the UV photo. There is no special training, other

than knowledge of how a 35 mm camera is operated, that is required to obtain good results with this method. Besides a good 35 mm camera, the only expensive piece of special equipment required for this technique is the "Kodak Wratten 18A" filter, which costs in the neighborhood of $500.

## The (not-so) bad news

The most significant problem with this technique is two-fold. First, since the bruise or bite mark is not visible, you must take numerous photos to make sure that any possible injured area is photographed. Second, because most 35 mm cameras focus through the lens, once the UV filter is in place, the camera can't be focused (This may not necessarily be true for auto-focus cameras, as most will still focus through the filter). Of course this means that the camera must be focused, than the filter installed without the subject moving out of focus.

## The equipment

Of course you must have a 35 mm camera. The Austin Police Department, will be using a 35 mm camera fitted with a Nikon "micro-NIKKOR" 55 mm lens. Additionally, the film used must be sensitive to a light wave length of 300-400 nanometers. Most literature that I have read suggests the use of the Kodak T-Max 400 black and white film. There is no advantage in using color film when taking UV photos. A standard flash will work as long as it produces UV light, which most do. Lots of light is the key to good photo's, so I use a standard flash mounted on the camera's hot shoe, and a second standard flash with a remote trigger that I can hold in my hand and get it very close to the subject. A tripod is also necessary since the camera must be focused, then held still while the filter is installed. Finally, a KODAK WRATTEN 18A Filter, and holder must be purchased. I suggest a holder that allows the filter to be placed on the camera quickly and without moving the lens, since the camera will be focused, and the subject sitting still. A manual cable release is also useful, as it allows the shutter release to be pressed without any camera movement.

 
(https://crime-scene-resources.myshopify.com/discount/5off?redirect=%2Fproducts%2Fcrime-scene-and-evidence-photography-downloadable-pdf)
With coupon code "5off" at checkout

## The technique, step-by-step*

1. The camera is loaded with the appropriate film, shutter speed set at 1/60s, and flash synchronization is set for electronic flash.

2. Mount the camera on a tripod. The best UV photos are taken parallel with the subject. You must adjust the tripod so that as little of an angle as possible exists between the subject and lens.

3. Position the victim comfortably about 12 - 14 inches from the lens. Again, insure that film plane and bite mark or bruise plane are parallel.

4. Take a visible light (unfiltered) photo of the area you are about to take a UV photo of, and some general orientation photos.

5. Focus the camera, instruct the victim that you will be taking a series of about 3-4 photos, and **they must keep their movement to a minimum during the process**. Place a ruler or other measurement device on the injured area, being sure not to block the injury itself. Re-check the camera focus. Then place the UV filter on the camera, and take several exposures, using f-stops f-5.6, f-8, and f-11. In order to achieve optimum results, you can then hold your flash or light source in a different relationship to the injury and re-shoot, using the same f-stops. **Lots of light is the key to good photos**. Make sure the flash is pointed in the direction of the injury.

# Finally

Prints made from the use of ultraviolet photography look like regular black and white photos. When this film is developed, it is treated as any other film, and can be made into slides, prints, or enlargements. The use of ultraviolet photography can greatly enhance an investigation by showing a history of injuries, or even the specific outline of the weapon used to cause an injury.

Make sure to take a few rolls of test photo's before actually going out and starting to photograph victims.









# Footnotes

\* Krauss, T.C. and Warlen, S.C., "The Forensic Science Use of Reflective Ultraviolet Photography," *Journal of Forensic Sciences*, JFSCA, Vol. 30, No. 1, Jan. 1985, pp. 262-268

\*\* Frair, John, "Ultraviolet Forensic Photography," TECH BITS, Issue #2, 1989. Reprinted from KODAK manual # AM-102 KIC, pp. 7



EXHIBIT "C" no. 1



EXHIBIT "C" no. 2



EXHIBIT "C" no. 3