IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF PAUL DANIELS, by<br>Personal Representative Kay Stover, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| CITY OF INDIANAPOLIS and<br>INDIANAPOLIS METROPOLITAN<br>POLICE DEPARTMENT, | ) ) ) ) | Case No. 1:20-cv-02280-JRS-MJD |
| STEPHEN GUYNN JR., | ) ) | |
| GEORGE ROSSMAN, and | ) ) | |
| ELI RAISOVICH, | ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by counsel, respectfully offers the following memorandum of fact and law in

opposition to Defendants' motion for summary judgment.  Defendant Officers argue they are

entitled to qualified immunity.  However, factual differences between the testimony of Defendant

Stephen Guynn and fellow Indianapolis Metropolitan Police Department officers give rise to material

questions of fact which prevent summary judgment.  Construing the facts and inferences in the light

most favorable to non-movant Plaintiff shows the Defendant Officers violated IMPD General Orders

and training, and the force that they used on Mr. Daniels was objectively unreasonable, violating Mr.

Daniels clearly established rights. The City is also liable because it's records show a clear pattern of

injuries to persons with mental instability by IMPD officers over a multi-year timeframe,

demonstrating indifference and failure to properly train officers and maintain policies to avoid unnecessary harm. Plaintiff's exhibits in support have been previously filed as cited herein.

## I. STATEMENT OF FACTS

Paul Daniels was born on 11-20-1952. In 1970 Paul was a freshman at Lincoln University in Jefferson City Missouri, and had just been elected freshman class president. Paul played several instruments and enjoyed basketball. ECF 117-2, Stover Aff., para. 2.

On January 14, 1971, a group of young men attacked Paul Daniels near the Lincoln University, leaving him with brain injury and mental issues. *Id.*, para. 3. Paul Daniels was forced to drop out of school because of his mental disability. *Id.* Eventually Paul's family had to take him in and care for him. *Id.* After his injury, Paul did not like to be touched, and could respond aggressively. *Id.*, para. 4. On September 1, 2018, at age 65, Paul Daniels was living with sister Kay Stover, where she had been taking care of Paul after their other sister died. *Id.*, para. 5. That morning Paul wandered away from home on foot, which he had never done before. *Id.* He was wearing one shoe. *Id.*

At 11:09 am On September 1, 2018 Officer Steven Guynn was dispatched to check on the welfare of a black male who was walking in and out of traffic. ECF 120-1, Guynn Deposition, pg. 26 lines 6-14. Officer Guynn arrived at the intersection of 56th Street and Cooper Rd. and stopped at the traffic light. He observed a subject matching the description staggering in and out of traffic. *Id.,* pg. 30 lines 2-12. Officer Guynn pulled up behind the black male, later identified as Mr. Paul Daniels, and parked his patrol car. *Id.*, pg. 31 lines 5-13. After a short physical altercation, Officer Guynn took Daniels to the ground in the grass beside the road, cuffed him and called in "mild resistor" at 11:20:11. *Id.,* pg. 97 – 98.

Officer Rossman arrived at the scene between 11:20 and 11:22am. ECF 120-2, Rossman Deposition, pg. 10 line 18 – 20. ECF 120-1, pg. 98 lines 5 -7 According to Off. Rossman, Off. Guynn had Daniels handcuffed prone on stomach when Rossman arrived on scene. ECF 120-2, pg. 19 lines 4 – 12. Daniels remained cuffed prone on ground on his stomach when. Sgt. T. Wilson arrived. *Id.,* pg. 18 line 23 to pg. 19 line 1. The officers were holding Daniels handcuffed and shackled prone on stomach because he was kicking and not calm. *Id.*, pg. 14 lines 2 – 6. Eventually Daniels became calm and stopped making noise. ECF 120-1, pg. 61 lines 1- 3. Mr. Daniels stopped struggling. ECF 120-2, pg. 20 lines 16 – 17.

When Sgt. T. Wilson came on the scene he noted Daniels was still cuffed and shackled on his stomach. ECF 120-3, Wilson Deposition, pg. 23 lines 7 - 8. When Sgt. T. Wilson arrived, Off. Guynn was holding Daniels' down with his hands, arms, and elbows on Daniels' shoulders from behind. *Id.*, pg. 53 lines 9 – 19. Off. Guynn weighed between 285 and 300 pounds at the time he was holding Daniels down. ECF 120-1, pg. 76 lines 15 – 23.

Sgt. T. Wilson gave the following description of the events when he arrived at the scene to Detective Craighill (ECF 120-3, p. 46):

```
20 "DETECTIVE CRAIGHILL: Did you see anything,

21 as you're pulling up, with him fighting or the

22 officers when you pulled up?

23 "SERGEANT WILSON: No. He was facedown,

24 cuffed. Guynn was on his right side. Raisovich

25 was on his left side with more -- I believe just a

    (Page 47)

1 hand on him, standing up with a hand on him. And

2 Rossman was kneeling on the back of his left calf.
```

```
 3 "DETECTIVE CRAIGHILL: Okay. Nobody was,

 4 like, lying across him or anything?

 5 "SERGEANT WILSON: No.

 6 "DETECTIVE CRAIGHILL: What about Guynn? What

 7 was Guynn doing?

 8 "SERGEANT WILSON: Guynn was -- had it -- was

 9 holding him down -- was physically holding him down

 10 with arms and elbows, but not with his entire body

 11 weight laying across him.

 12 "DETECTIVE CRAIGHILL: And what part of the

 13 body is he holding down, Mike; do you remember?

 14 "SERGEANT WILSON: I want to say right

 15 shoulder, back of the shoulder blades and the --

 16 like, the back of the right arm.
```

Sgt. T. Wilson said he replaced the oversized handcuffs on Mr. Daniels' ankles with leg shackles he brought. Sgt. T. Wilson described to Detective Craighill the following events after the shackles were applied (ECF 120-3, p 42):

```
 20 "I then told the three guys there, 'Let's roll

 21 him over and sit him up so we don't get into

 22 positional asphyxiation issues.' They started

 23 giving him commands saying, 'Hey, roll over, roll

 24 over.' He wasn't responding.

 25 "They rolled him over physically, sat him up.

        Page 43

 1 His head tips forward. I believe Officer Raisovich

 2 said is he -- 'Is he breathing?'
```

3 "I pushed his head back, went to reach for a

4 pulse, and at that point he was -- he started

5 taking breaths. And he was breathing on his own,

6 very short and shallow about every four to five

7 seconds in what appeared typically of -- he gave

8 the impression of an opiate overdose. The

9 breathing was slow and labored.

10 "So that was on the initial impression that

11 that's what it was. So when we sat him up, we kept

12 his head tilted forward and waited for the medics

13 to get here."

According to Medical Examiner Field Deputy Report, she was told when officers rolled Mr. Daniels over they indicated that the decedent was pale, lips were discolored and the decedent began having difficulty breathing. ECF 117-6, Field Deputy Report, page 4, "Terminal Episode", para 2. Off. Guynn called by radio for the ambulance immediately when Daniels was set up and unresponsive. ECF 120-3, pg. 26 line 2 - 9. He made the call at 11:27:04. ECF 117-7, Affidavit of Craighill. At that point at least 5 minutes had passed since Officer Rossman arrived on scene, during which Mr. Daniels had been kept restrained on his stomach and held by the officers.

In their depositions, the Defendant Officers did not state they took Mr. Daniels' pulse or made any other efforts to resuscitate Paul Daniels before the ambulance arrived once they recognized he was unresponsive.

Officer Rossman and Sgt. T. Wilson, only say they saw Mr. Daniels prone on his stomach on the ground. They did not testify that he was ever on his side. Officer Guynn disputes this and claims he had Daniels on his side "90 plus percent" of the time because of concern about

positional asphyxiation.  ECF 120-1, pg. 59 lines 8 – 12.  Officer Guynn specifically claims Mr.

Daniels was on his side when Sgt. T. Wilson arrived.  *Id.* pg. 60, line 23-25.   Officer Guynn

claims when Daniels was first taken down and cuffed he was put on his side.  *Id.*, pg. 49 lines 5 –

7 and pg. 51 – 52.   Witness April Woodson saw Daniels initially handcuffed and says he was not

placed on side at that time.  ECF 117-8, Woodson Deposition, pg. 12 line 13 to pg. 13 line 1.

  The possibility of causing an inability to breath by keeping a restrained person on their

stomach for a period time has long been recognized.   The risk of death from employment of

restraint in the face down prone position was warned about in a 1995 Department of Justice

advisory bulletin titled, "Positional Asphyxia – Sudden Death".  ECF 117-9.  Drawn from a

report prepared by the International Association of Chiefs of Police for the National Institute of

Justice, it advises in part, "To help minimize the potential for in-custody injury or death, officers

should . . . As soon as the suspect is handcuffed, get him off his stomach".  *Id.*  This bulletin was

sent to police departments around the country, and has been re-released several times.

  Section III of IMPD General Order 8.1 (ECF 117-10) describes the risk of positional

asphyxia and the measures to be taken to avoid it.  It specifically states:

> "III. Positional Asphyxia
>
> A. Officers must be aware of the warning signs that could result in death by positional
> asphyxia. A subject placed on their chest or stomach, with the legs and arms
> restrained behind the back, may have difficulty breathing, leading to serious injury or
> death.
>
>   1. Officers should avoid leaving any prisoner on their chest or stomach for any
>   period of time longer than is absolutely necessary, regardless of the type of
>   restraint used.
>
>   2. The subject should be moved onto their side, allowing less interference with
>   normal breathing, as soon as possible.
>
>   3. The subject should then be carefully observed and medical assistance should
>   be summoned immediately to evaluate the subject's health."

Defendant Officers Guynn, Raisovich, and Rossman all testified at they were aware of the risks of positional asphyxia at the time of September 1, 2018 encounter with Paul Daniels. ECF 120-2, pg. 28, lines 8 – 24. Guynn Deposition, pg. 82 line 15 to pg. 84 line 2. ECF 56-5, Raisovich Aff., para. 17 -19. However, the Defendant Officers failed to follow the requirements of General Order 8.1 III. Officer Guynn said he knew that mental health issues could create excited delirium which would exacerbate positional asphyxia. ECF 120-1, pg. 83 line 1 – 23. See also ECF 117-10, IMPD General Order 8.1 (III)(B), (defining signs of excited delirium increasing the risk of positional asphyxia, including "bizarre, aggressive, violent behavior outside the norm", "shouting", "thrashing after restraint", "paranoia", and "hallucinations").

## II.      FACTS REGARDING IMPD TRAINING, POLICIES, AND MENTAL ILLNESS

IMPD General Order 4.7 states that, "During the normal course of duty, members of the Indianapolis Metropolitan Police Department (IMPD) may come into contact with individuals who display symptoms of a mental disorder. It is the policy of this department to train officers to work effectively with such individuals and treat them and their families with dignity and respect." See ECF 117-11, GO 4.7, para. 1. The general order recognizes the fact that the City of Indianapolis relies on IMPD as the front line in handling situations involving persons with mental disorders, as opposed to having dedicated, credentialed mental health professionals available. To compensate, IMPD requires its officers to complete a course on responding to people with mental illness when completing their in-service training. EFC 111-1, Young Aff. para. 22. IMPD also required its officers to complete course on autism and first responders as well as a course on public safety and mental health first aid. *Id.,* para. 23. IMPD also offers an optional course for officers on Crisis Intervention Team ("CIT") training. *Id.,* para. 26. Despite

being requested written discovery and in depositions, the Defendants have failed to produce any educational materials used by IMPD to train officers regarding handling persons with mental health issues beyond IMPD General Orders.[1]  See ECF 52-1, *Memorandum in Support of Plaintiff's Motion to Compel Discovery Responses*, para. 6(a) and corresponding exhibits.  The City of Indianapolis has offered nothing to demonstrate the contents, comprehensiveness, or adequacy of IMPD mental crisis training in support of their summary judgment motion.

IMPD General Order 4.7(I) provides the following procedures for officers dealing with persons who have potential mental health issues:

"B. When communicating with an individual who may have a severe mental illness and/or is experiencing a crisis, certain tactics, attitudes and demeanors work best. Officers should attempt to:

1. Use the individual's name;

2. Speak calmly and quietly;

3. Keep a reasonable and safe distance;

4. Be honest, respectful, and helpful;

5. Respond to rage with quiet and calm reassurances;

6. Slow down the pace of the situation and be patient;

7. Give firm, clear, and simple directions;

8. Be willing to repeat yourself;

9. Ask, "Are you taking your medication?";

10. Ask, "What medications are you supposed to be taking?";

11. Listen carefully and do not interrupt;

12. Maintain a non-threatening stance;

13. Do not challenge delusions or hallucinations;

---

[1] Training Instructor Damon Young, whose affidavit was provided by defendants with their motion for summary judgment, testified at deposition that he personally did not conduct mental health training and could provide no details regarding the contents or coursework.

14. Use "I" statements (i.e. I understand); and/or

15. Make no sudden movements."

ECF 117-11, G.O. 4.7(I)(B).

When he arrived at the scene, Officer Guynn suspected Mr. Daniels to be impaired in some fashion. ECF 120-1, pg. 32, lines 17 to 23. Later tests showed that Mr. Daniels had no alcohol or drugs in his system apart from Benadryl, an over-the-counter antihistamine. ECF 56-7, Autopsy of Daniels, pg. 8 -11.

Although Officer Guynn was dispatched on a "welfare check" on September 1, 2018 and believed Mr. Daniels to be suffering some kind of impairment, the officer did not follow the instructions in General Order 4.7 when approaching Paul Daniels. Officer Guynn's testified he initially walked up from behind on Mr. Daniels saying, "Hey, are you okay?" and "Hey, I don't want somebody dying, so I'm talking to you." ECF 120-1, pg. 31, lines 16 – 19. According to Officer Guynn Mr. Daniels responded, "Fuck you, you know, don't talk to me". *Id.* Officer Guynn testified he then got in his police car, drove slowly next to Mr. Daniels as he continued to walk, and reportedly said out the passenger window, "Hey, sir, listen, I understand you might not want to talk to me, but, again, I just need to make sure you're all right. I've got a police run. If you're good, I'm going to leave you alone, just please talk to him (sic)." *Id.,* pg. 32 line 16 to pg. 33 line 8. Officer Guynn states Mr. Daniels responded, "Fuck you, leave me alone. Stop talking to me". *Id.* At this point, Officer Guynn states he exited his vehicle, and walked next to Mr. Daniels saying, "I'm not trying to be hostile. I'm not trying to be crazy. I'm not -- I just want to make sure you're all right". *Id.,* pg. 34 line 15 – 18. While doing this Officer Guynn grabbed Mr. Daniels by the left arm. *Id.,* pg. 36, line 22 – 24. Officer Guynn testified that Mr. Daniels was walking in the grass beside the road at the time, not in an aggressive stance or attempting to flee. *Id.* Indeed Officer Gyunn had not commanded Mr. Daniels to stop at this point. Officer

Guynn stated in his April 27, 2021 deposition he grabbed Mr. Daniels' arm just to "get his attention" and let him know the officer was there. *Id.,* pg. 36 line 22 to pg. 37 line 1. Note that in his subsequent August 31, 2021 affidavit, Officer Guynn changed his reason for grabbing Mr. Daniels to, "because I was concerned that he would continue walking back into the road if I did not attempt to stop him". ECF 56-4, Aff. of Guynn, para. 66. According to Officer Guynn Mr. Daniels, "turned around, he swung at me, and he almost connected . . . I remember him swiping at the glasses and knocking them off my head. He didn't make contact with my face or anything with his fist, it was more the glasses". ECF 120-1, pg. 37, line 4 – 15. At this time the 65 year old Mr. Daniels was 72 inches (6 feet) tall and weighed 186 pounds. ECF 56-7, Autopsy of Daniels, pg. 4 (General External Examination). Officer Guynn performed a "leg sweep" on Mr. Daniels, taking him to the ground and cuffing him. ECF 120-1, pg. 41, line 9 – 17. Officer Guynn, who was in his mid-thirties and weighed 285 pounds or more, reported no problems in taking Mr. Daniels to the ground. See ECF 120-1, pg. 5, line 16-18 and pg. 76 lines 15 – 23. Once Mr. Daniels was on the ground in cuffs, Officer Guynn radioed "mild resistor" at 11:20:11 am. *Id.,* pg. 97 line 20 to pg. 98 line 1. Mr. Daniels would remain held on the ground until he was no longer responsive at 11:27:04. ECF 120-3, pg. 26 line 2 - 9. ECF 117-7.

A review of Officer Guynn's self-reported interactions with Paul Daniels shows that he followed almost none of the IMPD General Order 4.7(I)(B) procedures for handling citizens with suspected mental health issues. He did not keep a reasonable and safe distance, he did not respond to rage with quiet and calm reassurances or clear simple directions, and he did not slow down the pace of the situation. He did not call for medical assistance. Presumably Officer Guynn could have continued to use his vehicle to ride along side Mr. Daniels or walked along side of him to keep him safely out of traffic while medical personnel could be dispatched.

Instead Officer Guynn chose to physically confront Mr. Daniels, knowing he was impaired in some fashion. Conversely, Crisis Intervention Training, which Officer Guynn reportedly had, called for use of "de-escalation techniques". See ECF 117-11, General Order 4.7 (VIII)(C)(5).

IMPD provides voluntary Crisis Intervention Training (CIT) to train officer to handle citizens such as Paul Daniels who primarily present as a mental health problem rather than a criminal situation. This training is not mandatory for IMPD officers. At deposition Officer Guynn could not remember the date or details of his CIT training. When asked about it he stated (ECF 120-1, Deposition of Guynn, pg. 77):

```
18 Q All right. Have you had any specific training with

19 regard to dealing with people who have mental

20 illness or mental defects?

21 A Yes.

22 Q Tell me about that.

23 A CIT, which is Crisis Intervention Training,

24 essentially is something that I've had

25 personally -- oh, Lord, I can't remember the first

        Page 78

1 CIT I had, back when I was with IPS Police. And

2 during that time, it was CIT for youth, because we

3 worked the school system. So it was more dealing

4 with, like, kids going through crisis.

5 And then when we got -- when I got to IMPD,

6 the different CITs that I've had were just general,

7 not just for juveniles, for everybody.
```

8 As far as how many times and where and all

9 that, Lord knows, I'm pretty sure somebody's got

10 all that documented somewhere as far as training.

11 But I know I had several trainings personally

12 regarding CIT.

ECF 120-1, Page 79:

5 Q And did they train you on how to discern a mental

6 health situation from an intoxication situation?

7 A As far as trying to discern things, I mean, you get

8 general -- I'm trying to remember all the

9 trainings. Just give me a second.

10 You get general things that they try to give

11 you, things you want to try to look for. But as

12 far as being able to discern between the two, it's

13 just not something you can do just, you know, like

14 that, snap of a finger.

15 You almost got to do some talking, do some

16 observing, do some things before you kind of get to

17 a point where it's, like, "Okay, this isn't just X,

18 Y and Z. This might be, you know, mental health."

19 But to directly answer that question, off of

20 memory, I don't remember sitting down and having a

21 moment in any of those trainings where it was,

22 like, "Hey, this is how you can quickly discern,

23 you know, "A" from -- you know, apples to oranges

24 here." I don't remember that. I don't remember

25 that specifically.

The evidence produced by the Defendants showing the failure of existing IMPD policies and training to be effective in preventing injury by IMPD officers to citizens is not just isolated to the present case.  The City of Indianapolis has produced "Blue Team" reports covering the period between 2015 and 2020 documenting 188 separate incidents where citizens with noted mental health issues were injured during their interactions with IMPD officers and required medical treatment.[2]  Clearly a pattern of incidents exists showing an ongoing problem with injuries to persons with mental health issues in IMPD custody, which have not been sufficiently addressed by City of Indianapolis policies and procedures.

## IV.    EXPERT OPINIONS BASED ON FACTS

### A.  Dr. Daniel Schultz – Cause of Death

Dr. Daniel Schultz, MD, a board certified medical examiner and pathologist, reviewed the evidence in this case, including the medical examiner's autopsy report from Dr. Christopher Poulos, the deposition of Dr. Christopher Poulos, autopsy photographs, the report of Defendants' expert Dr. Sozio, and witness statements.  ECF 117-13, Aff. and Report of Dr. Schultz, pg. 1 para. 1 to pg. 2 para. 2.  From these materials Dr. Schultz made the following determinations:

> "Based on the information available to me at this time regarding the death of Mr. Paul Daniels, a 65 yr old man, it is my opinion as follows:
>
> a.    CAUSE OF DEATH: Stress and impediment of respiration due to complications of police restraint with prone position and pressure applied to shoulders.

---

[2] The Blue Team reports describing injuries by IMPD officers to citizens with mental health issues from 2015 to 2020 total 1407 pages.  The court's ECF system would not accept an attachment of this size.  Rather than needlessly burden the court with copious exhibits, Plaintiff presents the number of incidents here by verification.

b.    CONTRIBUTORY CAUSE:    Hypertensive heart disease;
      Chronic obstructive pulmonary disease; Schizophrenia
      and autism with paranoia and aggression

c.    MANNER:  Homicide (Police intervention with restraint
      procedure)

d.    Considerations:

     (1). After restraint had been established (handcuffs/
leg cuffs), it is more probable than not that the
persistent application of pressure to his shoulders (and
thus torso) in the prone position harmed Mr. Daniels thus
leading to hypoxia. Mr. Daniels was pushed down with enough
pressure to leave hematomas on the front of his shoulders.
It was recognized that Mr. Daniels was unresponsive after
an approximate 5 minute period of restraint.  When sat up
he reportedly started taking shallow breaths. The
application of pressure to the torso/shoulders in the
company of the prone positioning over what was by witness
testimony as at least a 5 minute period after the restrains
were initially applied was unnecessary from an arrest
perspective and only further exacerbated hypoxia.

     (2). Movement from his prone position to a lateral
position more likely than not would have prevented this
outcome. It is probable that earlier removal of pressure to
the back and movement to a better air exchange position
would have enabled him to regain unobstructed/impinged
respirations.

     (3). After recognition of unresponsiveness and shallow
respirations, Mr. Daniels' pulse should have been checked
by police.  It is more likely than not that administration
of basic resuscitation measures when he became unresponsive
would have led to a prevention of his death and led to a
better outcome.

     (4).  It is unlikely that Benadryl contributed to Mr.
Daniels' death in my opinion.  It may have furthered his
initial behaviors that day.  His blood level was
commensurate with the expected dose one might see after one
dose of typical diphenhydramine preparation. While some
individuals may express agitation with presence
diphenhydramine, toxic effects rising to the level of being
reasonably additive to the other traumatic and physical
circumstances are unlikely."

*Id.,* pg. 4 - 5, para. 21.

Both Marion County Medical Examiner Dr. Poulos and Defendants' expert Dr. Sozio found the manner of Paul Daniels' death to be undetermined, but neither spoke to witnesses to investigate facts regarding of positional asphyxia. Dr. Poulos testified that he could not rule out positional asphyxia as the cause of death. ECF 120-4, Deposition of Dr. Poulos, pg. 55 line 22 to pg. 56 line 19. While mild hypertensive heart disease and chronic obstructive pulmonary disease were found to be factors contributing to Paul Daniels' death, Dr. Poulos testified that these health issues are not unusual or unexpected in a 65 year old male. *Id.,* pg. 16 line 18 to pg. 17 line 17.

### B. Dr. Roy Taylor – Police Procedures Used With Paul Daniels

Dr. Roy Taylor is a police training and procedure expert. See ECF 117-12, Aff. and Report of Dr. Taylor, pg. 1 para. 1 to pg. 2 para. 2. He reviewed materials including the deposition testimony of Officers Guynn, Raisovich, Rossman, and Sgt. Wilson. *Id.* Based on these materials Dr. Taylor offered the following opinion:

> "In my opinion as a police procedure expert, Officers Guynn, Raisovich, and Rossman failed to adhere to nationally accepted police practices and training in restraining Mr. Paul Daniels, and in failing to promptly move him from a prone position to a recovery or recumbent position and administer aid. Once Mr. Daniels had mechanical restraints on his wrists and ankles, his struggles no longer presented a substantial danger to himself or others. He was no longer a flight risk. Holding Mr. Daniels down in a prone position at this point was not necessary for safety, and carried a substantial risk of causing death or serious bodily harm. In my opinion, holding Mr. Daniels down prone after he was mechanically restrained at the wrists and ankles, and the failure of the defendant officers to administer life saving first aid after Mr. Daniels became unresponsive caused the death of Mr. Paul Daniels."

*Id.,* pg. 16 line 18 to pg. 17 line 17.

### C. Captain Patrick Cochran – Evidence of Excessive Force

Captain Cochran is law enforcement officer, investigator, and supervisor.  See ECF 117-14, Aff. and Report of Capt. Cochran, pg. 1 para. 1 to pg. 2 para. 4.  He has supervised and participated in police investigation units handling domestic violence, sex crimes, child abuse, and the Critical Intervention Team. *Id.*  He is a published author regarding the use of reflective ultraviolet photography of victims' bodies to investigate and document violence against children and deceased victims.  *Id.*  Capt. Cochran reviewed evidence including reflective ultraviolet photographs of Paul Daniels taken post-mortem, and the testimony of the officers at the scene. On the basis of this evidence, Capt. Cochran offers the following opinions:

> "6. I have reviewed the post-mortem ultraviolet photographs taken of Paul Daniels obtained through the technique used by myself and other detectives as described in the attached article.  In my opinion the three photographs attached as Exhibit "C" numbers 1, 2, and 3 show significant deep bruising of the decedent's left chest spanning from the lower to upper ribs.
>
> .   .   .
>
> 9. In my experience and training, the bruising seen in the Daniels ultraviolet photographs would have been cause by pressure applied to the left chest.  I note that Sergeant T. Wilson testified that when he arrived to the scene of Paul Daniels' apprehension on September 1, 2018, Mr. Daniels was prone face down on the ground, with Officer Guynn to Paul Daniels' side, with Guynn's elbows, upper arms, and hands on Paul Daniels' back.  Officer Guynn testified that he weighed between 285 pounds and 300 pounds at the time.  The chest bruising depicted in the ultraviolet photographs is consistent with the contusion I would expect to see from a sustained pressure caused by being pressed into the ground from above.  In my training and experience such a pressure on the chest would cause positional asphyxia.

*Id.*, pg. 3 – 4.

# V. APPLICATION OF LAW

## A. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett* , 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In applying this standard, all reasonable inferences must be construed in favor of the party who opposes the motion (the Plaintiff herein). *Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020). All disputed issues of fact are to be resolved in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## B. Excessive Use of Force and the Fourth Amendment under *Graham v. Connor*

Under prevailing Supreme Court precedent, "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This inquiry involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). This analysis is not capable of precise definition or mechanical application. *Id.* It "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

To determine whether the force used to effect a seizure is unreasonable, The Court must examine the "totality of the circumstances" surrounding the incident. *Estate of Phillips v. City of*

*Milwaukee*, 123 F.3d 586, 592 (7th Cir.1997). The "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" are specific factors for courts to consider. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. Mental illness may also be relevant to the reasonableness inquiry. *Abdullahi v. City of Madison*, 423 F.3d 763, 770 (7th Cir.2005).

Additionally, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. In excessive force claims, the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-397. The reasonableness inquiry in an excessive force case is an objective one. *Id.* The question is whether the officers' actions are `objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

The level of force that is constitutionally permissible in dealing with a mentally ill person differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community. *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). Consequently, Mr. Daniel's mental impairment was a factor that a police offices should have taken into account in determining what degree of force, if any, is appropriate. *Id.*

Applying the factors set forth in *Graham* shows the force used by the defendant officers herein was not objectively reasonable or proportional to the circumstances. Officer Guynn was dispatched on a welfare check, and there has been no allegation that Mr. Daniels has ever

committed a crime.  When Officer Guynn arrived, Mr. Daniels posed a minimal threat to himself and others.  Defendants assert that Mr. Daniels created a threat by wandering in and out of traffic.  However, whatever threat this behavior manifested could have been easily controlled by the Officer Guynn calling for medical assistance and walking or driving slowly along side Mr. Daniels to keep him out of the road until EMTs arrived.  As it stands, Officer Guynn did both drive and walk along side Mr. Daniels for a period of time.  But Officer Guynn never called for medical assistance before choosing to escalate the situation by grabbing the arm of the obviously agitated Mr. Daniels.  Grabbing Mr. Daniels arm was a seizure of him under the Fourth Amendment.  *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020).  Defendants do not allege any emergency which required quick action.  As noted, Officer Guynn stated at deposition he grabbed Mr. Daniels to get his attention, which would not be probable cause to seize a person.  At the time Officer Guynn grabbed Mr. Daniels he was walking at a normal rate of speed in the grass along side of the road, and the officer had not commanded Mr. Daniels to stop.  Mr. Daniels was not then in traffic, and not attempting to flee or evade arrest.  Tests showed that Mr. Daniels had no alcohol or drugs in his system apart from an over the counter antihistamine.  Officer Guynn was much younger and weighed at least 100 pounds more than Mr. Daniels.  Mr. Daniels had no reported weapons, and no known defensive training or history of violence.

Within minutes Officers Raisovich and Rossman arrived to assist, and oversized cuffs were placed on Mr. Daniels ankles. Mr. Daniels was still conscious and responsive at this point. According to the opinion of police procedure expert Dr. Roy Taylor, once cuffed at the wrists and ankles in the grass off the road, Mr. Daniels was no longer a risk to himself or others.  It would require minimal effort to keep Mr. Daniels from rolling into the road.  Yet the officers

chose to continue holding Mr. Daniels prone on his stomach. Needlessly increasing the hazard, Officer Guynn continued to hold down on Mr. Daniels' back and shoulders. Officer Guynn held with such force that Mr. Daniels was observed to have been injured, including hematomas on his shoulders (ECF 120-5} and deep bruising on the left side of his chest. (ECF 117-14). Officer Guynn remained holding Mr. Daniels down until Sgt. Wilson arrived, changed out the ankle cuffs for shackles, and observed that Mr. Daniels appeared to be suffering from asphyxia.

From an objective perspective, the grabbing of the agitated and impaired Mr. Daniels to get his attention was not a reasonable exercise of force. The holding of Mr. Daniels in a prone position once he had mechanical restraints on his wrists and ankles was not an objectively reasonable use of force. Most importantly, the placement of force on Mr. Daniels' back and shoulders once he was prone with mechanical restraints on his ankles and wrists was not objectively reasonable, and was in fact clearly an unnecessary use of hazardous and deadly force. The reasoning given by Officer Rossman, that Mr. Daniels was held in this position because he was not calm and was kicking, is not sufficient to justify such extreme force after he was mechanically restrained at the wrists and ankles. See ECF 120-2, pg. 14 lines 2 – 6. At that point Mr. Daniels could not flee into the road, and required minimal force to prevent injury to himself or anyone else. The court should find material questions of fact prevent summary judgment on whether the Defendant officers' use of force was objectively reasonable.

### C. Eighth Amendment and Fourteenth Amendment Violations

The Eighth Amendment and Fourteenth Amendment are recognized as the appropriate constitutional provisions to evaluate claims of official actions that amount to punishment. The Eighth Amendment is the correct standard to use when alleged cruel and unusual punishment happened after conviction, whereas the Fourteenth Amendment due process standard is

appropriate for any claims of punishment arising in pre-trial detention. *Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020). As it is undisputed that Mr. Daniels had been not been convicted of anything prior to the actions taken under color of governmental authority by the Defendants on September 1, 2018, the Plaintiff will rely on Fourteenth Amendment analysis going forward.

More often than not a Fourth Amendment claim for unreasonable use of force cannot be maintained with a claim for punishment. See *Richman v. Sheahan*, 512 F.3d 876, 882 (7th Cir. 2008). However, as previously discussed, in this case once Mr. Daniels was mechanically restrained at the wrists and ankles and lying in the grass off the road, and for all purposes was in police detention and custody. Minimal additional force was necessary to keep him and others safe. Yet the officers continued to hold Mr. Daniels prone with pressure on his back, shoulders, and legs, pressure sufficient to cause bruising on the chest and shoulders. Again the officers testified they were aware of the likelihood of harm from positional asphyxia from such actions. The reason given by Officer Rossman at deposition for this level of force was that Mr. Daniels would not be calm and continued to kick his legs. In the circumstances, where safety was no longer an issue, the use additional force applied regardless to the likelihood of harm appears to be punishment for "contempt of cop". Officer Rossman's statements back up this contention.

In *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473, 192 L.Ed.2d 416 (2015) the US Supreme court held that the proper standard for evaluating use of force under the Fourteenth Amendment is "objective reasonableness". It is therefore appropriate to employ the same factors and analysis set forth in *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). As discussed in section V. (B) above, material questions of fact regarding the objective reasonableness of the Defendant officers' actions prevent the entry of summary judgment.

### D. Continued Resistance Does not Make Prone Restraint Per Se Constitutional

The Defendants appear to argue that prone restraint by the Defendant Officers is per se constitutional so long as Mr. Daniels appeared to continue resisting the officers' efforts to subdue him. The US Supreme Court rejected this argument in *Lombardo v. City of St. Louis*, 141 S.Ct. 2239, 2241, 210 L.Ed.2d 609 (2021). In *Lombardo* the subject, Gilbert, was in jail at the time of the police encounter which led to his death. *Id.* While in his cell, Gilbert appeared to be attempting to hang himself. Three officers entered Gilbert's cell and an altercation ensued. *Id.* Gilbert initially evaded attempts to handcuff him and after being handcuffed he kicked the officers. *Id.* Additional officers arrived and put Gilbert in leg shackles. *Id.* Emergency medical services personnel were phoned for assistance. At this point six officers were in the cell. *Id.* The officers moved Gilbert to a prone position, face down on the floor. Three officers held Gilbert's limbs down at the shoulders, biceps, and legs. *Id.* At least one other placed pressure on Gilbert's back and torso. Gilbert tried to raise his chest, saying, 'It hurts. Stop.' *Id.*

> "After 15 minutes of struggling in this position, Gilbert's breathing became abnormal and he stopped moving. The officers rolled Gilbert onto his side and then his back to check for a pulse. Finding none, they performed chest compressions and rescue breathing. An ambulance eventually transported Gilbert to the hospital, where he was pronounced dead."

*Lombardo*, 141 S. Ct. at 2240 (2021) (internal citations omitted).

Gilbert's parents sued, alleging that the officers had used excessive force. The District Court granted summary judgment in favor of the officers, concluding that they were entitled to qualified immunity. *Id.* The U. S. Court of Appeals for the Eighth Circuit affirmed on different grounds, holding that, "the officers did not apply unconstitutionally excessive force against Gilbert." *Id.*, at 2240 – 2241.

On review, the US Supreme Court held that a full analysis of the facts was necessary to evaluate the objective reasonableness of the officers' actions under the factors set forth in

*Graham v. Connor*, 490 U. S. 386, 397 (1989). *Lombardo*, 141 S. Ct. at 2241. Per *Kingsley* v.

*Hendrickson*, 576 U. S. 389, 397 (2015), "A court (judge or jury) cannot apply this standard

mechanically." *Lombardo*, 141 S. Ct. at 2241. Rather, the inquiry "requires careful attention to

the facts and circumstances of each particular case." *Id.,* (citing *Graham*, 490 U. S. at 396). The

US Supreme Court went on find that the Eighth Circuit failed to fully consider the circumstances

at issue, and had dismissed important factual matters as "insignificant". *Lombardo*, 141 S. Ct. at

2240. Again citing *Kingsley*, 576 U. S., at 397, the Court found it was necessary to consider,

"the relationship between the need for the use of force and the amount of force used; the extent

of the plaintiff 's injury; any effort made by the officer to temper or to limit the amount of force;

the severity of the security problem at issue; the threat reasonably perceived by the officer; and

whether the plaintiff was actively resisting." *Lombardo*, 141 S. Ct. at 2241.

> "Having either failed to analyze such evidence or characterized it as insignificant, the court's opinion could be read to treat Gilbert's "ongoing resistance" as controlling as a matter of law. Such a per se rule would contravene the careful, context-specific analysis required by this Court's excessive force precedent." *Id.*

As in *Lombardo*, the circumstances of the Defendants' use of force should be examined

with regard to Mr. Daniels for objective reasonableness. Once Mr. Daniels was mechanically

restrained at the wrists and ankles off the road, minimal force was necessary. Mr. Daniels did

not pose a significant threat to himself or others. Yet witnesses say they continued to hold Mr.

Daniels in a prone position with force on his back and shoulders. The Court here should reject

Defendants' claims that ongoing resistance justified the deadly level of force used. A full review

of material factual issues is required from the trier of fact, preventing the entry of summary

judgment.

### E. Disputed Material Factual Contentions Prevent Summary Judgment

Despite claims in Defendants' summary judgment motion that the material facts are undisputed, a number of crucial factual issues remain in dispute and unresolved.

Officer Guynn stated in his deposition that he first grabbed Mr. Daniels' arm to get his attention, which would not be probable cause to seize a person under the Fourth Amendment. ECF 120-1, pg. 36 line 22 to pg. 37 line 1. In his later affidavit, Officer Guynn asserted that he grabbed Mr. Daniels out of concern that Mr. Daniels would wander into the road jeopardizing his safety, a significant and material difference. ECF 56-4, Aff. of Guynn, para. 66.

In Officer Guynn's deposition, he claimed that he turned Mr. Daniels on his side as soon as he was handcuffed to avoid the known risk of positional asphyxia. Witness April Woodson testified in her deposition that she witnessed Officer Guynn handcuff Mr. Daniels, and the officer did not turn Mr. Daniels on his side at that time. ECF 117-8, pg. 12 line 13 to pg. 13 line 1.

Officer Guynn testified that while Mr. Daniels was on the ground and cuffed, Guynn kept him on his side most or all of the time. ECF 120-1, pg. 59 lines 8 – 12. However, Officer Rossman testified at deposition that when he arrived Mr. Daniels was prone on his stomach and cuffed. ECF 120-2, pg. 19 lines 4 – 12. Officer Rossman further testified that Mr. Daniels remained prone when Sgt. Wilson arrived over five minutes later. *Id.,* pg. 18 line 23 to pg. 19 line 1.

Officer Guynn did not remember pushing down on Mr. Daniels' torso from above, and that Mr. Daniels was not prone when Sgt. Wilson arrived. Sgt. Wilson testified that Mr. Daniels was prone when he arrived with the three Defendant officers holding him, and that Officer was holding Mr. Daniels' upper back and shoulders with Guynn's elbows, upper arms, and hands. ECF 120-3, pg. 53 lines 9 – 19.

Sgt. Wilson claims at deposition that Officer Guynn was moderating the pressure he was placing on Mr. Daniels back and shoulders, and that Guynn was not using his entire weight. Id., pg. 47 line 8 – 11. However, post-mortem examination of Mr. Daniels shows he suffered hematomas to his shoulders and deep bruising to his left chest.

This is a partial list of the discrepancies between the facts as testified to by the officers at deposition and their later affidavits (presumably drafted by their attorneys) in support of Defendants' motion for summary judgment. "[S]ince the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Abdullahi*, 423 F.3d at 773. Where issues of material fact do exist, the court must resolve them in favor of the party opposing disposition as a matter of law in ruling on a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where material factual disputes remain unresolved, the entry of summary judgment is not appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### F. The Defendant Officers are Not Entitled to Qualified Immunity

The Defendant officers in this case have argued that regardless of whether their actions violated Mr. Daniels Constitutional rights, they are entitled to qualified immunity. To survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

Plaintiff has alleged violation of a valid constitutional right—if defendant Guynn applied deadly force to Mr. Daniels while he was lying prone on the ground with his arms behind him, this would violate Mr. Daniels' Fourth Amendment rights, as would an unjustifiable failure by the other officers to intervene. *Abdullahi v. City of Madison*, 423 F.3d 763, 775 (7th Cir. 2005) However, whether it would be clear to a reasonable officer that Officer Guynn's actions constituted unreasonable force under the circumstances, creating a duty to intervene, is a more difficult question. *Id.* If it was apparent to Officers Raisovich and Rossman, that Guynn was applying potentially deadly pressure to Mr. Daniels while he was lying prone, then the officers would not be entitled to qualified immunity. *Id.* Defendants have not alleged that deadly force was warranted.

However, it may have been difficult for the other officers to tell how much force Guynn was applying. Additionally, as noted a discrepancy exists between the testimony of Officer Guynn and other witnesses on how long Mr. Daniels was kept prone and how long Officer Guynn maintained pressure on Mr. Daniels shoulders and back. Since the very nature of Guynn's conduct remains undetermined, one can only speculate as to how visually obvious any violation of Mr. Daniels' rights might have been. *Id.* In other words, without knowing what Officer Guynn did or how his conduct appeared to others present, it would be difficult to say that a reasonable officer could not have known that Guynn's conduct violated Mr. Daniels' constitutional rights. *Id.* A jury should decide whether Guynn's actions would have made it clear to a reasonable officer that intervention was warranted, and, if so, whether Officers Rossman and Raisovich had a realistic opportunity to intervene. *Id.* Summary judgment based on qualified immunity for Officers Guynn, Rossman, and Raisovich is not supported by the undisputed evidence before the court.

**G.  Defendant Officers' Failure to Provide Medical Care**

Generally, four criteria are examined to determine whether officers responded reasonably to a detainee's need for medical care: (1) the officer's notice of the detainee's need for medical attention; (2) the seriousness of the need; (3) the nature or scope of the required treatment; and (4) any countervailing police interests, e.g., the need to prevent the destruction of evidence, or other similar law-enforcement interest. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir.2007)

IMPD General Order 8.1 (III)(C) requires that persons restrained in a prone position should be carefully observed and medical assistance should be summoned immediately to evaluate the subject's health.  Nothing in the evidence presented in support of summary judgment shows that the Defendants fulfilled this requirement.  The Defendant Officers stated at deposition that after a period of time held prone on the ground, Mr. Daniels became quiet and stopped struggling.  Still, none of Defendants noticed Mr. Daniels was no longer conscious until Sgt. Wilson arrived and became concerned about positional asphyxia.  Once he did, the Defendants sat Mr. Daniels up.  He was not responsive and his head lolled forward.  It was only then when the Defendants called for an ambulance.  But given the seriousness of the situation, Defendants did not take Mr. Daniel's pulse, start cardiopulmonary resuscitation, or make any other efforts to personally provide medical assistance.  The Defendants were trained resuscitation techniques, and there was no impediment or countervailing interest in not providing them. However the Defendant officers did nothing further, instead waiting passively for the ambulance to arrive. The didn't even remove the cuffs and shackles.  Compare *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010).  In that case the court found medical aid sufficient where officers consistently testified that as soon as the officers realized the subject was unconscious, they removed the hobble, began CPR, and summoned an ambulance.  In contrast, the Defendants in

the present case set Mr. Daniels up from the prone position, called an ambulance and did nothing further.

Police procedure expert Dr. Roy Taylor asserts the Defendants failed to perform their required duties to provide medical assistance in the circumstances.  Medical expert Dr. Daniel Schultz states that in his opinion, had the Defendant officers provided basic resuscitation efforts once Mr. Daniels was observed to be unconscious more, his death more likely than not could have been prevented.   Presented with the evidence and opinions here, the court should find questions of material fact prevent entry of summary judgment.

### H.      Comparison with other Seventh Circuit Cases

### 1.      *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005)

The circumstances in the present case are comparable to a claim considered by the Seventh Circuit in 2005.  That case involved a man (Mohamed) also in a mental-health crisis. *Abdullah*, 423 F.3d 763. Unlike Mr. Daniels, Mohamed posed an immediate and significant threat, having staggered across three lanes of traffic and punched a person in the face who tried to help him. *Id.* at 765. Mohamed began "whipping his belt" when officers arrived. *Id.* Three officers were required to take Mohamed to the ground onto his stomach to handcuff him. *Id.* "Once on the ground, Mohamed began kicking his legs, moving his arms so they could not be handcuffed and arching his back upwards as if he were trying to escape." *Id.*

As the other officers were holding Mohamed's legs, one officer "placed his right knee and shin on the back of Mohamed's shoulder area and applied his weight to keep Mohamed from squirming or flailing." *Id.* The officer "took his weight off Mohamed after he was handcuffed. Id.  The officer's knee and shin were placed on the back of Mohamed's shoulder. *Id.* Multiple

civilian eyewitnesses testified Mohamed acted aggressively and that the defendant police officers did not hit, strike or choke him. *Id.* at 767. Two minutes later, Mohamed died.

The Seventh Circuit analyzed the reasonableness of "kneeling on Mohamed's back/ shoulder area after he was already lying prone with his hands behind him." *Id.* at 768. It noted that the officer "knelt on Mohamed's shoulder or back for 30–40 seconds while Mohamed was prone on the ground. *Id.* The Court noted training materials that made clear that the pressure applied to a prone suspect would suffice to cause suffocation impacted reasonableness of force. *Id., at* 772. "Based on these straightforward facts alone," the Seventh Circuit held that "there is an issue of material fact as to whether the officer used an unreasonable amount of force." *Id.* The Court elaborated, "The reasonableness of kneeling on a prone individual's back during an arrest turns, at least in part, on how much force is applied. Kneeling with just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death." *Id.,* at 771. Given the evidence of Mohamed's cause of death by positional asphyxia, the court noted that Mohamed's "attempts to 'squirm' or arch his back upward while he was being restrained may not constitute resistance at all, but rather a futile attempt to breathe while suffering from physiological distress akin to drowning". *Id.,* at 771–773. The Court subsequently denied summary judgment to the defendants.

In the present case, Officer Guynn weighed between 285 pounds and 300 pounds at the time he was on top of the prone Mr. Daniels. The officer put enough weight on Mr. Daniels to cause hematomas on his shoulders and deep bruising on his chest. Clear questions of fact regarding the amount of force used by Guynn prevent the entry of summary judgment.

## 2. *Turner v. City of Champaign*, 979 F.3d 563, 568 (7th Cir. 2020)

Defendants urge the Court to find the circumstances in the present case are like those in *Turner*. However, a review shows material factual differences exist between them. Turner was homeless man known to the police, and was wandering in the road. Unlike with Daniels, in *Turner* police immediately called for an ambulance to take him for a mental health evaluation upon determining that Turner was impaired. *Id.,* at 566. They did so before ever physically touching Mr. Turner. *Id.* Also different is the fact that the officers did not touch Turner until he fled and ignored police commands to stop. *Id.* "while trying to handcuff him, Officer Young pressed his right knee onto Mr. Turner's shoulder to prevent him from moving. *Id.* The statement of facts does not say the officers maintained pressure on Turner's back once he was handcuffed. Compare this to the present case where testimony shows officer Guynn maintained pressure on Daniels' back and shoulders after he was handcuffed, up to the point where Daniels became unresponsive. The officers in *Turner* immediately attempted resuscitation upon finding Turner unresponsive. But most importantly, after Mr. Turner died, an autopsy determined the cause of death was cardiac arrhythmia, likely caused by an enlarged heart and insufficient blood supply to one of his heart's chambers. *Id.,* at 567. There was no medical opinion offered supporting any other cause of death. *Id.* Contrary to *Turner*, Mr. Daniels only had a mild enlargement of the heart, which by the testimony of Dr. Poulos, was not unusual or unexpected for a man of his age. The Court found, "[c]ritically, Mr. Turner's body showed no signs of suffocation or trauma from the officers' force." *Id.* at 570. Contrast this with the hematomas and bruising seen on Mr. Daniels shoulders and chest in the present case. Given the significant material factual differences, the Court here should not follow the example of the affirmed summary judgment in *Turner*.

### 3.     *Estate of Phillips v. Milwaukee*, 123 F.3d 586, 587 (7th Cir. 1997)

The Defendants in their summary judgment motion also draw parallels between this case and *Estate of Phillips.* However, in that case police were called not for a welfare check, but because Mr. Phillips had already caused extensive damage to a hotel room before police arrived. *Id.*, at 588. Police found Phillips holding potential weapons (pens) in both hands, in a way which the officers perceived as threatening. *Id.* The officers could not get the weapons out of his hands. *Id.* Phillips became increasingly violent and two police officers needed the help of hotel staff to take him to the floor. *Id.,* at 589. The Seventh Circuit Court of Appeals affirmed the officers were justified in grabbing Mr. Phillips based on the damage to the room and the potential weapons in his hands. *Id.*, at 592. Mr. Phillips was an extremely obese individual and difficult to physically control. *Id.*, at 590. A doctor testified that his obesity contributed to his inability to breath. Mr. Phillips was so large the officers required two sets of interlinked handcuffs to cuff him behind his back. *Id.* One female officer placed a knee on Mr. Phillips back for about thirty seconds to one minute to prevent him from raising up before a backup officer arrived with restraints for his legs. *Id.* Unlike the present case, when the officer's knee was removed from Mr. Phillips back he was still conscious. *Id.* Mr. Phillips attempted to retrieve a fork from his pocket while cuffed. *Id.* While restrained on the floor the officers constantly watched Mr. Phillips and spoke to him every ten to twenty seconds. *Id.* The officers attempted to perform CPR when it was determined Phillips was unresponsive. *Id.* Mr. Phillips eventually regained a pulse and did not die until the next day. *Id.* At the time of Mr. Phillips' death in 1993, it was not against the police department policy to keep a handcuffed person on their stomach. *Id.* A doctor testified that Mr. Phillips had Graves Disease, which caused an overproduction of thyroid hormone, and that stress could lead to a "thyroid storm" and sudden death. *Id.*

## I. Plaintiff's *Monell* Claim

The City of Indianapolis has sought summary judgment on Plaintiff's *Monell* claim, asserting there is no pattern or policy for which the city can be held liable. As noted, the City of Indianapolis relies on IMPD officers to handle situations such as the welfare check of Mr. Daniels on September 1, 2018, where the issue is plainly mental health rather than possible criminal activity. Mr. Daniels was reportedly wandering in and out of the road with one shoe on. To prepare officers to deal with the different challenges presented by subjects with mental health issues, IMPD requires them to complete a course on responding to people with mental illness when doing their in-service training. IMPD also had officers complete a course on autism as well as a course on public safety and mental health first aid. IMPD also offers an optional course for officers on Crisis Intervention Team ("CIT") training, which Officer Guynn took. As noted Defendant City of Indianapolis has failed to produce any educational materials used by IMPD to train officers regarding handling persons with mental health issues beyond IMPD General Orders, even after Plaintiff filed a motion to compel.[3] In the face of this failure to provide educational materials, Plaintiff has been afforded no opportunity to have experts review the training materials for content, adequacy, and comprehensiveness. Defendant's motion for summary judgment on the *Monell* claim should be denied on the basis of the failure of the City of Indianapolis to produce compelled educational materials.

Because Defendant has failed to provide IMPD training materials for officers on mental health, Plaintiff can only evaluate the adequacy and comprehensiveness of the training content based on the results of that training. As noted with regard to Officer Guynn, he failed to follow the requirements of General Order 4.7(I)(B) for handling citizens with suspected mental health

---

[3] Former counsel for defendant told Plaintiff that no written educational material on mental health training for IMPD officers could be located.

issues. He did not keep a reasonable and safe distance, he did not respond to rage with quiet and calm reassurances or clear simple directions, and he did not slow down the pace of the situation. Officer Guynn did not de-escalate the situation as required by General Order 8.1 in situations where mental health is an issue. Questioned about his CIT education, Officer Guynn was unable to provide any specifics about what he learned, and referred Plaintiff to documentation from the City of Indianapolis. In this case, the mental health training provided to Officer Guynn was almost entirely ineffective.

However, an individual case is not enough to support a *Monell* claim. A government entity is liable under §1983 only when an official policy or custom inflicts the injury of which the plaintiff complains. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "To succeed on this de facto custom theory, the plaintiff must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents*". Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). The Plaintiff must show a department wide custom or policy is at issue.

"[T]he word "policy" generally implies a course of action consciously chosen from among various alternatives; it is therefore difficult in one sense even to accept the submission that someone pursues a "policy" of "inadequate training" unless evidence be adduced which proves that the inadequacies resulted from conscious choice—that is, proof that the policymakers deliberately chose a training program which would prove inadequate". *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Liability should be imposed only when the degree of fault rises to the level of "deliberate indifference" to rights, that is, where the municipality's "choice to follow a course of action is made from among various alternatives by ... policymakers." *Id.*, quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483-84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

In this case, Plaintiff has obtained evidence of a department-wide failure to adequately prepare IMPD officers to handle subjects with mental health issues. The City of Indianapolis has produced 188 "Blue Team" reports covering the period between 2015 and 2020 where citizens with noted mental health issues were injured by IMPD officers and required treatment from a physician or medical provider. These reports are made by the responding IMPD officers themselves. The figures do not include individuals who had mental health issues which were not recognized by IMPD Officers because of the limited training they received. Clearly the City of Indianapolis should be able to glean from these facts that an ongoing problem exists with the current system of IMPD's training and dealing with subjects who have mental health issues. By IMPD's own figures, this problem results in hundreds of Indianapolis citizens injured and killed.

A number of alternatives exist to the current policies and procedures. IMPD could provide more comprehensive training. IMPD could incorporate licensed social workers and mental health professionals to go out on calls where it is clear the issues are mental health related. Expecting law enforcement officers who are primarily trained and equipped to deal with criminal matters to recognize and handle mental health crises is not a functional policy. It is not fair to law enforcement and it is dangerous for the public. The choice of the City of Indianapolis to continue with the same mental health policies, customs, and procedures in light of clear evidence that they are ineffective and harmful amounts to deliberate indifference by the city. Plain issues of fact prevent disposal of Plaintiff's *Monell* claim at summary judgment. In the interest of motivating the City of Indianapolis to alter its policies to the benefit the citizens of the city, Plaintiff's *Monell* claim should be allowed to continue.

## VI. CONCLUSION

Because unresolved questions of material fact remain regarding the initial seizure of Mr. Daniels, the amount of force used on Mr. Daniels, the failure of the officers to provide resuscitation efforts on finding Mr. Daniels unresponsive, and whether the training, policies, and procedures employed by the City of Indianapolis amount to deliberate indifference to the welfare of persons with mental health issues, summary judgment should be denied.

**I VERIFY UNDER PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE.**

Respectfully submitted,

KARPE LITIGATION GROUP

By: *s/ Craig R. Karpe*
 Craig R. Karpe, #18726-02
 Attorney for Plaintiff

KARPE LITIGATION GROUP
19 West 19th Street Indianapolis,
Indiana 46202
(317) 251-1840

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2022 this was served to all counsels for defendants through the Court's electronic filing system.

By *s/Craig R. Karpe*
 Craig R. Karpe