IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF PAUL DANIELS, by Personal Representative Kay Stover, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:20-cv-02280-JRS-MJD |
| CITY OF INDIANAPOLIS *et.al.* | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFF'S SURREPLY IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by Counsel, respectfully submits the following surreply memorandum of fact and law in opposition to Defendants' Motion for Summary Judgment.

**A. ADDITIONAL FACTS AND EXPERT OPINIONS PRESENTED IN REBUTTAL**

Plaintiff offers the following additional evidence attached filed contemporaneously herein in opposition and rebuttal to Defendants' Motion for Summary Judgment, incorporated by reference as specifically cited below.

1. Second Affidavit of Dr. Daniel Schultz
2. Deposition of Dr. Roy Taylor
3. Deposition of Officer Raisovich
4. Deposition of Officer Griffith
5. Affidavit of Kay Stover
6. Stipulation regarding Defendants' Expert Dr. Sozio

**B. CONSTITUTIONAL VIOLATIONS IN THE INITIAL ARREST**

Plaintiff's Fourth Amendment rights we violated by Defendant Guynn's initial arrest. All claims that law enforcement officers have used excessive force—deadly or not—in the course of

an arrest, investigatory stop, or other seizure of a free citizen must be analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This inquiry involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citations and quotation marks omitted). This analysis is not capable of precise definition or mechanical application. *Id.* It "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Applying the factors set forth in *Graham* shows the initial arrest of Mr. Daniels by Officer Guynn was not an objectively reasonable use of force or proportional to the circumstances. Defendants argue Officer Guynn had probable cause to arrest Daniels because he thought Daniels was intoxicated or mentally ill. Defendants cite Guynn's affidavit, ECF No. 56-4 ¶¶ 49-51 for the basis of Guynn's belief that Daniels was intoxicated, stating Daniels "was staggering as he walked" and had "red, glossy eyes". Id. However Officer Guynn never mentioned observing "red, glossy eyes" during his April 27, 2021 deposition, taken over four months before Guynn signed the affidavit prepared by his attorney on August 31, 2021 which Defendant's rely on here.

During the prior April 27, 2021 deposition Guynn testified:

```
17 Q Okay. And at this point, what is your impression
18 of what you're dealing with?
19 A At this point, observing him walking in that way,
20 maybe intoxicated. Maybe he's got some things
```

2

```
21 going on mentally speaking that I -- again, I don't
22 know, but there's something -- it didn't feel
23 normal, something else was going on.
24 And my initial thought was maybe this guy
25 might be intoxicated. There could be some other
```

Page 33

```
1 stuff, but, yeah, that was my first thought.
```

ECF 120-1, pg. 32 ln. 17 to pg. 33 ln. 1.

Not only did Guynn not describe seeing "red, glassy eyes" at any time prior to the August 31, 2021 affidavit, but by his own testimony, Guynn was not sure what "was going on". *Id.* Defendants' assertion that there was objective probable cause for an arrest at this point is not backed by Officer Guynn's testimony of his objective observations of Daniels staggering, which could be caused by any number of mental or physical issues. Indeed, Officer Guynn was not intending to make an arrest when he grabbed Mr. Daniels' arm, and was just trying to "get his attention" and let Daniels know Guynn was there. *Id.*, pg. 36 line 22 to pg. 37 line 1. Defendants' argue Guynn's subjective thoughts are not relevant to the Fourth Amendment objective reasonableness analysis, but they do show Guynn was not, in his own mind, making an arrest on any objective factual basis for probable cause.

However, grabbing Mr. Daniels arm was an arrest and detention under the Fourth Amendment. *Turner v. City of Champaign*, 979 F.3d 563, 569 (7th Cir. 2020). As noted Daniels was walking at normal speed in the grass along side of the road, and Officer Guynn had not commanded Mr. Daniels to stop. Mr. Daniels was not then in traffic, and not attempting to flee or evade arrest. Daniels was not "dangerous or gravely disabled", and Officer Guynn never testified Daniels was, "in immediate need of hospitalization and treatment", as required for arrest

on mental health grounds under I.C. § 12-26-4-1. Officer Guynn never called for medical assistance prior to grabbing Daniels, further undermining the post-hoc claim Guynn believed Daniels was mentally ill. A jury should be allowed to consider the credibility of Officer Guynn's deposition testimony against his later claims made by affidavit. For these reasons the Court should find questions of fact exist regarding the reasonableness of the force used by Officer Guynn precluding summary judgment.

### C. CONSTITUTIONAL VIOLATIONS IN THE PRONE RESTRAINT OF DANIELS

Even if the Court were to find it was objectively reasonable to detain and arrest Daniels, it was not reasonable to keep Daniels prone on the ground and apply force to his back after Daniels was cuffed. Keeping Daniels cuffed prone on the ground was a known to be a potentially deadly risk, as set forth in Indianapolis Metropolitan Police Department (IMPD) General Order 8.1 (ECF 117-10), section III, which states:

1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint used.

*Id.* The reason for the general order is the likelihood of causing, "difficulty breathing, leading to serious injury or death". *Id.* Defendants allege "undisputed evidence" proves Daniels was only kept prone for, "about a minute". A review of the following timeline shows this is patently untrue.

**11:20:11am**: Officer Guynn took Daniels to the ground in the grass beside the road, cuffed him and called in "mild resistor". ECF 120-1, pg. 97 – 98. Witness April Woodson testified in her deposition that she witnessed Officer Guynn take down and handcuff Mr. Daniels, keeping him in a prone position on the ground. ECF 117-8, pg. 12 line 13 to pg. 13 line 1. Defendants concede that Officer Guynn kept Daniels prone and put his arms on Daniels' back before backup officers arrived. ECF 138 pg. 8, para. 1.

**11:21:59am**: Officer Raisovich radios that he is on route to the scene. ECF 120-3, pg. 35 ln. 21 to pg. 36 ln. 2. Officer Raisovich doesn't check in when he arrives at the scene so the time cannot be determined. Pg. 11 ln. 17 – 25. Officer Raisovich estimates it took him 5 to 6 minutes to drive from South Guion Road, the location where he radioed he

4

was in route to the scene at 11:29:59am. Id., pg 12 ln. 20 to pg. 13 ln. 1. Raisovich doesn't remember if Daniels is handcuffed when he arrives. Id. pg. 15 ln. 8 – 12.

**11:22:56am**: Officer Rossman arrives at the scene. ECF 120-3 pg. 35 ln. 18-20. According to Officer Rossman, Officer Guynn has Daniels handcuffed prone on the ground when Rossman arrived on scene. ECF 120-2, pg. 19 lines 4 – 12. Daniels remained cuffed prone on ground on his stomach when. Sgt. T. Wilson arrives. *Id.,* pg. 18 line 23 to pg. 19 line 1. Officer Rossman has never testified to seeing Daniels in any position but prone on the ground.

**11:27am**: Sgt. T. Wilson arrives on the scene. He noted Daniels was still cuffed and shackled on his stomach. ECF 120-3, pg. 23 lines 7 - 8. When Sgt. T. Wilson arrives, Officer Guynn was holding Daniels' down with Guynn's hands, arms, and elbows on Daniels' shoulders from behind. *Id.*, pg. 53 lines 9 – 19. Sgt. T. Wilson said he replaced the oversized handcuffs on Mr. Daniels' ankles with leg shackles he brought. Sgt. T. Wilson then said to the other officers present, "Let's roll him over and sit him up so we don't get into positional asphyxiation issues." ECF 120-3, pg. 42, ln. 20 – 22. When the officers rolled Daniels over and set him up, he was unresponsive and appeared to not be breathing. Id. pg. 42 ln. 25 to pg. 43 ln. 2. Officer Guynn called by radio for the ambulance immediately when Daniels was set up and unresponsive. ECF 120-3, pg. 26 line 2 - 9. He made the call at 11:27:04. ECF 117-7.

As demonstrated by the undisputed facts set forth above, Defendants and witnesses put Mr. Daniels handcuffed in a prone position on the ground for as long as seven (7) minutes. Based on his review of the depositions and evidence, Dr. Taylor also estimates that Paul Daniels was kept cuffed and prone on the ground for approximately seven minutes. ECF 165-2 pg. 20 ln. 7 to pg. 21 ln. 21, and pg. 28 ln. 3 – 6.

Defendants assert the Defendants' actions were "reasonable as a matter of law" under *Turner v. City of Champaign*, 979 F. 3d 563 (7th Cir. 2020). This is a blatant misrepresentation of the case holding. In *Turner*, the court found, "while *trying to handcuff him*, Officer Young pressed his right knee onto Mr. Turner's shoulder to prevent him from moving (emphasis added)". *Id.* at 566. Unlike the present case, no there is no evidence of any officer placing pressure any on Turner's back once handcuffs were in place and he was prone. But most importantly, after Mr. Turner died, an autopsy determined he died from cardiac arrhythmia,

5

likely caused by the pre-existing condition of an enlarged heart and insufficient blood supply to one of his heart's chambers. *Id.* at 567. "The medical evidence showed no other causes of death. There were no signs of suffocation or trauma to Mr. Turner's body." *Id.* Defendant's argument that the facts herein resemble *Estate of Phillips v. Milwaukee*, 123 F.3d 586, 587 (7th Cir. 1997). should likewise be rejected. As in *Turner*, there was no significant external signs of trauma in *Estate of Phillips.* "The autopsy revealed some minor abrasions on Mr. Phillips' body, but there were no external injuries to the head, scalp or neck region. Nor did the doctor observe any hemorrhaging in body cavities to suggest trauma". *Estate of Phillips,* 123 F.3d at 590. Moreover, Phillips had advanced Graves' disease, causing his thyroid to be, "extremely enlarged and almost wrapped completely around Mr. Phillips' trachea". *Id.* Examining physicians noted Graves' disease could lead to a "thyroid storm" which left untreated can cause a racing heart and death. *Id.*

Contrast that with the present case. Plaintiff's expert Dr. Schultz determined Mr. Daniels death to be from, "Stress and impediment of respiration due to complications of police restraint with prone position and pressure applied to shoulders". ECF 117-13, pg. 4 -5, para. 21. Photographic evidence shows bruising and discoloration on Mr. Daniels' front shoulders consistent with the pressure noted by Dr. Schultz and testified to by Sgt. T. Wilson. ECF 120-5. ECF 120-3, pg. 53 lines 9 – 19. Dr. Schultz also found focal fascia hemorrhages in the right deltoid/infraspinatus/trapezius region in autopsy images indicating significant force on the back and shoulders. ECF 165-1 pg. 6.

Contrary to Defendants arguments otherwise, it is not reasonable for police to put force on the back of a prone and cuffed subject only because they continue to struggle. As noted in *Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005), struggle "may not constitute

6

resistance at all, but rather a futile attempt to breathe while suffering from physiological distress akin to drowning". *Id.,* at 771–773. In *Abdullahi* the defendant officer maintained pressure on Mohamed's shoulders for 30–40 seconds while Mohamed was prone on the ground. *Id.* Compare this to Sgt. T. Wilson's testimony that Guynn had pressure on Daniels shoulders from the time he pulled up to the scene, continuing while Sgt. T. Wilson initially spoke to the officers, removed the oversized cuffs from Daniels' legs, put the shackles on Daniels' legs, and told the officers to turn Mr. Daniels over and sit him up. Officer Guynn estimated this time to be about a minute. ECF No. 120-1 at 73:13-25, 74:1-17.

However, Defendants' admit that pressure was maintained on Daniels' shoulders and upper back for longer than just that minute in Sgt. T. Wilson's presence, stating, "(a)s to the hematomas on his shoulders, the evidence is undisputed that Officer Guynn restrained Daniels on the ground (mostly by himself) while Daniels struggled and resisted for about three minutes from approximately 11:20:11 when he called in the "mild resister" until sometime after 11:22:56 when Officer Rossman had arrived". ECF 138, pg. 11 para. 4.

The Court in *Abdullahi* found the reasonableness of putting pressure on a prone individual's back during an arrest "turns, at least in part, on how much force is applied" giving rise to a material question of fact. *Id.,* at 771. The Court there held, "(i)t is undisputed that (1) Brooks knelt on Mohamed's shoulder or back for 30-40 seconds while Mohamed was prone on the ground, and (2) Mohamed died roughly two minutes later of severe injuries consistent with pressure or crushing trauma to the chest and neck area. There is competent expert medical testimony that Mohamed suffered these injuries after being put on the ground by the arresting officers. Based on these straightforward facts alone, there is an issue of material fact as to whether Brooks used an unreasonable amount of force against Mohamed." *Id.* at 772.

7

The present case is on point with the facts in *Abdullah*. By his own admission Officer Guynn kept pressure on the back and shoulders of the prone Mr. Daniels for at least a minute. Other sources indicate it was longer. When the pressure was removed, Daniels was unresponsive and breathing 10 times a minute, which Dr. Schultz states is a sign of loss of higher brain activity. ECF 165-1 pg. 6. Mr. Daniels expires minutes later. Dr. Schultz states Mr. Daniels suffered a crushing type trauma, as shown by photos of hematomas on the front shoulders and focal fascia hemorrhage in the right deltoid/infraspinatus/trapezius region. *Id.* pg. 5-6. As in *Abdullah*, these undisputed facts demonstrate an issue of material fact whether officers used unreasonable force against Daniels.

Defendants assert Mr. Daniels suffered from medical conditions that were "not observable to the untrained eye" that contributed to his death, citing the Autopsy Report of Paul Daniels, ECF 56-7, made by Dr. Christopher Poulos. In fact the quote, "not observable to the untrained eye" occurs nowhere in the autopsy report. Rather, Dr. Poulos testified at deposition that Paul Daniels contributing health conditions were not exceptional, stating "these are not unusual . . . and, yes, you could find them on your average 65-year-old". ECF 120-4, pg. 17, ln. 10 - 12. It is common knowledge that the average 65 year old man does not possess the health and vigor of a younger man. But Defendants are arguing that the health condition of the average 65 year old man cannot be understood or anticipated by police officers, and police officers should not be held responsible if they use force likely to kill the average man of that age. This argument should be summarily rejected.

Defendants have argued Paul Daniels had schizophrenia as a pre-existing condition, which contributed to Paul Daniels' death, based on the Autopsy Report of Dr. Christopher Poulos. At deposition Dr. Poulos stated the only source of the assertion that Paul Daniels had

schizophrenia was his sister. ECF 120-4 pg. 27 ln. 24 to pg. 28 ln. 2. Kay Stover was Paul Daniels only living sister at the time of his death. ECF 165-5 pg. 1. Kay Stover knew Paul had mental health problems and required assistance for his care, but she has never been told by any doctor or medical personnel the exact nature of his mental health issues. *Id.* Kay Stover has no knowledge of Paul Daniels ever being diagnosed by any medical professional as having schizophrenia or any other mental health condition. *Id.* Kay Daniels has no medical training that would qualify her to diagnose physical or mental health conditions. *Id.* In summary, while Paul Daniels had mental health issues, there is no qualified basis to find he had schizophrenia. The Court should not give merit on Dr. Poulos' unsubstantiated finding. Summary judgment should be denied.

D. **QUESTIONS OF FACT IN THE CREDIBILITY OF THE DEFENDANTS**

Defendants assert there are no discrepancies between the testimony of Officer Guynn and the other police officers at the scene which would give rise to a material question of fact. A review of the deposition transcripts show this is untrue.

Officer Guynn testifies that when Sgt. T. Wilson arrived on the scene, Guynn had Mr. Daniels on his side, not prone on the ground. ECF 120-1, pg. 60 ln. 21 to pg. 61 ln. 22. In contrast, Sgt. T. Wilson testified that when he arrived Daniels was prone on the ground cuffed at the hands and feet with Guynn kneeling on the right side of Daniels putting his hands and arms on Daniels upper back and shoulders, Raisovich on Daniels' left side holding Daniels with one hand, and Officer Rossman kneeling on Daniels' ankle. ECF 120-3, pg. 23 lines 7 – 8, and pg. 46 ln. 23 to pg. 48 ln. 8. Daniels remained in this position until Sgt. Wilson says, "Let's roll him

over and sit him up so we don't get into positional asphyxiation issues." ECF 120-3, p 42, ln. 20 to 22.

Officer Guynn claims he had Daniels on his side over 90 percent of the time because of concern about positional asphyxiation. ECF 120-1, pg. 59 lines 8 – 12. Officer Guynn specifically states, "The only time he was briefly -- could have been on his stomach was when I was trying to get that other arm cuffed." *Id.* at pg. 118 ln. 25 to pg. 119 ln. 2. Guynn even claims he had Daniels on his side when Stg. Wilson told the officers to set Daniels up over concern about positional asphyxia. *Id.* at pg. 74, ln. 6 - 8. In addition to this being at odds with the testimony of Sgt. Wilson above, it also differs from the testimony of Officer Rossman. According to Officer Rossman, Guynn had Daniels handcuffed prone on his stomach when Rossman arrived on scene. ECF 120-2, pg. 19 lines 4 – 12. He stated Daniels remained cuffed prone on ground on his stomach when. Sgt. T. Wilson arrived. *Id.,* pg. 18 ln. 23 to pg. 19 ln. 1.

Defendant Raisovich's testimony is similarly at odds with Defendant Rossman and Sgt. Wilson. Raisovich claims Paul Daniels was not prone on the ground as described by Rossman when he arrived. See ECF 165-3 Page 19 ln. 7 - 23. Defendant Raisovich further claims Daniels was seated on his behind in the grass when Sgt. Wilson arrived, in conflict with Sgt. Wilson's assertion that Paul Daniels was prone being held by the Defendants when Wilson came on scene. See *Id.* pg 23 ln. 5 - 12.

Officer Rossman never testifies that Daniels was in any other position but prone on the ground. Rossman stated the officers were holding Daniels handcuffed and shackled on his stomach because Daniels was kicking and not calm. ECF 120-2 pg. 14 lines 2 – 6. The Court should note that Officer Rossman is uniquely available to Defendants, should he have any testimony to offer in support of Officer Guynn's claim that Daniels was kept on his side any of

the time he was cuffed. Defendants have presented affidavits from Defendants Raisovich and Guynn to support their position, but notably have not provided anything from Officer Rossman. Instead Defendants invite the court to assume the existence of evidence Defendants cannot provide, that Daniels was placed cuffed on his side at some point Officer Rossman's presence, which Rossman never testified to seeing. The court should reject the Defendants' invitation to take this leap of logic.

Defendants assert Officer Guynn's failure to remember pushing down on Daniels from above while Daniels was prone, is "consistent" with Sgt. Wilson's testimony that Daniels was prone and Guynn "was holding Mr. Daniels'[s] upper back and shoulders with Guynn's elbows, upper arms, and hands." ECF 138 pg. 15 para. 1. As discussed, Guynn asserts Daniels was not prone at all except when being cuffed. Defendants argue the differences between Officer Guynn's claims and the testimony of Sgt. Wilson do not give rise to a material question of fact because, "Sgt. Wilson's testimony only says that Officer Guynn was 'physically holding [Daniels] down with arms and elbows, *but not with his entire body weight laying across him*' and he was only doing so on the back of the right shoulder and back of the right arm (quotation and emphasis in original)." *Id.* Defendants' position ignores the central finding of *Abdullah;* when a police officer holds a cuffed detainee down from above while the detainee is prone, and competent medical opinion states hypoxia from pressure on the torso contributed to the detainee's manner of death, a material question of fact exists about how much force the officer used, preventing summary judgment. *Abdullahi*, 423 F.3d at 772. Additionally material questions of fact regarding the credibility of the Defendants' disparate testimony give rise to material questions of fact preventing the entry of summary judgment.

11

### E. CONSTITUTIONAL VIOLATIONS FROM LACK OF FIRST AID CARE

Plaintiff alleges that Defendants violated Plaintiff's Fourth Amendment rights by failing to promptly provide medical care. The 7th Circuit has held that an officer violates the prohibition on unreasonable seizures when, in the course of making an otherwise lawful arrest, the officer does not respond reasonably to an arrestee's medical needs. *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir.2007) (citing *Graham v. Connor*, 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

Defendants argue that they acted reasonably, citing *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600-01 (7th Cir. 2011), for the proposition that "promptly calling an ambulance for a person experiencing chest pains is reasonable". Plaintiff initially points out that *Florek* is factually distinct in that the arrestee there was conscious and did not display any distress or signs of medical emergency other than requesting baby aspirin. *Id.* at 600. It was later determined she had suffered a heart attack. *Id.* at 597. This is in contrast to the present case, where Plaintiff Paul Daniels was unresponsive when sat up, and Defendants' noted he appeared to have issues with breathing. ECF 120-3, pg. 43, ln. 1-8. Plaintiff's head was lulling forward, and the Defendant officers pushed it back. *Id.* Defendants then called for EMTs, and kept Plaintiff in a seated position with his head tilted forward until the ambulance arrived. *Id.* Plaintiff's expert Plaintiff's expert Dr. Roy Taylor testified that he teaches the first responder medical treatment course for Basic Law Enforcement training. ECF 165-2 pg. 7 ln. 22 -25. It's a 40-hour advanced first aid course for police officers. *Id.* Dr. Taylor notes every state in the country that receives federal Department of Transportation money is required to teach 40 hours of first aid in their basic police academy and most states also have continuing education that also reviews it. *Id.* at Pg 24 18 – 22.

Dr. Taylor testified, as a matter of basic police first aid training, when Paul Daniels was sat up and determined to be unresponsive, Defendants should have placed him on his back and positioned his head to prevent airway restriction. 165-2 pg. 32 ln. 23 to pg. 34 ln. 7. This is necessary to position the head and neck to allow the free flow of air and to monitor breathing as the rise and fall of the chest can be seen. *Id.* Instead Paul Daniels was kept seated with his head lulling forward or back, which in Dr. Taylor's experience would have restricted his airway and breathing. *Id.* Further, Defendant police officers should have carefully monitored Paul Daniels pulse during this time, and administered cardiopulmonary resuscitation if his breathing or pulse was not detectable. *Id.* The Defendants' failure to provide basic care contributed to Paul Daniels' injury and death. ECF 117-13, pg. 4 - 5, para. 21.

*Florek* provides a four factor test to be applied when whether an officer's response to an arrestee's medical needs is reasonable. *Florek*, 649 F.3d at 600. The factors are (1) notice of the arrestee's medical need ... whether by word ... or through observation of the arrestee's physical symptoms; (2) the seriousness of the medical need; (3) the scope of the treatment, which is balanced against the seriousness of the medical need; and (4) police interests, a factor which "is wide-ranging in scope and can include administrative, penological, and investigatory concerns." *Id.*

Regarding the first factor, Defendants admit that they observed Plaintiff to be unresponsive and having breathing issues. ECF 120-3, pg. 43, ln. 1-8. Defendants also knew that Plaintiff had been restrained in a prone position, which could lead to "positional asphyxia issues". *Id.* at pg. 42, ln. 20-22. On the second factor, it should be common knowledge that unconsciousness and hypoxia are very serious medical issues which can quickly lead to death if not addressed. Reviewing the third factor, the appropriate medical response of laying the Plaintiff on his back

and making sure his airway was unobstructed was a simple, easily implemented action which Defendants should have been trained to do in the circumstances, according to expert Dr. Taylor. Regarding the fourth factor, there was no administrative, penological, or investigatory concerns which would prevent the Defendants from laying the Plaintiff on his back and making sure his airway was unobstructed.

Review of the factors set out in *Florek* shows clear material questions of fact on whether Defendant officers violated Plaintiff's Fourth Amendment rights in failing to provide basic first aid care in the face of an obvious deadly medical crisis. Summary judgment should therefore be denied.

Plaintiff notes that they asked for police training materials in request for production number four (4) and eleven (11) of their first request for production of documents. ECF 52-2, requests 4 and 11. The Court ordered the Defendants to produce these materials in response to Plaintiff's motion to compel production. ECF No. 72. The City of Indianapolis has failed to produce any training materials showing IMPD officers are properly trained to provide first aid assistance to a person having breathing issues. Given the lack of evidence of proper training of police officers should receive as testified to by expert Dr. Taylor, Plaintiff's *Monell* claim against the City of Indianapolis should also survive judgment.

### F. CONSTITUTIONAL VIOLATIONS FROM FAILURE TO INTERVIENE

Defendants argue that Plaintiffs failed to state facts in their complaint and statement of claims to support a failure to intervene claim against Officers Raisovich and Rossman. This is untrue. Plaintiff's complaint, ECF No. 1, para 13, states "Officers Raisovich and Rossman assisted Officer Guynn in hand cuffing, leg cuffing, and holding Mr. Daniels face down". Count II of the Complaint against Officer Raisovich states that he is liable in part because of his failure

to act. *Id.* at para. 41. Count III of the Complaint similarly states officer Rossman was liable in part also because of his failure to act. *Id.* at para. 52. Failure to act clearly refers to the failure of Defendant Rossman and Raisovich to intervene and stop the use of unreasonable force likely to result in Daniels' injury or death.

Moreover, in Plaintiff's Statement of Claims, Plaintiff sets out facts supporting a claim of failure to intervene. Plaintiff specifically alleges Defendants, "restrained Paul Daniels in a face down prone position for an extended period of time while he was handcuffed and shackled at the ankles. During this period pressure was put on Paul Daniels' back by Officer Guynn, using his hands and upper arms to push down on Paul Daniels back and shoulders while the other two Defendant officers were restraining his extremities." ECF No. 45 para. 3. The allegations in the Complaint and the Statement of Claims are sufficient to plead a failure to intervene.

Defendants cite *Mwangangi v. Nielsen*, 536 F. Supp. 3d 371, 384, 386-87 (S.D. Ind. 2021) for their argument that Plaintiff's Complaint and Statement of Claims failed to plead failure to intervene. However, *Mwangangi* is significantly different, in that the plaintiff therein failed to make any use of force claims against the individual officers, and attempted to argue that their Monell claim covered individual claims against the individual officers as well. There is no such omission in Plaintiff's pleadings here, as failure to act has been alleged against both Defendants Rossman and Raisovich individually. Defendants' motion for summary judgment on this issue should thus be denied.

### G. DEFENDANTS SHOULD NOT BE GIVEN QUALIFIED IMMUNITY

Defendants assert, "The Estate has not carried its burden to defeat qualified immunity". In fact, Plaintiff undertakes a detailed analysis of Defendants' actions, and demonstrates that, as in

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005), Defendants actions were clearly unlawful and not protected by qualified immunity. The Defendants testified they knew holding Paul Daniels prone on the ground was potentially deadly and unlawful. Raisovich testified he was "keenly aware" that keeping an arrestee prone and restrained was deadly based on past events. ECF 165-3 pg. 19 ln. 12 - 25. Likewise, Guynn testified he knew deadly asphyxiation was likely to occur with an arrestee restrained in a prone position, particular where pressure is put on the arrestee's torso. ECF No. 120-1, pg. 119 ln. 3- 16. No one has claimed and no one can claim that deadly force was required or appropriate in the arrest of Paul Daniels.

As noted in Plaintiff's responsive brief in opposition to summary judgment, to survive summary judgment on grounds of qualified immunity, a plaintiff must (1) allege violation of a valid legal right and (2) demonstrate that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001). It was well established that keeping an arrestee restrained prone on the ground and applying force to their torso would violate Mr. Daniels' Fourth Amendment rights. See *Abdullahi v. City of Madison*, 423 F.3d 763, 775 (7th Cir. 2005). As noted above, the officers were clear that such action would be unlawful.

Defendants argue that the present case is not sufficiently similar to *Abdullahi* because of a lack of evidence of a "crushing or squashing-type trauma" as was found therein. However evidence shows bruising to the shoulders and chest. To further clarify and rebut Defendants' assertion that Guynn did not put significant force on Daniels' back, Plaintiffs' expert Dr. Schultz has provided a more detailed explanation of the force used:

> "The amount of force applied to impair chest wall movement, possibly even impeded intake through the mouth/nares (if face down) would be significant amounts (less if the individual is frail and has co morbid health issues). This weight in particular on the chest can lead to a compression of the chest and impairment of ventilation, particularly during

16

times of high stress, where additional oxygenation is necessary. Here we have one officer (Guynn) who even if he only uses one hand, if kneeling and leaning over him, his head and torso weight are transmitted to the focal point on that shoulder. His weight at that time was reportedly 285 lbs. and now he is 300 lbs. Add in the equipment such as a Kevlar vest, etc. and higher total weight is expected above 285 lbs. To further compound the weight applied to the shoulder was officer Raisovich on the opposite side (his weight was not noted in records I have). Personal experience (unpublished) on weight that can be transmitted from a kneeling position while leaning over and applying pressure on a scale is roughly ½ of overall body mass.

I would characterize this as a squashing type phenomena. The trauma sustained here is more than simply positional. It is technically a combined asphyxia from pressure applied to the back and shoulders in combination with his prone positioning. Such pressure applied does restrict chest wall movement, and the position also exerts pressure on the abdomen forcing it inward with the diaphragm correspondingly upward. This does impair normal respiratory efforts. And considering the application of force even by a hand, as we look at multiple officers, and particularly with Guynn, his hand and elbow application has the partial weight of his 285 and 300 pounds behind it, and then of course the other officer on the other side of his back applying pressure to the other side of the shoulder and back.

The significance of the injuries seen on the anterior shoulders in autopsy photos to show force. As it has some "dot-like" appearance it may have been interpreted by EMS as petechiae. (Haywood deposition page 15) To impact the pattern of the shirt mesh in the arm suggests very heavy force applied to the posterior back/shoulders.

Pressure applied to the body from the rear forces the skin into the clothing and capillaries in the dot-like areas have ruptured. It has the appearance of petechiae (as noted by EMS provider Haywood in deposition) and does have some similar features. This is from the pressure applied forcefully to the back of the shoulders. (consistent with the observation by Sergeant Wilson on arrival with positioning of officers on Daniels).

Right shoulder from autopsy photos showing impression of the jersey on the right anterior shoulder. This is most likely due to forceful pressure applied from the rear of the right shoulder. Further, the images of the back and shoulders from the autopsy does show some focal fascia hemorrhage in the right deltoid/infraspinatus./trapezius region for example. Also my experience has shown that pressure can be applied forcefully to the skin and yield no hemorrhage." ECF 165-1 pg. 3 - 6.

Dr. Schultz stated Mr. Daniels' shallow slow respiratory rate coupled with his flaccid state and unconsciousness meant Mr. Daniels was more likely than not terminally hypoxic at that time. *Id.* This sort of low shallow respiratory rate is "likely agonal respiratory reflexes due to the more primitive lower brainstem taking over in the face of cerebral hypoxia. It is the natural

17

reflex that occurs when the brain is not getting the oxygen it needs to survive. My impression given the described lip cyanosis he had, lack of responsiveness, flaccid state is that the cerebral hypoxia event was the cause of those terminal agonal respirations". *Id.*

Plaintiff directs the Court to pages 30 to 31 of their brief in opposition to summary judgment for analysis of why the present case does not fit the facts of *Turner v. City of Champaign*, 979 F.3d 563, 568 (7th Cir. 2020) and *Estate of Phillips v. Milwaukee*, 123 F.3d 586, 587 (7th Cir. 1997). ECF 115 pg 30 - 31. Dr. Schultz' expert medical opinion is that Paul Daniels died due to the Defendants prone restraint and pressure on Mr. Daniels torso causing "squashing type" trauma, just as in *Abdullahi*. IMPD's general orders and Defendants' own testimony establish that they knew this was deadly force. Defendants knew or should have known it was an unlawful use of deadly force. Qualified immunity and summary judgment should therefore be denied.

### H. PLAINTIFF'S MONELL CLAIMS

Defendants allege that Plaintiff has failed to demonstrate a viable Monell claim. In so doing, Defendants misrepresent Plaintiff's argument to be that the Defendant officers "purportedly did not comply with his training for handling citizens with suspected mental health issues." In fact, apart from the testimony of officers themselves, Defendants have failed to produce anything showing any officer training on dealing with people who have mental health issues. As noted Plaintiff requested training materials in their request for production, and the Court granted a motion to compel production of said materials. ECF 52-2, requests 4 and 11. And yet no documentation of training has been produced. Defendants have refused to produce any materials showing what if any training was provided, the scope of such alleged training, or the comprehensiveness of the material covered. Instead Defedants offer the self-serving

18

unsubstantiated assertion that, "The City has already established that it trains its officers on those policies". ECF 138 pg. 23, para. 2. No citation of any proof is provided.

Lack of documented training materials coupled with evidence of repeated injury to mentally impaired citizens by the IMPD show a deliberate indifference to the welfare of such people. This is not a matter of inadequate training but a lack of documentary evidence of any training. Failure to provide such training shows a conscious disregard for a known or obvious risk. The mere publication of a General Order cannot be regarded as "training" under any accepted definition of the word. Failure to provide documented training appears to be the custom of the City of Indianapolis and IMPD.

A government entity is liable under §1983 when an official policy or custom inflicts the injury of which the plaintiff complains. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "To succeed on this de facto custom theory, the plaintiff must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents*". Jackson v. Marion Cty.*, 66 F.3d 151, 152 (7th Cir. 1995). In that regard, Plaintiff has produced 188 reports of injury to mentally impaired persons by IMPD officers over a five year period. The Defendants argue that this is only a small percentage of the 8,129 use of force incidents reported during that time, but that comparison is not meaningful to judge the extent of the problem. The important measure is what percentage of mentally impaired persons who encounter IMPD end up requiring medical treatment. The Defendants do not provide this figure. And Plaintiff cannot provide it either, because Defendants have not produced requested materials.

Defendant rely on the affidavit of Sgt. Stephen Griffith, that the "vast majority of those (188) incidents resulted in minor injuries, such as minor scrapes, complaints of pain, bruising, or

lacerations." However, Sgt. Griffith testified that he has no medical training or experience. ECF 165-4 pg. 5 ln 24 to pg. 6 ln. 25. The extent of injuries listed in the report are based on the field officers own opinions. *Id.* pg. 16 ln. 20-22. The reports are made by the field officers, not Sgt. Griffith. *Id.* All of the reports involve people who required medical treatment, but there is no indication of follow up with treatment providers about the ultimate extent of injury. See *Id.* pg. 36 ln. 21-23.

Defendants' argument boils down to the assertion that the numerous reports produced by Plaintiff of injury to mentally impaired persons by IMPD do not provide enough information to sustain a Monell claim. If this is true it is because Defendants have refused to produce training information in the face of a court order compelling production. Defendants should not be allowed to bootstrap their lack of cooperation in discovery into a dispositive defense.

I. **CONCLUSION**

For the reason provided above Defendants' summary judgment motion should be denied.

Respectfully submitted,

By: *s/ Craig R. Karpe*
    Craig R. Karpe, #18726-02
    Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on July 5, 2022 this was served to all counsels for defendants through the Court's electronic filing system.

By *s/Craig R. Karpe*
    Craig R. Karpe